IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.

MARK FORKNER (01)

Case No. 4:21-CR-00268-O

**MARK FORKNER'S MOTION FOR ACCESS TO RELEVANT FAA EMPLOYEES
AND INFORMATION**

## Summary

- **Scape Goat**
- **The 737 max accidents were caused by a failure of the Engineering processes, but the public/media focus on "training and publications" aspects (including the Forkner indictment) is not only incorrect and misguided, it is detracting from the real lessons that SHOULD be learned.**

 Federal Aviation Administration

46

– **Reaction to indictment by FAA official who is familiar with the MAX, produced to the defense in discovery on December 3, 2021**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

WE LEARN OF FAVORABLE EVIDENCE ...................................................................... 1

THE RELEVANCE OF THE FAA POWERPOINT LEADS ............................................. 2

BACKGROUND ................................................................................................................. 6

The indictment and the FAA's role in the case .................................................. 6

The defense learns of favorable evidence, and the Agency invokes *Touhy* regulations ....................................................................................................... 7

The defense complies with *Touhy* and seeks access to FAA witnesses ............... 8

As an FAA official shares exculpatory evidence with the government, the Agency asks the defense for additional information, and the defense complies ............... 8

The defense subpoenas FAA employees and follows up with the FAA — to no avail ................................................................................................................ 9

ARGUMENT ...................................................................................................................... 9

I.      THE FAA CANNOT USE THE *TOUHY* REGULATIONS TO BLOCK THE DEFENSE FROM ACCESSING CURRENT AND FORMER FAA EMPLOYEES WITH INFORMATION RELEVANT TO THIS CASE .......................... 9

        A.      Neither the Housekeeping Statute nor Supreme Court precedent support the FAA's position ............................................................................. 11

        B.      If not prevented, the Agency's stonewalling will violate the Constitution ........... 14

II.     FORMER EMPLOYEES ARE NOT SUBJECT TO *TOUHY* REGULATIONS ............. 16

CONCLUSION ................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. F.B.I.*,
   186 F.R.D. 66 (D.D.C. 1998) ............................................................................ 13, 14

*Chambers v. Mississippi*,
   410 U.S. 284 (1973) ................................................................................................ 10

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) ................................................................................................ 11

*Exxon Shipping Co. v. Dep't of Interior*,
   34 F.3d 774 (9th Cir. 1994)................................................................................ 11, 13

*Gulf Grp. Gen. Enter. Co. W.L.L. v. United States*,
   98 Fed. Cl. 639 (2011) ............................................................................................ 15

*Gulf Oil Corp. v. Schlesinger*,
   465 F. Supp. 913 (E.D. Pa. 1979) .......................................................................... 17

*Hickman v. Taylor*,
   329 U.S. 495 (1947) ................................................................................................ 16

*Koopmann v. Department of Transportation*,
   335 F. Supp. 3d 556 (S.D.N.Y. 2018) ............................................................... 11, 17

*La. Dep't of Transp. & Dev. v. Dep't of Transp.*,
   2015 WL 7313876 (W.D. La. Nov. 20, 2015) ........................................................ 17

*N.L.R.B. v. Capitol Fish Co.*,
   294 F.2d 868 (5th Cir.1961)............................................................................... 11, 12

*Resource Invs., Inc. v. United States*,
   93 Fed. Cl. 373 (2010) ............................................................................................ 14

*Streett v. United States*,
   1996 WL 765882 (W.D. Va. Dec. 18, 1996) .......................................................... 15

*Taylor v. Illinois*,
   484 U.S. 400 (1988) ................................................................................................ 10

*United States ex rel. Touhy v. Ragen*,
   340 U.S. 462 (1952) .......................................................................................... *passim*

*United States v. Andolschek*,
    142 F.2d 503 (2d Cir. 1944) ................................................................. 13

*United States v. Bahamonde*,
    445 F.3d 1225 (9th Cir. 2006) ............................................................. 15

*United States v. Fuentes-Correa*,
    2013 WL 588892 (D.P.R. Feb. 13, 2013) ................................. 10, 12, 14

*United States v. Nobles*,
    422 U.S. 225 (1975) ............................................................................. 16

*United States v. Palma*,
    2020 WL 6743144 (E.D. Mich. Nov. 17, 2020) ................................... 15

*United States v. Reynolds*,
    345 U.S. 1 (1953) ..................................................................... 12, 13, 14

*United States v. Rosen*,
    520 F. Supp. 2d 802 (E.D. Va. 2007) .............................................. 13, 15

*United States v. Singer*,
    785 F.2d 228 (8th Cir. 1986) ............................................................... 16

*Washington v. Texas*,
    388 U.S. 14 (1967) ................................................................................. 9

**Statutes**

18 U.S.C. § 1343 ........................................................................................ 7

18 U.S.C. § 2 ........................................................................................... 6, 7

18 U.S.C. § 38(a)(1)(C) .............................................................................. 6

5 U.S.C. § 301 .................................................................................... 11, 17

**Regulations**

49 C.F.R. § 9 ......................................................................................... 7, 11

49 C.F.R. § 9.1 ........................................................................................... 7

49 C.F.R. § 9.1(c) ....................................................................................... 8

49 C.F.R. § 9.3 ......................................................................................... 17

49 C.F.R. § 9.3(b) ...................................................................................... 7

49 C.F.R. § 9.5 ................................................................................................................ 8

49 C.F.R. § 9.7(a) ..................................................................................................... 8, 16

49 C.F.R. § 9.7(b) ............................................................................................... 8, 15, 16

## INTRODUCTION

Through discovery, the defense is finding leads to relevant and exculpatory witnesses who work for the FAA.  Despite requests, the FAA refuses to give these witnesses permission to talk with us, regardless of whether they are otherwise willing.  That refusal deprives Mr. Forkner of his right to prepare a defense.  We therefore seek an order to prohibit further interference with material witnesses who happen to be present (or former) FAA employees.  For the reasons set forth below, the Court should order that:  (1) the defense may subpoena current FAA officials through the FAA; (2) the FAA shall not interfere with defense counsel's attempts to interview and call current or former FAA employees as witnesses – such employees may speak with defense counsel for Mr. Forkner if they choose, as any other witness; and (3) former employees are not subject to *Touhy* restrictions.

## WE LEARN OF FAVORABLE EVIDENCE

On October 26, 2021 – 12 days after indictment – an FAA official with personal knowledge of the 737-MAX contacted the government to request a meeting.  Forkner, he said, is a "scapegoat" and should "not be charged."    In a follow-up e-mail, he also stated that the government's position, as conveyed in its announcement of the charges against Forkner, contained "many errors in fact."

Around November 16, 2021, the FAA official sent the government a "PowerPoint" presentation – with new revelations about MCAS: Boeing did disclose "low speed" MCAS to key people at the FAA, but *it did not disclose far more important features of MCAS that  – if known – would have threatened the certification of the plane*.  These other features of MCAS are exactly what caused it to activate when it was not intended to during the Lion Air and Ethiopian Air crashes.  Importantly, these more important features that were not disclosed *were the responsibility and purview of Boeing's engineering team – not Mr. Forkner*.  On December 3, 2021, the

government produced the FAA official's PowerPoint to defense counsel – simply called the PowerPoint in this motion.

## THE RELEVANCE OF THE FAA POWERPOINT LEADS

This PowerPoint is exculpatory in its own right and also sheds light on why government witnesses are willing to "scapegoat" Mr. Forkner, who was neither an engineer nor a manager nor a policy maker.

As the indictment says, Boeing set out to design the MAX to fly "like" the NG, so that an experienced NG pilot could fly both models interchangeably and safely.  The MCAS feature – *as it was intended* – would help, not impede, this design.  *As intended*, MCAS would only operate "outside the normal operating envelope," flying at angles so sharp or high that they are "outside" what any commercial pilot would fly.  This was true at "high speed."  It was true when MCAS was expanded to "low speed."  Test pilots at the FAA flew the MAX prototypes and confirmed that, *as intended*, MCAS had no impact on pilot skills or knowledge.

The problem was that MCAS had the hidden possibility to activate when it *was not intended*.  FAA certification pilots and engineers – apparently – did not know this.  Also apparently, engineers at Boeing working under the government's witnesses did know this but did not tell.  These engineers designed MCAS to depend on what is known as a single angle-of-attack ("AOA") sensor.  This reliance on a single sensor increased the chance that MCAS could activate when it was not intended to.  The Boeing engineers analyzed the probability of such an unintended activation – which they called the "failure mode."  They knew it could be "catastrophic" but determined that the probability was low, and further determined that if it happened a pilot would react to it and save the plane, based on training that all pilots received on handling a well-known phenomenon called "runaway stabilizer."  These "determinations" turned out to be tragically wrong and foreshadowed the Lion Air and Ethiopian Air crashes.  In those crashes, (1) a single

faulty AOA sensor caused MCAS to activate when it shouldn't have, and (2) the pilots failed to follow their runaway-stabilizer training and crashed the planes.

Mark Forkner did not know about the "single AOA" design and the probability or assumptions about a "failure mode."  That alone makes him a scapegoat.  But now, the defense has learned for the first time that *neither did the FAA engineers and test pilots who had to certify the plane as airworthy*.  That is: Boeing's engineers apparently did not disclose to FAA certification engineers and test pilots that (1) MCAS relied on a single AOA, and (2) that Boeing found the failure mode could be catastrophic. According to the FAA official: "That is really the fundamental problem."  Moreover, it was the responsibility of Boeing engineers (not Mr. Forkner) to disclose this information to the FAA certification engineers and test pilots.  The FAA official then revealed: "*The effects of a single erroneous angle of attack failure case should never have been allowed. It is non-compliant as it was originally designed. . . . This was a failure of engineering, not operations, not training*."  (emphasis added).

Here are selections from the FAA PowerPoint:

## Purpose

- **To provide a first-hand view of the technical and engineering experience concerning the 737 Max certification, accidents, grounding and return to service (RTS) and to compare this view in the context of one specific "false narrative"**
- **Why?  Two reasons:**
  - **Potential miscarriage of justice (aka "Scape Goat"), in the case of Mark Forkner**
  - **The 737 max accidents were caused by a failure of the Engineering processes, but the public/media focus on "training and publications" aspects (including the Forkner indictment) is not only incorrect and misguided, it is detracting from the real lessons that SHOULD be learned.**

 Federal Aviation Administration                          4

## To be clear…

- **The effects of the single erroneous Angle of Attack failure case never should have been allowed (it is non-compliant to 25.1309b)**
- **All the training in the world can't solve this non-compliance.**
- **Material published in a manual can't solve this non-compliance.**

 Federal Aviation Administration                          28



# Indictment

"**Forkner allegedly abused his position of trust by intentionally withholding critical information about MCAS during the FAA evaluation and certification of the 737 MAX and from Boeing's U.S.-based airline customers.**"

**and**

"**In an attempt to save Boeing money, Forkner allegedly withheld critical information from regulators**"

→ **Withheld from WHOM?  The problem with MCAS, as you have learned, concerned an ENGINEERING issue that Mr. Forkner was neither qualified, expected, nor responsible for.  Any fault lies with personnel involved in the engineering certification under 14 CFR Part 25**


Federal Aviation Administration

45



**Summary**

- **Scape Goat**
- **The 737 max accidents were caused by a failure of the Engineering processes, but the public/media focus on "training and publications" aspects (including the Forkner indictment) is not only incorrect and misguided, it is detracting from the real lessons that SHOULD be learned.**

Federal Aviation Administration

46

Mr. Forkner needs to speak with the authors of the PowerPoint, but the FAA has refused them permission to do so.   In impeding defense counsel's access to these witnesses, the FAA has not asserted any claim of privilege.  Rather, the FAA has invoked so-called *Touhy* regulations.  As set out below, those regulations are designed to ensure that the agency knows when its employees are questioned, and to allow the agency to impose legitimate objections.  They do not authorize evidence to be suppressed without cause.  Moreover, in a criminal case, if the defense's need for a witness conflicts with the agency's need to keep that witness silent, then the Court must decide whether to dismiss the case, to preserve the interests of the agency.  Here, the government has two choices: allow access to the witnesses or dismiss the case.

6

## BACKGROUND

### *The indictment and the FAA's role in the case.*

The indictment charges Mr. Forkner with fraud involving aircraft parts in interstate commerce, in violation of 18 U.S.C. §§ 38(a)(1)(C) and 2, and wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.  It theorizes that Mr. Forkner deceived the FAA's Aircraft Evaluation Group ("AEG"), the arm of the Agency that published Flight Standardization Board Reports ("FSB Reports"), about a code in a software called "MCAS."  A key part of the government's case therefore concerns what FAA AEG officials knew about MCAS and when, what caused the FAA AEG to produce its FSB Report on the 737-MAX, and what effect, if any, Mr. Forkner's communications with the FAA AEG had on the FSB Report.

### *The defense learns of favorable evidence, and the Agency invokes* **Touhy** *regulations.*

On November 5, 2021, Mr. Forkner's counsel contacted the FAA's Office of the Chief Counsel, asking the FAA to permit its employees to speak freely to the defense.  The FAA Attorney answered that the Agency would not consider this request until the defense complied with a set of regulations promulgated by the Department of Transportation ("DOT"), commonly referred to as *Touhy*[1] regulations.  *See* 49 C.F.R. § 9.  The FAA Attorney also stated that in FAA's view, the *Touhy* regulations applied to not only current, but also former, employees.

The regulations "set forth procedures governing the testimony of [DOT] employee[s] in legal proceedings." 49 C.F.R. § 9.1.  They purport to apply even in criminal cases brought by the federal government, *id.*, and to prohibit former and current DOT employees from: (1) "provid[ing] testimony or produc[ing] any material contained in the files of [DOT] . . . or disclos[ing] any information or produc[ing] any material acquired as part of the performance of that employee's

---

[1] *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 463–64 (1952).  DOT's *Touhy* regulations apply to the FAA.  49 C.F.R. § 9.3(b).

official duties . . . unless authorized by law"; (2) providing expert or opinion testimony on behalf of criminal defendants; and (3) testifying on behalf of criminal defendants as fact witnesses unless DOT or FAA counsel approves of the testimony that will be given by the employee before the testimony is offered, *id.* § 9.5; 9.7(b).  By contrast, the regulations permit employees to testify on behalf of the government in any capacity, and they do not require the DOT or FAA to pre-approve such testimony.  *Id.*  DOT or FAA counsel will arrange for DOT or FAA employees to testify on behalf of the government "whenever the attorney representing the government requests it."  *Id.* § 9.7(a).

### *The defense complies with* **Touhy** *and seeks access to FAA witnesses.*

On November 15, as requested, the defense sent a letter to the FAA Attorney, seeking access to current FAA employees whom we identified.  A copy of this letter is attached as Exhibit A.  We asked the Agency to allow access to the witnesses, or to grant an exception to its *Touhy* requirements, as permitted under the regulations, *id.* 9.1(c), so that the regulations would not operate to (1) prevent the defense from accessing material and exculpatory evidence, (2) arrogate to the Executive Branch this Court's power to determine what evidence would be considered by the Court at Mr. Forkner's trial, and (3) deprive Mr. Forkner of his rights to prepare and present a defense.  Our submission to the FAA provided ample factual and legal support for our position.  Given the Court's scheduling order, we requested the FAA to respond promptly, by November 19.

### *As an FAA official shares exculpatory evidence with the government, the Agency asks the defense for additional information, and the defense complies.*

On November 17, 2021 – not knowing that the PowerPoint had been sent to the government on November 16 – we contacted the FAA Attorney to ensure that he received our letter of November 15.  The FAA Attorney said that the Agency would respond by November 22.  On

November 22, the FAA did not respond to the letter, and the defense team followed up.  The next day, the FAA stated that it would "respond formally in the next couple of days."  On November 24, the FAA called defense counsel, but it did not provide an answer to the request.  Rather, it asked the defense to describe with greater specificity why the defense sought to speak to the FAA employees.  Curiously, the FAA Attorney asked if we had received an exculpatory PowerPoint.  We did not know what he was talking about.  Also unknown to us at the time, DOJ – now in receipt of the PowerPoint – met its author on November 29.

On December 2, the defense complied with the FAA's request for more information, describing the topics we proposed to discuss.  The FAA advised the defense that it would respond to our request for access by the close of business on December 8.  As set out above, the DOJ produced the PowerPoint on December 3 (after trying to send it on December 2).

### *The defense subpoenas FAA employees and follows up with the FAA — to no avail.*

On December 6, the FAA Attorney agreed to accept service of process on behalf of FAA employees. The defense served the subpoenas the next day, December 7, for witnesses we believe are relevant.

On December 8, the FAA again failed to respond to the defense's request for access to relevant witnesses.  After defense counsel again followed up with the FAA, the FAA advised that it would respond the following day, December 9.  On December 9, the FAA again failed to respond.  To this day, the Agency has not responded to the *Touhy* request, thus effectively denying defense counsel's access to material and exculpatory information in the government's possession.

## ARGUMENT

**I.    THE FAA CANNOT USE THE *TOUHY* REGULATIONS TO BLOCK THE DEFENSE FROM ACCESSING CURRENT AND FORMER FAA EMPLOYEES WITH INFORMATION RELEVANT TO THIS CASE.**

An agency regulation cannot override its statutory authority, or a criminal defendant's constitutional rights.  Criminal defendants enjoy "the right to present a defense," which includes "the right to present the defendant's version of the facts as well as the prosecution's to the jury so that [the jury] may decide where the truth lies."  *Washington v. Texas*, 388 U.S. 14, 19 (1967).  Indeed, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense."  *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).  "The need to develop all relevant facts in the adversary system is both fundamental and comprehensive" because the integrity of the justice system "depend[s] on full disclosure of all the facts, within the framework of the rules of evidence."  *Id.* (internal quotation marks and citation omitted).  From these principles, it follows that the government cannot prevent witnesses with material, exculpatory information from speaking with the defense or threaten them for doing so, and that this Court has broad authority to prevent such conduct.  *See United States v. Fuentes-Correa*, 2013 WL 588892 (D.P.R. Feb. 13, 2013) (concluding that the government could not use its *Touhy* regulations to stymy the defendant and that, once the defendant complied with procedural requirements under the regulations, the court would compel the production of relevant evidence unless the government asserted privilege).

The Court should order that current and former FAA employees may, without fear of retaliation, speak with defense counsel if they choose, and it should prevent the FAA from interfering with such communications or otherwise impeding or monitoring the defense in our preparations for trial.  First, there is no legal basis for the FAA to invoke *Touhy* regulations to limit or delay a defendant's access to evidence in a criminal case, especially where the Agency played

a central role in the events alleged in the indictment. Second, absent the Court's intervention, the Agency will misuse its administrative "housekeeping" rules to displace the essential role of the judiciary, in violation of separation-of-powers principles and of Mr. Forkner's constitutional rights.

### A. Neither the Housekeeping Statute nor Supreme Court precedent support the FAA's position.

The regulations the FAA invokes, 49 C.F.R. § 9 *et seq.*, are promulgated under 5 U.S.C. § 301, the "Housekeeping Statute," and are referred to as *Touhy* regulations "after the Supreme Court case that spawned them," *Koopmann v. Department of Transportation*, 335 F. Supp. 3d 556, 557 (S.D.N.Y. 2018); *see* 49 C.F.R. § 9 (invoking the Housekeeping Statute as its source of authority). The Housekeeping Statute and *Touhy* allow an agency to adopt procedures for responding to legal process – for example, to require that employees be subpoenaed through the agency (and not directly), or to allow the agency to object or assert a privilege to discovery or testimony. They do not make the agency the sole "gatekeeper for the disclosure of government information." *Koopmann*, 335 F. Supp. 3d at 562 n.1. They do not authorize the agency to withhold information. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 309-10 (1979). Section 301 therefore does not provide "substantive rules regulating disclosure of government information." *Exxon Shipping Co. v. Dep't of Interior*, 34 F.3d 774 (9th Cir. 1994) (holding that agencies violated the Administrative Procedure Act when they instructed employees not to submit to deposition because "neither [§ 301's] text, its legislative history, nor Supreme Court case law support[ed] the government's argument that § 301 authorizes agency heads to withhold documents or testimony from federal courts"). Rather, § 301 is simply meant to ensure the "legitimate and tidy housekeeping objective in centralizing [in agency heads] the determinations of when to assert and when not to assert a privilege." *N.L.R.B. v. Capitol Fish Co.*, 294 F.2d 868, 873 (5th Cir. 1961).

In *Touhy*, a state prisoner filed a federal *habeas* action against his warden and sought exonerating documents possessed by an agency employee.  He subpoenaed the employee directly (rather than following the agency procedures requiring service on the agency) and moved for a finding of contempt when the employee failed to comply.  The Supreme Court held that the employee could not be held in contempt.  340 U.S. at 469.  The prisoner should have followed the procedures set out in the agency regulation – and served the subpoena through the agency rather on the employee himself.  The Court made clear, however, that the case did not concern whether the agency could prevent the employee from testifying, or from sharing relevant information and documents with defense counsel.  *Id.* at 467–68 ("We find it unnecessary, however, to consider the ultimate reach of the authority of the [agency head] to refuse to produce at a court's order the government papers in his possession . . . [n]or are we here concerned with the effect of a refusal to produce in a prosecution by the United States.").  Rather, the case simply held that a court should uphold the agency's procedural requirements when the agency insists.  *Id.* at 469; *see also id.* at 420 (Frankfurter, J., concurring) (explaining that "[t]he decision and opinion in this case cannot afford a basis for a future suggestion that the [agency head] can forbid every subordinate who is capable of being served by process from producing relevant documents and later contest a requirement upon him to produce on the ground that procedurally he cannot be reached," because a grant of such authority "would be to apply a fox-hunting theory of justice that ought to make Bentham's skeleton rattle").

This limited scope of *Touhy* has consistently been recognized in subsequent judicial decisions.  In *United State v. Reynolds*, for example, the Supreme Court held that an agency has no power to withhold documents even in a civil action in which the government is a party, unless the agency makes a "formal claim of privilege" for the court to evaluate.  345 U.S. 1, 7–8 (1953);

*see also United States v. Fuentes-Correa*, 2013 WL 588892, at *6 (D.P.R. Feb. 13, 2013) (explaining that *Reynolds* "strongly supports the notion that where the United States is already a party to a case, the court, and not the executive, is empowered to decide whether evidence should be produced"); *Capitol Fish Co.*, 294 F.2d at 875 ("[*Touhy*] carefully avoided the question of the power of the agency head to refuse a proper judicial demand for the production of records."); *Exxon Shipping Co.*, 34 F.3d at 776 (explaining that *Touhy* "specifically refused to reach the question of the agency head's power to withhold evidence from a court without a specific claim of privilege."); *Alexander v. F.B.I.*, 186 F.R.D. 66 (D.D.C. 1998) (*Touhy* does not stand for proposition that "an agency head is free to withhold evidence from a federal court"); *United States v. Rosen*, 520 F. Supp. 2d 802, 809 (E.D. Va. 2007) ("Once a defendant or litigant complies with an agency or department's *Touhy* regulations, the agency or department head must either authorize compliance with the subpoena or formally assert a privilege that would justify refusal to comply with the subpoena.").

Touhy was a civil case. It cannot be used in a criminal case to undermine Fifth and Sixth Amendment concerns, including the rights to due process, effective assistance of counsel, and a fair trial, which encompasses the right to call favorable witnesses. In a criminal case, the government's interference should lead to dismissal, if the evidence in question is relevant and exculpatory to the defense. *Reynolds*, 345 U.S. at 12 (explaining that in criminal cases, the government "can invoke its evidentiary privileges only at the price of letting the defendant go free" because "it is unconscionable to allow [the government] to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense" (citing *United States v. Andolschek*, 142 F.2d 503 (2d Cir. 1944) (Hand, J.) (concluding that it is unlawful for agencies to suppress documents in criminal cases "founded upon th[e] very

dealings to which the documents relate, and whose criminality they will, or may, tend to exculpate . . . . The government must choose; either it must leave the transactions in the obscurity from which a trial will draw them, or it must expose them fully.")).

Here, the criminal charges concern dealings with employees at the very agency that has so far denied access. The agency should explain if it is relying on some privilege: if not, then the Court should order access to the witnesses; if so, then the Court should determine whether the case can proceed or should be dismissed.

**B.    If not prevented, the Agency's stonewalling will violate the Constitution.**

To stonewall the defense without a legitimate privilege misuses the regulatory authority conferred by the Housekeeping Statute and recognized under *Touhy*. *See Fuentes-Correa*, 2013 WL 588892, at *7 ("Federal criminal prosecutions initiated by the [g]overnment present special circumstances" given that the government can make no claim to sovereign immunity and the accused "has the benefit of certain constitutional rights"). By preventing the defense from accessing critical witnesses (and therefore critical information) in such cases, an agency creates two types of constitutional problem: it undermines the separation of powers by arrogating to itself the judiciary's power to control the administration of pending cases, and it violates the criminal defendant's constitutional protections.

As to separation of powers, even assuming *Touhy* authorized agencies to limit access to evidence (and it does not), that principle cannot be applied when the government is a party to the proceeding. See *Alexander*, 186 F.R.D. at 70 (concluding that *Touhy* has no force when the government is a party to the original proceeding); *see also Resource Invs., Inc. v. United States*, 93 Fed. Cl. 373, 380 (2010) ("With near unanimity, . . . courts considering the issue have concluded that, when the United States is a party to the litigation, the reach of disclosure-limiting *Touhy* regulations ends at the courthouse doors."). For it would "create a significant separation of powers

problem" if the United States could limit a litigant's access to material evidence "[w]hen the United States is a party to the litigation." *Alexander*, 186 F.R.D. at 70 ("[J]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers.") (quoting *United States v. Reynolds*, 345 U.S. 1, 9–10 (1953)); *Fuentes-Correa*, 2013 WL 588892, at *7 (explaining that as the Supreme Court made clear in *Reynolds*, this is true even in "case[s] concerning national security"); *see also Streett v. United States*, 1996 WL 765882, at *4 (W.D. Va. Dec. 18, 1996) ("[*Touhy* may not] be used as a tool by the executive to usurp the judiciary's role in determining what evidence will enter the courtroom" because "[o]ur legal system would not endure long with the opposite rule, where a party to a dispute doubles as the referee."); *Gulf Grp. Gen. Enter. Co. W.L.L. v. United States*, 98 Fed. Cl. 639, 647 (2011) (rejecting *Touhy* invocation because "the judiciary, not the executive branch controls the admission of evidence at trial").

As to individual rights, when an agency stymies a criminal defendant from obtaining material evidence, the agency threatens core principles underlying multiple constitutional rights, including the rights to (1) receive exculpatory evidence in the government's possession, (2) compulsory process, and (3) due process and effective assistance of counsel. *See United States v. Palma*, 2020 WL 6743144, at *8 (E.D. Mich. Nov. 17, 2020) (holding that the right to *Brady* material includes information possessed by civil agencies involved in the criminal investigation even when no personnel from the civil agencies "participated in the decision to charge [the defendant]"); *Rosen*, 520 F. Supp. 2d at 808–10 (E.D. Va. 2007) (explaining that the right to compulsory process includes the principle that even where an agency implements *Touhy* regulations and asserts a valid evidentiary privilege, "the government's interest must give way" if the defendant demonstrates that the witness possesses material evidence); *United States v. Bahamonde*, 445 F.3d 1225, 1228–29 (9th Cir. 2006) (holding that *Touhy* regulation violated

defendant's due process right to reciprocal discovery where regulation required defendant to describe the evidence he sought from the agency but failed to demand the same of the government). Indeed – like the *Touhy* regulations invalidated in *Bahamonde*, and as we have already experienced in this case – DOT's *Touhy* regulations impose asymmetric burdens on defendants that tilt the scales in favor of the prosecution. *See* 49 C.F.R. § 9.7(b) (permitting the government to tender an employee as an expert or opinion witness merely upon request, while forbidding "any party other than the United States in any legal proceeding in which the United States is a party" from doing the same); *id.* § 9.7(a), (b) (allowing employees to testify for parties opposing the government only if that testimony is pre-approved by agency counsel, while promising to "arrange for an employee to testify as a witness for the United States whenever the attorney representing the United States requests it").[2]

In these circumstances, we ask the Court to order that FAA employees may speak with defense counsel if they choose, and may testify freely about matters relevant to the defense of this indictment.

---

[2] FAA's application of the *Touhy* regulations also infringes the protection afforded to attorney work-product and, for related reasons, the right to counsel. As noted above, the FAA required counsel to explain our reasons for identifying specific witnesses and to disclose the topics we would discuss with them, before it would even consider a request for access. 49 C.F.R § 9.7(b) ("An employee who receives a demand to testify on behalf of a party other than the United States may testify as to facts within [his] personal knowledge, *provided that the testimony be subject to the prior approval of agency counsel*. (emphasis added))." We complied, but the requirement is an intrusion into the defense. The opinions, judgments, and thought processes of counsel receive heightened protection under the work-product doctrine. *United States v. Nobles*, 422 U.S. 225, 236 (1975). Counsel is entitled to "assemble information," "prepare his legal theories, and plan his strategy without undue and needless interference," which includes work relating to potential witnesses. *See Hickman v. Taylor*, 329 U.S. 495, 510 (1947). As the Supreme Court has recognized, where that protection is compromised, attorneys are unable to perform their essential role in our adversarial system. *Id.* These principles have constitutional implications when the government intrudes on the defense's trial preparations and the formulation of strategy. *See United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986).

## II.     FORMER EMPLOYEES ARE NOT SUBJECT TO *TOUHY* REGULATIONS.

The authors of the PowerPoint are all current FAA employees.  Nevertheless, because we have also asked the FAA for access to a former employee, we write to advise the Court: the FAA claims that its *Touhy* regulations apply to former as well as current employees – but this position has been uniformly rejected by the Courts.

The DOT's *Touhy* regulations – in contradiction of the statute – purport to extend to former FAA employees, 49 C.F.R. § 9.3 (defining employee as "current or former" employees of DOT).  That position is legally indefensible.  Every court to have considered the issue has held that no statutory authority permits the application of *Touhy* regulations to former employees.  *See Koopmann v. Dep't of Transp.*, 335 F. Supp. 3d at 565 ("[DOT's] *Touhy* regulations are invalid to the extent that they extend to former employees"); *La. Dep't of Transp. & Dev. v. Dep't of Transp.*, 2015 WL 7313876, at *6–7 (W.D. La. Nov. 20, 2015) (holding that DOT acted *ultra vires* when its *Touhy* regulations extended the definition of "employees" to cover former employees); *Gulf Oil Corp. v. Schlesinger*, 465 F. Supp. 913, 917 (E.D. Pa. 1979) (concluding that *Touhy* regulations were invalid as to former employees because § 301 applies to current employees only).  "In short, the text, structure, and purpose of the [relevant statutory authority] all compel the conclusion" that the Agency lacks authority to forbid Forkner's access to its former employees.  *Koopmann*, 335 F. Supp. 3d at 562.[3]

### <u>CONCLUSION</u>

---

[3] As these cases explain, the Housekeeping Statute upon which DOT relied in promulgating its *Touhy* regulations provides no statutory authority for DOT's attempt to control litigants' access to former agency employees.  First, the reference to "employees" in the Housekeeping Statute's text unambiguously covers current – but not former – employees.  Second, the text surrounding "employees" confirms that the Housekeeping Statute is limited to current employees.  Third, the purpose and history of the Housekeeping Statute point in the same direction.

The FAA should not block access to relevant, exculpatory evidence.  We ask the Court to order that:

1.    Mr. Forkner may subpoena current FAA employees through the FAA, rather than through the employees directly.

2.    The FAA shall not interfere with defense counsel's attempts to interview and call current or former FAA employees as witnesses – such employees may speak with defense counsel for Mr. Forkner if they choose, as any other witness.

3.    Former employees are not subject to *Touhy* restrictions.


Respectfully submitted,

/s/
JEFF KEARNEY
Texas Bar Number: 11139500
CATHERINE STANLEY Texas
Bar Number: 24110542
KEARNEY LAW FIRM
One Museum Place
3100 West 7th Street, Suite 420
Fort Worth, Texas 76107
jkearney@kearneylawfirm.com
cstanley@kearneylawfirm.com
Phone: 8l7-336-5600
Fax: 817-336-5610

/ s /
David Gerger
State Bar No: 07816360
GERGER HENNESSY & MCFARLANE LLP
1001 Fannin, Suite 2450
Houston, Texas 77002
dgerger@ghmfirm.com
Phone: 713-224-4400
Fax: 713-224-5153

***CERTIFICATE OF CONFERENCE***

I hereby certify David Gerger conferred with Assistant United States Attorney Cory Jacobs, who stated the Government takes no position on Mark Forkner's Motion for Access to Relevant FAA Employees and Information.

/s/_____
JEFF KEARNEY

***CERTIFICATE OF SERVICE***

I hereby certify this Motion was electronically filed, and Assistant United States Cory Jacobs was electronically served via this Court's Electronic Filing System on this 13th day of December 2021.

/s/_____
JEFF KEARNEY