**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. **4:21-CR-00268-O** |
| | ) | |
| MARK FORKNER, | ) | ORAL ARGUMENT REQUEST |

**DEFENDANT MARK FORKNER'S MEMORANDUM IN OPPOSITION**
**TO UNITED STATES' OMNIBUS MOTION IN LIMINE**



## Summary

- **Scape Goat**
- **The 737 max accidents were caused by a failure of the Engineering processes, but the public/media focus on "training and publications" aspects (including the Forkner indictment) is not only incorrect and misguided, it is detracting from the real lessons that SHOULD be learned.**

Federal Aviation Administration

46

-   Reaction of FAA 737-MAX official to this indictment.

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................................... 1

II.    THE MOTION IN LIMINE IS NOT REALLY ABOUT "NULLIFICATION" OR "VICTIM BLAMING......................................................................................... 2

III.    THE CHARGES AND THE EVIDENCE THAT SHOULD BE ALLOWED TO IMPEACH GOVERNMENT WITNESSES AND PROVE THE DEFENSE ............... 3

    A.    The Allegations Against Mr. Forkner. ............................................ 3

    B.    Boeing's Disclosure of MCAS' Low-Speed to FAA Groups Working with AEG. ........ 3

    C.    Bias of Boeing Witnesses. ............................................................ 6

    D.    Boeing's DPA. ............................................................................ 7

    E.    The FAA PowerPoint......................................................................... 9

IV.    LEGAL STANDARD .................................................................................... 14

V.    THE CONSTITUTION AND CASES ALLOW THE EVIDENCE ........................... 15

    A.    Evidence of Witness Bias is Allowed. .......................................... 15

    B.    The Government's Cases Are Inapposite. ..................................... 18

    C.    Boeing's Disclosure of MCAS Information to Other FAA Groups Is Relevant to Whether the AEG Was Deceived. .............................. 18

VI.    CAUSE OF THE CRASHES ......................................................................... 20

VII.    MR. FORKNER'S PERSONAL CIRCUMSTANCES AND CONSEQUENCES OF A CONVICTION ...................................................................................... 21

VIII. CONCLUSION .......................................................................................... 22

Page(s)

Other Authorities

*Aperia Sols., Inc. v. Evance, Inc.*,
  2021 WL 1171870 (N.D. Tex. Mar. 29, 2021) ........................................................ 14

*Burbank v. Cain*,
  535 F.3d 350 (5th Cir. 2008) .................................................................................. 16

*Davis v. Alaska*,
  415 U.S. 308 (1974) .......................................................................................... 15, 18

*Greene v. Wainwright*,
  634 F.2d 272 (5th Cir. 1981) .................................................................................. 16

*Shannon v. United States*,
  512 U.S. 573 (1994) ................................................................................................ 22

*United States v. Abel*,
  469 U.S. 45 (1984) ...................................................................................... 15, 16, 18

*United States v. Croucher*,
  532 F.2d 1042 (5th Cir. 1976) ................................................................................ 16

*United States v. Funches*,
  135 F.3d 1405 (11th Cir. 1998) .............................................................................. 20

*United States v. Jackson*,
  1994 WL 539292 (D. Kan. July 25, 1994) ............................................................. 22

*United States v. Kay*,
  513 F.3d 432 (5th Cir. 2007) .................................................................................. 18

*United States v. Kreimer*,
  609 F.2d 126 (5th Cir. 1980) .................................................................................. 19

*United States v. Mathew*,
  2012 WL 6115676 (S.D. Tex. Dec. 10, 2012)............................................. 14, 15, 21

*United States v. Onori*,
  535 F.2d 938 (5th Cir. 1976) .................................................................................. 22

*United States v. Penn*,
  969 F.3d 450 (5th Cir. 2020) .................................................................................. 18

*Wilkerson v. Cain*,
  233 F.3d 886 (5th Cir. 2000) .................................................................................. 15

**Rules**

Fed. R. Evid. 404(a)(2)(A)...........................................................................................21

**Other Authorities**

*The Evolution of Corporate Criminal Settlements:  An Empirical Perspective on Non-
    Prosecution, Deferred Prosecution, and Plea A*greements,
    52 Am. Crim. L. Rev. 537 (2015)..............................................................................8

## I.   INTRODUCTION

In its "Omnibus Motion in Limine" (Doc. 32, hereinafter "MIL"), the government seeks to block its own witnesses from any "scrutiny" of their "culpability" or "negligence" in connection with the 737-MAX, or their motives to curry favor with their employers and the government by pointing the finger at Mr. Forkner.  As set out below, that would violate fundamental Fifth and Sixth Amendment rights to confrontation and cross-examination: facts and circumstances that challenge the credibility and bias of government witnesses are fair game.

The MIL also argues that because the indictment alleges Mr. Forkner withheld information from a particular FAA employee named Stacey Klein, the Court should exclude the evidence that many of her close FAA co-workers knew about the same information.  As set out below, such evidence should be allowed, because it tends to show that Ms. Klein also knew; or that Mr. Forkner could not believe he could keep her in the dark; or – *if she really did not know* – that she could be criticized in her job for not learning the information that was so easily available to her.

We file this response just 24 days after gaining access to 67.2 million pages of discovery. The productions continue – most recently, on December 3, 2021, when the government provided the slide reprinted above, from an FAA official who is familiar with the 737-MAX.  According to this FAA official, the "fundamental issue" with MCAS was that it carried a risk of activating when it was not intended to – and engineers (not Mr. Forkner) failed to disclose that risk to the FAA. That slide deck creates many investigation leads, and with more time, we are confident we will find more favorable evidence.  But it alone defeats the MIL.

## II.   THE MOTION IN LIMINE IS NOT REALLY ABOUT "NULLIFICATION" OR "VICTIM BLAMING

Under the title "victim blaming," the MIL seeks to block evidence that relevant people at the FAA knew about MCAS expansion and argues that we should not question the failings and negligence of the "victim" Stacey Klein.  For purposes of the Fifth and Sixth Amendments, Ms. Klein is an accusing witness, and her motive to minimize her own failings is relevant to her credibility.  As set out below, Boeing's disclosures of MCAS expansion to relevant people at the FAA who worked closely with Ms. Klein tends to prove that the FAA and the airline customers were not victims at all and were not deceived by anything Mr. Forkner allegedly withheld.

Under the title "scapegoating," the government argues that we may not "scrutinize" the conduct of the Boeing witnesses who will testify; we may not show their culpability and role in the MAX; or question the thoroughness of the government's investigation.  These, of course, are proper areas of cross examination.  In fact, the FAA PowerPoint discussed below at page 9 shows that MCAS low speed expansion is a "red herring;" that the "fundamental problem" with MCAS was that the engineering department failed to disclose far more important problems to the FAA; and that Mr. Forkner is indeed a "scape goat" in a "miscarriage of justice."  Those are not our words: those are the words of FAA officials who are familiar with what happened.  In any event, the failings and negligence of the government's Boeing witnesses is a proper subject of "scrutiny" to show that the witnesses have a motive to falsely incriminate.  This is especially true in light of an unusual "deferred prosecution agreement" ("DPA") that binds the Boeing witnesses to a statement of facts that has grown increasingly suspect as we review discovery.

In sum, the government's MIL asks the Court to assume the Indictment is true – so there is no need to allow exculpatory and impeachment evidence that conflicts with it.  The motion should be denied.

### III. THE CHARGES AND THE EVIDENCE THAT SHOULD BE ALLOWED TO IMPEACH GOVERNMENT WITNESSES AND PROVE THE DEFENSE

#### A.  The Allegations Against Mr. Forkner.

Mr. Forkner was "Chief Technical Pilot" for the 737-MAX at Boeing.  He was not an engineer or  a "manager" or an "executive."  Boeing itself described him as "team leader" of three other "technical pilots" working on the MAX.

The Indictment charges knowing and deliberate "fraud" with intent to deceive.  The theory is that Mr. Forkner withheld information about a code in the flight controls called "MCAS" from the FAA's Aircraft Evaluation Group ("AEG"); this tricked the AEG into approving a certain level of pilot training; and his real target was to defraud Boeing's airline customers into buying the MAX for tens of millions of dollars.

The airline customers who bought the MAX already owned the earlier model of the 737, called the "NG."  The AEG determined the minimum level of pilot training ("differences training") required for an U.S.-based "NG" pilot to fly the MAX.  *Id.* ¶¶ 3-4.  The indictment claims that Mr. Forkner learned information in November 2016, that contradicted previous representations to the AEG, but then withheld this information from the AEG to influence its training determination and make the MAX more profitable.  *Id.* ¶¶ 23, 26.  That information was that MCAS – originally designed to only operate at high speed – had been expanded to operate at low speed (the "low-speed expansion").  *Id.* ¶¶ 14, 21.  According to the Indictment, two 737 MAX crashes in October 2018 and March 2019 brought MCAS' low-speed expansion to the AEG's attention.

#### B.  Boeing's Disclosure of MCAS' Low-Speed to FAA Groups Working with AEG.

The Indictment omits the fact that many others at the FAA – with whom Ms. Klein worked closely – already knew about MCAS' low-speed expansion.  The government acknowledged this

previously, in its DPA with Boeing in January 2021, stating: "Boeing disclosed [the MCAS] expansion to FAA personnel, but only to those personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards." Dkt. 4 (DPA Statement of Facts ¶ 25). These disclosures are important. We are searching for them in the discovery haystack to see who at the FAA was told. So far we see: Boeing disclosed that MCAS could operate "at low speed" to the FAA 737 Program Manager Patrice Adjibly and FAA test pilots (among others) who were the very people responsible to test whether the MAX flew like the NG. DOJ-PROD-0002116733-59. We are searching the 67.2 million pages to see whether and to whom such disclosures were forwarded within the FAA. Mr. Adjibly ultimately supervised the AEG. *See, e.g.*, DOJ-PROD-0002116813-15; *see also* DOJ-PROD-0009841330-32.

The government – without pin-pointing these disclosures for us – moves to exclude them, but they are relevant. Whether or not the AEG physically received a disclosure, the AEG works closely with the FAA groups that did. Ms. Klein of AEG told Boeing Technical Pilots that she worked closely with FAA "air worthiness people," "certification folks," "operational suitability" personnel, and "test pilots." *E.g.* DOJ-PROD-0053743432-33 (per Klein, the groups "were physically upstairs and downstairs in the same building" and "had overlapping interests in the design of the airplane all along."). AEG documents corroborate this close working relationship. In a May 2019 presentation, the AEG stated that it "works closely with Flight Test pilots to address identified areas of change for training considerations and operational suitability." DOJ-PROD-0004478551-77; *see* DOJ-PROD-0004478550.

Moreover, FAA rules required the AEG to coordinate with these other groups. In particular, FAA Order 8110.4C (2007) requires the AEG to coordinate with the Aircraft Certification Office ("ACO") – who knew about low-speed expansion – in establishing pilot

training guidelines.  The ACO prepares a key certification document called the Type Inspection Authorization ("TIA") after "coordination is accomplished with each appropriate engineering discipline and, when appropriate, the AEG, so that all required information for each disciplines' portion of the inspection or authorization is included."  *Id*. ¶ 2-6(r)(1).  The AEG must participate "in compliance with TIA testing to evaluate the operational suitability of the aircraft."  *Id.* ¶ 2-6(u)(1)(a).  We are searching in the haystack for these TIAs – they are important for us to find.

The AEG and ACO also must coordinate on approving air flight manuals ("AFMs"): "The ACO approves the AFMs and AFM supplements.  The . . . flight test pilot, flight test engineer, AEG operations specialist, and appropriate FAA engineers [must all] concur."  *Id.* ¶ 2-6(x)(1).  In sum, "the ACO and the AEG . . . are managed in such a manner that the agency's position is clearly represented as *one FAA*."  *See*  FAA Order 8430.21A (1986) (emphasis added).

The government says that Mr. Forkner – knowing all this – intended to keep Ms. Klein in the dark.  The knowledge of others working with Ms. Klein is relevant to whether Mr. Forkner intended to defraud her – when she was surrounded by people who knew what the Indictment claims Mr. Forkner was trying to hide.

Moreover, these co-workers would have told Ms. Klein about information that was material to her work.  Either they told her – in which case she was not deceived – or they did not, because the information was not material, which also is relevant.

Strangely, the government may claim that the information was material, yet Ms. Klein still failed to learn it.  If that is true, then she could be criticized for not communicating effectively with her colleagues, i.e., for skipping meetings she should have attended, giving her a motive to avoid criticism and claim she was lied to.

Ms. Klein's actions after the first crash here are particularly relevant. Whatever she knew before the first crash (October 28, 2018), she learned about the expansion after that crash. Yet she did not then require MCAS training in response. In fact, after the first crash, and after learning about expansion, Ms. Klein found that the 737 MAX "meets all aircraft certification standards." DOJ-PROD-0002275129.

We have just received the FAA PowerPoint that questions that finding. With tragedies so great, anyone at Boeing or the FAA who worked on certification would want to deflect attention from themselves and onto the convenient scapegoat. The defense should be allowed to explore the basis for that bias.

## C. Bias of Boeing Witnesses.

The government also will call senior engineers who worked at Boeing. They have a bias and motive to point the finger at Mr. Forkner to deflect attention from themselves; to curry favor with the government's theory; and to support Boeing's DPA and protect their positions there. The government's MIL incredibly argues that, because they were not indicted, we should not be allowed to show their "culpability" or "scrutinize" their conduct. This would be fundamental error. These witnesses were once "subjects" of the investigation (e.g. DOJ-PROD-0053743738); they became "witnesses" through their cooperation; and even beyond the threat of prosecution they have a motive to save their careers and reputations and protect their company (and the benefits they receive from high positions there).

The reasons for their "subject" designations are buried in the haystack of discovery, but we are finding them. In fact, the FAA PowerPoint bears on the role of one of these witnesses – who gave a key presentation to the FAA in December 2018 after the first crash, defending MCAS.

His presentation revealed the features of MCAS that the FAA certification engineers and test pilots apparently had not known before – features that led the FAA Official to write his

PowerPoint after seeing that Mr. Forkner had been scapegoated in the Indictment.   In his December 2018 presentation, the Boeing witness defended the very engineering features that FAA experts now say made the plane non-certifiable, so that it could continue to fly.  For reasons that we now need to investigate, the FAA accepted his arguments, until the second crash proved that his assumptions were wrong.  That presentation – in light of the FAA PowerPoint – made him a "subject" with a motive to deflect attention from himself.  He has done so by providing an entirely uncorroborated oral conversation against Mr. Forkner – highlighted in paragraph 29 of the indictment – which allows impeachment that he is pointing the finger at Mr. Forkner rather than himself and the engineering decisions that he supervised.

We continue to comb the discovery haystack for more evidence that is favorable to Mr. Forkner or impeaches the government's witnesses.

### D.  **Boeing's DPA.**

Boeing's DPA presents another incentive for the Boeing witnesses to cooperate in Mr. Forkner's prosecution.  That DPA is the equivalent of a "plea agreement" that confers benefits on the company and its senior managers.  Most importantly, the DPA spared Boeing a conviction, suspension, and debarment that could threaten billions of dollars of government contracts.  In fact, to negotiate the DPA, Boeing explained to the prosecutors the devastating effect of a conviction: Boeing is the largest U.S. manufacturer; a leading U.S. employer; and the second largest American defense contractor, critical to national security.   *E.g.*  DOJ-PROD4-0000001899-938.

Commentators have criticized the DPA for being generous to Boeing – but it achieved important objectives for the corporation and its stakeholders.[1]

Critically, the DPA contains a Statement of Facts incriminating Mr. Forkner, *see* DPA SOF ¶¶ 12-44, and providing: "[Mr. Forkner's] misconduct was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management."  DPA ¶ 4(h).  Then, the DPA prohibits Boeing and its employees from "mak[ing] any public statement, in litigation or otherwise, contradicting" this Statement of Facts, or else Boeing could land in breach of the DPA and be subject to ruinous prosecution, in the sole discretion of the government.  DPA ¶ 32.  This prohibition against contradicting the government's case against Mr. Forkner applies to the Boeing employees who will testify for the government at trial.

The FAA PowerPoint – and documents that we are finding in the discovery haystack – question the accuracy of this Statement of Facts – which gives the Boeing witnesses even more reason to defend the DPA and also undercuts the thoroughness of the government's investigation (which always is a proper topic for examination).

---

[1] *See* Cindy R. Alexander & Mark A. Cohen, *The Evolution of Corporate Criminal Settlements: An Empirical Perspective on Non-Prosecution, Deferred Prosecution, and Plea Agreements*, 52 Am. Crim. L. Rev. 537, 556 (2015) (A corporate DPA "may avoid risks of costly consequences that can arise from criminal conviction, such as loss of critical business licenses or debarment from government contracts"); Ankush Khardori, *The Trump Administration Let Boeing Settle a Killer Case for Almost Nothing*, New York Magazine (Jan. 23, 2021), *available at* https://nymag.com/intelligencer/ 2021/01/boeing-settled-737-max-case-for-almost-nothing.html (noting the rarity of "an affirmative exculpation like this in any other corporate settlement," and that only 10% of Boeing's monetary penalty was a "fine," whereas the remaining damages would have been paid anyway).

**E.  The FAA PowerPoint.**

On October 26, 2021 – 12 days after indictment – an FAA official who is familiar with the 737-MAX contacted the government to request a meeting.  Forkner, he said, is a "scapegoat" and should "not be charged."  No meeting occurred.

Undeterred, around November 16, 2021, the FAA official sent the government a PowerPoint presentation – with revelations about MCAS: Boeing did disclose "low speed" MCAS to key people at the FAA, but *it did not disclose far more important features of MCAS that – if known – would have threatened the certification of the plane*.  These other features of MCAS are exactly what caused it to activate when it was not intended to during the Lion Air and Ethiopian Air crashes.  Importantly, these more important features that were not disclosed *were the responsibility and purview of Boeing's engineering team – not Mr. Forkner*.  The leaders of that engineering team were once subjects of this criminal investigation, but now are government witnesses against Mr. Forkner.  On December 3, 2021, the government produced the FAA official's PowerPoint to defense counsel.

As the PowerPoint shows, the 737-MAX was a widespread corporate and regulatory failure.  The government's witnesses from Boeing and the FAA each played their part in the failure.  Now, they point their fingers at Mr. Forkner, but each has a motive to minimize his own responsibility and exaggerate Mr. Forkner's.

The FAA PowerPoint is important: As the indictment says, Boeing set out to design the MAX to fly "like" the NG, so that an experienced NG pilot could fly both models interchangeably and safely.  The MCAS feature – *as it was intended* – would help, not interfere with, this plan.  *As intended*, MCAS would only operate "outside the normal operating envelope," meaning flying at angles so sharp or high that they are "outside" what any commercial pilot would fly.  This was true at "high speed."  It was still true when MCAS was expanded to "low speed."  Test pilots at

the FAA flew the MAX prototypes and confirmed that, *as intended*, MCAS had no impact on pilot skills or knowledge.

The problem was that MCAS had the hidden potential to activate when it *was not intended*. The FAA certification engineers and test pilots apparently did not know this. The Boeing engineering team did know this, but apparently did not tell them. The engineers designed MCAS to depend on what is known as a single "angle of attack" sensor. This reliance on a single sensor increased the chance that MCAS could activate when it was not intended to. The Boeing engineers analyzed the probability of such an unintended activation – which they called the "failure mode." They knew it could be "catastrophic" but determined that the probability was low, and further determined that if it happened a pilot would react to it and save the plane, based on training that all pilots received on handling a well-known phenomenon called "runaway stabilizer." These "determinations" were tragically wrong and foreshadowed the Lion Air and Ethiopian Air crashes. In those crashes, (1) a single faulty AOA sensor input caused MCAS to activate when it should not have, and (2) the pilots failed to follow their runaway stabilizer training and crashed the planes.

Mark Forkner did not know about the "single AOA sensor" design and the probability or assumptions about a "failure mode." That alone makes him a scapegoat. But now, the defense has learned for the first time – just on December 3 – that *neither did the FAA engineers and test pilots who had to certify the plane as airworthy*.

According to the FAA PowerPoint, Boeing did not disclose to FAA certification engineers and test pilots that (1) MCAS relied on a single AOA sensor, and (2) that Boeing found the failure mode could be "catastrophic." The FAA Official noted: "That is really the fundamental problem."

10

It was the responsibility of Boeing engineers (not Mr. Forkner) to disclose this information to the

FAA certification engineers and test pilots.  The FAA official then delivered a bombshell:

>   "*The effects of a single erroneous angle of attack failure case should never have been allowed. It is non-compliant as it was originally designed. . . . This was a failure of engineering, not operations, not training.*"

Here are selections from the expert's slides:

## Purpose

- **To provide a first-hand view of the technical and engineering experience concerning the 737 Max certification, accidents, grounding and return to service (RTS) and to compare this view in the context of one specific "false narrative"**
- **Why?  Two reasons:**
  - **Potential miscarriage of justice (aka "Scape Goat"), in the case of Mark Forkner**
  - **The 737 max accidents were caused by a failure of the Engineering processes, but the public/media focus on "training and publications" aspects (including the Forkner indictment) is not only incorrect and misguided, it is detracting from the real lessons that SHOULD be learned.**

 **Federal Aviation Administration**                                                                      **4**

## To be clear...

- **The effects of the single erroneous Angle of Attack failure case never should have been allowed (it is non-compliant to 25.1309b)**
- **All the training in the world can't solve this non-compliance.**
- **Material published in a manual can't solve this non-compliance.**

Federal Aviation Administration

28

## And stuff like this is supposedly a "smoking gun"...BUT IT's NOT!



**a few DT updates please**

From: "Forkner, Mark A" <█████@boeing.com>
To: ██████(FAA)█████lfaa.gov>
Cc: ██████@boeing.com>
Date: Tue, 17 Jan 2017 19:00:58 -0500

Hi ████

We're starting to work on the reverse differences DT, and I noticed a few things that should be changed in the DT for the NG to MAX, that are in the draft FSB:

Flight Controls:
Delete MCAS, recall we decided we weren't going to cover it in the FCOM or the CBT, since it's way outside the normal operating envelope
Delete reference to Direct Lift Control (DLC), we decided to not refer to the system in those terms, as it is more of an engineering term. It's removed from the FCOM and the CBT

Any updated on when you think you'll get all the issues resolved with 280 and put this on the street for public comment?

Thanks!

Mark

**Captain Mark Forkner**
737 Chief Technical Pilot
██████ ~ Desk
██████ ~ Mobile
██████@boeing.com

Federal Aviation Administration

38

12

## Indictment

"Forkner allegedly abused his position of trust by intentionally withholding critical information about MCAS during the FAA evaluation and certification of the 737 MAX and from Boeing's U.S.-based airline customers."

and

"In an attempt to save Boeing money, Forkner allegedly withheld critical information from regulators"

→ Withheld from WHOM?  The problem with MCAS, as you have learned, concerned an ENGINEERING issue that Mr. Forkner was neither qualified, expected, nor responsible for.  Any fault lies with personnel involved in the engineering certification under 14 CFR Part 25

 Federal Aviation
Administration

45

## Summary

- **Scape Goat**
- **The 737 max accidents were caused by a failure of the Engineering processes, but the public/media focus on "training and publications" aspects (including the Forkner indictment) is not only incorrect and misguided, it is detracting from the real lessons that SHOULD be learned.**

 Federal Aviation
Administration

46

This PowerPoint, of course, casts doubt on the December 2018 presentation from Boeing's senior engineer/now government witness.  In that presentation, the government witness disclosed the "single AOA" and failure mode assumptions and said that they were "compliant" and that the MAX should continue flying.   For reasons we would like to investigate – and which bear on Ms. Klein's credibility as a witness accusing Mr. Forkner – the FAA agreed and allowed the MAX to keep flying.[2]  After a second MAX crashed in March of 2019 – just six months after the first – the FAA grounded the MAX fleet.  Evidence that MCAS was not compliant in December 2018 is relevant to the credibility of the Boeing witness who told the FAA that it was. Mr. Forkner had no role in the December 2018 presentation: he had left the company by then.

The FAA PowerPoint creates many new leads to other witnesses and document searches that we will need time to review.  But the facts uncovered so far are sufficient to defeat the government's MIL.

## IV.  LEGAL STANDARD

"Evidence should not be excluded in limine unless it is clearly inadmissible on all potential grounds." *Aperia Sols., Inc. v. Evance, Inc.*, 2021 WL 1171870, at *1 (N.D. Tex. Mar. 29, 2021); *see United States v. Mathew*, 2012 WL 6115676, at *1 (S.D. Tex. Dec. 10, 2012).  "Evidentiary rulings, especially those addressing broad classes of evidence, should often be deferred until trial so that questions of foundation, relevancy and potential prejudice can be resolved in the proper context." *Mathew*, 2012 WL 6115676, at *1.  Denial of a motion *in limine* "merely means that

---

[2] Also in December, the FAA reportedly modeled the probability of additional crashes – and estimated that without a fix to MCAS, there could potentially be 15 additional fatal crashes during the lifetime of the MAX fleet – or 2,900 deaths. House Committee on Transportation & Infrastructure, Final Committee Report: The Design, Development & Certification of the Boeing 737 MAX, p. 29 (Sept. 2020).

without the context of trial, the court is unable to determine whether the evidence in question should be excluded." *Mathew*, 2012 WL 6115676, at *1 (citation omitted).

## V.   THE CONSTITUTION AND CASES ALLOW THE EVIDENCE

The government's Motion would exclude evidence tending to show that Mr. Forkner lacked a motive and intent to defraud, that the AEG was not deceived, that low-speed expansion was not material, and that government witnesses have self-interested reasons to falsely incriminate Mr. Forkner.  Such evidence is both relevant and admissible.

### A.  <u>Evidence of Witness Bias is Allowed.</u>

As set out above, Mr. Forkner is indeed a "scape goat," and whether that word is used or not, he is allowed to impeach the credibility of government witnesses with motives to point the finger at him.  The government's motion seeks to block this.  Mot. at 9, 12.

Proof of a witness's bias "is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness's testimony." *United States v. Abel*, 469 U.S. 45, 50-52 (1984); *Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony."). "Bias may be induced by a witness' like, dislike, or fear of a party, *or by the witness' self-interest*." *Abel*, 469 U.S. at 52 (emphasis added); *Davis,* 415 U.S. at 311 (witness who was on probation could have a motive to misidentify the defendant "to shift suspicion away from himself" out of concern that he might be a suspect in the investigation).  "It is axiomatic that defense counsel should be permitted to expose to the jury facts relative to a witness' possible motivation to testify favorably for the prosecution or his potential bias for or against any party to the criminal proceeding." *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000).

Many cases deal with a witness who is facing criminal charges and seeking leniency in sentencing from the government.  Here, Boeing reached a leniency agreement with the government, which the Boeing witnesses have an incentive to support.  *See Burbank v. Cain*, 535 F.3d 350, 359 (5th Cir. 2008) (error to prevent cross-examination about the witness' plea agreement).  But the principles of *Abel* and *Davis* go far beyond seeking leniency in sentencing. *See Wilkerson*, 233 F.3d at 891 (error to exclude evidence that witness – already sentenced – wanted a prison transfer – which could be a motive to testify for the government).  Indeed, charges that have *not* been filed can be a motive.  *Greene v. Wainwright*, 634 F.2d 272, 276 (5th Cir. 1981) (error to limit impeachment for bias, where defendant could have argued that the witness "was testifying to avoid prosecution for other illegal activities.")  *See also United States v. Croucher*, 532 F.2d 1042, 1046 (5th Cir. 1976) ("bias and prejudice" can stem from fear of charges that have not been filed but "which could still be pursued against [the witness]").  Here, the Boeing witnesses were once "subjects" of investigation.  As *Greene* held, where "a prosecution witness is . . . recently under . . . investigation," a defendant "has an absolute right to bring those circumstances out on cross-examination or otherwise so that the jury will be fully apprised as to the witness' possible motive or self-interest with respect to the testimony he (or she) gives."  *Greene*, 634 F.2d at 274.

Moreover, bias is not even limited to pending or possible criminal charges – but extend to protecting ones reputation or employment, to avoiding embarrassment or publicity, and other factors that motivate all of us.  As the Fifth Circuit has noted, "[a] desire to cooperate may be formed beneath the conscious level, in a manner not apparent even to the witness, but such a subtle desire to assist the state nevertheless may cloud perception."  *Greene*, 634 F.2d at 276.  Boeing employees have a bias not to upset their company's DPA – which coincides with their motives to

16

protect themselves. A Boeing witness who contradicted the DPA would endanger not only Boeing but their own job, career advancement, stock value, and other benefits of employment. A contradiction would risk forfeiting the government's broad exoneration of Boeing employees in DPA ¶ 4(h) and subjecting the conduct of others to further scrutiny – including into the revelations of the FAA PowerPoint that was produced just 12 days ago.

The government's argument that we should not be allowed to "scrutinize" anyone else's behavior or argue that witnesses "unfairly blame" Mr. Forkner (MIL at 9) is thus baseless. That is exactly what the case law and Constitution require. The Court should allow Mr. Forkner to impeach the government's witnesses on these and any other motives they have to deflect "scrutiny" from themselves and "unfairly blame[]," "scapegoat," and incriminate Mr. Forkner.

Boeing and FAA employees who participated in the certification process are subject to scrutiny for their own failings in the process: this certainly may bias them to claim that someone else was solely to blame. A Boeing senior engineer/witness who made questionable statements to the FAA – or supervised engineers who did – is subject to scrutiny. And even without a threat of indictment, a fear of being criticized at work or in public for the worst aviation tragedy in history is a powerful motive to point the finger elsewhere. That is because witnesses can have a bias to "scapegoat" another whether they are guilty of crimes or not. And Mr. Forkner can be a "scapegoat" whether he is guilty or not.

Thus, the Fifth Circuit's pattern jury instructions allow jurors to believe "none' of what a witness has to say and requires them to consider potentially self-interested motives:

> You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. . . . You should decide whether you believe all, some part, or none of what each person had to say. [You may consider:] Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness have any relationship with either the government or the defense?

Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 1.09 (2019).  This instruction only works if Mr. Forkner is allowed to show and argue that witnesses have motives to scapegoat him falsely.

**B.  <u>The Government's Cases Are Inapposite.</u>**

The cases cited by the government to preclude "scapegoating" arguments are entirely inapposite.  The government cites *United States v. Kay*, 513 F.3d 432, 442 (5th Cir. 2007), for the proposition that it is not a defense to foreign bribery that "everybody pays bribes."  *Id*. ("[T]he fact that other companies were guilty of similar bribery during the 1990's does not excuse [the company's] actions.").  Mr. Forkner is not arguing that he is allowed to lie because others did, too. In fact, we dispute that Mr. Forkner lied.  Rather, he seeks to impeach government witnesses for having motives to shift suspicion away from themselves and onto another.  *See, e.g.*, *Davis*, 415 U.S. at 316.  The government cites pattern jury instructions to argue that a jury should not "return a verdict as to the guilt of any other person or persons not on trial," *see* Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 1.21 (2019); but these same instructions tell jurors to consider witnesses' self-interested motives to testify, *id*. § 1.09.  The government cites *United States v. Penn,* 969 F.3d 450, 458 (5th Cir. 2020), which held that "[e]vidence admitted *solely to encourage nullification* is by definition irrelevant" (emphasis added).  But *Penn* did not concern impeachment evidence, *see id*.; and proof of a witness' bias "is almost always relevant," *Abel*, 469 U.S. at 52.

**C.  <u>Boeing's Disclosure of MCAS Information to Other FAA Groups Is Relevant to Whether the AEG Was Deceived.</u>**

Under these principles, evidence that Ms. Klein's co-workers knew about MCAS' low speed expansion is relevant.  The government alleges that Ms. Klein received no disclosure of MCAS expansion before the Lion Air Crash; that she was surrounded by and worked closely with FAA officials who did receive disclosures; and that Mr. Forkner thought he could deceive her

18

nonetheless.  That is only an allegation – and it does not render Boeing's disclosures to Ms. Klein's co-workers inadmissible.

First, evidence will show that the relevant people to test MCAS at the FAA were the people who did receive disclosures.  Under the law, Boeing had to disclose to the "FAA," which it did.

Second, evidence will show that Ms. Klein worked closely with those same FAA officials to "coordinate" training guidelines and on "training considerations and operational suitability."  It is for the jury to determine when the AEG learned about the expansion.

Third, evidence that the low-speed expansion was widely known within the FAA tends to negate that Mr. Forkner had any intent to defraud – because the information was so widely known within the FAA that he could not suppress it even if he tried.  The government will argue that he did try, but that is a disputed fact, and our evidence is admissible to challenge the weight of that accusation.  Even assuming Mr. Forkner knew about MCAS' low-speed expansion, he would have expected the AEG to know it, too.

Finally, the government claims that Ms. Klein's FAA colleagues knew about MCAS expansion but withheld it from her, or she somehow failed to learn it.  If true, this tends to show that MCAS' expansion was not considered material to the AEG's work, and materiality is an element the government must prove.  As mentioned above, the AEG's actions after learning about low-speed expansion – no training was required – show why materiality is in dispute.

Here again, the government's cases for excluding this evidence are inapposite.  The government cites *United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980), a mail fraud case in which the court held that a "victim's negligence is not a defense to criminal conduct."  But the challenged evidence here would be introduced to show that the AEG was never deceived, that Mr. Forkner had no motive or intent to defraud, and that the government cannot prove materiality.  The

*Kreimer* court never suggested that evidence serving such purposes could be excluded. The government cites *United States v. Funches*, 135 F.3d 1405, 1408-1409 (11th Cir. 1998) to argue that Mr. Forkner cannot encourage jury nullification. But Mr. Forkner is not seeking "nullification": he is seeking to attack the government's case on the merits and witness credibility.

For all of these reasons, the MIL should be denied.

## VI.  CAUSE OF THE CRASHES

The government will offer evidence that two planes crashed and argue that low-speed MCAS contributed to those crashes. The government is not arguing that Mr. Forkner caused the crashes, but without further explanation, the jury will be confused and think that he did. The government seeks to exclude the true causes – which will leave the unanswered impression that Mr. Forkner is to blame.

We agree that this trial should not be about the crashes. But the Indictment as written links the crashes to MCAS' low-speed expansion, the AEG's alleged ignorance of the low-speed expansion, and thus Mr. Forkner's alleged concealment of the low-speed expansion. *See* Indictment ¶¶ 35-37. Without showing that Mr. Forkner did not cause the crashes, the jury would think that he did. Indictment ¶¶ 26-27, 33-34. Mr. Forkner seeks to correct that prejudicial misimpression. The only effective way to mitigate this prejudice is to permit Mr. Forkner to show – briefly – that factors both beyond his knowledge and control actually caused the crashes.

Much has been written about the causes, and we will need more time to locate the best expert to summarize them.

### VII.   MR. FORKNER'S PERSONAL CIRCUMSTANCES AND CONSEQUENCES OF A CONVICTION

Finally, the government seeks to exclude any evidence or arguments concerning Mr. Forkner's "personal circumstances" or the potential consequences of his conviction.  Mot. at 13-14.  These requests go too far.

**Personal Circumstances**: First, any criminal defendant may offer character evidence, namely "evidence of the defendant's pertinent trait."  Fed. R. Evid. 404(a)(2)(A).  *See Mathew*, 2012 WL 6115676, at *1-2 (denying government's motion to exclude evidence of "specific acts of good character" as "overly broad and devoid of any specific context," noting that government could raise objections at trial).  Furthermore, the defense is given some leeway to "humanize" the defendant with basic personal and background information.    "'During the course of a trial, it is customary for a defendant to introduce evidence concerning his background, such as information about his education and employment.  Such evidence is routinely admitted without objection . . . .'"  *United States v. Blackwell*, 853 F.2d 86, 88 (2d Cir. 1988) (quoting *Gov't of the Virgin Islands v. Grant*, 775 F.2d 508, 513 (3d Cir. 1985)).  Presumably, the government does not want the jury to know that Mr. Forkner is an honorably discharged Air Force Veteran who flew C-17 missions after 9/11, who then flew commercially and worked at the FAA himself before joining Boeing. These are facts that the Court should allow.

**Consequences of Conviction**: The government also moves to exclude evidence or arguments concerning "a possible sentence following conviction."   MIL at 14.   The MIL overreaches – to the extent it seeks to exclude what a witness could be facing.  The government secured the cooperation of witnesses who were subjects of the investigation – witnesses who have not been charged but engaged in conduct no less severe than Mr. Forkner's – and who have a motive to keep it that way.  The possible punishment that a witness faces is always fair game for

cross examination. *See United States v. Onori*, 535 F.2d 938, 946 (5th Cir. 1976) (sufficient to tell the jury the maximum sentence that the witness faced); *see also United States v. Jackson*, 1994 WL 539292, at *4 (D. Kan. July 25, 1994) (witness' maximum punishment is allowed – court may instruct the jury that punishment is a matter exclusively for the court).

The government cites *Shannon v. United States*, 512 U.S. 573, 579 (1994), to argue that jurors must "not . . . consider the consequences of their verdicts" and reach their verdicts "without regard to what sentence might be imposed."  That is different from showing the possible sentence that a witness seeks to avoid.

## VIII.  CONCLUSION

For all of the foregoing reasons, the government's Motion should be denied.

Respectfully submitted,


*/s/ Jeff Kearney*
JEFF KEARNEY
Texas Bar Number: 11139500
CATHERINE STANLEY
Texas Bar Number: 24110542
KEARNEY LAW FIRM
One Museum Place
3100 West 7th Street, Suite 420
Fort Worth, Texas 76107
jkearney@kearneylawfirm.com
cstanley@kearneylawfirm.com
Phone: 8l7-336-5600
Fax: 817-336-5610


/s/ *David Gerger*
David Gerger
State Bar No: 07816360
GERGER HENNESSY & MCFARLANE LLP
1001 Fannin, Suite 2450
Houston, Texas 77002
dgerger@ghmfirm.com
Phone: 713-224-4400
Fax: 713-224-5153

23

### ***CERTIFICATE OF SERVICE***

I hereby certify this Motion was electronically filed, and Assistant United States Cory Jacobs was electronically served via this Court's Electronic Filing System on this 15th day of December 2021.

/s/ _____

JEFF KEARNEY