IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MARK FORKNER (01) | Case No. 4:21-CR-00268-O |

**MOTION FOR JOINT JURY QUESTIONNAIRE
AND UNOPPOSED MOTION FOR INDIVIDUAL QUESTIONING OF
VENIREMEMBERS REGARDING EXPOSURE TO PRETRIAL PUBLICITY**

Defendant Mark Forkner moves this Court to submit a short jury questionnaire to potential jurors. The government joins in this request, and the parties have agreed to the joint questionnaire attached as Exhibit A.

Mr. Forkner also moves that potential jurors be questioned about their exposure to pretrial publicity *individually*, and outside the presence of other jurors, to avoid tainting the rest of the venire. As set out below, this is appropriate in light of the emotional nature and intense publicity of the Boeing 737 MAX tragedy. The government does not oppose this request.

1. In 2018 and 2019, two 737 MAX planes crashed, killing 346 people and causing the grounding of thousands of flights, passengers, and employees. Mr. Forkner is the sole person charged with crimes related to the 737 MAX. He has not been charged with causing the crashes -- but he is charged with defrauding two major Northern District of Texas employers, American and Southwest Airlines. The indictment alleges that Mr. Forkner withheld information about the Boeing 737 MAX from part of the Federal Aviation

Administration ("FAA") and intentionally schemed to defraud American and Southwest Airlines.

2. The crashes and groundings have spawned Congressional hearings, civil lawsuits, TV documentaries, a book, and thousands of news articles. The media has specifically called out Mr. Forkner by name. Early on, the media reported that he had taken the "Fifth Amendment" in the DOJ investigation—which of course is inadmissible at trial. *See* Steve Miletich, *Former Boeing Official Subpoenaed in 737 MAX Probe Won't Turn Over Documents, Citing Fifth Amendment Protection*, The Seattle Times (Sep. 7, 2019, 8:37 AM), https://www.seattletimes.com/business/boeing-aerospace/former-boeing-official-subpoenaed-in-737-max-probe-wont-turn-over-documents-citing-fifth-amendment-protection/. On November 30, 2021, Penguin Random House released a book highlighting Mr. Forkner's role titled, *Flying Blind: the 737 MAX Tragedy and the Fall of Boeing*. In September 2021, PBS released a Frontline documentary doing the same titled, "Boeing's Fatal Flaw."

3. Various news reports—and reader/viewer comments thereto—have seemingly prejudged Mr. Forkner's guilt and made negative remarks about him. A sample of 10 articles and attendant public comments from news media is attached as <u>Exhibit B</u> to this motion. Highlights of public comments about Mr. Forkner include

   i. "**Good. Prison for life**." (Public Comment to Oct. 15, 2021 CNN article);

   ii. "Put the friends, relatives and loved ones, from those who died, **because of his lies**, on the jury." (Public Comment to Oct. 15, 2021 FOX News article);

   iii. "…if he isn't **charged with murder**, we may as well burn our law books as worthless." (Public Comment to Oct. 14, 2021 Washington Post article);

   iv. "Should be **sentenced to life** in prison for the death of 349 people." (Public Comment to Oct. 14, 2021 Associated Press article);

    v.      "I always wonder: how can people like him with **blood on their hands** sleep well at night. Can they?" (Public Comment to Sept. 17, 2021 CBS News article);

    vi.    "He should be in **prison for mass murder**." (Public Comment to Sept. 14, 2021 PBS Frontline documentary);

    vii.    "Mark Forkner is the tip of the iceberg when it comes to Boeing employees withholding key safety facts from the FAA.  Their failures are criminal and should be prosecuted as such.  We're effectively looking at **346 counts of manslaughter** for each of them." (Public Comment to March 13, 2020 Wall Street Journal article);

    viii.    "That is where **Forkner actively participated in the crime** of omitting MCAS instructions in the training manual." (Public Comment to December 24, 2019 Seattle Times article);

    ix.    "Probably **unlike Forkner**, I can come home and face my family at night." (Public Comment to September 7, 2019 Seattle Times article); and

    x.    "Sounds like Mark Forkner should be **charged with manslaughter** at the least." (Public Comment to June 1, 2019 New York Times article).

4. These comments warrant a questionnaire and individual *voir dire*.  Even more concerning is that a juror might convict Mr. Forkner of the charged crime, thinking he is guilty of causing the crashes when he did not and has not been charged with doing so, and the crashes had many confounding causes unrelated to Mr. Forkner.

5. Where there is a significant possibility of prejudice from pretrial publicity, a court's *voir dire* procedure must "provide a reasonable assurance that prejudice would be discovered if present." *United States v. Pratt*, 728 F.3d 463, 470 (5th Cir. 2013) (internal quotation marks and footnote omitted), *abrogated on other grounds by Molina-Martinez v. United States*, 578 U.S. 189, 136 S. Ct. 1338, 1347–48 (2016).

6. In such cases, the court should determine what each juror has "heard or read" and how that information affects the juror's "attitude toward the trial"—and the court should determine

for itself "whether any juror's impartiality ha[s] been destroyed." *United States v. Davis*, 583 F.2d 190, 196 (5th Cir. 1978). Put another way,

> when a juror is exposed to potentially prejudicial pretrial publicity, it is necessary to determine whether the juror can lay aside any impression or opinion due to the exposure. The juror is poorly placed to make a determination as to his own partiality. Instead, the trial court should make this determination.

*Id.* at 197 (holding that the district court erred when it asked no follow-up questions and made no specific inquiries of any individual juror); *see also United States v. Beckner*, 69 F.3d 1290, 1294 (5th Cir. 1995) (applying *Davis* to reverse a conviction because the "district court's *voir dire* did not afford a reasonable assurance that prejudice would have been discovered if present": the court failed to ask "what" information jurors had received from pretrial publicity and "how" the information affected jurors' attitudes and perceptions and, instead, allowed jurors to decide their own impartiality about pretrial publicity).

7. Though use of jury questionnaires and individual *voir dire* about pretrial publicity is left to the Court's discretion—*see, e.g.*, Federal Rule of Criminal Procedure 24(a)—both the United States Supreme Court and the Fifth Circuit have approved the use of these techniques in high-profile cases with significant pretrial publicity. A prominent example is *United States v. Skilling*, 554 F.3d 529 (5th Cir. 2009) ("*Skilling I*"), *vacated in nonrelevant part*, *Skilling v. United States*, 541 U.S. 358 (2010) ("*Skilling II*"). At issue in *Skilling* were events leading up to the catastrophic collapse of Enron, which had received widespread news coverage.

8. The Fifth Circuit found that the district court *voir dire* was sufficient (and not reversible error) because it had (1) submitted a 14-page jury questionnaire to the jury panel, which was used for prescreening potential jurors; (2) conducted individual *voir dire* of the veniremembers about their answers to the questionnaire (including exposure to pretrial publicity); and (3) permitted follow-up questions by counsel. *Skilling I*, 554 F.3d at 562. The Supreme Court

also approved of the district court's jury-selection process. *See Skilling II*, 561 U.S. at 388–95. The Court noted that the jury questionnaire "helped to identify prospective jurors excusable for cause and served as a springboard for further questions put to remaining members of the array." *Id.* at 388. The Court also observed that "[t]he District Court conducted *voir dire* . . . aware of the greater-than-normal need, due to pretrial publicity, to ensure against jury bias" by "examin[ing] each prospective juror individually, thus preventing the spread of any prejudicial information to other venire members."[1] *Id.* at 389. The *Skilling* questionnaire—attached hereto as Exhibit C—was 14 pages. It included questions crucial to targeting bias, such as whether the veniremember had "an opinion about the cause of the collapse of Enron" (Question 39) or had "heard or read about any of the Enron cases" (Question 41). Our joint proposed questionnaire is shorter and asks similar, neutral questions.

9.  In *Pratt*, another high-profile case, the Fifth Circuit also approved the district court's jury-selection process because it used "procedures [that] were substantially the same as those in *Skilling*." *Pratt*, 728 F.3d at 471. "The potential jurors completed an eight-page screening questionnaire that included multiple questions about media exposure and bias. During *voir dire*, the court questioned all potential jurors individually and out of the presence of the other potential jurors about their ability to be impartial." *Id.* at 471–72. Recognizing the efficacy of these measures, district courts—both in the Fifth Circuit and outside it—have chosen to use jury

---

[1] The Fifth Circuit long ago recognized that "[t]he safer practice in situations involving possible prejudice from newspaper articles or other sources is to interrogate each juror separately and out of the presence of the other jurors." *United States v. Scrimsher*, 493 F.2d 848, 854 (5th Cir. 1974) (footnote omitted). Similarly, while not requiring individual *voir dire* as a matter of course, the Fifth Circuit, over four decades ago, noted that the American Bar Association "recommend[ed] that . . . district court[s] examine each juror individually and out of the presence of other jurors to determine what he heard or read and how it ha[d] affected his attitudes toward the trial." *Davis*, 583 F.2d at 196.

questionnaires and individual *voir dire* as tools to ferret out possible bias in high-publicity cases. *See, e.g., United States v. Fthoui*, Case No. 4:17-cr-20456, 2018 WL 4235091, at *1–*2 (E.D. Mich. Sept. 6, 2018); *United States v. Dimora*, Nos. 1:10CR387 & 1:11CR491, 2011 WL 6318395, at *5 (N.D. Ohio Dec. 16, 2011); *United States v. Fastow*, 292 F. Supp. 2d 914, 921 (S.D. Tex. 2003). (Copies of the unpublished opinions are attached as Exhibit D and E to this motion.)

10. A questionnaire can be administered efficiently. The best option is to mail the questionnaire to potential jurors in advance, to be returned to the Court for review by counsel the day before jury selection. Another option is for potential jurors to complete the questionnaire the morning of jury selection and return after a reasonable amount of time to permit counsel to review the responses before *voir dire*. Under this second option, counsel could bring a high-speed copier to the courthouse to facilitate copying the questionnaires for review.

11. In our experience, a questionnaire also can facilitate agreement on challenges for cause. That was what happened in the trial of the BP Deepwater Horizon Blowout (between Mr. Gerger and members of the DOJ Fraud Section) and in *Skilling*. *See, e.g.*, *Skilling I*, 554 F.3d at 562 ("After prescreening veniremembers based upon their responses to a fourteen-page questionnaire, the parties mutually agreed to excuse 119 of them.").[2]

\* \* \* \*

For the foregoing reasons, defendant Mark Forkner – joined by the government -- asks that the Court submit the joint agreed jury questionnaire attached as Exhibit A. He also asks – unopposed – the Court to conduct and allow individual *voir dire* of potential jurors (outside the

---

[2] Individualized *voir dire* will serve a second purpose as well—to obtain honest answers from potential jurors about how they feel participating in a trial during the ongoing COVID-19 pandemic.

presence of the other veniremembers) on their exposure to, and reaction to, pretrial publicity concerning this case and its subject-matter.

Respectfully submitted,

/s/ *Jeff Kearney*
JEFF KEARNEY
Texas Bar Number: 11139500
CATHERINE STANLEY
Texas Bar Number: 24110542
KEARNEY LAW FIRM
One Museum Place
3100 West 7th Street, Suite 420
Fort Worth, Texas 76107
jkearney@kearneylawfirm.com
cstanley@kearneylawfirm.com
Phone: 8l7-336-5600
Fax: 817-336-5610

/s/ *David Gerger*
David Gerger
State Bar No: 07816360
GERGER HENNESSY & MCFARLANE LLP
1001 Fannin, Suite 2450
Houston, Texas 77002
dgerger@ghmfirm.com
Phone: 713-224-4400
Fax: 713-224-5153

7

## *CERTIFICATE OF CONFERENCE*

We conferred with Cory Jacobs, Attorney of record for the Government. The government joins the request for the Exhibit A questionnaire. The government does not oppose the rest of the motion.

                                     /s/ *Jeff Kearney*
                                     JEFF KEARNEY

## *CERTIFICATE OF SERVICE*

I hereby certify this Motion was electronically filed, and Assistant United States Cory Jacobs was electronically served via this Court's Electronic Filing System on the day of filing.

                                     /s/ *Jeff Kearney*
                                     JEFF KEARNEY