IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Criminal Action No. 4:21-CR-00268-O |
| | § | |
| MARK A. FORKNER (01) | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court are Defendant's Motion to Dismiss (ECF No. 84), filed December 23, 2021; the Government's Response (ECF No. 93-1), filed January 3, 2022, and Defendant's Reply (ECF No. 102), filed January 7, 2022. The motion is **GRANTED in part** and **DENIED in part**.

I.  BACKGROUND

In June 2011, The Boeing Company began developing a new, more fuel-efficient version of the Boeing 737 called the 737 MAX.[1] Indictment 3, ECF No. 1. Boeing fitted the 737 MAX with larger engines and situated them differently under the airplane's wings compared to the 737 MAX's predecessor. *Id.* The adjustments altered the airplane's aerodynamics and caused the 737 MAX's nose to pitch up during a flight maneuver called a high-speed, wind-up turn. *Id.* at 4. Although a pilot would never perform this "corkscrew-like" maneuver during a normal commercial passenger flight, the airplane's pitch-up behavior during the maneuver affected its airworthiness. *Id.* To correct this behavior, Boeing installed the Maneuvering Characteristics Augmentation System ("MCAS") "as a new part of the flight controls for the 737 MAX." *Id.* MCAS worked by adjusting the horizontal stabilizer located near the 737 MAX's tail, causing the

---

[1] The Court recites the facts as stated in the Indictment (ECF No. 1), which, at this stage, the Court must accept as true. *See United States v. Moss*, 872 F.3d 304, 308 (5th Cir. 2017).

nose of the airplane to pitch down. *Id.* As originally designed, MCAS would operate only during high-speed, wind-up turns. *Id.*

The Federal Aviation Administration ("FAA") is responsible for evaluating and approving new versions of commercial airplanes before use by U.S.-based airlines. *Id.* at 1. The Aircraft Evaluation Group ("AEG"), a subset of the FAA, is responsible for determining the minimum level of training required for U.S.-based airline pilots to fly a new version of an aircraft. *Id.* at 2. The AEG does that by evaluating the differences between the new and old aircraft versions, then publishing a "differences training" determination for the new version. *Id.* Training levels range from Level A, the least intensive, to Level E, the most intensive. *Id.* The AEG publishes its determination in a Flight Standardization Board Report ("FSB Report"). *Id.* at 2, 5. Airlines must train their pilots in accordance with the FSB Report, and more intensive training tends to be more expensive for the airlines. *Id.* at 2.

Defendant Mark Forkner was the Chief Technical Pilot for Boeing's 737 MAX Flight Technical Team. *Id.* at 4–5. While in that position, Defendant helped Boeing obtain FAA certification for the commercial sale and use of the 737 MAX. *Id.* at 5. His job involved providing the AEG with information about the differences between the 737 MAX and its predecessor, to help the AEG develop its FSB Report. *Id.* One of Boeing's—and Defendant's—goals was to secure differences training for the 737 MAX no greater than Level B. *Id.* Level B differences training is generally computer-based and therefore cheaper than more intensive, simulator-based training levels. *Id.* at 2, 10. According to Defendant, differences training above Level B could cost Boeing and its customers "tens of millions of dollars." *Id.* at 5–6.

In June 2015, Defendant attended a 737 MAX briefing for the AEG. *Id.* at 6. During the briefing, Defendant and Boeing employees told the AEG that MCAS was designed to operate

2

during high-speed, wind-up turns, at speeds of Mach 0.7 to 0.8. *Id.* On August 16, 2016, the AEG provisionally determined that 737 MAX pilots should receive Level B differences training. *Id.* at 7. A few months later, Defendant conducted a simulated test flight of the 737 MAX in which he experienced MCAS at significantly lower speeds (Mach 0.2) than what he had been telling the AEG (Mach 0.7–0.8). *Id.* Defendant contacted a Boeing senior engineer assigned to the 737 MAX program to ask about MCAS. *Id.* at 8. The engineer confirmed that MCAS was no longer limited to operate during only high-speed, wind-up turns. *Id.* Defendant did not update the AEG of MCAS's low-speed expansion. *Id.*

One week after his simulator flight, Defendant provided edits to the AEG on a draft FSB Report. In his edits, Defendant proposed removing all references to MCAS "since it's outside the normal operating envelope." *Id.* at 9 (cleaned up) (quoting Defendant). He proposed similar edits in a subsequent draft report. *Id.* On July 5, 2017, the AEG published the 737 MAX FSB Report, which included a final determination that 737 MAX pilots should receive Level B differences training. *Id.* at 2, 10. The report did not mention MCAS. *Id.* at 10. Defendant emailed a copy of the FSB Report to representatives of major U.S.-based airlines. *Id.*

The Government alleges that by withholding material information from the AEG and Boeing's U.S.-based airline customers, Defendant caused, among other things:

(a) the AEG to publish a 737 MAX FSB Report that was materially false;

(b) the AEG to issue a Level B differences-training determination that was based on materially false information about MCAS;

(c) airplane manuals and pilot-training materials for U.S.-based airlines to lack any reference to MCAS; and

(d) Boeing's U.S.-based airline customers to be deprived of economically material information when making their decisions to purchase the 737 MAX, which allowed Boeing to obtain uninterrupted and undiminished 737 MAX sales and revenue from their customers.

*Id.* at 10–11.

The Government charges Defendant with six counts. The first two counts allege that Defendant "knowingly and with the intent to defraud, made and used a materially false writing, entry, certification, document, record, data plate, label, and electronic communication concerning an aircraft part" in violation of 18 U.S.C. § 38(a)(1)(C). *Id.* at 12. The bases for the charges are Defendant's copies of the 737 MAX FSB Report that he sent to two U.S.-based airlines that were Boeing customers. *Id.* Counts Three through Six allege that Defendant committed wire fraud by causing Boeing to send fraudulent invoices to the same two airlines, in violation of 18 U.S.C. § 1343. *Id.* at 13–14. A grand jury returned the indictment on October 14, 2021. *Id.* at 17.

## II.     LEGAL STANDARD

The indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "The point of an indictment 'is to inform a defendant of the charge against him.'" *United States v. Evans*, 892 F.3d 692, 712 (5th Cir. 2018) (citation omitted). "Practical, not technical, considerations govern the validity of an indictment, and the test of the validity of an indictment is 'not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.'" *United States v. Chaney*, 964 F.2d 437, 446 (5th Cir. 1992) (footnote and citation omitted).

"[A]lthough the indictment must allege each and every element of the offense to pass constitutional muster, the law does not compel a ritual of words." *United States v. Webb*, 747 F.2d 278, 284 (5th Cir. 1984). "An indictment is legally sufficient if (1) each count contains the essential

4

elements of the offense charged, (2) the elements are described with particularity, and (3) the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense." *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014) (citation and internal quotation marks omitted).

A defendant may move to dismiss an indictment that contains a defect. *See* Fed. R. Crim. P. 12(b)(3)(B). One possible defect is the failure to state an offense. *Id.* "In reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Moss*, 872 F.3d 304, 308 (5th Cir. 2017) (citation and internal quotation marks omitted).

### III.     ANALYSIS

Defendant raises three arguments. First, the Court should dismiss Counts One and Two because Defendant did not "make" or "use" a false writing about an aircraft "part." Second, the Court should dismiss Counts Three through Six because the Government does not sufficiently allege causation or materiality. Third, the Court should dismiss the entire indictment because the AEG knew about MCAS's low-speed expansion. The Court addresses each argument in turn.

> **A.    The indictment fails to state an offense that Defendant made or used a false writing about an aircraft "part."**

Counts One and Two allege Defendant "made and used a materially false writing . . . concerning an aircraft part" in violation of 18 U.S.C. § 38(a)(1)(C). Defendant raises two arguments that Counts One and Two must be dismissed. First, Defendant argues that MCAS is not a "part" as that term is defined in the statute. Second, Defendant argues that he did not "make" or "use" a false report as those terms are used in the statute. Because the Court concludes that MCAS is not a "part" under § 38(a)(1)(C), it need not address whether Defendant "made" or "used" a false report.

5

The Court begins with the text. When "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citation omitted). The Court "begin[s] with the assumption that the words were meant to express their ordinary meaning." *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015) (citation and internal quotation marks omitted). But when a statute "includes an explicit definition," the Court "'must follow that definition,' even if it varies from a term's ordinary meaning." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) (citation omitted). "Statutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (citation omitted).

Section 38 criminalizes fraud "concerning any aircraft or space vehicle part." The statute defines "part" as "a frame, assembly, component, appliance, engine, propeller, material, part, spare part, piece, section, or related integral or auxiliary equipment." 18 U.S.C. § 31(a)(7). Defendant's indictment for violating § 38 is predicated on allegedly false records concerning MCAS, which the Government says is "an aircraft 'part' as defined in [§ 31(a)(7)]." Indictment 4, ECF No. 1. The difficulty is that MCAS is intangible computer code in the aircraft's flight control software. The issue, then, is whether MCAS, as software, is an aircraft "part."

Several terms in the definition are clearly inapplicable. MCAS is not a "frame" or an "assembly." 18 U.S.C. § 31(a)(7). It is also not an "engine, propeller, [or] material," nor is it a "spare part, piece, [or] section." *Id.* That leaves "component, appliance, . . . related integral or auxiliary equipment," and, unhelpfully, "part." *Id.* Because those terms are undefined in the statute, the Court gives them their ordinary meaning. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).

Contemporary dictionaries are the primary guide to the ordinary meaning of those terms. A "component" is "a constituent part." *Webster's Third New International Dictionary* 446 (Philip Babcock Gove et al. eds., 2002). An "appliance" is "something applied to a purpose or use," as in "a piece of equipment for adapting a tool or machine to a special purpose." *Id.* at 104–05. "Equipment" is "the physical resources serving to equip a person or thing." *Id.* at 768. And a "part" is "a constituent member of a machine or other apparatus." *Id.* at 1645.

Three of the words—appliance, equipment, and part—suggest a physical attribute. "Component," arguably, does not. If MCAS fits into any of the words in the list, "component" is the most reasonable candidate—a point the Government recognized at the hearing on this motion. But "[t]hat a definition is broad enough to encompass one sense of a word does not establish that the word is ordinarily understood in that sense." *Taniguchi*, 566 U.S. at 568. Moreover, the dictionary definitions of component, appliance, equipment, and part are broad and self-referential. As in many cases concerning broad statutory terms, dictionaries do not resolve the issue. *See Torres v. Lynch*, 578 U.S. 452, 459 (2016). But the Court does not consult the dictionary definitions in a vacuum. The terms "must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon*, 577 U.S. at 438.

The surrounding words supply the first level of context. The associated-words canon (also called *noscitur a sociis*) is particularly helpful in construing broad terms. *In re Crocker*, 941 F.3d 206, 219 (5th Cir. 2019). This "commonsense canon" stands for the simple maxim that "a word may be known by the company it keeps." *United States v. Koutsostamatis*, 956 F.3d 301, 307 (5th Cir. 2020) (cleaned up). In other words, "when a statute contains a list, each word in that list presumptively has a 'similar' meaning." *Yates v. United States*, 574 U.S. 528, 549 (2015) (Alito, J., concurring).

The listed words in the statutory definition share a related meaning. They refer to tangible objects. "The common quality suggested by a listing should be its most general quality—the least common denominator, so to speak—relevant to the context." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 196 (2012). Tangibility is the "least common denominator" that unifies Congress's definition. *Id.* Frame, assembly, engine, propeller, material, spare part, piece, equipment, and section are physical parts. True, some of those words have nonphysical uses—one might refer to a "section" of an essay, for example. But context resolves those ambiguities. Section 38 criminalizes fraud concerning *aircraft* sections, not essay sections. An aircraft section is a physical, tangible thing. Modified by the statutory term "aircraft," each of those words share a related meaning: tangibility.

The related meaning of the listed words guides interpretation of the statute. To the extent a word in the list does not already connote tangibility—say, "component"—the associated-words canon suggests it be construed to apply to tangible objects. "Component" easily bears that construction.

Taking a step back from the statutory definition, construing the statute to apply to tangible objects accords with the ordinary usage of the word "part." One might reasonably say that computer code is *part of* an aircraft, but it stretches ordinary usage to say that computer code is an *aircraft part*. To be sure, the Court must follow Congress's definition even if it varies from the term's ordinary meaning. *See Digital Realty Tr.*, 138 S. Ct. at 776. But for a circular definition such as this one, where Congress has defined "part" as "part," the ordinary meaning of the word is at least somewhat relevant in construing Congress's definition.

Examples are helpful. Suppose that, after experiencing car trouble, you take your car to a mechanic. The mechanic tells you one of your car parts is obsolete, and he will need to install a

8

new one. He then plugs in a laptop and updates your car's computer software. Most car owners would express surprise—not at the suggestion that the car needs a software update, which is now commonplace, but that the mechanic called the software a "car part." The word choice in that context conjures images of engine blocks and alternators, not lines of code. Similarly, even when speaking of computers, the word "part" connotes the hardware, not the software. The motherboard, graphics card, and power supply are computer parts. The operating system, web browser, and Microsoft Word are not. Airplanes are no different. MCAS is not an "aircraft part."

The Government's response is unpersuasive. The Government stresses that § 38 criminalizes fraud concerning "any" aircraft part. *See* Gov't Resp. 12–17, ECF No. 93-1. The Government is correct that the word "any" carries an expansive meaning. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008). But that argument does not go as far as the Government suggests. In *Ali*, the Supreme Court addressed whether certain law enforcement "officers" were immune from suit. *Id.* at 215–16. It concluded that the phrase "any officer of customs or excise or any other law enforcement officer" included officers of the Federal Bureau of Prisons. 28 U.S.C. § 2680(c); *see Ali*, 552 U.S. at 218–19. The dispute was not whether officers of the Federal Bureau of Prisons were "law enforcement officers," but whether they fell under the catchall "any other law enforcement officer." The word "any" provided the answer. This case is different. The dispute here is not *what types* of aircraft parts are covered by the statute, but whether MCAS is an aircraft part. The word "any" does not clarify the meaning of the word "part."

The Government also has difficulty proposing an alternative attribute that unites the words in the definition. The Government argues a common attribute among the words is that they "have the capacity to affect the integrity and safety of an airplane in flight." Gov't Resp. 17, ECF No. 93-1. But the Government's theory is underinclusive. It excludes, for example, "auxiliary

9

equipment" such as the airplane's radio systems. The Government's theory is also overinclusive. Jet fuel, for example, undoubtedly has "the capacity to affect the integrity and safety of an airplane in flight," but the Government conceded in the hearing that jet fuel is not an aircraft part. *Id.* The Government's proposed unifying attribute simply does not fit the statutory definition. Alternatively, the Government suggests the statute applies to anything affecting the function of tangible aircraft parts. *Id.* at 15. That construction sweeps too broadly and renders much of Congress's definition superfluous. In short, "[t]he government's alternative common attributes do not persuade." *Kaluza*, 780 F.3d at 662.

MCAS is the lynchpin of Counts One and Two. The indictment claims "MCAS was an aircraft 'part' as defined in [18 U.S.C. § 3l(a)(7)]." Indictment 4, ECF No. 1. Counts One and Two charge Defendant with making false statements "concerning an aircraft part, namely MCAS." *Id.* at 12. The Government agrees that MCAS is software and does not dispute that software is intangible. *See* Gov't Resp. 12, ECF No. 93-1. Finally, the Government proposes no other aircraft "part" supporting the indictment. The Government is prosecuting Defendant on a novel interpretation of the statute,[2] but the interpretation does not support the facts of this case. Because MCAS is not an aircraft "part" as defined in 18 U.S.C. § 3l(a)(7), the indictment fails to allege an offense that Defendant violated § 38(a)(1)(C). The Court therefore **GRANTS** the motion to dismiss Counts One and Two.[3]

---

[2] The closest case seems to be *United States v. Frediani*, 790 F.3d 1196 (11th Cir. 2015), in which the Eleventh Circuit affirmed a conviction involving aircraft computer microchips. *Frediani* confirms that the statute applies to tangible aircraft components.

[3] The Court need not address Defendant's alternative argument that he did not "make" or "use" a false report. *See* Def.'s Mot. to Dismiss 14–17, ECF No. 84.

### B. The indictment sufficiently alleges causation and materiality for wire fraud.

Counts Three through Six charge Defendant with wire fraud. Federal law criminalizes "transmit[ting] or caus[ing] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings . . . for the purpose of executing" a "scheme or artifice to defraud." 18 U.S.C. § 1343. The elements of wire fraud are: "(1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016). The first element, a scheme to defraud, requires proof that the defendant "made some kind of a false or fraudulent material misrepresentation." *Id.* (citation omitted). Defendant argues the wire-fraud charges must be dismissed for two reasons: (1) the Government does not sufficiently allege causation; and (2) the Government does not sufficiently allege materiality. *See* Def.'s Mot. to Dismiss 22, ECF No. 84.

#### 1. Causation

Defendant argues the indictment insufficiently alleges causation in two respects: (1) the indictment fails to allege that Defendant caused an illegal transmission of wire communications; and (2) the indictment fails to allege that Defendant caused the airline companies to lose money or property. Both arguments fail.

*First*, Defendant argues the indictment fails to allege facts establishing that Defendant caused an illegal transmission of wire communications. *See id.* at 23–26. The "fatal gap" in the causal chain, Defendant says, is that the indictment does not allege that Defendant himself wired the four invoices to the airlines. *Id.* at 23. That gap is not fatal. "A defendant need not personally have made the communication on which the wire-fraud count is based, nor have directed that it be made." *United States v. Richards*, 204 F.3d 177, 207 (5th Cir. 2000). The indictment sufficiently

11

alleges Defendant "cause[d]" the fraudulent materials "to be transmitted" via interstate wire communications. Indictment 13, ECF No. 1.

The indictment's supporting facts back up its causation allegation. "To 'cause'" interstate wire communications facilities to be used "is to do an act with knowledge that the use of the wire . . . communications facilities will follow in the ordinary course of business or where such use can reasonably be foreseen." Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 2.57 (2019).[4] The indictment alleges Defendant "knew and could reasonably foresee that Boeing sold the 737 MAX to airlines worldwide . . . and that Boeing electronically sent invoices to its airline customers . . . for these and other payments in the ordinary course of Boeing's business." Indictment 6, ECF No. 1. The indictment sufficiently alleges that the use of wire communications "was reasonably foreseeable." *Richards*, 204 F.3d at 207 (citation and internal quotation marks omitted).

The indictment also alleges the communications furthered the alleged fraud scheme. Like the mail-fraud statute, the wire-fraud statute "does not require that the material . . . be fraudulent in itself." *United States v. Shively*, 927 F.2d 804, 814 (5th Cir. 1991) (citation and internal quotation marks omitted). Rather, the communications must be "'sufficiently closely related' to the fraudulent scheme." *Id.* (citation omitted). The indictment alleges the wire communications were "for the purpose of executing" and "in furtherance of" the fraud scheme. Indictment 13, ECF No. 1. The theory is that the invoices deprived Boeing's airline customers of "tens of millions of dollars" in potential training costs and financial penalties. *Id.* at 5–6. Defendant knew his allegedly fraudulent scheme would result in those invoices. *Id.* The invoices were, at a minimum, "a necessary step in the plot." *United States v. Manges*, 110 F.3d 1162, 1169 (5th Cir. 1997).

---

[4] *See Pereira v. United States*, 347 U.S. 1, 9 (1954) (applying the "ordinary course of business" test to the closely related mail-fraud statute); *United States v. McClelland*, 868 F.2d 704, 707 (5th Cir. 1989) (same); *see also United States v. Richards*, 204 F.3d 177, 207 (5th Cir. 2000) (applying mail-fraud cases to interpret the wire-fraud statute).

Defendant primarily relies on *United States v. Ingles*, 445 F.3d 830 (5th Cir. 2006), but the reliance is misplaced. In *Ingles*, a father was convicted of mail and wire fraud based on a scheme to defraud his son's insurance company by burning down his son's houses. *Id.* at 833. The son was not involved in the scheme, and the insurance company was obligated to pay proceeds to the son regardless of the fire's cause. *Id.* at 833–34. The Fifth Circuit reversed the conviction, holding that the evidence was insufficient to support a mail-fraud conviction because the government had failed to identify a fraudulent insurance claim. *Id.* at 837–38. This case is different. First, unlike the insurance company in *Ingles*, Boeing's customers were not obligated to purchase airplanes from Boeing. Second, according to the indictment, Defendant, a Boeing employee, held a position enabling him to influence the invoices and to direct the allegedly fraudulent scheme. In contrast, the father in *Ingles* testified that the son "had nothing to do" with the arson. *Id.* at 833–34.

Third, this case is not yet at the sufficiency-of-the evidence stage. To support a conviction the Government must produce "evidence tending to connect" the invoices with the fraudulent claims. *United States v. Tencer*, 107 F.3d 1120, 1126 (5th Cir. 1997). At this early stage, however, the indictment need only contain the essential elements of the offense, describe them with particularity, and provide specific enough information to protect the defendant against a subsequent prosecution for the same offense. *Simpson*, 741 F.3d at 547. The invoices are "'sufficiently closely related' to the fraudulent scheme" to provide Defendant notice of the charges against him. *Shively*, 927 F.2d at 814 (citation omitted); *see also Evans*, 892 F.3d at 712.

*Second*, Defendant argues the indictment fails to allege that Defendant caused the airline companies to lose money or property. *See* Def.'s Mot. to Dismiss 26–30, ECF No. 84. Again, Defendant reads the indictment and case law too narrowly. The indictment alleges that Defendant's scheme deprived Boeing's airline customers of "tens of millions of dollars" in the form of

13

penalties, cost savings, continued payment, and potential overpayment for the 737 MAX. Indictment 5–6, ECF No. 1. The indictment explicitly alleges Defendant knew that "differences training above Level B would be more costly for Boeing's U.S.-based airline customers to implement, which in turn could affect Boeing's 737 MAX sales and revenue." *Id.* at 5. According to the factual allegations, which must be taken as true, "the alleged scheme is one to deprive the [victims] of money or property through misrepresentations." *United States v. Ratcliff*, 488 F.3d 639, 645 (5th Cir. 2007). Moreover, "the deception of regulatory agencies for the purpose of allowing victimization of third parties is a cognizable mail fraud offense." *United States v. McMillan*, 600 F.3d 434, 450 (5th Cir. 2010).

Again, Defendant relies on inapplicable cases. In *Ratcliff*, the defendant had devised a fraudulent scheme to obtain re-election as president of a Louisiana parish. *Ratcliff*, 488 F.3d at 641–42. The Fifth Circuit affirmed the district court's dismissal of the mail-fraud charges because "it cannot be said that the parish would be deprived of this money by means of [the defendant]'s misrepresentations, as the financial benefits budgeted for the parish president go to the winning candidate regardless of who that person is." *Id.* at 645. Here, Boeing was competing for multiple contracts from airline customers, and the indictment alleges that Defendant's fraudulent scheme directly affected the price and success of those contracts. *See* Indictment 5–6, ECF No. 1. The indictment "satisfies *Ratcliff*'s requirement that the scheme be to defraud the victim insofar as victims were left without money that they otherwise would have possessed." *McMillan*, 600 F.3d at 449. The indictment thus sufficiently alleges causation.

### 2. Materiality

Defendant also argues the indictment fails to allege that Defendant's statements or nondisclosures were material. According to Defendant, the indictment "offers no specifics" of materiality. Def.'s Mot. to Dismiss 31, ECF No. 84. "For example, the Indictment does not allege

that, had [Defendant] informed the AEG of [MCAS's low-speed expansion], the AEG would have issued a training determination higher than Level B." *Id.* That argument contests the sufficiency of the evidence, not the sufficiency of the allegations.

"[A]n allegation of fraud in an indictment will be sufficient so long as 'the facts alleged in the indictment warrant an inference that the false statement is material.'" *United States v. Bieganowski*, 313 F.3d 264, 285 (5th Cir. 2002) (citation omitted). A statement is material if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question," or if the person making the statement "knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *United States v. Davis*, 226 F.3d 346, 358 (5th Cir. 2000) (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 538 (1976)).

The indictment alleges Defendant's misstatements were "material" no fewer than fifteen times. *See generally* Indictment, ECF No. 1. Moreover, the indictment alleges that Defendant's misstatements directly affected the contents of the 737 MAX FSB Report. *See id.* at 10. Those allegations support an inference of materiality. Defendant's fact-intensive arguments about the nature of MCAS and the AEG's knowledge of MCAS reveal a "failure to distinguish between a challenge to the sufficiency of the indictment and a challenge to the evidence produced at trial." *Bieganowski*, 313 F.3d at 286. The allegedly fraudulent misstatements are "potentially capable of being proved material by the government at trial," and therefore sufficient at this stage. *Id.*

In sum, the indictment sufficiently alleges causation and materiality. The indictment tracks the essential elements of wire fraud, describes them with sufficient particularity, and is specific

15

enough to provide Defendant notice of the charges against him. *See Simpson*, 741 F.3d at 547. The Court thus **DENIES** Defendant's motion to dismiss Counts Three through Six of the indictment.

### C. That other FAA subgroups knew of MCAS's low-speed expansion does not undermine the indictment.

Defendant argues that all counts in the indictment must be dismissed because the AEG knew about MCAS's low-speed expansion. Defendant's argument rests on three premises: (1) Personnel in the FAA's Aircraft Certification Office were fully informed of MCAS's low-speed expansion; (2) FAA regulations require the Court to impute that knowledge to the AEG as a matter of law; and (3) that the AEG "knew" of what Defendant allegedly withheld leaves the Government unable to prove the "scheme to defraud" alleged in the indictment. *See* Def.'s Mot. to Dismiss 34–39, ECF No. 84. Even assuming the first and second premises are true, Defendant fails to support the third.

That parts of the FAA knew about MCAS's low-speed expansion does not, as a matter of law, nullify the indictment's allegation that Defendant engaged in a scheme to defraud. "The victim's negligence is not a defense to criminal conduct." *United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980). Even if Defendant is correct that parts of the FAA knew of MCAS's low-speed expansion, that evidence is not necessarily a defense to the scheme to defraud. At the very least, that evidence does not defeat the claims in the indictment, which, at this stage, the Court must accept as true. The FAA's knowledge may be relevant to the materiality of the information, but that is a question for the jury. The Fifth Circuit's model jury instructions contain a limiting instruction for precisely that question: "In determining materiality, you should consider that naivety, carelessness, negligence, or stupidity of a victim does not excuse criminal conduct, if any, on the part of the defendant." Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 1.40 (2019).

Defendant's cited cases are unpersuasive. Defendant cites one binding authority, *United States v. Comstock*, 974 F.3d 551 (5th Cir. 2020), for the proposition that the FAA's knowledge "leaves the government unable to prove the 'scheme to defraud' alleged in the Indictment." Def.'s Mot. to Dismiss 38, ECF No. 84. *Comstock* does not support that proposition, and Defendant does not explain how it does. A fleeting, unexplained citation of a single criminal case does not justify a novel ruling that partial agency knowledge negates an indictment for fraud.

Likewise, the Tenth Circuit civil case Defendant cites does not go nearly as far as Defendant suggests. In a False Claims Act case, the Tenth Circuit recognized that the government's knowledge of facts underlying a false claim helps distinguish "between the submission of a false claim and the *knowing* submission of a false claim—that is, between the presence and absence of scienter." *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 952 (10th Cir. 2008). Even in that context, the government's knowledge produces only *inference* negating scienter. The panel was careful about that point: "It is only an inference. It does not automatically preclude a finding of scienter." *Id.* Even if this were a False Claims Act case (a critical distinction in itself), *Burlbaw* confirms that a victim's knowledge does not necessarily negate a finding of fraud. The remaining authorities Defendant cites are similarly unpersuasive. The Court therefore **DENIES** Defendant's request to dismiss all counts based on the theory that other FAA divisions knew of MCAS's low-speed expansion.

## IV.    CONCLUSION

Defendant levels several arguments against the indictment. Most fall short, but one hits the mark. The Court **GRANTS** Defendant's motion to dismiss Counts One and Two because the Government has failed to state an offense that Defendant violated 18 U.S.C. § 38(a)(1)(C). The Court otherwise **DENIES** the motion to dismiss. Accordingly, the Court **DISMISSES** Counts One and Two in the indictment. In light of the Court's ruling, the parties are **ORDERED** to file an

amended proposed jury charge within seven days of the date of this Order. Defendant's Motion for Leave to File a Supplemental Agreed Charge (ECF No. 110) is thus **DENIED as moot**.

    **SO ORDERED** this **8th day** of **February, 2022**.

*[Signature]*
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**