1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF TEXAS

3                   FORT WORTH DIVISION

4

5   UNITED STATES OF AMERICA, ) CASE NO. 4:21-cr-00268-O-1
                              )
6        Government,          ) FORT WORTH, TEXAS
                              )
7   VS.                       ) March 21, 2022
                              )
8   MARK A. FORKNER,          )
                              )
9        Defendant.           )

10

11

12

13                      VOLUME 2
                  TRANSCRIPT OF JURY TRIAL
14          BEFORE THE HONORABLE REED C. O'CONNOR
               UNITED STATES DISTRICT COURT JUDGE
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 178

```
1

2   A P P E A R A N C E S:

3   FOR THE GOVERNMENT: CORY JACOBS, ESQ.
                        MICHAEL O'NEILL, ESQ.
4                       SCOTT ARMSTRONG, ESQ.
                        ASSISTANT U.S. ATTORNEYS
5                       NORTHERN DISTRICT OF TEXAS
                        801 Cherry Street, Suite 1700
6                       Fort Worth, Texas  76102
                        Telephone:  817.252.5200
7

8

9   FOR THE DEFENDANT:  JEFF KEARNEY, ESQ.
                        CATHERINE STANLEY, ESQ.
10                      KEARNEY LAW FIRM
                        3100 W. 7th Street, Suite 420
11                      Fort Worth, Texas 76107

12                      DAVID GERGER, ESQ.
                        JON LIROFF, ESQ.
13                      MATT HENNESSY, ESQ.
                        ASHLEE McFARLANE, ESQ.
14                      GERGER KHALIL HENNESSY & McFARLANE, LLP
                        1001 Fannin Street
15                      Houston, Texas 77002
                        Telephone:  713.224.4400
16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2        WITNESSES

3

4    KENT BYERS

5        Direct Examination by Mr. O'Neill ........  189

6        Cross-Examination by Ms. McFarlane ........ 231

7        Redirect by Mr. O'Neill  .................. 292

8

9    STACEY KLEIN

10       Direct Examination by Mr. Armstrong ....... 300

11       Cross-Examination by Ms. McFarlane ........ 402

12       Redirect Examination by Mr. Armstrong ..... 465

13

14

15

16

17

18

19

20

21

22

23

24

25

1              E X H I B I T S

2    GOVERNMENT EXHIBITS

3    Government's Exhibit 1   ...............   194

4    Government's Exhibit 2 .................   194

5    Government's Exhibits 4 - 8 ............   194

6    Government's Exhibit 10 ................   194

7    Government's Exhibit 11 ................   194

8    Government's Exhibit 11A ...............   194

9    Government's Exhibits 12 - 17  ..........   194

10   Government's Exhibit 19   ..............   194

11   Government's Exhibits 21 - 23  ..........   194

12   Government's Exhibit 26 ................   194

13   Government's Exhibits 28 - 30 ...........   194

14   Government's Exhibit 31 ................   195

15   Government's Exhibit 32A   ..............   196

16   Government's Exhibits 101 - 104  ........   197

17   Government's Exhibit 9 .................   300

18   Government's Exhibits 18 - 24 ...........   300

19

20

21

22

23

24

25

1

2    DEFENSE EXHIBITS

3        Defendant's Exhibit 24H  ...............   238

4        Defendant's Exhibit 24G ................   241

5        Defendant's Exhibit 7 ..................   260

6        Defendant's Exhibit 9 ..................   268

7        Defendant's Exhibit 89 .................   269

8        Defendant's Exhibit 246 ................   269

9        Defendant's Exhibit 35A ................   408

10       Defendant's Exhibit 12A ................   452

11       Defendant's Exhibit 12C ................   455

12       Defendant's Exhibit 14A ................   460

13       Defendant's Exhibit 14C ................   460

14       Defendant's Exhibit 20A ................   461

15       Defendant's Exhibit 20C ................   461

16       Defendant's Exhibit 21A ................   461

17

18

19

20

21

22

23

24

25

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 182

```
1              P R O C E E D I N G S

2                  March 21, 2022

3                       oOo

4         THE COURT:  Okay.  Please be seated.

5         All right.  I've looked at you all's briefings,

6   pleadings, the briefing that you all filed, and after

7   reviewing it and listening to the opening statements, I've

8   determined that disclosures to the FAA and internal FAA

9   communications, as they were conveyed to Ms. Klein, are

10  relevant to the extent that they show that the information

11  at issue was material.

12        The government is correct that the communications

13  are not probative of the defendant's intent.  So for that

14  reason, I find that a limiting instruction on the

15  materiality in communications is appropriate and will

16  instruct the jury to consider the communications for that

17  purpose.

18        As it relates to the crashes, I find that brief

19  information about them are relevant to the materiality of

20  the information that Ms. Klein considered, and so I will

21  permit limited discussion of the crashes for that purpose

22  with her.

23        I will reserve judgment, though, on the

24  admissibility of the defendant's expert witnesses until

25  after the close of the government's case.  So that's my
```

```
 1   ruling.

 2            MR. GERGER:  Your Honor, and we would invoke the

 3   rule, but those two experts are in the courtroom, and I

 4   would ask that they be allowed to stay.

 5            THE COURT:  Yeah.  Okay.

 6            MR. JACOBS:  Yeah, we would object to that, your

 7   Honor.

 8            THE COURT:  You object to which part?

 9            MR. JACOBS:  To having the witnesses stay in the

10   courtroom.

11            THE COURT:  Yes, the expert witnesses stay in the

12   courtroom or?

13            MR. JACOBS:  Except for the experts.

14            THE COURT:  Yeah, right.  I think that's what he

15   said.  So do you all have experts in the courtroom?  Just go

16   ahead and bring them.

17            MR. JACOBS:  We do not, your Honor.

18            THE COURT:  I mean, do you have witnesses in the

19   courtroom?

20            MR. JACOBS:  Not to my knowledge.

21            THE COURT:  And do you have witnesses in the

22   courtroom?

23            MR. GERGER:  Only those two.

24            THE COURT:  Okay.  So --

25            MR. JACOBS:  Your Honor, I just have the case
```

UNITED STATES vs MARK A. FORKNER

| 4:21-cr-00268-O-1 | Vol 2 March 21, 2022 | Page 184 |

1   agent and the case agent will be at the table with us.

2           THE COURT:  Yeah, right.  That's okay.  So what I

3   will need you to do, then, is to communicate the rule to

4   your witnesses so that they, from this point forward, are

5   complying with the rule.

6           MR. JACOBS:  Will do.

7           THE COURT:  And you, too.

8           MR. GERGER:  Yes, your Honor.

9           And then we all saw this morning's news about a

10  737.  It was not a MAX.  I don't know if your Honor would

11  instruct the jury it was not a MAX, but --

12          THE COURT:  You tell me what you want.  What is it

13  that you request?

14          MR. GERGER:  What should we ask --

15          THE COURT:  Because they're on their way, so --

16          MR. KEARNEY:  Just that it was not a MAX.

17          MR. GERGER:  Just that it was not a MAX.

18          THE COURT:  So I will tell the jury that there

19  have been news reports that there has been an airplane

20  crash, that tentative reports indicate that it may be a

21  Boeing aircraft, but that it is not a 737 MAX airplane.

22          MR. GERGER:  Thank you, your Honor.

23          MR. KEARNEY:  Thank you, your Honor.

24          MR. JACOBS:  No objection.

25          THE COURT:  Do you have a witness?

1          MR. JACOBS:  We do, your Honor.

2          THE COURT:  Let's get him up here.

3          MR. JACOBS:  Your Honor, may I just ask a few more

4   things?

5          We also submitted to the Court the unopposed

6   request for the motion for instruction from the Court to the

7   jury about the plane crashes.

8          THE COURT:  Yes.

9          MR. JACOBS:  I'm just asking if you would consider

10  perhaps giving that to the jury in this case?

11         THE COURT:  I will do that right now.

12         MR. JACOBS:  Thank you, your Honor.

13         And then the other thing that I would ask, too, is

14  if your Honor would consider just letting the jury members

15  know that when we see them in the hallway, around the

16  courthouse and we don't talk to them, we're not trying to be

17  rude.

18         THE COURT:  Yes.  I will do that right now.

19         MR. JACOBS:  And then there's one other thing that

20  we were talking to with the Court last week was the

21  redaction to certain exhibits.

22         THE COURT:  Yes.

23         MR. JACOBS:  I think we've come to an agreement

24  with respect to those redactions.

25         THE COURT:  Very good.  Just proceed.  Just you

1    all act like that's acceptable with me.

2              MR. JACOBS:  Thank you, your Honor.

3              THE COURT:  Okay.  So I will give those three

4    instructions.

5              MR. JACOBS:  Thank you, your Honor.

6         (The jury was brought into court.)

7              THE COURT:  Okay.  Please be seated.  All right.

8    Thank you all very much, ladies and gentlemen.  Just a

9    couple of housekeeping measures.

10             The first one is, there are a lot of people

11   involved in this lawsuit, and you all will be coming and

12   going at the end of the day and at the beginning of the day,

13   at breaks, lunch, and so you may encounter people connected

14   with this case during the day in your comings and your

15   goings.

16             They are not going to even politely say, "Good

17   morning," or, "How are you doing," or, "What about this

18   weather?"  They're going to act as if they don't know you,

19   and they're going to pretend like they're from New York or

20   somewhere where they don't exchange pleasantries, right?

21             Here we exchange pleasantries, even with people we

22   don't know, but they're not going to do that in this case.

23   So please don't take that as a sign of disrespect or

24   discourteousness, because it's not that way at all.  It's --

25   everybody associated with this case is working very hard on

1  the case and wants to avoid even the appearance of

2  impropriety.

3           And so, if someone were to see you exchanging

4  pleasantries with someone involved in the case and they

5  weren't involved in that conversation, they might be

6  concerned that you're thinking -- that you're actually

7  talking about the case and so that's why.

8           So if you see people in the hallway and they duck

9  their heads and avoid eye contact with you or don't get on

10  the elevator with you, that's the reason.  And that's

11  pursuant to my direction to the participants.  That's not

12  even something that they brought up.  So please take note of

13  that.

14          Second, there has been a report, a news report

15  today, of an airplane crash that may or may not be a Boeing

16  aircraft.  These are preliminary reports.  But what is

17  certain, I think, that we all agree that it is not a 737

18  MAX, which is what we're -- the subject matter that we are

19  dealing with here in this courtroom.

20          Again, avoid all news coverage that might talk

21  about airplanes and Boeing and this lawsuit, but you need to

22  know that any report that has taken place today has nothing

23  to do with the 737 MAX.

24          Anything else we should take up?

25          MR. JACOBS:  Other than the two other charges.

1          THE COURT:  No, I'm going into that.

2          MR. JACOBS:  Thank you.  Other than that, nothing

3   on that.

4          THE COURT:  Very good.

5          MR. JACOBS:  Thank you.

6          THE COURT:  All right.  Now, the next instruction

7   I need to give you is that in this lawsuit, the government

8   does not allege that Mr. Forkner caused any plane crash.

9   Mr. Forkner is not charged with causing any plane crash.  He

10  is charged with four counts of wire fraud.

11          Your job as jurors is to determine only whether

12  the government has proved, beyond a reasonable doubt, that

13  Mr. Forkner committed those wire fraud offenses.

14          And so, you are otherwise to follow my

15  instructions as it relates to this case as we go forward,

16  but keep that in mind as the evidence unfolds.

17          Now, finally, one of the things that you will be

18  called upon to make a determination on is an element of wire

19  fraud that is known as "materiality."

20          I will give you other instructions about all of

21  the elements at the -- at the conclusion of the evidence,

22  but I want you to remember -- and this will be in the final

23  instructions that you get at the end of the day, at the end

24  of the case.

25          But I want you to remember, as we go along, that

1    in determining materiality, you should consider that

2    naiveté, carelessness, negligence, or stupidity of a victim

3    does not excuse criminal conduct, if any, on the part of the

4    defendant.

5              So please remember these instructions as we go

6    through the case.  And again, I'll repeat those to you,

7    probably periodically, as we go through the case, but

8    certainly in the final instructions that you get when you go

9    back to deliberate on your verdict.

10             So thank you all for being here this morning.  We

11   are ready to go.

12             The Government can call its first witness.

13             MR. O'NEILL:  Thank you, your Honor.  The United

14   States calls Kent Byers to the stand.

15      (The oath was administered.)

16             THE COURT:  Be sure and speak up good and loud so

17   everyone can hear what you're saying.

18             THE WITNESS:  Yes, your Honor.

19                      DIRECT EXAMINATION

20   BY MR. O'NEILL:

21      Q.   Good morning.

22      A.   Good morning.

23      Q.   Would you please state your full name and spell it

24   for the record?

25      A.   Certainly.  My name is Kent Byers.  My name is

 1   spelled K-e-n-t, last name B-y-e-r-s.

 2        Q.   Where do you work, sir?

 3        A.   I work for the U.S. Department of Transportation,

 4   Office of Inspector General, Midwestern Regional Office

 5   Investigations.

 6        Q.   And what is the Department of Transportation,

 7   Office of Inspector General?

 8        A.   So the Department of Transportation, Office of

 9   Inspection General, DOT OIG, as we often call it for short,

10   is an agency charged with investigating allegations of

11   fraud, waste, and abuse pertaining to DOT's programs,

12   operations, and contracts and things of that nature.

13        Q.   And, sir, if I could ask you to speak up a bit and

14   maybe position yourself a little closer to the microphone so

15   we can all hear you.

16        A.   Sure.

17        Q.   Thank you.  That's better.

18             What is your job at the DOT OIG?

19        A.   I'm a Special Agent, currently serving as the

20   Assistant Special Agent in Charge, or ASAC.

21        Q.   Would you please tell the jury a bit about your

22   path to your current role as ASAC?

23        A.   Sure.  I started about 24-plus years ago as a

24   special agent with a different agency, and then came to the

25   Department of Transportation, Office of Inspector General in

1  2001, working a variety of investigations relating to fraud,

2  waste, and abuse; particularly a lot of fraud cases.

3          And then, for the last three years, I've been

4  serving as an ASAC supervising other agents and, you know,

5  working with other law enforcement agencies as well, so --

6      Q.   So you mentioned you work on fraud investigations.

7  As part of your job, do you work on investigations of

8  criminal fraud?

9      A.   Yes, we do.

10     Q.   Did you work on the criminal investigation of this

11 case?

12     A.   Yes.

13     Q.   Did you work with any other federal law

14 enforcement agents on this investigation?

15     A.   We did, yes.

16     Q.   Did you and your team collect documents as part of

17 this investigation?

18     A.   Yes.

19         MR. O'NEILL:  Your Honor, may I approach the

20 witness?

21         THE COURT:  Yes.

22 BY MR. O'NEILL:

23     Q.   Special Agent Byers, I've just handed you a binder

24 of materials.  Have you had a chance to review the contents

25 of this binder before trial?

```
1         A.    I have, yes.

2         Q.    Does it contain documents?

3         A.    It does.

4         Q.    Did you and your team obtain all of these

5    documents in the course of your investigation?

6         A.    We did.

7         Q.    Generally speaking, how did you obtain them?

8         A.    So these documents were obtained by way of

9    subpoena and record request, generally speaking.

10        Q.    I would like to direct your attention in your

11   binder, first, on a series of exhibits marked for

12   identification -- and there are a number of them, so I will

13   go through the series -- marked for identification as

14   Government Exhibit 1.

15        A.    Okay.

16        Q.    Government Exhibit 2.

17        A.    Yes.

18        Q.    Government Exhibits 4 through 8.

19        A.    Okay.

20        Q.    Government Exhibit 10.

21        A.    Okay.

22        Q.    Government Exhibits 11 and 11A, as in "apple."

23        A.    Okay.

24        Q.    Government Exhibits 12 through 17.

25        A.    Yes.
```

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 193

1      Q.   Government Exhibit 19.

2      A.   Yes.

3      Q.   Government Exhibits 21 through 23.

4      A.   Okay.

5      Q.   Government Exhibit 26.

6      A.   Okay.

7      Q.   And last in this series, Government Exhibit 28

8  through 30, all of which have previously been provided to

9  the defense.

10         So generally, Special Agent, what are these

11 exhibits?

12     A.   So these are communications from -- or with

13 Mr. Forkner.

14     Q.   And are these communications from Mr. Forkner

15 about the 737 MAX, just generally?

16     A.   Yes.  Generally, they're electronic communications

17 with Mr. Forkner.

18     Q.   When you say "electronic communications," does

19 that include email messages and chat communications?

20     A.   Yes, sir.

21     Q.   And where did you get this series of documents

22 from?

23     A.   These documents came from The Boeing Company.

24     Q.   Are they true and accurate copies of the documents

25 that you received from Boeing in the course of your

1    investigation?

2         A.    Yes.

3              MR. O'NEILL:  At this time, we offer Government

4    Exhibits 1, 2, 4 through 8, 10, 11, 11A, 12 through 17, 19,

5    21 through 23, 26, and 28 through 30.

6              MS. MCFARLANE:  Your Honor, no objection.

7              THE COURT:  Those will be admitted.

8         (Government Exhibits 1, 2, 4-8, 10, 11, 11A, 12-17, 19,

9         21-23, 26, and 28-30 were admitted into evidence.)

10   BY MR. O'NEILL:

11        Q.    Special Agent, can I direct you to what's marked

12   for identification as Government Exhibit 31 in your binder?

13   Do you see that document?

14        A.    Yes, sir.

15        Q.    And this was also previously provided to defense.

16              Are you familiar with this document?

17        A.    I am.

18        Q.    What is it?

19        A.    This is an email from Mr. Forkner to Bob Waltz at

20   Southwest Airlines.

21        Q.    And where did you obtain this -- this email?

22        A.    This email came from Southwest Airlines.

23        Q.    Generally speaking, is it about the MAX?

24        A.    Yes, it's an email about the MAX.

25              I'm sorry.  Go ahead.

1      Q.   That's all right.

2      A.   I was just looking at the subject line, "AEG and

3  MCAS," but it pertains to the MAX.

4      Q.   And is a true and accurate copy of the document

5  you received from Southwest?

6      A.   It is.

7           MR. O'NEILL:  We offer Government Exhibit 31.

8           MS. MCFARLANE:  No objection, your Honor.

9           THE COURT:  Thirty-one will be admitted.

10     (Government Exhibit 31 was admitted into evidence.)

11  BY MR. O'NEILL:

12     Q.   Special Agent, I'm now directing you to what's

13  been marked for identification as Government Exhibit 32A, as

14  in "apple", in your binder.  Do you see that?

15     A.   Yes, sir.

16     Q.   Are you familiar with this document?

17     A.   I am.

18     Q.   Generally speaking, what is it?

19     A.   So this is a purchase agreement, or a letter

20  agreement, between The Boeing Company and Southwest

21  Airlines.

22     Q.   And this was also previously provided to the

23  Defense.

24          Special Agent, did you obtain this document from

25  The Boeing Company?

1      A.   Yes.

2      Q.   Is it a true and accurate copy of the document you

3   received from Boeing in the course of your investigation?

4      A.   It is.

5           MR. O'NEILL:  We offer Government Exhibit 32A.

6           MS. MCFARLANE:  No objection, your Honor.

7           THE COURT:  It will be admitted.

8           (Government Exhibit 32A was admitted into

9      evidence.)

10   BY MR. O'NEILL:

11     Q.   And finally, Special Agent Byers, direct your

12   attention to what are marked for identification and

13   previously provided to the Defense as Government Exhibits

14   101, 102, 103, and 104.  Do you see those documents in your

15   binder?

16     A.   I do.

17     Q.   Are you generally familiar with each of these

18   documents?

19     A.   I am, yes.

20     Q.   What are they, generally speaking?

21     A.   So these are, generally, electronic communications

22   from The Boeing Company to -- to the airlines regarding,

23   well, sending invoices for the MAX.

24     Q.   And when you say "the airlines," are Government

25   Exhibits 101 and 102 communications from The Boeing Company

1    to American Airlines?

2          A.   They are, yes.

3          Q.   And 103 and 104, are those communications from The

4    Boeing Company to Southwest Airlines?

5          A.   Yes.

6          Q.   Okay.  And do they relate to the MAX?

7          A.   They do.

8          Q.   Did you obtain these electronic messages and their

9    attachments from The Boeing Company?

10         A.   Yes.

11         Q.   Are they true and accurate copies of the materials

12   you received?

13         A.   Yes.

14              MR. O'NEILL:  At this time, we offer Government

15   Exhibit 101, 102, 103, and 104.

16              MS. MCFARLANE:  No objection, your Honor.

17              THE COURT:  That will be admitted.

18              (Government Exhibits 101-104 were admitted into

19       evidence.)

20   BY MR. O'NEILL:

21         Q.   Special Agent Byers, let's discuss some of the

22   defendant's communications about the 737 MAX.

23         A.   Okay.

24         Q.   Did you review communications of the defendant's

25   about something called Level B differences training and

1   Southwest Airlines?

2       A.   Yes.

3            MR. O'NEILL:  If we could turn to what's in

4   evidence as Government Exhibit 1, if we could please publish

5   this on the screen, Ms. Holbrook.

6   BY MR. O'NEILL:

7       Q.   Looking at what's in evidence on your screen,

8   Special Agent, as Government Exhibit 1, are you familiar

9   with this email from the defendant?

10      A.   I am, yes.

11           MR. O'NEILL:  If we could please call out the

12  date, Ms. Holbrook.

13  BY MR. O'NEILL:

14      Q.   What is the date of this email?

15      A.   The date of the email is May 21 of 2014.

16      Q.   It's a three-page email.  I would like to focus on

17  what the defendant writes at 8:55 a.m.

18           MR. O'NEILL:  If we could please call out that

19  portion of the message, Ms. Holbrook.

20  BY MR. O'NEILL:

21      Q.   Special Agent, is the defendant responding to a

22  Boeing colleague in this message?

23      A.   Yes, sir, he is.

24      Q.   What does the defendant write about a $1 million

25  penalty, here in the highlighted text?

1       A.   Sure.  He stated, with a $1 million penalty per

2   airplane written to the -- into the SWA sales contract, via

3   CSID letter, as I understand, if the training level

4   difference goes beyond Level B, I'm guessing that's not a

5   viable plan.  Not to mention many of the design decisions

6   for the MAX were specifically -- made specifically to

7   protect Level B.

8       Q.   And Special Agent, do you see here where the

9   defendant uses the initials "SWA"?

10      A.   Yes, sir.

11      Q.   Are you familiar with those initials?

12      A.   I am.

13      Q.   In the context of this message, what does "SWA"

14  mean?

15      A.   Southwest Airlines.

16           MR. O'NEILL:  If we could please turn to what's in

17  evidence as Government Exhibit 4, and if we could publish

18  that for the jury, please.

19  BY MR. O'NEILL:

20      Q.   Are you familiar with this email from the

21  defendant?

22      A.   Yes.

23      Q.   What's the date of this email?

24      A.   The date of this email is September 15 of 2014.

25      Q.   And does the subject of the defendant's email

1   reference the MAX?

2        A.   It does.

3             MR. O'NEILL:  And if we could, Ms. Holbrook, go up

4   the content of the message, please.

5   BY MR. O'NEILL:

6        Q.   And Special Agent, does the -- does the defendant

7   also use the initials Southwest Airlines -- the initials for

8   Southwest Airlines in this message?

9        A.   Yes, he does.

10       Q.   What does the defendant write about Level B and

11  Southwest Airlines in the highlighted text?

12       A.   He wrote, "One of the prime program directives is

13  that the NG to MAX differences training level cannot exceed

14  Level B CBT."

15            He went on to state, "If Level B or C or D

16  training is triggered, it results in a financial penalty to

17  the company, per the sales contract with SWA, at a minimum."

18            And in parentheses, "There may be other contracts

19  I am not aware of with a similar penalty."

20            MR. O'NEILL:  If we could please turn to and

21  publish what's in evidence as Government Exhibit 8.

22  BY MR. O'NEILL:

23       Q.   Special Agent, are you familiar with this email

24  from the defendant?

25       A.   Yes, sir.

```
 1        Q.    What is the date of this email?

 2        A.    The date of this email is April 8 of 2015.

 3        Q.    And what is the subject line of defendant's email?

 4        A.    "Financial Impact of Risk 218 Level B Diff

 5   Training."

 6        Q.    You mentioned it's a message forward from the

 7   defendant.  Is that right?

 8        A.    Correct, yes.

 9        Q.    I would like to focus here on the top part of the

10   email chain focusing on the defendant's message.  Does he

11   again use the initial "SWA" for "Southwest" in this email?

12        A.    Yes, sir, it appears so.

13        Q.    And focusing here on the highlighted text, what

14   does the defendant write about determining the financial

15   impacts of greater than Level B?

16        A.    Sure.  So he wrote, "Frankly, that number is so

17   big, and the nonfinancial impacts are so bad, that to try to

18   determine a number is a waste of time, in my opinion,

19   especially as widely variable as that cost will be from

20   customer to customer" -- "besides Southwest Airlines," in

21   parentheses.  "We must obtain Level B for RCAS and the NG to

22   MAX differences, or it's a planet killer."

23        Q.    Special Agent Byers, in addition to those

24   communications from the defendant about Level B and

25   Southwest Airlines that we just saw, did you also review
```

```
 1   communications from the defendant about Level B differences
 2   training, more generally?
 3        A.   Yes.
 4        Q.   Let's start with what the defendant wrote about
 5   Level B in 2014.
 6             MR. O'NEILL:  If we could please turn to and
 7   publish what's in evidence as Government Exhibit 2.
 8   BY MR. O'NEILL:
 9        Q.   Are you familiar with this email from the
10   defendant?
11        A.   Yes, sir.
12        Q.   What is the date of the message?
13        A.   The date of this message is May 23 of 2014.
14        Q.   And this is another multipage email.  Let's focus
15   on the top part of the chain from the defendant here at
16   10:48 p.m.
17        A.   Okay.
18        Q.   Is the defendant responding to a colleague's
19   message here?
20        A.   Yes, sir.
21        Q.   What does the defendant write about Level B in the
22   highlighted text?
23        A.   He wrote, "In the current environment we're
24   dealing with, with regards to the AEG and training-level
25   differences, I have to assume that even a small change in a
```

 1  memory item may trigger a level beyond a Level B."

 2          He went on -- pardon me -- to state, "Protecting

 3  Level B differences training is a primary ground rule for

 4  the program."

 5      Q.   And you mention that the defendant is

 6  communicating with colleagues in these messages.  Where does

 7  the defendant and his colleagues work at the time?

 8      A.   The Boeing Company.

 9          MR. O'NEILL:  If we could please turn to and

10  publish government Exhibit 5.

11  BY MR. O'NEILL:

12      Q.   Are you familiar with this email from the

13  defendant?

14      A.   Yes, sir.

15      Q.   What's the date?

16      A.   The date on this one is December 18 of 2014.

17      Q.   It's a two-page email chain here.  Who is the

18  defendant emailing?

19      A.   A colleague at Boeing.

20      Q.   Is that someone named Ross Chamberlain?

21      A.   Yes, sir.

22      Q.   Do you see toward the bottom of this first page

23  there is some discussion between the defendant and

24  Mr. Chamberlain about not getting a second interview.  Do

25  you see that?

1    A.    Yes, sir.

2    Q.    And do you see where Mr. Chamberlain writes at

3    12:24 p.m., "After the MAX is done, you will be able to

4    write your own ticket"?

5    A.    Yes.

6    Q.    What does the defendant write in response?

7    A.    He wrote, "Except, of course, if we lose Level B,

8    which will be thrown squarely on my shoulders.  It was Mark,

9    yes, Mark, who cost Boeing tens of millions of dollars.

10   Burn him at the stake.  Oh, well.  Someone will have to

11   pay."

12   Q.    What does the defendant say would cost Boeing tens

13   of millions of dollars?

14   A.    Mark, himself.

15   Q.    If we lose what?

16   A.    Level B training differences.

17         MR. O'NEILL:  If we can take that down,

18   Ms. Holbrook.  Thank you.

19   BY MR. O'NEILL:

20   Q.    Special Agent, did the defendant continue writing

21   about Level B differences training into 2015?

22   A.    He did, yes.

23         MR. O'NEILL:  Let's turn to, please, and publish

24   Government Exhibit 6.

25   ///

 1   BY MR. O'NEILL:

 2        Q.   Are you familiar with this email from the

 3   defendant?

 4        A.   Yes, sir.

 5        Q.   What's the date of the message?

 6        A.   The date of this message is February 5th of 2015.

 7        Q.   This is another multipage email with a number of

 8   people.  Generally, do they work for The Boeing Company?

 9        A.   Yes, they do.

10        Q.   Do you see they're emailing about potential

11   differences between the 737 NG and MAX?

12        A.   Yes.

13        Q.   Let's focus on the top email here at 11:29 a.m.

14   from the defendant.

15             What does the defendant write to his colleague in

16   the highlighted part about Level B differences training?

17        A.   He wrote, "I can say that from a training

18   certification perspective, every difference between the NG

19   and the MAX is being scrutinized heavily by the FAA AEG, who

20   makes the training level determination.  Each new difference

21   represents a threat to obtaining no greater than Level B CBT

22   differences training between the NG and MAX.  If this

23   happens, big financial penalties occur."

24             MR. O'NEILL:  If we could turn to and publish

25   Government Exhibit 7.

1   BY MR. O'NEILL:

2       Q.   Are you familiar with this email from the

3   defendant?

4       A.   Yes, I am.

5       Q.   What's the date of the defendant's message?

6       A.   March 2nd of 2015.

7       Q.   And again, it's a multipage email thread.

8   Focusing on the defendant's top message at 4:33 p.m., what

9   does he write in the highlighted text about Level B?

10      A.   He wrote, "One of the program directives is to

11  minimize system differences between NG and MAX to preserve

12  Level B training differences at all costs.  Each new change

13  difference jeopardizes that directive."

14           MR. O'NEILL:  If we could please turn to and

15  publish Government Exhibit 12.

16  BY MR. O'NEILL:

17      Q.   Are you familiar with this email from the

18  defendant?

19      A.   Yes.

20      Q.   What's the date of his message?

21      A.   The date of this message is March 8 of 2016.

22      Q.   And what is the subject of the defendant's email?

23      A.   "Flight Controls SB Review."

24      Q.   What does the defendant write about flight

25  controls and Level B here in the highlighted text?

1          A.    He wrote, "Here's the flight control module,

2    updated with a thorough review by the flight control

3    engineers.  This module is, of course, the big one for us.

4    This material poses the greatest threat to Level B, so let's

5    be thorough and strategic about stressing either how similar

6    the MAX is to the NG and/or how the new functionalities are

7    transparent to the flight crew."

8          Q.    Mr. Forkner's email references a flight controls

9    module.  Do you see that?

10         A.    Yes, sir.

11         Q.    Does he attach that document to the message?

12         A.    Yes.  There's a -- there's an attachment.

13               MR. O'NEILL:  Ms. Holbrook, if we could please

14   turn to the attachment of this Exhibit, page 7 of 13.  And

15   if we could please call out the header in the top of this.

16   BY MR. O'NEILL:

17         Q.    Special Agent, what is the title, or header, of

18   this page in the attachment to Mr. Forkner's email?

19         A.    "737 Flight Controls NG MAX Differences."

20               MR. O'NEILL:  And if we could please call out the

21   last row on this page, Miss Holbrook.

22   BY MR. O'NEILL:

23         Q.    Special Agent, do you see here on this page under

24   "Flight Controls" something called "Maneuvering

25   Characteristics Augmentation Systems," or "MCAS" for short?

1      A.   Yes, sir.

2      Q.   In the context of this attachment, is MCAS

3  referenced as part of flight controls?

4      A.   Yes.

5           MR. O'NEILL:  So looking back at the defendant's

6  if we could go back to that, Ms. Holbrook, and looking at

7  this page together.

8  BY MR. O'NEILL:

9      Q.   So in the defendant's own words, what material

10  posed the greatest threat to Level B?

11     A.   Flight controls.

12     Q.   Flight controls including what?

13     A.   Including MCAS.

14          MS. MCFARLANE:  Objection, your Honor.  Misstating

15  the evidence.

16          THE COURT:  Okay.  The jury will recall the

17  evidence, and you will make the determination on what was

18  said and what was meant in all of this.

19          MR. O'NEILL:  Thank you, your Honor.

20          If we could please turn to and publish government

21  Exhibit 14.

22  BY MR. O'NEILL:

23     Q.   Special Agent, are you familiar with this email

24  from the defendant?

25     A.   I am, yes.

 1       Q.   Generally, who is he write -- who is he writing to

 2    in this message?

 3       A.   This message is with colleagues.

 4       Q.   And colleagues -- colleagues at The Boeing

 5    Company?

 6       A.   At The Boeing Company, yes.

 7       Q.   What is the date of this message to his Boeing

 8    colleagues?

 9       A.   This was May 20th of 2016.

10       Q.   Does the subject of the defendant's message

11    reference 737 MAX differences training?

12       A.   Yes.

13       Q.   What does the defendant write to his Boeing

14    colleagues here about Level B here in the highlighted

15    portion of the message?

16       A.   He wrote, "There is no backup plan if we don't get

17    Level B.  We're going to get Level B.  The program won't

18    allow anything but that to happen."

19            MR. O'NEILL:  And if we could please turn to and

20    publish government Exhibit 15.

21    BY MR. O'NEILL:

22       Q.   What's the date of this email from the defendant?

23       A.   June 14 of 2016.

24       Q.   What does the defendant write in the highlighted

25    portion here about his job and work?

 1        A.   He wrote, "My job is insanely busy.  The airplane

 2   certification project I've been working on for two years is

 3   coming to a head this August with the AEG.  If I pull this

 4   off, I will be a hero.  If not, they'll string me up on a

 5   flag pole for the world to see."

 6        Q.   Who did the defendant say that the airplane

 7   certification project he'd been working on was with?

 8        A.   The AEG.

 9        Q.   When did the defendant say that his project was

10   coming to a head?

11        A.   In August.

12        Q.   And in the context of this message, August of what

13   year?

14        A.   Of 2016.

15             MR. O'NEILL:  Let's turn to and publish

16   Exhibit 16.

17   BY MR. O'NEILL:

18        Q.   Are you familiar with this email chain from the

19   defendant?

20        A.   Yes, sir.  I am.

21        Q.   It's a two-page chain.  Let's walk it -- walk

22   through it from the bottom up.

23             First, what's the date of the defendant's first

24   message here?

25        A.   The date is August 16 of 2016.

1       Q.   And the defendant's writing to a bunch of folks

2   here.  At a high level, who is he writing to?

3       A.   These are folks within The Boeing Company.

4       Q.   What's the subject of the defendant's email to his

5   Boeing colleagues?

6       A.   The subject was, "MAX Differences Training Level"

7   [sic] -- or "Training Approved at Level B," and then a whole

8   bunch of exclamation points.

9            MR. O'NEILL:  If we could turn to the next page,

10  please, Ms. Holbrook, which is the body of defendant's

11  message.  If we could call out the message, please.

12  BY MR. O'NEILL:

13      Q.   What does the defendant write here in the

14  highlighted portion about Level B and the MAX?

15      A.   He wrote, "I'm happy to inform you that we

16  successfully passed the T3 differences training validation

17  flight today, establishing the 737 MAX as the same type

18  rating as the 737 NG and requiring no greater than Level B

19  computer-based training (CBT) differences training between

20  the two.  This is provisional approval pending final Part 25

21  type certification and assuming no significant systems

22  changes on the airplane."

23      Q.   And who does the defendant say in this message

24  would provide this provisional Level B approval?

25      A.   The FAA.

1      Q.   Working our way back up through the email thread,

2  here, Special Agent, do you see that somebody named Keith

3  Leverkuhn replies to the defendant at 5:24 p.m.?

4      A.   Yes, sir.

5           MR. O'NEILL:  If we could focus on that message,

6  please, Ms. Holbrook.

7  BY MR. O'NEILL:

8      Q.   What does Mr. Leverkuhn write to the defendant and

9  others?

10      A.   He wrote, "Fantastic news, Mark.  Just a huge win

11  for the team, for Boeing, and our customers.  Thanks so much

12  for your leadership on what I'm sure has been a long,

13  strange trip.  We can now eliminate the longest-standing

14  risk on the MAX program.  Thanks again, Mark.  Well, done."

15           MR. O'NEILL:  If we could zoom back out, please.

16  BY MR. O'NEILL:

17      Q.   Does the defendant forward Mr. Leverkuhn's

18  thank-you message to a smaller group?

19      A.   Yes, he does.

20      Q.   What does he write when forwarding this chain to

21  the smaller group?

22      A.   He wrote, "Program is very happy.  See below."

23      Q.   And, again, is Mr. Forkner forwarding this message

24  to his colleagues at Boeing?

25      A.   He is, yes.

1          MR. O'NEILL:  Let's go to and publish Government

2    Exhibit 17, please.

3    BY MR. O'NEILL:

4          Q.   Are you familiar with this email from the

5    defendant?

6          A.   Yes.

7          Q.   What's the date of the defendant's message?

8          A.   August 16 of 2016.

9          Q.   Is that the exact same date as the email chain we

10   just saw?

11         A.   Yes, it is.

12         Q.   Is this essentially another branch or thread of

13   that same email chain?

14         A.   Yes.  It appears so.

15         Q.   At the top of this email chain in Government

16   Exhibit 17, what did the defendant write to someone named

17   Stephen Taylor?

18              And if we could focus on the highlighted text here

19   at the top.

20         A.   Sure.  He wrote, "I would like to discuss the 787

21   chief tech pilot position with you when you're free, Steve.

22   I'm wondering if it might be the best thing for both myself

23   and the whole flight tech team now that we've achieved Level

24   B."

25         Q.   Special Agent, in the context of the defendant's

1   message, what is the 787 chief tech pilot position?

2       A.   It is a position that he's not in right now.  It's

3   a different position.  It's on a different aircraft.

4       Q.   And is this -- the 787, in the context of this

5   message, does that refer to a different aircraft than the

6   737 MAX?

7       A.   Yes, it does.

8       Q.   So I think you mentioned this, but would that be a

9   different position than the defendant's position on the

10  737 --

11      A.   Yes.

12      Q.   -- at the end of this message?

13      A.   Yes.

14      Q.   What did the defendant tell Mr. Taylor here about

15  that position the same day that he wrote about achieving

16  Level B MAX?

17      A.   That he thought it might be the best thing for

18  both himself and the whole flight tech team.

19      Q.   And now that we achieved what?

20      A.   Now that they've achieved Level B.

21           MR. O'NEILL:  If we could take that down, please,

22  Ms. Holbrook.

23  BY MR. O'NEILL:

24      Q.   Special Agent Byers, did you review communications

25  from the defendant after he wrote about provisional Level B

1    for the MAX?

2         A.   Yes.

3              MR. O'NEILL:  Let's publish, please, Government

4    Exhibit 19.

5    BY MR. O'NEILL:

6         Q.   Are you familiar with this email from the

7    defendant?

8         A.   I am, yes.

9         Q.   What's the date of his email?

10        A.   This email was dated November 3rd of 2016.

11        Q.   Who's he writing to in this message?

12        A.   This is a message to colleagues at The Boeing

13   Company.

14        Q.   And November 3, 2016, is that a couple of months

15   after the defendant's August 26th email about provisional

16   Level B?

17        A.   Yes.

18        Q.   What does the defendant write to his Boeing

19   colleagues here in the highlighted portion of the message?

20        A.   He wrote, "Remember, we only have provisional

21   approval for Level B and for the CBT, as presented to the

22   regulators.  This would be an appreciable change to both the

23   airplane and the training that would risk our Level B

24   determination."

25             MR. O'NEILL:  And if we could please turn to and

 1   publish Government Exhibit 21.

 2   BY MR. O'NEILL:

 3        Q.   Special Agent, are you familiar with this email

 4   from the defendant?

 5        A.   Yes.

 6        Q.   What's the date of the message?

 7        A.   The date of this message was November 10 of 2016.

 8        Q.   So is that about a week after the email we just

 9   saw where the defendant reminds his colleagues that they

10   only have provisional Level B?

11        A.   Approximately, yes.

12        Q.   Does the subject line here refer to the 737 Max?

13        A.   It does.

14        Q.   This is another multipage email from the defendant

15   and others.  Let's focus on page 2, please.

16             MR. O'NEILL:  If we could call out this message

17   here and focus on the highlighted portion.

18   BY MR. O'NEILL:

19        Q.   In this message, does the defendant appear to be

20   writing about a system on the MAX?

21        A.   Yes.

22        Q.   What does the defendant write in the highlighted

23   portion of this message?

24        A.   He wrote, "This, of course, creates a massive

25   threat to the differences training.  One of the program

1   directives we were given was to not create any differences

2   in memory items.  This is what we sold to the regulators who

3   have already granted us the Level B differences

4   determination.  To go back to them now and tell them that

5   there is, in fact, a difference in how you must operate the

6   MAX during an emergency descent would be a huge threat to

7   that differences training determination."

8        Q.   What does the defendant write was one of the

9   program directives we were given?

10       A.   Level B.

11       Q.   Who does the defendant say that this was "sold to"

12  in this message?

13       A.   The regulators.

14       Q.   Now, here, on November 10, 2016, what does the

15  defendant write about going back to the regulators now and

16  telling them there is, in fact, a difference on the MAX?

17       A.   He wrote that would be a huge threat to that

18  differences training determination.

19            MR. O'NEILL:  Let's turn to and publish Government

20  Exhibit 22, please.

21  BY MR. O'NEILL:

22       Q.   Special Agent Byers, are you familiar with this

23  chat communication from the defendant?

24       A.   Yes, sir.

25            MR. O'NEILL:  If we could call out the header,

 1  please, Ms. Holbrook.

 2  BY MR. O'NEILL:

 3      Q.   First, what is the date of this chat?

 4      A.   This is a chat dated November 15 of 2016.

 5      Q.   So this is about five days after the chat -- the

 6  email we just saw?

 7      A.   Yes.

 8      Q.   Who is the defendant communicating with in this

 9  chat?

10      A.   Mr. Gustavsson, who is a colleague of his.

11      Q.   Colleague at Boeing?

12      A.   At Boeing, yes.

13      Q.   And it is a two-page message, a chat

14  communication.

15          MR. O'NEILL:  If we could look at both pages

16  together and call out what Mr. Gustavsson and the defendant

17  wrote to each other.  And let's focus on what they started

18  writing at 6:50 p.m. down to 6:53 p.m., Ms. Holbrook.

19  BY MR. O'NEILL:

20      Q.   Special Agent Byers, could you please read this

21  part of the defendant's back-and-forth with Mr. Gustavsson?

22  If you could just start on the left here with the

23  defendant's message starting the 6:50 all the way down

24  through Mr. Gustavsson's message at 6:51.

25      A.   Mr. Forkner stated, "Oh, shocker alert.  MCAS is

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                        Vol 2 March 21, 2022                        Page 219

1   now active down to M.2.  It is running rampant in the sim on

2   me, at least that's what Vince thinks is happening."

3              Mr. Gustavsson responded stating, "Oh, great.

4   That means we must update the speed trim description

5   involved to."

6              At which point, Mr. Forkner responded, "So I

7   basically lied to the regulators (unknowingly)."

8              And then Mr. Gustavsson responds to him, "It

9   wasn't a lie.  No one told us that was the case."

10      Q.   Okay.  Now, when the defendant writes at

11  6:50 p.m., "Oh, shocker alert.  MCAS is now active down to

12  M.2," what does "M.2" refer to in the context of this chat?

13      A.   Mach .2.

14      Q.   Just generally, what does the term "Mach" mean?

15      A.   Mach is a measurement of speed.

16      Q.   And then one line down, the defendant references,

17  "It's running rampant in the sim on me," s-i-m.  In the

18  context of this chat, what do you understand "sim" to mean?

19      A.   Flight simulator.

20      Q.   And then when the defendant -- what does the

21  defendant write here with respect to regulators, at

22  6:51 p.m.?

23      A.   He wrote that he basically lied to the regulators

24  unknowingly.

25      Q.   Based on the context of this chat and the emails

 1   we just saw, which regulators was the defendant referring

 2   to?

 3              MS. MCFARLANE:  Objection.  Speculation.

 4              THE COURT:  Do you know which regulator?

 5              THE WITNESS:  Based on the context of other

 6   emails.

 7              THE COURT:  Okay.  Overruled.

 8              You can answer the question.

 9              THE WITNESS:  Okay.  The FAA AEG.

10   BY MR. O'NEILL:

11       Q.   So when the chat continues, and Mr. Gustavsson

12   writes, "It wasn't a lie.  No one told us that was the

13   case," how does the defendant respond?

14       A.   He responds at 6:51 stating, "I'm leveling off at,

15   like, 4,000 feet, 230 knots, and the plane is trimming

16   itself like crazy.  I'm like, what?"

17       Q.   And then Mr. Gustavsson writes, "That's what I saw

18   on sim 1, but on approach.  I think that's wrong."

19              How does the defendant respond?

20       A.   He responds stated, "Granted, I suck at flying,

21   but even this was egregious."

22       Q.   And Mr. Gustavsson continues, "No.  I think we

23   need aero to confirm what it's supposed to be doing."

24              How does the defendant respond?

25       A.   He responds stating, "Vince is going to get me

 1   some spreadsheet table to that shows when it's supposed to

 2   kick in.  Why are we just now hearing about this?"

 3        Q.   Special Agent Byers, did you review emails from

 4   the defendant about something called the "Flight

 5   Standardization Board," or "FSB"?

 6        A.   Yes, sir.

 7             MR. O'NEILL:  If we could please publish what's in

 8   evidence as Government Exhibit 28.

 9   BY MR. O'NEILL:

10        Q.   Are you familiar with this email from the

11   defendant?

12        A.   Yes.

13        Q.   What is the date of the defendant's email?

14        A.   The date of this email was July 7 of 2017.

15        Q.   Is that about eight months after the November 15,

16   2016, shocker alert chat that we just saw?

17        A.   Yes, sir.

18        Q.   What's the subject of this email from the

19   defendant?

20        A.   The subject was regarding the FSB report.

21        Q.   And at a high level, who was the defendant writing

22   to?

23        A.   Colleagues within The Boeing Company.

24        Q.   What does Mr. Forkner write to his Boeing

25   colleagues about the FSB report?  If you could focus on the

 1    highlighted text, please.

 2         A.    Sure.  "Attached is the final and approved 737 FSB

 3    report which adds the 737 MAX."  He went on to state, "This

 4    formally approves the MAX as the same type rating as the 737

 5    and Level B differences between NG and MAX in the report."

 6         Q.    Does the defendant say that he's attached the FSB

 7    report?

 8         A.    Yes.

 9         Q.    And does this email have an attachment?

10         A.    Yes.

11              MR. O'NEILL:  If we could please turn to page 5 of

12    the exhibit, which is the first page of the attached report.

13    If we could please call out the bottom "approved by"

14    section, Ms. Holbrook.

15    BY MR. O'NEILL:

16         Q.    Special Agent Byers, who approved the FSB report,

17    as noted here?

18         A.    This was approved by the Federal Aviation

19    Administration, Air Traffic Evaluation Group, or AEG.

20         Q.    Have you had a chance to review this before your

21    testimony today?

22         A.    Yes, sir.

23         Q.    Based on your review, is MCAS, or the Maneuvering

24    Characteristics Augmentation System, is that referenced

25    anywhere in this final FSB report?

1      A.   No, sir.

2           MR. O'NEILL:  If we could please go back to the

3  defendant's cover email.

4  BY MR. O'NEILL:

5      Q.   Special Agent, what level of differences training

6  does the defendant say is reflected in this final and

7  approved FSB report?

8      A.   Level B.

9           MR. O'NEILL:  Let's please publish and turn to

10  government Exhibit 29.

11  BY MR. O'NEILL:

12      Q.   Are you familiar with this email from the

13  defendant?

14      A.   I am, yes.

15      Q.   Who is the defendant emailing, just generally?

16      A.   Chris Hurrell at American Airlines.

17      Q.   And what is the defendant emailing to American

18  Airlines?

19      A.   The 737 FSB report updated with the MAX.

20      Q.   With what level of training for the MAX?

21      A.   Level B.

22      Q.   On what date?

23      A.   July 7 of 2017.

24      Q.   Is that the date that the report was published?

25      A.   Yes.

1          MR. O'NEILL:  If we could please turn to and

2     publish government Exhibit 30.

3     BY MR. O'NEILL:

4          Q.   Special Agent, are you familiar with this email

5     from the defendant?

6          A.   Yes, sir, I am.

7          Q.   Just on a high level, who is the defendant

8     emailing?

9          A.   These gentlemen are with Southwest Airlines.

10         Q.   Does this email have an attachment?

11         A.   It does, yes.

12         Q.   What is the defendant sending to Southwest

13    Airlines in this email?

14         A.   In this email, it's also the 737 FSB report, which

15    is adding the 737 MAX.

16         Q.   With what level of training for the MAX?

17         A.   Level B.

18         Q.   And on what date does he send this to Southwest

19    Airlines?

20         A.   This is the same day, July 7, 2017.

21         Q.   The same date the report was published?

22         A.   Yes, sir.

23         MR. O'NEILL:  We can take that down Ms. Holbrook,

24    thank you.

25    ///

1    BY MR. O'NEILL:

2         Q.    Special Agent, I believe you testified that the

3    FAA AEG approved the FSB report we just saw; is that right?

4         A.    Yes.

5         Q.    Did you review emails from the defendant

6    discussing how to deal with or interact with the FAA AEG?

7         A.    I did.

8         Q.    Let's talk about Government Exhibit 11A, as in

9    "apple," and 11, which are in evidence.  And before I

10   publish them, are you generally familiar with these emails?

11        A.    I think so.  Yes, sir, I am.

12        Q.    Are they two parts of the same email thread?

13        A.    Yes.  It looks like it's an email thread that has

14   been branched off in a different direction.

15        Q.    Okay.  And does the defendant reply at the top of

16   the thread?

17        A.    He does on Government Exhibit 11, yes.

18             MR. O'NEILL:  If we could please publish

19   Government Exhibit 11A, which is the first message in the

20   chain.

21   BY MR. O'NEILL:

22        Q.    Focusing on this first message in the longer

23   chain, who is this email from?

24        A.    Um, this is from Mr. Chamberlain at The Boeing

25   Company.

1        Q.    And who's it to?

2        A.    Mr. Forkner and Mr. Gustavsson.

3        Q.    What's the subject line of Mr. Chamberlain's

4   message?

5        A.    "AEG Visit Thursday."

6        Q.    And do you see here, does Mr. Chamberlain write to

7   the defendant and Mr. Gustavsson things to talk about?

8        A.    Yes, sir.

9        Q.    And one of those is, "Respond to Stacey's email

10  attached."  Do you see that in the highlight?

11       A.    I do, yes, sir.

12       Q.    And later in the message, see highlighted at the

13  bottom, Mr. Chamberlain writes, "Anything else to talk to

14  her about?"

15       A.    Correct.

16       Q.    And does Mr. Chamberlain attach someone named

17  Stacey's email as he references here?

18       A.    Yes, he does.

19             MR. O'NEILL:  If we could please turn to page 12

20  of this exhibit, Ms. Holbrook.  And if we could just pull it

21  up side by side with this cover email from Mr. Chamberlain.

22  BY MR. O'NEILL:

23       Q.    Is this the signature block of the email that was

24  attached to Mr. Chamberlain's message?

25       A.    Yes, it was.

1    Q.   And looking at the bottom here, who is the Stacey

2    that's referenced in Mr. Chamberlain's message to the

3    defendant?

4    A.   Stacey Klein.

5    Q.   And where does she work, according to her

6    signature block here?

7    A.   She works for the Aircraft Evaluation Group, or

8    AEG.

9    Q.   What is Ms. Klein's role or her group' role with

10   respect to the FSB?

11   A.   She's the chair.

12   Q.   Does the email conversation continue?

13   A.   Yes, it does.

14        MR. O'NEILL:  Okay.  Now, let's take a look, if we

15   could, Ms. Holbrook, at 11, Government Exhibit 11, which is

16   the top email in the thread, and if we could keep that side

17   by side here with Ms. Klein's signature block in the

18   attached message.

19   BY MR. O'NEILL:

20   Q.   Special Agent, what did the defendant write to his

21   colleagues here in the highlighted text?

22   A.   "Patrick, remember the three tools to instructing

23   with her:  Fear, sarcasm, and ridicule."

24   Q.   Based on this email thread, who does the defendant

25   appear to be referring to when he writes "her"?

1      A.   Stacey Klein.

2      Q.   And what tools, to instructing with Ms. Klein, did

3   the defendant tell his colleagues to remember?

4      A.   Fear, sarcasm, and ridicule.

5           MR. O'NEILL:  If we could please publish

6   Government Exhibit 10.

7   BY MR. O'NEILL:

8      Q.   Are you familiar with this document?

9      A.   Yes, sir.

10     Q.   What's the date?

11     A.   The date of this document is January 5th of 2016.

12     Q.   And who is the defendant talking with in this

13   communication?

14     A.   This is a chat communication with Mr. Chamberlain.

15     Q.   Writing with, excuse me.

16          Is this chat communication with Mr. Chamberlain,

17   is this before the defendant's November 15th, 2016, "shocker

18   alert" chat with Mr. Gustavsson?

19     A.   Yes.

20          MR. O'NEILL:  If we could zoom back out to the

21   highlighted portion of the defendant's conversation with

22   Mr. Chamberlain, please.

23   BY MR. O'NEILL:

24     Q.   Special Agent, could you please read the

25   back-and-forth here between Mr. Chamberlain and the

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                        Page 229

1    defendant from 7:57 through 8:00?

2         A.   I'm sorry.  Can you repeat that, sir?

3         Q.   Yes.  Can you please read the back and forth here

4    between Mr. Chamberlain the defendant starting at 7:57 a.m.

5    in the highlighted portion?

6         A.   Certainly.  "That leaves Stacey and Thayer as the

7    ones that have the understanding of the differences between

8    the NG and MAX."  That's from Mr. Chamberlain.

9              And then Mr. Forkner states, "Dogs watching TV."

10        Q.   And does the chat continue?

11        A.   It does.  I'm sorry.

12             Mr. Chamberlain then goes on to state at

13   7:59 a.m., "I think we make our money at this meeting by

14   getting them to buy into the training and evaluation plans.

15   Unfortunate that Roman won't be here.  He can corral Stacey

16   and guide her."

17             And then Mr. Forkner goes on to state at

18   8:00 a.m., "I think with all the inexperience present, we

19   should be able to gang up on them and steer it in the

20   direction that we want."

21        Q.   Mr. Chamberlain's messages refer to the name

22   "Stacey."  Do you see that?

23        A.   Yes, sir.

24             MR. O'NEILL:  Ms. Holbrook, if we could keep this

25   and pull up 11A side by side with this chat.

1  BY MR. O'NEILL:

2      Q.   Special Agent, based on the context of this chat

3  communication and the email we just saw at Government

4  Exhibit 11A, who is Mr. Chamberlain referring to, the name

5  Stacey?

6      A.   Stacey Klein.

7      Q.   The Chair of the FSB?

8      A.   That is correct, yes.

9      Q.   And in his 7:58 a.m. communication, how does the

10 defendant refer to folks, including Ms. Klein?

11     A.   As "Dogs watching TV."

12     Q.   And when Mr. Chamberlain continues at 7:59 a.m.,

13 when he writes, "I think we make our money at this meeting

14 by getting them to buy into the training and evaluation

15 plans.  Unfortunate that Roman won't be here.  He can corral

16 Stacey and guide her," which Stacey does Mr. Chamberlain

17 appear to be referring to here?

18     A.   Stacey Klein, the Chair of the FSB.

19     Q.   How does the defendant respond with regard to

20 Ms. Klein and others?

21     A.   "That with the inexperience present, we should be

22 able to gang up on them and steer it in the direction we

23 want."

24          MR. O'NEILL:  Court's indulgence.

25          Nothing further.

 1              MS. MCFARLANE:  Thank you, your Honor.
 2                     CROSS-EXAMINATION
 3   BY MS. MCFARLANE:
 4        Q.   Good afternoon, Agent Byers.  How are you?
 5        A.   Good morning.  Okay.
 6        Q.   Or morning.  Sorry.  My time is off today.
 7             My name is Ashlee McFarlane, and I represent
 8   Mr. Mark Forkner on this case.
 9             On direct examination you said that you're a
10   special agent with DOT OIG, correct, Department of
11   Transportation?
12        A.   Yes, ma'am.
13        Q.   And you've been an agent for over 24 years; is
14   that right?
15        A.   Yes.
16        Q.   And over 20 years with the Department of
17   Transportation; is that right?
18        A.   Yes, ma'am.
19        Q.   And you've been investigating this case for
20   several years?
21        A.   Yes.
22        Q.   It's been several years, right?
23        A.   Several years, right.
24        Q.   You're one of the lead agents on this case; is
25   that right?

1        A.    I'm not one of the primary agents.  I'm an agent

2    on the case, yes.

3        Q.    You're an agent on the case, correct?

4        A.    Yes.

5        Q.    And you've been involved over those few years in

6    this matter reviewing documents; isn't that right?

7        A.    At times, yes.

8        Q.    And, in fact, you talked about how you obtained

9    documents in this case from Boeing and Southwest Airlines

10   and American Airlines.  You mentioned that you obtained them

11   through subpoenas and other requests; isn't in a correct?

12       A.    Yes.

13       Q.    And you've received, and your team has received,

14   over 57 million pages of documents in this investigation; is

15   that right?

16       A.    I don't know the number, but I trust that's

17   accurate.

18       Q.    You trust that's accurate?

19       A.    It's a lot -- a lot of records were obtained.

20       Q.    And that amounts to over 15 million documents in

21   this matter alone; do you recall that?

22       A.    I'm sure that's probably an accurate number.

23       Q.    And the documents that you went over today that

24   have been selected by the prosecutors in this matter

25   amounted to 30 or so documents; is that about right?

1      A.   Something along those lines.

2      Q.   Out of the 15 million that you received?

3      A.   Yeah, we received a lot of exhibits.  It was

4   thorough.

5      Q.   Okay.  And in your investigating this case and

6   reviewing the mountain of documents, you learned that Boeing

7   is a government contractor; isn't that right?

8           MR. O'NEILL:  Objection, relevance.

9           THE COURT:  Overruled.

10           THE WITNESS:  I believe they're a government

11   contractor.  I don't have any first-hand knowledge of that.

12   BY MS. MCFARLANE:

13      Q.   You believe they're a government contractor?

14      A.   Yes.

15      Q.   And, in fact, they not only manufacture commercial

16   airplanes, they also are a weapons manufacturer; isn't that

17   correct?

18           MR. O'NEILL:  Objection.

19           THE COURT:  Overruled.  Do you know?

20           THE WITNESS:  I don't know firsthand.  I assume

21   so, but I don't have any firsthand knowledge, your Honor.

22           THE COURT:  Okay.

23   BY MS. MCFARLANE:

24      Q.   So Agent Byers, you did not look into Boeing's

25   relationship with the government in reviewing this case?

1    A.   That wasn't the focus of our investigation.

2    Q.   Okay.  And you said you assumed they're a weapons

3 manufacturer, but you're not sure?

4    A.   Well, I know they -- I know there was a separate

5 division Boeing has, but we looked in the records related to

6 commercial aircraft.

7    Q.   And you understand that Boeing is the largest --

8 one of the largest multinational employers in the world?

9         You do understand that, correct?

10   A.   They're a large company, yeah.

11   Q.   Okay.  And in your working on this case, you know

12 that Boeing did not -- did not plead guilty in this matter

13 at all?

14        MR. O'NEILL:  Objection.  Objection, relevance.

15        MS. MCFARLANE:  Your Honor, it's relevant to the

16 motive of several Boeing witnesses in this case.

17        THE COURT:  Okay.  I'm going to sustain that to

18 this witness.

19        MS. MCFARLANE:  I'm sorry, your Honor?

20        THE COURT:  Is it relevant to the motive of this

21 witness?

22        MS. MCFARLANE:  It's relevant to the motive of

23 other Boeing witnesses in this case.

24        THE COURT:  Okay.  Well, I'll sustain it as to

25 this witness.

1          MR. O'NEILL:  Move to strike, your Honor.

2          THE COURT:  Ladies and gentlemen of the jury,

3    remember my instruction to you.  If I sustain an objection

4    that goes unanswered, you are not to consider the question

5    for any purpose.

6          MR. O'NEILL:  Thank you, your Honor.

7    BY MS. MCFARLANE:

8      Q.   And Agent Byers, you've already testified that

9    Boeing is a weapons manufacturer, the largest multinational

10   employer in the world, and a contractor for the federal

11   government --

12         MR. O'NEILL:  Objection.

13         THE COURT:  I will sustain that.  He has not

14   testified to that.

15   BY MS. MCFARLANE:

16     Q.   But Mr. Forkner is sitting here in this courtroom

17   today; isn't that correct?

18     A.   Mr. Forkner?

19     Q.   Yes.

20     A.   Yes, ma'am.

21     Q.   And he's the only former Boeing employee sitting

22   here today; isn't that correct?

23         MR. O'NEILL:  Objection, relevance, 403.

24         THE COURT:  Sustained.

25   ///

```
 1   BY MS. MCFARLANE:

 2        Q.   Now, Mark Forkner -- in investigating this matter,

 3   you looked at Mark Forkner's salary as a Boeing employee,

 4   didn't you?

 5        A.   The investigative team might have.  I did not.

 6        Q.   You did not?

 7        A.   No, ma'am.

 8        Q.   Through your investigation, did you learn what his

 9   salary was in this case?

10             MR. O'NEILL:  Objection.

11             THE COURT:  Overruled.

12             Did you learn of the salary?

13             THE WITNESS:  I don't know his exact salary.

14   BY MS. MCFARLANE:

15        Q.   You don't know his exact salary?

16             Okay.  I'm going to hand you what's been premarked

17   as Government's Exhibit 24H.

18             Oh, sorry, Defense Exhibit, not Government

19   Exhibit.

20             Your Honor, may I approach?

21             THE COURT:  Yes.

22             MR. O'NEILL:  Your Honor, we would object.

23   Outside the scope; hearsay.

24             THE COURT:  Outside the scope and hearsay, you

25   said?
```

1           MR. O'NEILL:  Outside the scope of direct.

2           THE COURT:  Outside the scope of direct.  Okay.

3    Overruled.

4    BY MS. MCFARLANE:

5       Q.   Agent Byers, can you take a look at the document I

6    just handed you, please.

7           If you look at the bottom right-hand corner, do

8    you see the notation there on the bottom?

9       A.   Yes.

10      Q.   What does that mean to you?

11      A.   It's a Bates stamp.

12      Q.   Is that a Bates stamp that was received from The

13   Boeing Company?

14      A.   Yes, it appears so.

15      Q.   And in looking at this document, is this a

16   document from The Boeing Company?

17      A.   Appears to be, yes.

18      Q.   And is this a document that the government

19   obtained in this investigation from The Boeing Company?

20      A.   It would have been, yes.

21      Q.   Okay.

22          MS. MCFARLANE:  Your Honor, defense moves to admit

23   Defense Exhibit 24H.

24          MR. O'NEILL:  Objection, your Honor.  May I

25   approach?

```
 1              THE COURT:  Okay.
 2         (A sidebar was had.)
 3              THE COURT:  Overruled.  Exhibit 24H, Exhibit 24H
 4    will be admitted.
 5              (Defense Exhibit 24H was admitted into evidence.)
 6    BY MS. MCFARLANE:
 7         Q.   Agent Byers, 24H is now in evidence.
 8              MS. MCFARLANE:  Can we please publish that to the
 9    jury, Mr. Payton.  And if we could just highlight the top
10    box, please.
11    BY MS. MCFARLANE:
12         Q.   Agent Byers, at the top of this document, doesn't
13    it say "Work history for" -- is this the work history for
14    Mr. Mark Forkner?
15         A.   That's what it says in the document.
16         Q.   Okay.
17              MS. MCFARLANE:  And if we can highlight on the
18    left column.
19    BY MS. MCFARLANE:
20         Q.   What is his pay rate, as of -- the last pay rate
21    that he received?  Can you read that?
22         A.   On the left column?
23         Q.   Left column under "Highest Major."
24         A.   Under that states, "Pay rate:  159,500."
25         Q.   Okay.
```

1            MS. MCFARLANE:  And if we can go back out of that,

2   please, Mr. Payton.

3   BY MS. MCFARLANE:

4        Q.   And if you flip through the document you have,

5   Agent Byers, are there other pay rates throughout the years

6   that Mr. Forkner received at The Boeing Company?

7        A.   On this document?

8        Q.   Yes, sir.  Do you notice the various rates?

9        A.   I'm probably looking in the wrong place.

10       Q.   Third from the right column.

11       A.   Third from the right column.

12       Q.   Third or forth from the right column.

13       A.   Total compensation rate.  Yes, there's different

14   rates, looks like.

15       Q.   And it corresponds to all the different years

16   Mr. Forkner worked for The Boeing Company, correct?

17       A.   Corresponds to different years, yes.

18       Q.   Okay.  If we look at the third page, last row,

19   this is the lowest amount he's received, correct?

20            Let me highlight that row.  If you can say, what's

21   the -- what's the pay rate for that row?

22       A.   The one referencing October of 2011 it looks like?

23       Q.   That's correct.

24       A.   Okay.  That -- that is -- that number is 117,500.

25       Q.   Okay.  So it would seem from this document that

 1    his pay ranged, while at The Boeing Company, from 2011

 2    through when he left in 2018, was from $117,500 through that

 3    first number we read, 159,000; is that correct?

 4         A.   It appears so, based on the document, yes.

 5         Q.   Okay.  Thank you.

 6              MS. MCFARLANE:  We can take that down, please.

 7              Your Honor, may I approach the witness?

 8    BY MS. MCFARLANE:

 9         Q.   All right.  Agent Byers, I've just handed you

10    another document.  And do you recall, in the course of your

11    investigation, receiving documents from Boeing that were in

12    their native form?

13         A.   I believe we did.

14         Q.   So, long Excel spreadsheets would be in sort of

15    the actual form of the document; isn't that correct?

16         A.   I don't know, but during the investigation, I

17    received a lot of documents.

18         Q.   Right.

19         A.   I'm sorry.  Go ahead.

20         Q.   And so if you received documents in native form,

21    they would not have a Bates number on them; isn't that

22    correct?

23         A.   Most likely not, yes.

24         Q.   Okay.  But at the top of this document, this is a

25    Boeing proprietary document; isn't that correct?

1        A.    That's what it states, yes.

2        Q.    And this is for Mr. Mark Forkner again, correct?

3        A.    Yes, his name is on this.

4        Q.    And there's information on here regarding various

5    pay periods, pay rates, and also bonus information; isn't

6    that correct?

7        A.    It appears that there's, yes, pay information on

8    here.

9        Q.    Okay.

10            MS. MCFARLANE:  Your Honor, the Government moves

11   to admit -- sorry.  I'm saying "the Government."  Defense

12   moves to admit Defense Exhibit 24G.

13            MR. O'NEILL:  No objection.

14            THE COURT:  24G will be admitted.

15        (Defense Exhibit 24G was admitted into evidence.)

16   BY MS. MCFARLANE:

17        Q.    Okay.  If you can turn to page 10 of this exhibit,

18   Agent Byers.  Are you there?

19        A.    I am.

20            MS. MCFARLANE:  Okay.  If we can pull up this

21   exhibit, please.  All right.  If we can highlight line with

22   the cash award payment for August 12, 2016.  On page 10 of

23   this document.  There we go.  Can we please highlight that

24   line?  Okay.

25   ///

1    BY MS. MCFARLANE:

2        Q.   Agent Byers, for pay period August 12, 2016, how

3    much was the cash award payment that Mark Forkner received?

4        A.   It looks like 2,500.

5        Q.   $2,500.  Okay.

6             MS. MCFARLANE:  Thank you.  We can take that down.

7    BY MS. MCFARLANE:

8        Q.   Agent Byers, back to the 57 million pages, 15

9    million documents, on direct, you talked with the Government

10   about a chat that Mr. Forkner engaged with Patrik

11   Gustavsson.

12       A.   Yes, ma'am.

13       Q.   And you know that Patrik Gustavsson was a friend

14   of Mr. Forkner's that worked in -- that worked in the same

15   group as Mr. Forkner; isn't that correct?

16       A.   I know they worked together.

17       Q.   Okay.  And they communicated often; isn't that

18   correct?

19       A.   They did communicate, yes.

20            MS. MCFARLANE:  Okay.  I want to pull up

21   Exhibit 22.  It's a little blurry on my screen.  I don't

22   know if it's blurry on anyone else's.  Can you all see that?

23   BY MS. MCFARLANE:

24       Q.   Can you see that, Agent Byers?

25       A.   When it's pulled up, I can see it.

1    Q.   On direct examination, we only read parts of that

2    chat, so I would like to read the whole thing, if you don't

3    mind.  This was November 15, 2016.  And again, this was a

4    chat conversation; isn't that correct?

5    A.   Yes, ma'am.

6    Q.   It was not a formal email chain, correct?

7    A.   Correct.  It was a chat.

8    Q.   Okay.  Can you start reading that for us at the

9    top with Mark Forkner at 6:46 p.m.?

10   A.   6:46 in the call-out box that you've got here; is

11   that correct?

12   Q.   I'm sorry?

13   A.   What you want on the screen, is that correct, the

14   call-out box?

15   Q.   Yes.

16   A.   So it starts with Mr. Forkner stating, "Dude, log

17   off."

18        Mr. Gustavsson responds, "You, too.  I just logged

19   on to check my schedule.  I have so much to do that I want

20   to work from home.  I can't get stuff done in the office."

21        And then Mr. Forkner responds back, "Naw, I'm

22   locked in my hotel room with an ice cold Grey Goose, and

23   I'll probably fire off a few dozen inappropriate emails

24   before I call it a night."

25   Q.   Okay.  Stop right there for me.

```
1        A.    Uh-huh.

2        Q.    What's Grey Goose?

3        A.    I assume he's talking about vodka.

4        Q.    Okay.  Keep going.

5        A.    "LMAO."

6        Q.    Do you understand what "LMAO" stands for?

7        A.    Yes.  As far as the text goes, yes.

8        Q.    It refers to laughing, correct?

9        A.    Yeah.

10       Q.    Okay.  Keep going.

11       A.    Mr. Forkner responds, "This job is insane."

12             Mr. Gustavsson responds, "So did you get anything

13   done in the sim, today, or was it the normal chaos there?"

14       Q.    And you -- I'm sorry to interrupt.  I have to

15   interject a little bit, Agent Byers, but --

16       A.    Sure.

17       Q.    -- on direct you said "sim" referred to the

18   simulator, correct?

19       A.    Yes, ma'am.

20       Q.    And that's not the actual plane; it is a separate

21   sort of box; is that correct?

22       A.    That is correct.

23       Q.    Okay.  Keep going, please.

24       A.    Mr. Forkner responds saying, "Although it must be

25   easy compared to working as a tech pilot for RYR."
```

1              Mr. Gustavsson responds, "It's different here.  We

2    are pretty busy here for sure."

3              And Mr. Forkner responds, "Actually, this one is

4    pretty stable.  I signed off some DRs, but there are still

5    some real fundamental issues that they claim they're aware

6    of."

7         Q.   Pause right there for me, Agent Byers.  Based on

8    your review of this email and other emails that put this one

9    into context, "This one is pretty stable."

10             What -- what does "one" refer to?

11        A.   I assume they're talking about the -- well, the

12   simulator.

13        Q.   The simulator.  That's your understanding?

14             And then it says, "I signed off on some DRs."

15   What are "DRs"?

16        A.   I would assume he is referring to discrepancy

17   reports.

18        Q.   Discrepancy reports.

19             And that's based on your investigation in

20   reviewing other emails, correct, that you would know that

21   "DR" is discrepancy reports?

22        A.   Yes, that's my --

23             MR. O'NEILL:  I would object to the scope.

24             THE COURT:  Overruled.

25   BY MS. MCFARLANE:

1    Q.   And it says, "But there are still some real

2   fundamental issues that they claim they're aware of."

3         Do you know who he's referring to when he says

4   "they"?

5    A.   I don't know.

6         MS. MCFARLANE:   Okay.   Can we pull up the next

7   call box, please?

8   BY MS. MCFARLANE:

9    Q.   Please proceed, Agent Byers.

10   A.   Oh, I'm sorry.   "What I hated about Ryanair was

11  the extreme pressure they put on people.   Okay.   That's

12  good."

13        Mr. Forkner responds, "So I just need to start

14  being a dick to make you quit?"

15        Mr. Gustavsson responds, "LOL, that's it."

16        Mr. Forkner responds, "All right.   No more mister

17  Nice Guy."   He went on to state, "Actually, I'd cry

18  uncontrollably if you left.   I would ask for a sales job --

19  or job in sales where I can just get paid to drink with

20  customers and lie about how awesome our airplanes are."

21        Mr. Gustavsson responded, "I would cry if anyone

22  in our group left."

23        Mr. Forkner responded, "Oh, shocker alert.   MCAS

24  is now active down to M .2.   It's running rampant in the sim

25  on me.   At least that's what Vince thinks is happening."

1        Q.   Okay.  Pause right there for me.  Mr. Forkner

2   says, "It's running rampant in the simulator on me."  The

3   "sim."

4             You don't know what "it" -- what "it" means in

5   this chat, do you?

6        A.   Well, he says --

7        Q.   "It's running rampant on the sim on me"?

8        A.   We talked about MCAS going down.  It's running

9   rampant, no.

10       Q.   I'm sorry, I'm not understanding your answer.

11            You do not know what "it" is referring to in this

12   chat; is that correct?

13       A.   Only in the context of what's written above it,

14   but I don't know what "it" by itself -- I guess, can you

15   rephrase that or repeat that?  I'm sorry.

16       Q.   Okay.  Is it true that you do not know what

17   Mr. Forkner is referring to when he says, "It's running

18   rampant on the sim"?

19       A.   "It's"?  No.

20       Q.   Okay.  You do not know what that is?  Okay.

21            And then it says, "At least that's what Vince

22   thinks is happening."

23            Based on your investigation, do you know who he's

24   referring to when he says "Vince"?

25       A.   It's my understanding he's a colleague, but I

```
 1   don't know.  I did not --
 2        Q.   What's -- what's his full name?
 3        A.   I don't know.
 4        Q.   You don't know the full name for Vince?
 5        A.   I don't.  Others on the investigative team, I
 6   believe, looked into some of that, but I don't recall his
 7   name.
 8        Q.   Okay.  Have you heard of a Vince Pupo?
 9        A.   I've heard the name.
10        Q.   Okay.  Do you know who Vince Pupo is?
11        A.   I don't.
12        Q.   Okay.  Keep going.
13        A.   "Oh, great.  That means we have to update the
14   speed trim prescription in Vol 2."
15             Mr. Forkner responded, "So I basically lied to the
16   regulators unknowingly."
17             Mr. Gustavsson responded, It wasn't a lie.  No one
18   told us that was the case."
19             Mr. Forkner responded, "I'm leveling at, like,
20   4,000 feet, 230 knots, and the plane is trimming itself like
21   crazy."
22        Q.   Okay.  Next call out, please.
23        A.   "I'm like, what?"
24             Mr. Gustavsson responds, "That's what I saw on Sim
25   1, but on approach, I think that's wrong."
```

```
 1              Mr. Forkner responded, "Granted, I suck at flying,
 2    but even this was egregious."
 3              Mr. Gustavsson goes on to state, "No.  I think we
 4    need Aero to confirm what it's supposed to be doing."
 5         Q.   Okay.  Stop right there for me, Agent Byers.
 6         A.   Yes.
 7         Q.   Based on your investigation and your
 8    understanding, who is Aero?
 9         A.   My understanding is that Aero is a group made up
10    of engineers.
11         Q.   At Boeing?
12         A.   Yes.
13         Q.   Okay.  The engineering group at Boeing?  Okay.
14              So he says, "I think we need Aero to confirm what
15    it's supposed to be doing."
16              Again, what do you understand "it's" to be
17    referring to?  Or do you know?
18         A.   In the context of this?
19         Q.   Yes.
20         A.   Are you asking for my opinion?
21         Q.   No, I'm not.  Your understanding of this, if you
22    have one.  Do you know?  It's okay if you don't.
23         A.   My understanding would either be MCAS or the
24    simulator.
25         Q.   MCAS or the simulator?
```

1        A.   Well, MCAS is part of the flight controls for the

2   simulator, so I'd assume the simulator.

3        Q.   You would assume the simulator?

4        A.   Right.

5        Q.   Do you know if that's what he's referring to?

6        A.   Beyond the context of this, no.

7        Q.   Okay.  Please keep going, the next line.  "Vince

8   is going to get me" --

9             MR. O'NEILL:  Your Honor, I would object to the

10  form.  Is there a question?

11            MS. MCFARLANE:  I'm asking him to proceed reading.

12            THE COURT:  Well, you want him just to read this

13  stuff?

14            MS. MCFARLANE:  Yes, your Honor.

15            THE COURT:  Okay.  Do you have a question about

16  anything in particular or are you just wanting him to read

17  all of the --

18            MS. MCFARLANE:  I will have a question right after

19  he reads this next line.

20            THE COURT:  Okay.

21            MS. MCFARLANE:  And your Honor, just -- I'm sorry.

22  Did you rule?

23            THE COURT:  Go ahead and read the next line.

24            THE WITNESS:  Okay.  Sorry.  Lost my place here on

25  the screen.  Mr. Gustavsson stated, "I don't know" --

1  BY MS. MCFARLANE

2      Q.   This is --

3      A.   Oh, I already read this line.  I'm sorry.

4           THE COURT:  Go ahead and read the next line.

5           THE WITNESS:  I'm sorry.  "Vince is going to get

6  some spreadsheet table that shows when it's supposed to kick

7  in.  Why are we just now hearing about this?"

8  BY MS. MCFARLANE:

9      Q.   Okay.  Mr. Forkner says, "Vince is going to get me

10 some spreadsheet tables," and you mentioned that -- we've

11 talked about the 15 million documents that have been

12 received in this case.

13          Isn't it true that there was never a spreadsheet

14 table provided by Mr. Vince?

15     A.   I don't know.

16     Q.   You don't know?

17          Okay.  Have you ever seen a spreadsheet table

18 provided by Mr. Vince?

19     A.   I have not.

20     Q.   Okay.

21          MS. MCFARLANE:  Your Honor, I would like for him

22 to continue reading this.  For the rule of completeness, I

23 believe that the government --

24          THE COURT:  Well, is this not in evidence?

25          MS. MCFARLANE:  It is, your Honor.

```
1              THE COURT:  Okay.  Well, the jury will have it.
2              MS. MCFARLANE:  Okay.  May we proceed, just the
3    last few lines?
4              THE COURT:  Say that again?
5              MS. MCFARLANE:  Your Honor, may we proceed reading
6    the final few entries?
7              THE COURT:  Well, it's in evidence.  So do you
8    have a question about any of the specific lines?
9              Just direct him to the lines you want to ask him
10   about.
11             MS. MCFARLANE:  Just the very next line, your
12   Honor.
13             THE COURT:  Go ahead.
14             THE WITNESS:  The next line, Mr. Gustavsson
15   responds, stating, I don't know.  The test pilots have kept
16   us out of the loop.  It's really only Christine that is
17   trying to work with us, but she is busy -- been too busy.
18   BY MS. MCFARLANE:
19        Q.   Thank you, Agent Byers.
20             When Mr. Gustavsson says, "I don't know.  The test
21   pilots have kept us out of the loop," who is he referring to
22   when he says "the test pilots"?
23        A.   Test pilots would be people within Boeing.
24        Q.   And is it your understanding that FAA also has
25   test pilots?
```

1      A.   They do.

2      Q.   Okay.  And when he says, "Christine" -- "It's

3  really only Christine that is trying to work with us," do

4  you know who he's referring to when he says "Christine"?

5      A.   In the context of this chat or with this work

6  group?

7      Q.   If you have any knowledge on who he would be

8  referring to when he says "Christine."  Is that Christine

9  Walsh?

10      A.   That would be my --

11      Q.   Okay.

12      A.   Who I believe he would be referring to, yes.

13           MS. MCFARLANE:  Okay.  We can take this down.

14  BY MS. MCFARLANE:

15      Q.   In the course of your investigation, Agent Byers,

16  you've also reviewed phone records, Boeing phone records,

17  other phone records of pertinent individuals in this case;

18  isn't that correct?

19      A.   The investigative team has, yes.

20      Q.   Have you?

21      A.   I don't believe I've gone through phone records,

22  no.

23      Q.   But you have knowledge that others on the

24  investigative team have, correct?

25      A.   Yes.

1    Q.   And you are familiar with a Mr. David Loffing;

2  isn't that correct?

3    A.   I know who he is.

4    Q.   And who is he?

5    A.   He works for Boeing.

6    Q.   He's a Boeing employee?  Do you know his position

7  at Boeing?

8    A.   I do not.

9    Q.   Okay.  And do you -- are you aware of any records,

10 phone records of calls, between Mr. David Loffing and

11 Mr. Mark Forkner?

12   A.   I am not.

13   Q.   You are not.  Okay.

14        Do you know if any of those records exist?

15   A.   I don't know.

16   Q.   Okay.  I want to pull up what I believe has

17 already been admitted.  I want to make sure.  Yes.

18        Do you have your government exhibit binder --

19   A.   I do.

20   Q.   -- there?

21   A.   Yes.

22   Q.   And you've looked at Government Exhibit 13 and

23 Government Exhibit 26; is that correct?

24   A.   Yes.

25   Q.   Okay.

1          MS. MCFARLANE:  Can we pull up Government Exhibit

2     13, please?

3     BY MS. MCFARLANE:

4          Q.   You went over this email on direct.  I'm not sure

5     we read this on direct.  Do you recall this email?

6          A.   I'm familiar with this email, yes.

7          Q.   Okay.  And it's an email from Mark Forkner to

8     Stacey Klein at the FAA, correct?

9          A.   Correct.  And Aaron Perkins at the FAA, yes.

10         Q.   And it talks about the fact that MCAS -- it

11    confirmed with flight control engineers that MCAS does live

12    in both FCCs.

13              And what had does "FCC" refer to?

14         A.   Flight control computers.

15         Q.   Flight control computers.

16              "And only needs one to function."  Okay.  He goes

17    on to say, "Are you okay with us removing all reference to

18    MCAS from the FCOM?"

19              This is the first communication from Mark Forkner

20    to Stacey Klein about MCAS; isn't that correct?

21         A.   I'm not sure if there's more --

22         Q.   Written communication.

23         A.   Written communication, I believe this is one of

24    the earlier ones.

25         Q.   Right.

1      A.   I'm not sure if it's the first.

2      Q.   I'm sorry.  I didn't hear you.

3      A.   I don't know if it's the first, but -- but it is

4  an earlier communication.

5      Q.   Have you seen an earlier written communication

6  from Mr. Forkner to Stacey Klein about MCAS?

7      A.   I don't recall one.

8      Q.   You don't recall one.  Okay.

9      A.   No.

10     Q.   Okay.  And this is March 30, 2016; is that

11  correct?

12     A.   Yes, it is.

13     Q.   All right.  And then Government Exhibit 26, I

14  believe, has also already been admitted.

15          This is another communication from Mr. Forkner to

16  Ms. Klein at the FAA about MCAS; isn't that correct?

17     A.   It is, yes.

18     Q.   And he's reminding her that they weren't going to

19  cover it in the FCOM, and it's way outside the normal

20  operating envelope; isn't that correct?

21          MR. O'NEILL:  Objection to the characterization of

22  evidence.

23          THE COURT:  Overruled.

24          If you can answer the question, you can.  If it

25  doesn't say what -- if it doesn't say what she says it is,

 1    go ahead and say what it says.

 2              THE WITNESS:  Okay.

 3    BY MS. MCFARLANE:

 4         Q.   I can rephrase.

 5              It says recall, "We decided we weren't going to

 6    cover it in the FCOM or the CBT."  Doesn't it say that?

 7         A.   It states, "Under Flight Control Section, Delete

 8    MCAS recall.  We didn't" -- "we decided we weren't going to

 9    cover it in the FCOM or the CBT since it's way outside of

10    the normal operating envelope," yes.

11         Q.   And this is another communication from Mark

12    Forkner to Stacey Klein about MCAS; isn't that correct?

13         A.   Yes.  This was dated January 17 of 2017.

14         Q.   So that's two.

15              And Government Exhibit 24 --

16              That's two communications from Mr. Forkner to

17    Ms. Klein regarding MCAS.  Do you know if there are many

18    more?

19         A.   I don't know the exact number, if there were any

20    more.

21         Q.   Okay.  Would it ring true to you that there are

22    only three written communications from Mr. Forkner to

23    Ms. Klein about MCAS?

24         A.   I trust that's accurate.

25         Q.   And that is out of 15 million documents that the

1   government has recovered, we have three written

2   communications from Mr. Forkner to Ms. Klein about MCAS.

3   That's correct?

4       A.   Okay.

5       Q.   Okay.  And in those emails that we've just

6   reviewed, there is no mention from Mr. Forkner to Ms. Klein

7   about wind-up turns, correct?

8       A.   In those communications, no.

9       Q.   Right.  That MCAS only functions within wind-up

10  turns.  That's not said there; isn't that correct?

11      A.   No.  Wind-up turns was not said.

12      Q.   Okay.  And it does not even mention speed; that it

13  only operates in high speeds, for instance, does it?

14      A.   Not in those communications.

15      Q.   Okay.  But both of those communications, they both

16  talk about it operating outside the normal operating

17  envelope; isn't that correct?

18      A.   Yes.

19      Q.   And what is your understanding of the normal

20  operating envelope?

21           MR. O'NEILL:  Objection.  Objection, foundation.

22           THE COURT:  Okay.  What do you say to that?

23           MS. MCFARLANE:  If he has an understanding, your

24  Honor.

25           MR. O'NEILL:  Your Honor, if I may?  This is

1    summary witness testimony that the government has narrowed

2    and not undertaken in its direct.

3              THE COURT:  Okay.  Do you know what that means,

4    "operating out of the normal operating envelope"?  Do you

5    know what that means?

6              THE WITNESS:  I would only have to speculate on

7    that, your Honor.  I'm not a pilot.

8              THE COURT:  Okay.  All right.  I will sustain the

9    objection because he would have to speculate.

10   BY MS. MCFARLANE:

11        Q.   Agent Byers, but you would -- you would admit that

12   that is the phrase that was used in both of those emails

13   from Mr. Forkner?

14        A.   "The normal operating envelope"?

15        Q.   Correct.

16        A.   Yes.

17        Q.   Okay.

18              MS. MCFARLANE:  Your Honor, may I approach?

19   BY MS. MCFARLANE:

20        Q.   Agent Byers, do you recognize this document?

21        A.   I'm not familiar with this one, no.

22        Q.   If you look at the bottom right-hand corner, are

23   you familiar with that Bates number?

24        A.   Yes, there's also a Bates number in there.

25        Q.   And does "DOJ PROD" mean the Department of Justice

1    produced this document?

2        A.    Yes.

3        Q.    And at the top of the document, does it refer to

4    it being Boeing's document?

5        A.    Yes.

6        Q.    And is this one of the documents that the

7    government received as part of your investigation?

8        A.    I would assume so, based on that, yes.

9              MS. MCFARLANE:  Your Honor, the defense moves to

10   admit Defendant's Exhibit 7.

11             THE COURT:  He said he's not familiar with Defense

12   Exhibit 7.

13             MS. MCFARLANE:  This is a business record from

14   Boeing that the government received, your Honor.

15             THE COURT:  Okay.  So you're saying that it's

16   authenticated, and it's a business record, so I will admit

17   the exhibit.

18             MS. MCFARLANE:  Yes, your Honor.

19             THE COURT:  So I will admit the exhibit.  He's

20   saying he's never seen the exhibit, though.  So go ahead.

21   The exhibit is admitted.

22        (Defense Exhibit 7 was admitted into evidence.)

23             MS. MCFARLANE:  Thank you, your Honor.

24             If we can now publish this to the jury, your

25   Honor.

UNITED STATES vs MARK A. FORKNER

4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 261

1              Mr. Payton, if you can pull up Defendant's

2    Exhibit 7?

3    BY MS. MCFARLANE:

4        Q.   This says at the top that it is -- this is a

5    Coordination Sheet, isn't that right, Agent Byers?

6        A.   That's what it states, yes.

7        Q.   And Coordination Sheet, I'm sure in your

8    investigation you've learned that "COORD Sheet" refers to

9    Coordination Sheet?

10             MR. O'NEILL:  Objection.

11   BY MS. MCFARLANE:

12       Q.   Is that true?

13             THE COURT:  Do you know the answer to that?

14             THE WITNESS:  As far as this document goes, I'm

15   not familiar with it.  Coordination?

16             THE COURT:  Do you know what -- but do you know

17   what "COORD Sheet" means?

18             THE WITNESS:  I -- I have no basis on that, no.

19   BY MS. MCFARLANE:

20       Q.   You don't know what "COORD Sheet" refers to?

21       A.   No.

22       Q.   Okay.  No problem.

23             This is a Coordination Sheet.

24             MS. MCFARLANE:  If you can take that down, please.

25   ///

1   BY MS. MCFARLANE:

2        Q.   And at the top, there's TOs and CCs.  Do you see

3   that?  The names there?

4        A.   I do, yes.

5        Q.   Do you see Mark Forkner's name listed there at

6   all?

7        A.   I don't on this, no.

8        Q.   And what's the date of this document?

9        A.   Looks like March 30th of 2016.

10       Q.   Okay.

11            MS. MCFARLANE:  You can take that down.

12            If we can highlight that bold paragraph there, I

13   have a question for you about this, Flight Test Results.

14   BY MS. MCFARLANE:

15       Q.   And I understand, Agent Byers, you don't know what

16   a COORD Sheet is, so I'm not going to ask you about that.

17            THE COURT:  Well, but he's not even seen this

18   document.  So why are you asking him questions about a

19   document he has not seen?

20            MS. MCFARLANE:  Your Honor, I would like to ask

21   him about a subject matter that he's familiar with.

22            THE COURT:  You can ask him about a subject

23   matter, but I don't understand why you're showing him this

24   document that he's never seen and directing him to portions

25   of the document.

 1              MS. MCFARLANE:  I can ask the question without
 2     referring to the document, your Honor.
 3              THE COURT:  Go ahead.
 4              MS. MCFARLANE:  We can take that down, Mr. Payton.
 5              MR. O'NEILL:  And your Honor, we would object to
 6     the summary -- to eliciting of summary testimony that has
 7     been the subject of a ruling of this case.
 8              THE COURT:  You will have to say that one more
 9     time.  I didn't hear you.  Speak up good and loud.
10              MR. O'NEILL:  We object, your Honor, to the
11     questions that would essentially elicit what's close to
12     summary testimony in light of prior rulings in this case.
13              THE COURT:  Okay.  I'm not sure what you mean by
14     "prior rulings of the case."  I know the subjects that I've
15     ruled on.  So object if this gets into one of those
16     subjects.
17              MR. O'NEILL:  Yes, your Honor.
18     BY MS. MCFARLANE:
19         Q.   In the course of your investigation, Agent Byers,
20     are you aware that MCAS, the system, was changed at some
21     point?
22         A.   Yes, at some point.
23         Q.   Okay.  Do you know when?
24         A.   I don't know.
25         Q.   Okay.  And do you know how it was changed?

```
1        A.   I understand from a high level how it was changed,

2   yes.

3        Q.   Can you explain that?

4        A.   So it's the --

5             MR. O'NEILL:  Objection.  Hearsay.

6             THE COURT:  Okay.  What's your response to that?

7             MS. MCFARLANE:  He's speaking of his understanding

8   and how do you understand -- I can lay the foundation, your

9   Honor, if necessary.

10            MR. O'NEILL:  Your Honor, may we approach?

11            THE COURT:  No.  That objection is sustained.

12            MS. MCFARLANE:  Okay.

13  BY MS. MCFARLANE:

14       Q.   You mentioned you understood.  How do you

15  understand, Mr. -- before saying what your understanding is?

16            MR. O'NEILL:  Objection, calls for hearsay.

17            THE COURT:  Well, he -- you can answer how it is

18  you've come to understand this.

19            THE WITNESS:  Just through the course of the

20  investigation from others.

21            THE COURT:  From other people in the

22  investigation?  Is that what you're saying?

23            THE WITNESS:  I'm sorry.  You have to repeat the

24  question here.  As far as the basis of my understanding?  As

25  far as -- can you repeat the question?  I'm getting lost
```

 1    here.  I'm sorry.

 2            MS. MCFARLANE:  No problem.  I will repeat.

 3    BY MS. MCFARLANE:

 4       Q.   I asked you if you understood that MCAS had

 5    changed at some point.  You said yes.

 6            And my question is, what is the basis -- how do

 7    you know that?  What's the basis of that understanding,

 8    without saying what that understanding is?

 9            THE COURT:  How did you learn that it changed?

10            THE WITNESS:  From others, other people that have

11    conveyed information through the course of the

12    investigation.

13            THE COURT:  Okay.

14            THE WITNESS:  There's a specific document --

15            THE COURT:  Hold on.

16            THE WITNESS:  I'm sorry.

17            THE COURT:  Wait for the next question.

18            THE WITNESS:  Okay.

19    BY MS. MCFARLANE:

20       Q.   When you say you learned from others --

21       A.   Yes.

22       Q.   -- within this investigation, who are you -- who

23    are you talking about?

24       A.   Other -- well, a variety of things.  So it's an

25    investigative team, so there's other people on the team and

1   then there's individuals that we've interviewed along the

2   way.  Although I've interviewed some people, I have not

3   interviewed, by any means, most, or all of the people.  So

4   information would be passed along just in the course of the

5   investigation.  So that's kind of my general understanding.

6   I couldn't pinpoint a particular individual or time

7   regarding that.

8              MS. MCFARLANE:  Your Honor, I don't want to go

9   into this --

10             THE COURT:  It sounds like it would be hearsay at

11  this point.

12             MS. MCFARLANE:  Okay.  I can move on from that,

13  your Honor.

14             Can I also see Defense Exhibit No. 9, please.

15             May I approach, your Honor?

16             THE WITNESS:  Thank you.

17  BY MS. MCFARLANE:

18      Q.   Agent Byers, I've just handed you what's been

19  premarked as Defendant's Exhibit No. 9.  If you can look at

20  the bottom right-hand corner, do you recognize those Bates

21  numbers?

22      A.   Yes.

23      Q.   And does "DOJ PROD" mean that the government

24  received -- or produced this document to us; is that

25  correct?

1     A.   Correct, yes.

2     Q.   And do you recognize this to be emails between

3 Boeing employees; is that correct?

4     A.   That's correct.

5     Q.   And attachment?

6     A.   That's what it appears, yes.

7     Q.   And this was document -- this was a document that

8 the government received from the Boeing Company; is that

9 correct?

10     A.   Correct.

11          MS. MCFARLANE:  Your Honor, the defense would move

12 to admit Defense Exhibit No. 9.

13          MR. O'NEILL:  Objection, relevancy and hearsay.

14          MS. MCFARLANE:  This is an official business

15 record, your Honor.

16          THE COURT:  So you have business record affidavit?

17          MS. MCFARLANE:  Yes, your Honor.

18          THE COURT:  All right.  And then he says -- so how

19 is it relevant?

20          MS. MCFARLANE:  Your Honor, this is the CSID

21 document that discusses the MCAS that was never updated.

22          MR. O'NEILL:  Your Honor, it does not appear that

23 Mr. Forkner is on these documents.  I would object to its

24 relevance.

25          MS. MCFARLANE:  Again, it's a --

```
 1                 THE COURT:  Overruled.

 2                 Exhibit 9 will be admitted.

 3                 MS. MCFARLANE:  Thank you, your Honor.

 4             (Defense Exhibit 9 was admitted into evidence.)

 5   BY MS. MCFARLANE:

 6        Q.   Okay.  If we can turn to page 3 of this document,

 7   Agent Byers, the title of this document is "Crew Systems

 8   Interface Document."

 9             Have you seen this document before?

10        A.   I'm not familiar with this document.

11        Q.   Have you ever seen a Crew Systems Interface

12   Document, just generally?

13        A.   I'm not overly familiar with it.  I couldn't

14   recall seeing something like this before.

15        Q.   Okay.  And are you familiar with the term "CSID"

16   at all?

17        A.   No.

18        Q.   Okay.  Thank you.

19             MS. MCFARLANE:  We can take that down.

20             May I approach, your Honor?

21             THE WITNESS:  Thank you.

22   BY MS. MCFARLANE:

23        Q.   I've just handed you, Agent Byers, what has been

24   premarked as Defense Exhibit 89 and 246.  Do you see that?

25        A.   I do, yes.
```

1      Q.   And if you look at both of those documents, they

2   both have DOJ PROD Bates numbers, which means that they've

3   been produced to us by the government; is that correct?

4      A.   Yes, ma'am.

5      Q.   And these are, again, both Boeing documents that

6   the government received; isn't that correct?

7      A.   It appears so, yes.

8           MS. MCFARLANE:   Okay.   Your Honor, the defense

9   moves to admit Defendant's Exhibit 89 and 246 as official

10  business records.

11          MR. O'NEILL:   Your Honor, no objection to 89, but

12  the government objects to Defense Exhibit 246, outside the

13  scope of the scheme charged, and the defendant is not on the

14  document.   So we object to relevance.

15          MS. MCFARLANE:   Again, your Honor, this is

16  relevant to the official Boeing records that have either --

17  that have not updated the description of MCAS.

18          THE COURT:   Okay.   That will be overruled.   Those

19  two will be admitted.

20          (Defense Exhibits 89 and 246 were admitted into

21      evidence.)

22  BY MS. MCFARLANE:

23      Q.   Now, if we look at Exhibit 89 -- this will be

24  fast -- I believe you already testified that you do not

25  recognize the Crew Systems Interface Document; is that

```
 1   correct?

 2        A.   That is correct.

 3        Q.   Okay.  And both of these documents are Crew

 4   Systems Interface Documents, or CSIDs, correct?

 5        A.   That's what it appears, yes.

 6        Q.   Okay.  So we won't ask you about those.  You can

 7   take that down.

 8             I would like to go to -- I have some questions

 9   about some of the documents that the government discussed

10   with you on direct examination.

11             If you turn to Government Exhibit 4, please, in

12   your binder.  Do you have that document in front of you?

13        A.   Yes, ma'am, I do.

14        Q.   You testified to this document.  Do you know --

15             MS. MCFARLANE:  Can we pull that up, please,

16   Government Exhibit 4 and highlight from the top through the

17   content of the email, please.

18   BY MS. MCFARLANE:

19        Q.   Do you know who Katie Younkin is, Agent Byers?

20        A.   I believe she's somebody within The Boeing

21   Company.

22        Q.   I'm sorry.  I can't hear you.

23        A.   I believe she's somebody within The Boeing

24   Company.

25        Q.   Do you what department she's in?
```

1      A.   I do not.

2      Q.   Okay.  And the government highlighted the first

3  sentence.  "One of the prime program directives is that the

4  NG to MAX differences training level cannot exceed Level B."

5  Do you see that?

6      A.   I do, yes.

7      Q.   What is your understanding of what "program"

8  refers to?

9      A.   I don't know.

10     Q.   You don't know?  Okay.

11          And it talks about a financial penalty.  And you

12  said "SWA" refers to Southwest Airlines --

13     A.   Yes, ma'am.

14     Q.   -- right?

15          Have you reviewed those contracts with Southwest

16  Airlines?

17     A.   I've seen some of Southwest's documents reflected.

18  The sales contract, yes.

19     Q.   But you don't understand the contract language

20  within those documents, correct?

21     A.   I understand some of the contract language

22  associated with them, yes.

23     Q.   Are you an attorney?

24     A.   No.

25     Q.   Okay.  Do you know any of the legal contract

1  language and what that means within those contracts?

2       A.   How so?  Sorry.

3       Q.   You said you understand some of the language.

4       A.   Right.

5       Q.   Okay.  Did you review specifically the provision

6  that's mentioned here about a financial penalty?

7       A.   The investigative team did, yes.

8       Q.   Did you?  I'm sorry.

9       A.   Did I?

10      Q.   Yes.

11      A.   Not the direct reference.

12      Q.   So that's "no"?

13      A.   No.

14      Q.   Okay.  So you don't have an understanding about

15  what that specifically means?

16      A.   Oh, I have an understanding, yes, based on what we

17  learned through the investigation.

18      Q.   Based on what you've learned in the investigation?

19      A.   Yes, ma'am.

20      Q.   And I'll ask you the same question I asked

21  earlier:  How did you learn that?

22      A.   Through another agent that specifically reviewed

23  that contract.

24      Q.   Through another agent that reviewed the contract?

25      A.   Yes.

UNITED STATES vs MARK A. FORKNER

| 4:21-cr-00268-O-1 | Vol 2 March 21, 2022 | Page 273 |
|---|---|---|

```
1        Q.    Okay.  So -- but you don't know yourself?

2        A.    Not directly.

3        Q.    Okay.

4              MS. MCFARLANE:  Let's go to No. 8, please.

5   BY MS. MCFARLANE:

6        Q.    The government reviewed with you the top of this

7   email on direct examination.  Do you recall that?

8        A.    Yes.

9        Q.    And it talks about -- that last line says, "We

10  must obtain Level B for RCAS."

11       A.    Yes.

12       Q.    RCAS is not MCAS, correct?

13       A.    Correct.

14       Q.    And you're not familiar with what RCAS is, are

15  you?

16       A.    I believe it's another system, but I'm not

17  familiar with the details of it, no.

18       Q.    You're not familiar?

19       A.    No.

20       Q.    Okay.  And it says, "It's a planet killer."  He

21  says, "It's a planet killer."

22              Is that your understanding that's hyperbole in

23  this email?

24       A.    Yes.

25       Q.    It's not really a planet killer, right?
```

1      A.   Well, I don't know the context in which he was

2 writing it, but I can only assume the context by which I

3 would be reviewing it as; it is not actually a planet

4 killer.

5      Q.   It's not actually a planet killer?

6      A.   Rather, a reference to most likely something else,

7 a movie.

8      Q.   Okay.  Referencing a movie?

9      A.   Correct.

10     Q.   And in your reviewing emails from Mr. Forkner, he

11 does that a lot, isn't that right, reference movies?

12     A.   At times.

13     Q.   Uh-huh.

14          MS. MCFARLANE:  Okay.  If we can go to No. 12,

15 please.

16 BY MS. MCFARLANE:

17     Q.   This is an email from Mr. Forkner dated March 8,

18 2016, about flight controls.  Do you recall going over this

19 email with the government?

20     A.   Yes.

21     Q.   And he says here, "The flight controls module was

22 updated with a thorough review of the flight control

23 engineers."

24          And Mark Forkner is not a flight control engineer,

25 correct?

1      A.    Correct.

2      Q.    He's not an engineer at all?

3      A.    Not that I am aware.

4      Q.    And "flight controls module," do you know what

5   that refers to?  "Module"?

6      A.    Only within the context of the email.  I'm not

7   sure I could unpack it much further for you than that.  As

8   far as -- do I know -- I'm aware -- I have a general

9   awareness of what it is.

10      Q.    I'm only asking in the context of this email.  Do

11   you refer -- do you know what "flight controls module"

12   refers to?

13      A.    In the context of this email, yes.

14      Q.    And what is that?

15      A.    Well, it's system on the aircraft.

16      Q.    The module is the system on the aircraft?

17      A.    I'm sorry?

18      Q.    "Module"?

19      A.    Yes.

20      Q.    Is that the system on the aircraft --

21      A.    No, it's a part of aircraft.

22      Q.    -- or is that the training program?

23      A.    As far as the details of that, I couldn't tell

24   you.

25      Q.    So you don't know what "module" is?

1      A.   Only with respect to the changes that were

2  referenced in the email.

3      Q.   I'm sorry, Agent Byers.  I just want to know if

4  you know what "module" is when he refers to a "flight

5  controls module."  It's okay to say you don't know, if

6  that's the truth.

7      A.   Only with respect the attachment that he sent.  I

8  mean, I'm not an engineer myself, so from that standpoint, I

9  don't know.

10      Q.   Are you saying that "module" refers to the

11  attachment?

12      A.   No.  What I'm saying is the reference to the

13  module that's in the attachment, the description provided is

14  all I can tell you about as far as -- I don't know in great

15  detail what a flight control module is other than it's

16  associated with an aircraft.

17      Q.   Okay.  So you don't know what a flight control

18  module is?

19          THE COURT:  He's answered the question.

20          MS. MCFARLANE:  Okay.  I just want to be clear.

21  BY MS. MCFARLANE:

22      Q.   Within this document, I want to refer to -- you

23  went over with the government the reference to MCAS, page 7

24  of 13.

25          MS. MCFARLANE:  Can we go to page 7 of that,

1   please.  If we can highlight the very bottom, just the

2   bottom part.  I only have a question about.

3   BY MS. MCFARLANE:

4       Q.  Okay.  Do you see on page 7 of 13 at the bottom

5   "Read" column there, Agent Byers?  Can you read that?

6       A.  Sure.  The portion you've highlighted states,

7   "Maneuvering Characteristic Augmentation System, MCAS.  MCAS

8   duplicates NG approach to stall."

9       Q.  And if we can go to the next page, it just

10  continues on there, that small box, top of the next page.

11      A.  Okay.  "Fuel forces at cruise Mach numbers by

12  automatically commanding nose-down stabilizer trim in

13  certain high angle of attack and high airspeed conditions.

14  This functionality only functions well outside the normal

15  operating envelope."

16      Q.  That phrase "well outside the normal operating

17  envelope," it's familiar; isn't that correct?

18      A.  Yes.

19      Q.  And isn't that the very same phrase that Mark

20  Forkner used in emailing Stacey Klein at the FAA?

21      A.  It is, yes.

22      Q.  And this is a document that was updated with a

23  thorough review by the flight control engineers, correct?

24      A.  Yes.

25      Q.  Okay.

1          THE COURT:  Okay.  Why don't we go ahead and take

2   our morning break.  Why don't we take about a 10-minute

3   break, then we'll get you back down here and keep going

4   through the case.

5       (A recess was had.)

6   (The jury was brought into court.)

7          THE COURT:  Okay.  Please be seated.

8          MS. MCFARLANE:  Thank you, your Honor.

9   Let's go to the Government's Exhibit 10, please.

10  BY MS. MCFARLANE:

11      Q.   Do you recall, Agent Byers, you went over this

12  document with the government on Direct, and this is Mark

13  Forkner's chat with colleague, Ross Chamberlain, at Boeing?

14      A.   Yes, ma'am.

15      Q.   And at the top of the chat, they start off by

16  saying "Yo" to each other, so this is a pretty informal chat

17  with colleagues at Boeing, correct?

18      A.   It appears to be, yes.

19      Q.   And if we go down, Ross Chamberlain at 7:59 a.m --

20  if we could highlight that.

21          It says, "Funny, I was going to say the same.  I

22  think we make our money at this meeting by getting them to

23  buy into the training and evaluation plans.  It's

24  unfortunate that Roman won't be here.  He can corral Stacey

25  and guide her."

```
 1              You said on the record "Stacey" refers to Stacey

 2    Klein.

 3         A.   That's correct.

 4         Q.   And Roman is also sort of the counterpart to

 5    Stacey.  He's at the FAA with Canada, Transport Canada;

 6    isn't that right?

 7         A.   I don't know.

 8         Q.   And when they -- Ross refers to Roman corralling

 9    Stacey, that's his -- her counterpart at Transport Canada,

10    the Canadian FAA?

11              MR. O'NEILL:  Objection.  Asked and answered.

12              THE COURT:  Well, he said he didn't know who Roman

13    was, so sustained.

14              MS. MCFARLANE:  I'll move on.

15    BY MS. MCFARLANE:

16         Q.   If we go to Government's Exhibit 14.

17              And, again, this is an email that you read just a

18    line from on direct.  And so I would like to give a little

19    bit more context here.

20              Can you read the top line of this email that Mark

21    Forkner sent May 20th, 2016, and he sent it to Steven and

22    Casey.  Those are sales and marketing people at Boeing.  Can

23    you start reading?

24         A.   Sure.  "The training is actually at two hours

25    right now and probably won't go past three by the time we're
```

1   done.  There really isn't too much to train.  It's an NG

2   with bigger displays, a few new alerts that we were required

3   to put on the jet by the regulators.  There is no backup

4   plan if we don't get Level B.  We're going to get Level B.

5   The program won't allow anything but that to happen."

6        Q.   And sorry.  Stop there.

7             And when Mark Forkner says, "the Program," he's

8   referring to the MAX program; isn't that right?

9        A.   I'm not sure what program he's referring to.

10        Q.   You've seen that term, "the Program" often through

11   his emails.

12        A.   Right.  I would assume it's the MAX program.

13        Q.   The MAX program.  Okay.  Keep going.

14        A.   "RCAS was Level B, as determined by the AEG a few

15   weeks ago.  We're beginning to distribute the 30-minute CBT

16   to customers on request now.  The pitch I send you is what

17   we're giving all MAX customers.  We won't be breaking it

18   down into timing for each subsystem."

19        Q.   And, again, RCAS is not MCAS.  That's a separate

20   system; isn't that right?

21        A.   Right.

22        Q.   And he says that Level B was determined by the AEG

23   related to RCAS; isn't that right?

24        A.   Correct.  He states that in his email.

25        Q.   All right.  If you would go to Government's

1   Exhibit 16, please.  You read this -- part of this email on

2   direct.  Again, this is Mark Forkner emailing lots of people

3   at Boeing after the AEG gave provisional Level B approval;

4   isn't that right?

5       A.   That's correct, yes.

6       Q.   And if we look to the second page, the second

7   paragraph, can you read starting there with "This is

8   provisional approval."

9       A.   Sure.  "This is provisional approval pending the

10  final Part 25 type certification and assuming no significant

11  systems change to the airplane.  The FAA will be sending us

12  a provisional approval letter within the next two weeks

13  documenting the Joint Flight Operations Evaluation Board

14  acceptance of this finding.  FAA, Transport Canada, and EASA

15  are now considered to have accepted this Level B

16  determination."

17      Q.   And FAA Transport Canada and EASA are also

18  counterparts for different countries; isn't that right?

19      A.   That's my understanding, yes.

20      Q.   So FAA is for America, correct?

21      A.   For the United States, yes.

22      Q.   Okay.  Keep going, please.

23      A.   "This culminates more than three years of tireless

24  and collaborative efforts across many business units.

25  Flight Technical, Flight Technical Data, training,

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 282

1    development, Flight Deck Crew Ops, all MAX engineer teams,

2    Flight Test Engineering and, of course, Ed Wilson's

3    Engineering Test Pilot team, all should be commended for

4    their efforts in getting us to the finish line.

5              "CAS communications and 737 program communications

6    are jointly crafting a BNN article to be released on receipt

7    of the FAA's provisional approval letter."

8         Q.   Okay.  Thank you.  If we can go to this -- the

9    first page of this.  As you said on direct, Keith Leverkuhn

10   responded, "Fantastic news, Mark."

11             And Keith Leverkuhn is sort of the big boss at

12   Boeing -- one of the big bosses at Boeing; is that correct?

13        A.   I understand he's executive level.

14        Q.   He's executive level at Boeing?

15        A.   That's my understanding.

16        Q.   And he says, "Fantastic news, Mark.  Just a huge

17   win for the team, for Boeing, and for our customers.  We can

18   now eliminate the longest-standing risk on the 737 MAX

19   program."

20             Again, there's that word "program."  So the MAX --

21   "the program" refers to the MAX program, as we said before.

22             And then Mark replies, "The program is very happy.

23   See below."  Do you see that?

24        A.   Yes, I do.

25        Q.   And in your investigation of this case, you

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 283

1  understand that the program set the expectation for the MAX
2  to be at Level B; isn't that correct?
3      A.   I'm not sure who set the expectation as Level B.
4      Q.   Meaning, Boeing set the expectation for the MAX to
5  be at Level B before Mark even came, is that correct, based
6  on your investigation?
7      A.   I don't know when that goal was established.
8      Q.   But you know it was established above Mark
9  Forkner?
10     A.   I'm sorry?
11     Q.   You know that that goal was established above Mark
12 Forkner within Boeing?
13     A.   With -- based on the emails, that's correct.
14     Q.   That's correct.  Okay.
15          MS. MCFARLANE:  If we can go to Government
16 Exhibit 17, please.
17 BY MS. MCFARLANE:
18     Q.   You talked about this email with the government
19 related to Mark Forkner reaching out to discuss the 787
20 chief technical pilot position.  Do you recall that?
21     A.   Yes.
22     Q.   And at this time, Mark Forkner was the chief tech
23 pilot for the 737 MAX, correct?
24     A.   For the MAX, yes.
25     Q.   And the 787 is just a different type of air -- a

1    different type of the plane, correct?

2         A.   It's a different model of aircraft.

3         Q.   A different model.  But it's the same position,

4    chief tech pilot; isn't that correct?

5         A.   Of a different aircraft, yes.

6         Q.   Right.  So this was a lateral -- request for a

7    lateral position, not a promotion?

8         A.   I don't know if there was any promotion involved

9    on it, as far as if there was compensation or anything of

10   that nature.  It's a different position.

11        Q.   And it says within this email, "I'm wondering" --

12   the second line -- "I'm wondering if that might be the best

13   thing for both myself and the whole Flight Tech Team,"

14   correct?

15        A.   Yes.

16        Q.   He's also looking out for Patrik, who is Patrik

17   Gustavsson, who is also in this group; isn't that right?

18        A.   Yes.

19        Q.   And looking for Patrik Gustavsson to fill his role

20   as chief tech pilot of the 737; isn't that correct?

21        A.   It appears so, yes.

22        Q.   Okay.  If we can go to Government Exhibit 19.

23   This is another email that you read on direct.  I would like

24   to just give a little bit of context.

25             This was dated November 3rd, 2016, from Mr. Mark

1    Forkner to others at Boeing.  And within this email, I would

2    like you to read that first -- the first two top paragraphs

3    if you could.

4        A.   Okay.  He stated, "This must be fixed prior to

5    EIS.  We went out of our way in the FD requirements to

6    minimize the training impact of the BRM logic, and one of

7    the keys to that is to allow the start to look normal by

8    having the crew observe an increasing N2 without the

9    monitoring queue on its way up to 25 percent.  We've already

10   built and certified the training with the regulators based

11   on this logic.  We've already socialized with dozens of MAX

12   customers.  This was the design intent and what the

13   regulators and customers expect.

14            "Remember, we only have provisional approval for

15   Level B and for the CBT, as presented to the regulators.

16   This would be an appreciable change to both the airplane and

17   the training that would risk our Level B determination.  I

18   need to know ASAP if this will not be fixed prior to EIS, as

19   we will have to negotiate this with the AEG."

20       Q.   And as you've mentioned on direct, Agent Byers,

21   the AEG was referring to Ms. Stacey Klein, correct?

22       A.   Correct.

23       Q.   And he's telling others at Boeing that something

24   needs to be fixed; otherwise, he would have to go back to

25   Ms. Klein to talk about it, correct?  "We would have to

1    negotiate" --

2         A.    "We would have to negotiate with the AEG," yes.

3         Q.    Okay.  And he also mentioned that he understands

4    that the approval for Level B is only provisional; isn't

5    that correct?

6         A.    Yes, he states that.

7         Q.    Okay.  I would like to go to Government Exhibit

8    21.  Again, this is another email that you read parts of on

9    direct.  I would like to give more context.

10            If we go down to -- starting with email from

11   Steven Burrington on November 10th of 2016, page 2.

12            No.  It's November 10th, 2016, at 7:33 a.m.

13            MS. MCFARLANE:  Can you hear me okay, Mr. Payton?

14   There you go.

15   BY MS. MCFARLANE:

16        Q.    And this -- this is November 10th.  Is isn't that

17   right, Agent Byers?

18        A.    Yes, November 10 of 2016.

19        Q.    And at this point in time, Boeing had received the

20   provisional Level B training, correct?

21        A.    Correct.

22        Q.    And this was a few days before the chat, correct?

23        A.    That's correct --

24        Q.    All right.

25        A.    -- the November 15 chat.  There's a couple chats,

 1    but the November 15th chat.

 2        Q.    November 15th chat.  That's right.

 3              Can you read starting with "Sean, while training,"

 4    please.

 5              MR. O'NEILL:  Objection.  Is there a specific

 6    question?  The jury has the exhibit in evidence.

 7              THE COURT:  Yes.  Is there something you want to

 8    point to, because this is in evidence?

 9              MS. MCFARLANE:  Yes, your Honor, there is.  The

10    very first sentence.

11    BY MS. MCFARLANE:

12        Q.    It says, "While training would be one

13    consideration in making the MAX behavior different than the

14    NG, there's also just the impact and risk of having a

15    difference between the models."  Correct?

16        A.    Correct, as stated there, yes.

17        Q.    And the impact between the models is sort of the

18    impact of having a safety issue, in having differences

19    between models, correct?

20              MR. O'NEILL:  Objection, calls for speculation.

21    BY MS. MCFARLANE:

22        Q.    Do you know?

23              THE COURT:  Do you know?

24              THE WITNESS:  Can you repeat your question again?

25    I'm sorry.

1    BY MS. MCFARLANE:

2        Q.   When they're talking about differences between the

3    models, correct?

4        A.   Yes.

5        Q.   And the two models we're talking about would be

6    the NG, 737 NG, and the 737 MAX, correct?

7        A.   Yes.  Those are the two referenced here.

8        Q.   And we're looking -- they are talking about the

9    differences in changes between the MAX to the NG, correct?

10       A.   Yes.

11       Q.   Okay.  And one of the considerations they talk

12   about, in considering differences, would be training,

13   correct?

14       A.   Yes, that's what it references.

15       Q.   All right.  And other considerations would be

16   impact and risk of having differences, correct?

17       A.   I'm sorry.  You're asking me to speculate on that?

18       Q.   I'm not.  I'm asking you, is that what it says in

19   this email?

20            It says, "Impact and risk and training"; isn't

21   that right?

22       A.   I'm sorry.  Where exactly are you referring to?

23   I'm sorry.  "There's just the impact and risk of having

24   differences between the models."  Yes, as referenced.

25       Q.   Okay.  Okay.  And on direct you also read the

1  above email.  And I'm not going to read it all here because

2  the jury will have this, as we've said.  But Mr. Forkner

3  says, again -- if you look where it says, "in my opinion,"

4  just above his signature block.

5       A.   Yes.

6       Q.   It says, "In my opinion, this must be fixed prior

7  to the EIS.  The impact to our customers is too great."

8            And the customers that Mr. Forkner is referring to

9  are the airlines; isn't that correct?

10      A.   Yes.

11      Q.   Boeing's customers are airlines, like Southwest

12  Airlines, American Airlines, correct?

13      A.   Yes, ma'am.

14      Q.   And what he's saying is, this must be fixed prior

15  to EIS.  The impacts are -- to Southwest and American is too

16  great, is that correct, as an example?

17      A.   Yes, it appears so.

18      Q.   Okay.  And then at the very top of the first page

19  of this email, Mr. Forkner is talking to Christine Walsh.

20  And you've testified already that Christine Walsh is another

21  Boeing employee in the Flight Test Crew, right?

22      A.   She is, yes.

23      Q.   She is like the Top Gun test pilot, Christine

24  Walsh?

25           MR. O'NEILL:  Objection.

1    BY MS. MCFARLANE:

2         Q.   Is that what you understand her to be?

3         A.   I don't know exactly what her role is.

4         Q.   Okay.  But you understand her to be in the test

5    crew, correct?

6         A.   I know she's --

7         Q.   The flight test crew?

8         A.   -- a group within Boeing, yes.

9         Q.   Okay.  And Mark Forkner says, "No.  No one listens

10   to our inputs anyways.  We are just peons.  Everybody wants

11   to change procedures without any regard for the impact to

12   the crews.  The emergency descent thing is a perfect

13   example.  But when our training level determination gets

14   reversed because the program is too cheap to fix these

15   issues prior to EIS and proceduralizes around all these

16   last-minute issues, I'm the one who's going to take the

17   fall.  I'm really fed up."

18            That's Mark Forkner, right?

19        A.   Yes.

20        Q.   Okay.  And this is the same issue that he's been

21   saying to Boeing employees, to fix the EIS issue?

22            MR. O'NEILL:  Objection, calls for speculation.

23   BY MS. MCFARLANE:

24        Q.   Based on your review of this document.

25            THE COURT:  Do you know?

```
 1              THE WITNESS:  I don't know.

 2              THE COURT:  Okay.

 3              Ask your next question.

 4   BY MS. MCFARLANE:

 5      Q.   Government Exhibit 11.  The government had you

 6   talk about this on direct examination.

 7              At the top two lines, Mark Forkner is writing to

 8   Ross Chamberlain.  And Patrik Gustavsson was also in this

 9   group.  And he says, "Patrik remembered the three tools to

10   instructing with her:  Fear, sarcasm, and ridicule."

11              Agent Byers, have you served in the military?

12      A.   No.

13      Q.   "Fear, sarcasm, and ridicule" is a common phrase

14   used in the Air Force.  Are you aware of that?

15      A.   No.

16      Q.   Are you aware that Mr. Forkner served in the Air

17   Force?

18      A.   That's my understanding, yes.

19      Q.   Okay.  And when Mr. Forkner writes, "Instructing

20   with her," he's referring to instructing -- helping her in

21   the simulator; isn't that correct?

22              MR. O'NEILL:  Objection.

23   BY MS. MCFARLANE:

24      Q.   Do you know?

25      A.   I don't know.
```

1    Q.   Okay.

2         MS. MCFARLANE:  Your Honor, if I may have a moment

3    to confer?

4         No further questions, your Honor.

5         MR. O'NEILL:  Briefly, your Honor?

6                    REDIRECT EXAMINATION

7    BY MR. O'NEILL:

8    Q.   Special Agent Byers, Ms. McFarlane asked you on

9    cross-examination a number of questions about Mr. Forkner's

10   salary and how much money he made.  Do you recall those

11   questions?

12   A.   I do, yes.

13        MR. O'NEILL:  Can we pull up what's in evidence as

14   Government Exhibit 15, please.  If we could blow up the

15   highlighted portion.

16   BY MR. O'NEILL:

17   Q.   Special Agent Byers, when the defendant wrote --

18   regarding his -- the airplane project with the AEG, and he

19   wrote, "If I pull this off, I'll be a hero," did he put a

20   dollar figure on that?

21   A.   No, sir, he did not.

22        MR. O'NEILL:  If we could please turn to what's in

23   evidence as Government Exhibit 17.  If we could please call

24   out the top portion of the message.

25   ///

1    BY MR. O'NEILL:

2        Q.    Special Agent, you will recall that the date of

3    this email was August 16, 2016?

4        A.    Yes, sir.

5        Q.    That was the same day that the defendant wrote to

6    his colleagues about provisional Level B approval for the

7    MAX?

8        A.    Correct.

9        Q.    When the defendant wrote to Mr. Taylor at Boeing

10   that "I'd like to discuss the 787 Chief Technical Pilot

11   position with you," and he continues, "I'm wondering if it

12   might be the best thing for myself and the whole team now

13   that we've achieved Level B," did he put a dollar figure on

14   that?

15       A.    No, sir.

16       Q.    On cross-examination, Ms. McFarlane asked you some

17   questions about the Southwest Airlines contract provisions.

18   Do you recall those questions?

19       A.    I do, yes.

20       Q.    And you were asked your understanding of those

21   provisions.  Do you remember that?

22       A.    Yes.

23       Q.    In the course of your review, do you ever see any

24   documents where Mr. Forkner said that he felt he was

25   mistaken about financial penalties to Boeing if they did not

1  achieve Level B training for the MAX?

2      A.   No.

3      Q.   On cross, you were also asked by Ms. McFarlane a

4  number of questions about the volume of documents obtained

5  during the course of your investigations.  Do you remember

6  those questions?

7      A.   Yes.

8      Q.   In the course of your investigation and review of

9  documents, who wrote that he lied to the regulators?

10          MS. MCFARLANE:  Objection.  Misstates the

11 evidence.

12          THE COURT:  Overruled.  The jury will remember the

13 evidence.

14          THE WITNESS:  He stated that he did, Mr. Forkner

15 did.

16 BY MR. O'NEILL:

17     Q.   Did Mr. Forkner state that in a document?

18     A.   Yes, he did.

19          MR. O'NEILL:  Could we pull up Government Exhibit

20 22, please, which is in evidence.

21 BY MR. O'NEILL:

22     Q.   And this is the two-page chat communication that

23 we talked about.

24          MR. O'NEILL:  Ms. Holbrook, could we pull up the

25 two pages and call out the portions of the chat for

 1  Mr. Forkner and Mr. Gustavsson?

 2  BY MR. O'NEILL:

 3      Q.   Now, Special Agent Byers, Ms. McFarlane asked you

 4  on cross-examination a lot of questions about documents that

 5  may talk about MCAS that Mr. Forkner didn't receive.  Do you

 6  recall those questions?

 7      A.   Yes.

 8      Q.   Okay.  Now, looking at Government Exhibit 22, the

 9  chat communication with Mr. Forkner, what does Mr. Forkner

10  say on November 15th, 2016, in his own words about how MCAS

11  operates?

12      A.   Down to Mach .2 -- or M .2.

13      Q.   After noting in this communication that MCAS is

14  now active down to M, or Mach .2, what does Mr. Forkner

15  write with respect to regulators?

16      A.   So that he basically lied to the regulators,

17  unknowingly.

18      Q.   You were asked on cross a number of questions

19  about communications, Mr. Forkner's communication with

20  Ms. Klein, Ms. Stacey Klein.  Do you recall those questions?

21      A.   Yes.

22      Q.   And you were also asked about the volume of

23  documents collected in your investigation.  Do you remember

24  those questions on cross?

25      A.   Yes, sir.

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 296

1        Q.   Special Agent, in over 57- -- approximately 57

2   million pages -- I believe it was approximately 15 million

3   documents -- in how many of those documents did the

4   defendant tell Ms. Klein that MCAS was expanded and now

5   active down to Mach .2?

6        A.   None.

7        Q.   Special Agent Byers, in all of those documents

8   that you collected in the course of this investigation, the

9   57 million pages, the 15 million documents, are you aware of

10  a single document where the defendant disclosed the

11  low-speed expansion of MCAS to anyone at the FAA?

12       A.   No, sir.

13            MR. O'NEILL:  Nothing further, your Honor.

14            MS. MCFARLANE:  One point, your Honor.

15            Your Honor, may I approach the witness?

16                      RECROSS-EXAMINATION

17  BY MS. MCFARLANE:

18       Q.   Agent Byers, if you could take a look at the

19  documents I just handed to you.

20       A.   Sure.  Just one moment.  Let me move some of this

21  out of the way.

22       Q.   Just let me know when you're ready.

23       A.   Do you want me to look through all of them?

24       Q.   Yeah, if you could look through all of them,

25  please.

```
 1        A.   Okay.

 2             MR. O'NEILL:  Objection, your Honor.  Is there a

 3   specific question?

 4             THE COURT:  Well, right now she's just asked him

 5   to look at these documents.

 6             Have you seen these documents before?

 7             THE WITNESS:  I do not recall these documents,

 8   your Honor.

 9             THE COURT:  Okay.

10   BY MS. MCFARLANE:

11        Q.   Whenever you're ready, Agent Byers.

12             THE COURT:  Is there any way we can speed it up?

13   He's not recognizing them.  Is there anyway we can speed

14   this up?

15             MS. MCFARLANE:  There is, your Honor.

16   BY MS. MCFARLANE:

17        Q.   These documents, if you recognize at the bottom of

18   the right-hand corner, these are all Boeing records that the

19   government produced to us from Boeing that you all -- that

20   you and your investigation team received in the course of

21   this investigation; isn't that correct?

22        A.   Yes, I believe so.

23        Q.   And they are all emails or chats from Boeing, from

24   their official records that you, in your investigation,

25   received as part of this investigation, correct?
```

```
 1        A.   Yes.  It appears so, yes.

 2             MS. MCFARLANE:  Okay.  Your Honor, the defense

 3   would like to offer Defense Exhibit 275 A through I.  We

 4   have an authentication affidavit.

 5             THE COURT:  275 A through I; is that right?

 6             Go ahead.

 7             MR. O'NEILL:  Your Honor, we object.  These

 8   materials are irrelevant and beyond the scope of a very

 9   limited redirect.

10             THE COURT:  Okay.  I'll defer ruling on this until

11   we get a witness up here that this is pertinent to, and so

12   it's not admitted at this time.

13             MR. O'NEILL:  It's also self-serving hearsay.

14             MS. MCFARLANE:  Your Honor --

15             THE COURT:  Very good.  Ask your next question.

16   BY MS. MCFARLANE:

17        Q.   In reviewing the records in this case, Agent

18   Byers, you've reviewed many emails from Mark Forkner; is

19   that correct?

20        A.   I've reviewed some, yes.

21        Q.   And in reviewing those emails you have reviewed,

22   oftentimes, Mr. Forkner says, "I lied"; isn't that correct?

23             MR. O'NEILL:  Objection, beyond the scope and

24   relevance.  Redirect about lies to the AEG, not lies in

25   general.
```

1           THE COURT:  Overruled.

2           THE WITNESS:  I'm sorry.

3           THE COURT:  Has he said "I lied" in other

4   communications.  That's the question.  Do you know?

5           THE WITNESS:  Yes.

6   BY MS. MCFARLANE:

7       Q.  Yes, he has, correct?

8       A.  Yes.

9       Q.  He's said it numerous times in communication,

10  official communication, "I lied" to various folks; isn't

11  that correct?

12      A.  I'm not sure who the various folks were.

13      Q.  Various employees, others at Boeing; isn't that

14  correct?

15      A.  Yes.

16          MS. MCFARLANE:  Your Honor, defense would like to

17  move to admit Defense Exhibit 275 A through I.

18          THE COURT:  Okay.  That's denied.  Ask another

19  question.

20          MS. MCFARLANE:  Okay.

21          THE COURT:  We need to move, okay?

22          MS. MCFARLANE:  Yes, your Honor.  That's my final

23  question, your Honor.

24          THE COURT:  You may step down.

25          Call your next witness.

```
 1              MR. ARMSTRONG:  Your Honor, the United States
 2   calls Stacey Klein.
 3              THE COURT:  Just put everything on that table.
 4              Are you Stacey Klein?
 5              THE WITNESS:  I am.
 6              THE COURT:  Would you raise your hand to be sworn?
 7         (The oath was administered.)
 8              THE WITNESS:  I do.
 9              THE COURT:  Very good.  Come have a seat.
10              MR. ARMSTRONG:  Your Honor, before Ms. Klein
11   testifies, I believe that we were going to offer Government
12   Exhibits 9, 18, and 24 without objection.
13              THE COURT:  Okay.  Nine, 18 and 24 will be
14   admitted.
15              (Government Exhibits 9, 18, and 24 were admitted
16         into evidence.)
17              MR. ARMSTRONG:  Thank you, Judge.
18                     DIRECT EXAMINATION
19   BY MR. ARMSTRONG:
20         Q.   Two minutes shy.
21              Good morning, ma'am.
22         A.   Good morning.
23         Q.   Please introduce yourself to the Jury and spell
24   your name for the record.
25         A.   Sure.  My name is Stacey Klein, S-t-a-c-e-y,
```

1    K-l-e-i-n.

2        Q.   And Ms. Klein, if I could ask you to speak into

3    the microphone a little bit so we can hear you.

4        A.   Yeah.  Stacey Klein.  S-t-a-c-e-y, K-l-e-i-n.

5        Q.   Ms. Klein, where do you work?

6        A.   I work for the Federal Aviation Administration.

7        Q.   Is that also known as the FAA?

8        A.   Yes.

9        Q.   Generally speaking, what does the FAA do?

10       A.   We provide aviation safety

11   for particularly airliners and keep the public safe.

12       Q.   You mentioned that you do public safety for

13   airlines.  Is that airlines here in America?

14       A.   Yes, in the United States.

15       Q.   Airlines like who and like what?

16       A.   Airlines like Southwest, American, Delta, United.

17       Q.   Ms. Klein, do you have a degree from Southern

18   Illinois?

19       A.   Yes.  I have a bachelor of science degree in

20   aviation management from Southern Illinois University.

21       Q.   I'm sorry.  Your bachelor of science was in what,

22   ma'am?

23       A.   Aviation management.

24       Q.   And what year did you get that?

25       A.   1998.

1      Q.    Ma'am, are you a pilot?

2      A.    I am a pilot.

3      Q.    How long have you been a pilot for?

4      A.    Since 1992.

5      Q.    What kind of planes have you flown?

6      A.    I've flown everything from a Cessna 140, in which

7   I learned on, to a 787 and a 747 Boeing aircraft.

8      Q.    How does the Cessna you learned on compare to a

9   787 or 737?

10      A.    You pitch up, the houses get smaller.  You pitch

11   down, the houses get bigger.  So they fly, basically.

12      Q.    Is a Cessna like one of those, like, small, little

13   one-propeller planes?

14      A.    Yes, it's a small airplane with a little

15   reciprocating engine.

16      Q.    Were you also a check airman at some point?

17      A.    Yes.

18      Q.    What's a check airman?

19      A.    A check airman is somebody who's blessed by the

20   FAA to conduct training for airlines.  And so I was a check

21   airman, and a line check airman, so I also did line flight

22   training.

23      Q.    What do you mean "blessed by the FAA" to do pilot

24   training?

25      A.    So in addition to myself being a captain for the

1   airline, I had to qualify as somebody the FAA would trust to

2   conduct flight training for our airline and also checking.

3        Q.    And so as a check airman, who else did you

4   actually train?

5        A.    Our airline pilots.

6        Q.    And how long did you do that for?

7        A.    I was check airman for three and a half years.

8        Q.    And where did you do that?

9        A.    At Skyway Airlines.

10        Q.    Are you also a captain?

11        A.    Yes.  I worked for Skyway Airlines for six and a

12   half years; three and a half of which I was a captain and

13   check airman for the company.

14        Q.    Can you ballpark for the jury about how many hours

15   you were a captain for Sky Airways?

16        A.    Skyway Airlines.  Um, I have 6800 hours total

17   time.  3,000 of that was as a first officer, and about 1800

18   as a captain and check airman before I joined the FAA.

19        Q.    You mentioned that you at some point did join the

20   FAA, right?

21        A.    Yes.

22        Q.    When did you join the FAA?

23        A.    In May of 2006.

24        Q.    Is where did you start out?

25        A.    I started out as the assistant principal

1   operations inspector at the Milwaukee FSDO, the Flight

2   Standard District Office.

3        Q.    And generally speaking, what did you do there?

4        A.    I provided oversight for Midwest Express Airlines

5   to ensure that the airline was compliant with our Federal

6   Aviation regulations.

7        Q.    And for about how long did you do that for?

8        A.    For three years.

9        Q.    Where did you go next?

10       A.    I joined the Seattle Aircraft Evaluation Group in

11  2009.

12       Q.    I'm sorry.  Let me back up.

13             Before you joined the Seattle Aircraft Evaluation

14  Group, are you familiar with the term "type rating" for

15  pilots?

16       A.    Yes.

17       Q.    What does that mean "type rating" for pilots?

18       A.    So any aircraft that's 12,500 pounds or greater,

19  the pilot has to be trained in accordance with our Federal

20  Aviation regulations, and then receive a type rating on that

21  aircraft.

22       Q.    And are you type-rated as a pilot?

23       A.    Yes, I am.

24       Q.    For how many planes are you type-rated for?

25       A.    I hold seven type ratings.

1      Q.   And can you rattle off the top of your head what

2   those planes are?

3      A.   Yes.  Beech 1900D, which I flew for Skyway

4   Airlines; DC-9; Boeing 737; Boeing 747-400, Boeing 787,

5   Embraer 170, and an Embraer 190.

6      Q.   That was seven type ratings, right?

7      A.   That's correct, sir.

8      Q.   Then you mentioned that you went to the Seattle

9   Aircraft Evaluation Group, right?

10      A.   Yes.

11      Q.   Is that also known as the AEG for short?

12      A.   Yes.

13      Q.   Is the AEG part of the FAA?

14      A.   Yes.

15      Q.   What does the AEG do?

16      A.   The AEG is -- I was a operations inspector, so as

17   a pilot, we provided evaluation criteria for

18   transport-category aircraft, so airliners in evaluating the

19   type rating and the training required for airlines to fly.

20      Q.   Okay.  Ma'am, if I could ask you just to slow down

21   just --

22      A.   Yeah, sorry.

23      Q.   You're talking very technically, so I want to make

24   sure everyone gets it.

25           So at a high level, does the AEG set the level of

1   training for new versions of airlines?

2       A.   Yes.  We evaluate the training required for

3   airlines and also the differences between different

4   airplanes.

5       Q.   And those airlines -- sorry.  Is that evaluation

6   for U.S.-based, or airlines here in the United States?

7       A.   The United States.

8       Q.   Where is the AEG based?

9       A.   There's five different offices, and I worked for

10  the Seattle AEG in Seattle, Washington.

11      Q.   Do you still work for the AEG?

12      A.   I do not.

13      Q.   Why not?

14      A.   I was promoted.

15      Q.   When were you promoted?

16      A.   January 2022.

17      Q.   And where do you work now?

18      A.   I'm the Denver Aircraft Certification Office

19  branch manager.

20      Q.   The Denver Aircraft Certification Office.  Is that

21  still part of the FAA?

22      A.   Yes.

23      Q.   Before you were promoted and went to the Aircraft

24  Certification Office in Denver, how long did you work at the

25  AEG in Seattle?

1      A.   I worked at the Seattle AEG from 2009,

2   October 2009, until January 2022.

3      Q.   Is that about 13 years?

4      A.   Yes.

5      Q.   Are you familiar with The Boeing Company?

6      A.   Yes.

7      Q.   What's Boeing?

8      A.   Boeing is an aircraft manufacturer.

9      Q.   What do they manufacture?

10      A.   They manufacture airline jets.

11      Q.   And where does Boeing actually build the

12   airplanes?

13      A.   They build airplanes in the Seattle area, as well

14   as North Carolina.

15      Q.   And what is AEG's role with respect to the

16   airlines or the aircrafts built by Boeing?

17      A.   Can you repeat the question?

18      Q.   Of course.

19           What is AEG's role with respect to the aircrafts

20   built by Boeing?

21      A.   We evaluate those aircraft for pilot training

22   requirements.

23      Q.   Are you familiar with the 737?

24      A.   Yes, sir.

25      Q.   What's the 737?

1        A.    The 737 is an airplane that Boeing manufactures.

2   It's a narrow-body, twin-engine aircraft.

3        Q.    How long has Boeing been manufacturing the 737

4   for?

5        A.    The first aircraft, they started developing in

6   1964, and it took flight, I believe, in 1968 or -7.

7        Q.    And so from the 1960s through around today, have

8   there been different versions of the 737 along the way?

9        A.    Yes.

10       Q.    Are you familiar with the 737 NG and the 737 MAX?

11       A.    Yes.   The 737 NG stands for "Next Generation."   It

12   was a family of aircraft that was developed and took flight

13   in 1998.

14       Q.    And what's the 737 MAX?

15       A.    The 737 MAX is a family of aircraft that were

16   developed after the NG, starting in 2012.

17       Q.    Did Boeing sell the MAX to airlines here in the

18   United States?

19       A.    Yes.

20       Q.    To which airlines?

21       A.    Southwest, American, Alaska.

22       Q.    During your time at the AEG, did you actually work

23   on the MAX?

24       A.    I did.

25       Q.    Around when did you first start working on the

UNITED STATES vs MARK A. FORKNER

4:21-cr-00268-O-1                  Vol 2 March 21, 2022                  Page 309

```
 1   MAX?
 2        A.    In May of 2012.
 3        Q.    What was your role in the AEG for the MAX?
 4        A.    I was the Boeing 737 Flight Standardization Board
 5   chairman.
 6        Q.    As the chairman of the MAX, did you have a team of
 7   other people working for you?
 8        A.    I did.
 9        Q.    About how many people?
10        A.    There were two additional people.  There was a
11   team of three.
12        Q.    And did the AEG's work on the MAX and your work as
13   the chair involve something called "pilot differences
14   training"?
15        A.    Yes, sir.
16        Q.    On a high level, what is pilot differences
17   training?
18        A.    Pilot differences training is new or modified,
19   changed systems from whatever the base aircraft is to the
20   new airplane.  So you evaluate those differences.
21        Q.    So in this case, what were you comparing to what
22   for pilot differences training?
23        A.    So for this example, we were comparing the 737 NG
24   aircraft to the 737 MAX, the new and changed systems to
25   evaluate for pilot training.
```

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 310

1       Q.   And so were you looking at the new and changed

2   systems on the MAX for purposes of pilot training?

3       A.   Yes, sir.

4       Q.   Why were you doing that?  Why were you comparing

5   the NG to the MAX for newer changed systems on the MAX?

6       A.   So every aircraft that's developed has to receive

7   some sort of rating on what training is required for the

8   pilots to receive so that they can adequately fly the

9   aircraft safely.

10      Q.   Ma'am, as the chair, are you familiar with

11  different levels of training?

12      A.   Yes.

13      Q.   What are the different levels of training?

14      A.   There are different levels.  There's Level A, all

15  the way up to Level E.  Level A training is simply a piece

16  of paper that a pilot would receive that outlined what the

17  difference is between those two airplanes all the way up to

18  Level E, which requires hands-on training in a full flight

19  simulator.

20      Q.   And how do the levels differs among themselves?

21  You mentioned Level A all the way up to Level E?

22      A.   It's incrementally more training-intensive.  So

23  Level A to Level B requires another layer of training; Level

24  B to Level C would require another layer of training, all

25  the way up to Level E, where we're training in a full flight

1   simulator.

2       Q.   So what's the least intense level of training?

3       A.   Level A.

4       Q.   And what is the highest intensity level of

5   training?

6       A.   Level E.

7       Q.   Are you familiar with the Level B, as in "boy,"

8   training?

9       A.   Yes, sir.

10      Q.   What's Level B training?

11      A.   Level B training is computer-based training that's

12  pushed out via computer or iPad.

13      Q.   Are you familiar with simulator training?

14      A.   Yes, sir.

15      Q.   What level is that?

16      A.   That's Level E.

17      Q.   And at a high level, how does Level B, or the iPad

18  training, compare with Level E, or the simulator training?

19      A.   It's much more labor-intensive and requires a lot

20  more training than a Level E; full flight simulator, Level

21  E.

22      Q.   So which one is more labor-intensive, Level E

23  simulator training, or Level B, the iPad training?

24      A.   Level E.

25      Q.   Is differences training important for pilots here

1   in the United States?

2        A.   Yes.

3        Q.   Why is that?

4        A.   Differences training establishes what the training

5   requirements are for airlines, for their pilots to be able

6   to fly the airplanes safely.

7        Q.   And who makes that final decision about the level

8   of training for pilots, for airlines like American and

9   Southwest?

10       A.   I did.

11       Q.   Are you familiar with the Flight Standardized

12  Board, or the FSB?

13       A.   Yes, sir.

14       Q.   What's the FSB?

15       A.   The Flight Standardization Board is a group of

16  professional pilots from different backgrounds that I, as

17  the chair, put together in order to conduct the evaluation

18  of those differences.

19       Q.   And does the FSB, which you were the chair,

20  ultimately set the level of pilot training for the MAX?

21       A.   Yes.

22       Q.   How many other people sat on the FSB with you?

23       A.   For the 737 MAX, I think we had a total of 12.

24  There may have been eight board members and then four

25  airline pilots that also were participants on the board.

 1          Q.   And generally speaking, where did you pull these
 2    people from?
 3          A.   So the FAA members are pilots that work for the
 4    FAA in different realms, either providing oversight to the
 5    airlines themselves, or we had policy people who are
 6    intimately familiar with the policy.  We also included
 7    flight test pilot on the board.  And then the participants
 8    are actual airplane pilots who are flying the line for
 9    American, Alaska Airlines -- and I'm drawing a blank on the
10    third.  We included three different airlines.
11          Q.   And, ma'am, I forgot to remind you, but you have a
12    water bottle up there in case you get tired of talking.
13          A.   Thanks.
14          Q.   In 2016 and 2017, how many chairs were there on
15    the FSB for the MAX?
16          A.   Just one, myself.
17          Q.   And what does that mean, that you were the chair
18    of FSB for the MAX?
19          A.   I had the ultimate decision in evaluating the
20    training determination.
21          Q.   Did you have the ultimate decision to set the
22    level of training for the MAX?
23          A.   Yes, sir.
24          Q.   And did you, in 2017, set the level of training
25    for the MAX?

1    A.   Yes.  I did.

2    Q.   What level did you decide?

3    A.   Level B.

4    Q.   Is Level B that iPad training you mentioned

5    before?

6    A.   Yes.

7    Q.   From the time you started working on the MAX

8    around 2012 through 2017 when you set the level of training

9    for the MAX, why did that take so long?  Why did it take

10   five years?

11   A.   So the aircraft is being developed by engineers

12   and it takes a long time to develop a new airplane.  So

13   Boeing's first presentation of what the MAX was going to be

14   was in May of 2012, and then the final certification of the

15   aircraft was, I believe, in March 2017.

16   Q.   But, generally speaking, why did it take five

17   years?  Is it an easy job, a complex job?

18   A.   No.  It's a very complex job of developing the

19   aircraft in accordance with our rules and regulations for

20   aircraft certification.  And then the job of the AEG is to

21   evaluate all those type of differences during that time.

22   Q.   Ms. Klein, do you know Mark Forkner?

23   A.   I do.

24   Q.   Where did you first meet Mark Forkner?

25   A.   I first met Mark at the FAA when he was employed

1    there.

2         Q.    Around when did you first meet Mr. Forkner?

3         A.    I believe it was 2010.

4         Q.    Where were you working at the times?

5         A.    The AEG.

6         Q.    Was Mr. Forkner also working at the AEG with you

7    at the time?

8         A.    No.  Mr. Forkner worked for the Airports Division,

9    I believe.

10        Q.    The Airports Division, what was that?

11        A.    The Airports Division.  It's an area that they

12   find compliance for airport development and, you know, U.S.

13   airport Part 39.

14        Q.    Did you work directly with Mr. Forkner at this

15   time?

16        A.    No.

17        Q.    How did you get to know him?

18        A.    We shared the same floor at the FAA office, and he

19   would come over and visit from time to time.

20        Q.    Were you aware that he was a pilot?

21        A.    I was.

22        Q.    At some point did he leave the Airport Division at

23   the FAA?

24        A.    Yes.

25        Q.    Where did he go?

1    A.   The Boeing Company.

2    Q.   Once Mr. Forkner was at Boeing, did you have

3  opportunities to actually deal with him at your job at the

4  AEG?

5    A.   Yes, sir.

6    Q.   What did you deal with Mr. Forkner about when you

7  were at AEG and he was at Boeing?

8    A.   Mr. Forkner was the Boeing 737 chief technical

9  pilot, so he was my direct counterpart at The Boeing

10  Company.

11    Q.   Do you see Mr. Forkner in court today?

12    A.   I do.

13    Q.   Can you please identify him by where he's sitting

14  and what he's wearing?

15    A.   Mark is sitting there in a white shirt and gray

16  coat.

17    Q.   Is he sitting right next to this lady right here?

18    A.   Yes.

19        MR. ARMSTRONG:  Your Honor, may the record reflect

20  an in-court identification of Mr. Forkner?

21        THE COURT:  Yes.

22  BY MR. ARMSTRONG:

23    Q.   How often did you deal with Mr. Forkner when he

24  was at Boeing?

25    A.   As the chief technical pilot, he was my direct

 1   counterpart.  So I would have meetings with him.  We had

 2   established meetings every other week, but we would see each

 3   other often in other certification meetings, and we'd get

 4   together for meetings at his office or my office.

 5        Q.   How frequently would you talk to him?

 6        A.   Every week.

 7        Q.   What did y'all talk about?

 8        A.   The Flight Standardized Board, evaluation of the

 9   MAX.

10        Q.   What was his position at Boeing during the bulk of

11   your work together with him on the MAX?

12        A.   He was the chief technical pilot for the Boeing

13   737.

14        Q.   What does that mean, "He was the chief technical

15   pilot"?

16        A.   He was responsible for providing all the 737

17   material to the AEG.  So the design changes, the design of

18   the aircraft; evaluate what the training requirements would

19   be; create the plan for the evaluation; give that as a

20   proposal to myself and my team members.

21        Q.   About how far was his office from yours outside

22   Seattle?

23        A.   I was two blocks away.

24        Q.   As the chief technical pilot, did Mr. Forkner have

25   a specific group at Boeing?

```
 1          A.   Yes.  He worked in the Flight Technical Group.

 2          Q.   Did he have people in that group working with him?

 3          A.   Yes.

 4          Q.   About how many?

 5          A.   Six.

 6          Q.   Who was the chief of that group, from your

 7   perspective?

 8          A.   It was Mark Forkner.

 9          Q.   How would you describe his position within his

10   team at Boeing?

11          A.   I would describe him as the boss.

12          Q.   Why do you say that?

13          A.   He's the chief technical pilot.

14          Q.   How would you describe Mr. Forkner's position as

15   the chief technical pilot compared to yours as the chair of

16   the FSB?

17          A.   He was my direct counterpart.

18          Q.   Why do you say that?

19          A.   That's how it works, in that there's a single

20   point of contact at the manufacturer that proposes all of

21   the design changes and the training requirements to the FSB

22   chair of that aircraft.  So each individual aircraft has its

23   own team, and there is a chief technical pilot on the

24   manufacturer's side and there is an FSB chair that works for

25   the government, the AEG, that's assigned to that aircraft
```

1   fleet.

2        Q.   And who is of that single point of contact at

3   Boeing for you?

4        A.   It was Mark Forkner.

5        Q.   Was Mr. Forkner's job as the chief technical pilot

6   at Boeing important to your job as chair of FSB?

7        A.   Yes.

8        Q.   Why?

9        A.   It's how we got information on what the training

10  differences would be based on what those system designs

11  were.

12       Q.   For what plane?

13       A.   For the 737 MAX.

14       Q.   Could you do your job as the chair of the FSB if

15  Mr. Forkner didn't do his job?

16       A.   No.

17       Q.   Why not?

18       A.   I solely relied and trusted Mark Forkner to

19  provide all of that information.

20       Q.   Provide what information?

21       A.   The system differences and the design changes of

22  the aircraft.

23       Q.   To decide the level of training for the MAX, what

24  information did you need to receive?

25       A.   I would need accurate, true design information on

```
 1    what the design of the aircraft is.
 2         Q.   Did you need complete information or incomplete
 3    information?
 4         A.   Complete.
 5         Q.   Was it important to your job that you receive
 6    true, accurate, and complete information about the MAX?
 7         A.   Yes, sir.
 8         Q.   Can you explain why?
 9         A.   It's essential.  We can't evaluate the aircraft
10    without true and complete information, and then keep the
11    public safe.
12         Q.   And from whom did you need to receive true,
13    accurate, and complete information about the MAX?
14         A.   Mr. Forkner.
15         Q.   Who did you rely on to give you that information?
16         A.   Mark Forkner.
17         Q.   Who did you trust?
18         A.   Mark Forkner.
19         Q.   Was that normal or abnormal that you would rely on
20    someone at the manufacturer to provide you that true,
21    accurate, and complete information on the plane that you
22    were evaluating at the AEG?
23         A.   It's normal.
24         Q.   How so?
25         A.   It's what our guidance and regulation is based off
```

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 321

 1    of, of mutual trust between the manufacturer and the

 2    regulator; that they will provide detailed design

 3    information.  And so I relied on Mark Forkner for that

 4    detailed design information to evaluate the training

 5    differences.

 6        Q.   During your evaluation of the MAX, did you come to

 7    learn the resources that Mr. Forkner had at Boeing?

 8        A.   Yes, sir.

 9        Q.   How did you learn that?

10        A.   We would attend Aircraft Certification Office

11    meetings where Boeing engineers and our flight test pilots

12    and Mark Forkner and his team would attend.  So we got to

13    know a lot of the engineers that would develop those

14    presentations, to present to all of us as regulators; so our

15    aircraft certification branch, and the flight test branch

16    and then myself and my team.

17        Q.   How would you describe the level of resources that

18    Mark Forkner had at his disposal at Boeing?

19        A.   A lot.  They develop the airplane, so they have

20    thousands of people that work there doing that.

21        Q.   And how would you compare that level of resources

22    that Mr. Forkner had at Boeing to the level of resources

23    that you had at the AEG?

24        A.   We didn't have as many.  We provide the oversight,

25    so I had a team of three to evaluate, for myself, I can

1   speak.  That's how many people we had.

2        Q.   Now, when you ultimately set -- when you first

3   set -- I apologize.

4             When you first set Level B for the MAX back in

5   July of 2017, did you believe that Mr. Forkner had provided

6   you true, accurate, and complete information about the MAX?

7        A.   Yes, sir.

8        Q.   What do you believe now?

9        A.   That is not true.

10       Q.   What's not true?

11       A.   That it was not true and accurate information.

12       Q.   Ma'am, are you familiar with something called the

13   "Maneuvering Characteristics Augmentation System"?

14       A.   Yes, sir.

15       Q.   Is that also known as "MCAS," M-C-A-S?

16       A.   Yes.

17       Q.   And did you learn about MCAS during the course of

18   your evaluation of the MAX?

19       A.   Yes.

20       Q.   Generally speaking, if MCAS kicked in, what would

21   that do for the front, or the nose, of the plane?

22       A.   It would push the nose of the aircraft down.

23       Q.   And if the nose of the plane is pushed down, how

24   does that affect the flight of the plane?

25       A.   The flight of the aircraft goes down.

1      Q.   During your evaluation of the MAX, what was your

2   understanding of the speeds at which MCAS could operate?

3      A.   I first learned about MCAS in 2015, and the speeds

4   are high speeds; so .7 Mach and above.

5      Q.   I'm sorry.  You said what speed specifically?

6      A.   High speed.

7      Q.   And you mentioned a Mach number.  What Mach number

8   did you mention?

9      A.   .7 Mach and above.

10      Q.   At any point in your evaluation of the MAX, did

11   you learn that MCAS could operate at speeds below .7 Mach?

12      A.   No, I did not.

13      Q.   During your evaluation of the MAX, what was your

14   understanding of when MCAS could operate in normal passenger

15   flight?

16           MS. MCFARLANE:  Your Honor, objection.  Can we

17   have a time frame for evaluation of the MAX?

18           MR. ARMSTRONG:  Sure.

19   BY MR. ARMSTRONG:

20      Q.   Ms. Klein, at any point from 2015 through 2017,

21   what was your understanding of when MCAS could operate a

22   normal passenger flight?

23      A.   Never.

24      Q.   Based on that understanding, what level of

25   training did you set for the MAX?

1      A.   B level training.

2      Q.   And is that the level you set in July of 2017?

3      A.   Yes, sir.

4      Q.   In October 2018, was there an incident with the

5   MAX?

6      A.   Yes.

7      Q.   About how long after you set Level B for the MAX

8   was this incident?

9      A.   A year and a half.

10     Q.   Around the time of this incident, did you learn

11   about the speeds when MCAS could actually kick in?

12     A.   Yes.

13     Q.   What did you learn?

14     A.   That MCAS had been expanded down to Mach .2, which

15   is a slow, low, airspeed.

16     Q.   Mach .2?

17     A.   Yes, sir.

18     Q.   Was the fact that MCAS was expanded at the low

19   speeds like Mach .2 new information to you?

20     A.   Yes.  It was new information.

21     Q.   Can you explain why?

22     A.   I -- the understanding that I had based on the

23   presentation and system design information that was provided

24   through the FCOM, which is the Flight Crew Operating Manual,

25   was a high-speed, high-G maneuver that MCAS would actually

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                        Vol 2 March 21, 2022                        Page 325

1  activate.

2          So learning about the expansion of MCAS after the

3  2018 incident was quite a surprise.

4      Q.   Who provided the information to you at the time of

5  your evaluation about how MCAS only operated at high speeds?

6      A.   Mr. Forkner.

7      Q.   At the time of your evaluation, did you have any

8  idea that MCAS could operate all the way down to low speeds

9  like Mach .2?

10     A.   No.

11     Q.   After the incident in 2018, did you come to learn

12 if anybody else in this courtroom saw that MCAS could be

13 active all the way down to Mach .2?

14     A.   I did.

15     Q.   Who?

16     A.   Mark Forkner.

17     Q.   How did you learn that?

18     A.   I learned that from an internal text message that

19 was publicized in 2019.

20     Q.   Whose text message?

21     A.   Mark Forkner and Patrik Gustavsson.

22     Q.   Did Mr. Forkner ever share with you how MCAS could

23 be active down to Mach .2 during your evaluation of the MAX?

24     A.   No.

25     Q.   Did you want to know that?

1    A.   Yes.

2    Q.   Why?

3    A.   So we could evaluate it for pilot training, keep

4    the public safe.

5    Q.   How could knowing that fact have affected your

6    evaluation of the 737 MAX?

7    A.   It would have affected the Level B determination.

8    Q.   How so?

9    A.   The evaluation -- we would have had to redo the

10   evaluation for all the required pilot training maneuvers

11   that are required under our regulations, and upon doing so,

12   that would determine if Level E training could be

13   sufficient.

14   Q.   Level B training to be sufficient or insufficient?

15   A.   No.  I said Level E training would be sufficient

16   was what the determination was after we evaluated it.

17   Q.   And Level E training, was what kind of training?

18   A.   Full flight simulator training.

19   Q.   Ma'am, showing you Government Exhibit 227.

20        MR. ARMSTRONG:  And Ms. Holbrook, if you can

21   please pull up the top, please.

22   BY MR. ARMSTRONG:

23   Q.   Ma'am, what's the date of this chat?

24   A.   It's November 15th, 2016.

25   Q.   And who are the participants?

 1       A.   It's an instant message between Mark Forkner and

 2  Patrik Gustavsson.

 3       Q.   Is this the chat you saw after the 2018 incident

 4  that you referenced?

 5       A.   Yes.  And October 2019 is when this was brought to

 6  my attention.

 7       Q.   So this chat was brought to your attention about

 8  three years after the fact?

 9       A.   Yes, sir.

10            MR. ARMSTRONG:  And Ms. Holbrook, can you please

11  blow-up the bottom 650 to 651, please.

12  BY MR. ARMSTRONG:

13       Q.   Ma'am, are those the words that you saw in 2019?

14       A.   Yes, they are.

15       Q.   Including, "MCAS is now active down to Mach .2,

16  and so I basically lied to the regulators, unknowingly"?

17       A.   Yes.

18       Q.   And whose words are those?

19       A.   Mark Forkner.

20       Q.   How long after you set Level B for the MAX did you

21  see those words?

22       A.   What was that, two and a half years?  I saw these

23  in October of 2019.  We set the level of training in 2017.

24       Q.   What was your reaction when you saw these words

25  about two years after your evaluation of the MAX?

UNITED STATES vs MARK A. FORKNER

4:21-cr-00268-O-1                  Vol 2 March 21, 2022                  Page 328

1        A.    I was shocked, dismayed, sad, angry.  All of the

2    feelings.

3        Q.    Why is that?

4        A.    Because I trusted Mark.  And I trusted him to give

5    me this information.

6              THE COURT:  Okay.  Why don't we go ahead and take

7    our lunch break now.  We have ordered you in sandwiches, so

8    you will have sandwiches back upstairs when you go back

9    upstairs.  It's good today, because we have bad weather

10   today, so you don't have to go out to get food if you don't

11   want to.  Of course, if you want to, you can.

12             We'll start back up -- why don't we start back up

13   at about 1:45?  And in the meantime, please remember all of

14   my instructions.  Please avoid any push notifications, news

15   stories.  Don't conduct any independent investigation.

16   Don't read any news stories that might mention anything

17   about this case.

18             We'll get you back in just as soon as everybody is

19   back here and you-all are ready to go.  We will get you back

20   in, and we will keep going through the testimony.  So we

21   will see you after lunch.

22             All rise.

23        (A recess was had at 12:31 p.m.)

24             THE COURT SECURITY OFFICER:  All rise.

25             THE COURT:  Okay.  Please be seated.

```
 1              It looks like we are missing a participant or two.
 2    They should be here, and we can get started.
 3              (Discussion off the record.)
 4              THE COURT:  Where is the witness?
 5              MR. ARMSTRONG:  The witness is in the hallway,
 6    your Honor.
 7              THE COURT:  Let's go ahead and get them in here.
 8          (Thereupon, the witness entered the courtroom.)
 9                 DIRECT EXAMINATION -- CONTINUED
10    BY MR. ARMSTRONG:
11         Q.   All right, ma'am.  Good afternoon.
12         A.   Good afternoon.
13              MR. ARMSTRONG:  If you will pull up Exhibit 22,
14    please.
15              Please put up the time and date of the chat and
16    the chat, Exhibit 22, starting with 6:50 all the way down to
17    the bottom, please.
18              THE WITNESS:  Is it supposed to be populated on
19    this the screen here?
20    BY MR. ARMSTRONG:
21         Q.   Yes, ma'am.
22         A.   It is not.
23              THE COURT:  I haven't done anything.
24    BY MR. ARMSTRONG:
25         Q.   This document is in evidence, GE-22.
```

1    Can you see it?

2    THE COURT:  Maybe you hit the machine somehow.

3    MR. ARMSTRONG:  Your Honor, may I approach?

4    THE WITNESS:  Okay.  It is up.

5    BY MR. ARMSTRONG:

6    Q.   All right.  Ms. Klein, right before the break, we

7    are talking about Mr. Forkner's words on November 15, 2016,

8    right?

9    A.   Yes, sir.

10   Q.   Who is Mr. Forkner telling the MCAS is not active

11   down to Mach .2 and regulators knowing --

12   A.   This is a communication between Mark Forkner and

13   Patrik Gustavsson.

14   Q.   Do you know who Patrik Gustavsson is?

15   A.   Excuse me.  Yes, sir.

16   Q.   Who was Mr. Gustavsson or Gustavsson?

17   A.   Gustavsson.  I pronounce it Gustavsson.

18   Q.   Who was Mr. Gustavsson at the time back in

19   November of 2016?

20   A.   Patrick was Mark's deputy chief pilot.

21   Q.   What was role compared to Mr. Forkner's role back

22   in November 2016?

23   A.   He worked for Mark.

24   Q.   Now, ma'am, are you included on this chat?

25   A.   No.

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 331

1      Q.   Did Mr. Forkner share this chat with you at the

2 time, back in November of 2016?

3      A.   No, he did not.

4      Q.   Did you have access to it?

5      A.   No, I do not.

6      Q.   Why not?

7      A.   This is an internal Boeing instant message between

8 himself and Mr. Gustavsson.

9      Q.   Did Mr. Forkner ever share this chat with you at

10 any point?

11      A.   No, he did not.

12      Q.   Mr. Forkner writes, "MCAS is now active down to

13 M.2."

14           Do you see that, ma'am?

15      A.   Yes.

16      Q.   Are you familiar with the term M.2?

17      A.   Yes, that is Mach .2.

18      Q.   Is Mach .2 high speed or low speed?

19      A.   Low speed.

20      Q.   What does that mean to you, "MCAS is now active

21 down to Mach .2"?

22      A.   It means that the functioning of the software is

23 now active, has been expanded down to a low speed aircraft

24 regime.

25      Q.   Based on this chat, at what speed could MCAS now

```
 1  operate -- operable down to Mach .2?
 2       A.   During a normal airline flight.
 3       Q.   At what basis of flight does a plane normal
 4  operate in at speeds Mach .2 or low speed?
 5       A.   Takeoff and landing.
 6       Q.   Are you familiar with the phase "critical phase of
 7  flight"?
 8       A.   Yes, sir.
 9       Q.   What is that?
10       A.   The critical phase of flight is the flight during
11  takeoff and landing in which if anything were to go wrong,
12  its critical and you have to be able to recover.
13       Q.   So why is takeoff and landing a critical phase of
14  flight?
15       A.   Because if anything goes wrong, you have very
16  little time to recover.  You are close to the ground.
17       Q.   How important is pilot training during this
18  critical phase of flight?
19       A.   It's essential.  The majority of all of our pilot
20  training happens essential below 5,000 feet from the ground.
21       Q.   And when a plane is going Mach .2 or around there,
22  is that high in the sky or low in the sky?
23       A.   Low in the sky.
24       Q.   Would it have been important for you to know at
25  the time that MCAS is now active down to Mach .2?
```

1      A.   Yes, sir.

2      Q.   Can you explain why?

3      A.   We would need to evaluate it for all the required

4   parking lot training requirements to see how it would

5   interact with the system and how it would fail, so we could

6   evaluate what type of pilot training would be required when

7   it is operative and when it's inoperative.

8      Q.   Were you able to evaluate MCAS at low speed for

9   how it operated, what it interacted with and what happens

10   when it failed at the time?

11      A.   No, I did not.

12      Q.   Why not?

13      A.   I didn't know that the software had been expanded

14   to include a normal operating envelope.

15      Q.   Back in November 2016, at what speeds did you

16   think MCAS could operate?

17      A.   Only high speeds, above Mach .7.

18      Q.   Did you believe at the time that MCAS could kick

19   in or could not kick in during passenger flights?

20      A.   It would not kick in during a normal passenger

21   flight.

22      Q.   When MCAS is active down to Mach .2, could MCAS

23   now kick in during a passenger flight?

24      A.   Yes, depending on the conditions.

25      Q.   Mr. Forkner writes here at 6:51, "So I basically

 1    lied to the regulators unknowingly."

 2            Do you see that, ma'am?

 3    A.    Yes, sir.

 4    Q.    Who was the regulator working with Mr. Forkner

 5    back in November 2016?

 6    A.    I was.

 7    Q.    And what were you working with Mr. Forkner on?

 8    A.    The Flight Standardization Board evaluation.

 9    Q.    Who did you rely on to tell you that MCAS had been

10    expanded and changed from high speeds?

11    A.    I relied on Mark Forkner to do that.

12    Q.    When would you have wanted Mr. Forkner to tell you

13    that MCAS was now active down to Mach .2 or low speed?

14    A.    As soon as he learned about it.

15    Q.    Why is that?

16    A.    It is a system based on trust.  We rely on the

17    manufacturer to tell us about the designs so that we can

18    evaluate them for pilot training and safety.

19            So I trusted Mark to do that.

20    Q.    Did Mr. Forkner ever tell you that MCAS is now

21    active down to Mach .2?

22    A.    No, he did not.

23    Q.    At the time of this chat in November 2016, were

24    you close to finalizing your Level B decision for the MAX?

25    A.    Yes.  We had already conducted the evaluation of

 1   the training and provided a provisional approval for Level

 2   B, pending the certification of the aircraft and no design

 3   changes.

 4         Q.   And how close were you to actually finalizing that

 5   level of pilot training decision?

 6         A.   We finalized that decision in July of 2017.

 7         Q.   Even if you were close to finalizing your final,

 8   what would be your decision for the MAX, is there any

 9   scenario in which you didn't want to know about the

10   low-speed expansion of MCAS?

11         A.   No.

12         Q.   About how many times after November 16th -- I'm

13   sorry -- after November 2016 did you talk with Mr. Forkner?

14         A.   A lot.  We met often.

15         Q.   In person or over the phone?

16         A.   Both.

17         Q.   In any of these conversations, did he tell you

18   that MCAS was active down to low speeds?

19         A.   No, he did not.

20         Q.   Shifting gears, during your evaluation of the MAX,

21   did you and Mr. Forkner ever talk about the level of

22   training that he thought was appropriate for the MAX?

23         A.   Yes.

24         Q.   So what did he tell you?

25         A.   That it would be Level B differences training.

1    Level B would be appropriate.

2         Q.   So he told you that it will be Level B?

3         A.   Yes, sir.

4         Q.   How often would he say the MAX will be Level B?

5         A.   In the beginning, really often.  It was the main

6    topic of conversation as we were trying to understand the

7    system design.

8         Q.   Would he tell you this in person or over the

9    phone?

10        A.   In person.

11        Q.   Who was the ultimate decision maker about the

12   level of pilot training for the MAX?

13        A.   I was.

14        Q.   Did you ever raise with Mr. Forkner the

15   possibility that it might not be Level B?

16        A.   Yes.  I was very concerned that the system design

17   on the MAX would not qualify for Level B, and so I had

18   raised that concern with him as well as up my supervisory

19   chain.

20        Q.   When you raised those concerns with him, would he

21   agree with you?

22        A.   No, he would not.

23        Q.   What would he tell you in response?

24        A.   He would try to identify regulations where Level B

25   would be sufficient or training would not be required.

1       Q.    Would he tell you if you were right or wrong?

2       A.    He would tell me I was wrong.

3       Q.    How would he speak to you when he was telling you

4  that?

5       A.    In the beginning, Mark would be aggravated,

6  irritated with the process.

7       Q.    What do you mean he was agitated and irritated?

8       A.    He would be in the meetings, he would get

9  irritated, red faced, raise his voice at me.  He would be

10 angry.

11      Q.    Would he do anything physically when he was

12 getting red in the face and getting irritated at these Level

13 B conversations?

14      A.    Yes.  He would be red faced and slam his hands

15 down on the conference room table.

16      Q.    Had you ever encountered anything like that in

17 your work in the AEG reports?

18      A.    No.  It was very unprofessional.

19      Q.    Did you feel like Mr. Forkner was open at all to

20 the possibility of training for the MAX above Level B?

21      A.    No.

22      Q.    Why do you say that?

23      A.    Well, we couldn't have a normal conversation about

24 what would qualify for the training.  And so the meetings

25 were very contentious and difficult to have a mutual

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                     Vol 2 March 21, 2022                     Page 338

1   understanding that we were trying to evaluate for safety.

2        Q.   How would you describe overall his attitude

3   towards the AEG's process and the AEG's evaluation?

4        A.   I would describe it as being irritated, at trying

5   to follow that process.

6             He felt that a lower level of training would be

7   sufficient and that they wouldn't even have to follow the

8   process.  They could just do what was called a T1 test at

9   the time.

10       Q.   Were you concerned at all about his attitude at

11  the time?

12       A.   Yes.

13       Q.   Did you raise your concerns with anybody?

14       A.   I raised my concerns with my supervisors.

15       Q.   Despite your concerns, did you keep working with

16  Mr. Forkner?

17       A.   Yes, I did.

18       Q.   Why is that?

19       A.   I didn't have a choice.  Mr. Forkner was the chief

20  technical pilot, and so I started documenting everything and

21  writing it down in issue papers and briefing papers up to

22  our executive leadership in DC.

23       Q.   Overall, how would you characterize how Mr.

24  Forkner acted towards you and your colleagues at AEG during

25  your evaluation of the MAX?

1          A.    I felt like he was a bully.

2          Q.    Did he ever stop being a bully towards you and

3     your colleagues at AEG?

4          A.    Yes.

5          Q.    When?

6          A.    Once we agreed to evaluate the aircraft for their

7     proposal at Level B, it became a much more mutual,

8     professional engagement between myself and Mr. Forkner.

9          Q.    When Mr. Forkner told you that the MAX will be

10    Level B, did he tell you why he thought that?

11         A.    Yes.  Boeing had sold the aircraft to their

12    airlines to be no greater than Level B training.

13         Q.    Is that what he actually told you?

14         A.    Yes.

15         Q.    And when you said the airlines, did you take it

16    mean airlines like American and Southwest?

17         A.    Yes.

18         Q.    What did Mr. Forkner say about the financial

19    importance of Level B to Boeing?

20         A.    That it would be very expensive to be greater than

21    Level B; that they had sold the aircraft as Level B.

22         Q.    Very expensive to who?

23         A.    The airlines.

24         Q.    Based upon your experience, would a lower level of

25    training, like computer-based train or iPad training, save

1   money for airlines like American and Southwest compared to

2   simulator training?

3        A.   Yes.  Training via CBT, or a computer-based

4   training module is a lot less expensive than a full flight

5   simulator.

6        Q.   Can you explain why the iPad training is

7   essentially cheaper than the simulator training?

8        A.   Sure.

9             An iPad, all pilots are issued an iPad at the

10  airlines.  And so they can conduct that training, you know,

11  while they're on the road, on an overnight, or at their home

12  base at home.

13            In a full flight simulator training or hands-on

14  experience requires the flight crew to be taken off the line

15  flying.  They have to -- you know, the airline has to invest

16  in the cost of the simulator, which is millions of dollars,

17  they have to have facilities to host that.  They need to

18  have flight instructors, sim technicians.  It is a very

19  expensive undertaking.

20        Q.   You mentioned that pilots have to be taken off the

21  line for simulator training.

22            What does that mean?

23        A.   So a pilot is issued what we call a line segment

24  for the month.  And they would have to not fly their

25  scheduled trips and come to their training facility and

 1  spend several days in a hotel, and receive that training

 2  with the training instructors.

 3       Q.   How much more expensive, generally speaking, is

 4  simulator training compared to iPad training for the

 5  airline?

 6       A.   It is very expensive.

 7            To rent a simulator is anywhere from 400 to $1,500

 8  an hour, typically, for an airline.  And then the cost of

 9  the instructor, the training of having to come in do ground

10  training and then flight training.

11            It gets very costly.

12       Q.   Back in 2017, could American or Southwest even

13  have the ability to train their pilots on simulators for the

14  MAX?

15       A.   No.

16       Q.   Why not?

17       A.   Because Boeing was not going to be developing a

18  simulator for the MAX.

19       Q.   Were there even enough simulators to go around

20  back in 2017 to train all the pilots?

21       A.   No.  The idea would be that the airlines would

22  train their pilots on the NG, and then receive the

23  differences training via the CBT in an iPad training.

24       Q.   Ma'am, I'm shifting gears.

25            Was MCAS on any version of the 737 before the MAX?

UNITED STATES vs MARK A. FORKNER

4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 342

```
 1        A.   No, it was not.

 2        Q.   Around June 2015, did you receive information

 3   about MCAS and how it works?

 4        A.   Yes.

 5        Q.   How did you receive this information?

 6        A.   Boeing came over to the Seattle AEG's conference

 7   room and did a presentation on flight controls, so all the

 8   different changes to the flight control system.

 9        Q.   This presentation was at the AEG's office?

10        A.   Yes, sir.

11        Q.   What was the purpose of this presentation, from

12   your perspective?

13        A.   The purpose was to educate the AEG, myself, our

14   aircraft certification engineers, the program manager and

15   the flight test pilots on what the system differences were

16   between the NG and the MAX.

17        Q.   Were there any particular types of system

18   differences that were included in this presentation?

19        A.   Yes.

20             There were all kinds of system differences on the

21   737 MAX flight control system.  There were many different

22   changes, including MCAS.

23        Q.   So was the presentation essentially about flight

24   controls on the MAX?

25        A.   Yes.
```

```
 1        Q.    What are flight controls?
 2        A.    Flight controls are the surfaces used to turn the
 3   aircraft to pitch the aircraft up and down.  It's connected
 4   to the yoke or steering wheel that the pilot controls to
 5   maneuver the aircraft.
 6        Q.    Were your team members from the AEG also at the
 7   presentation about flight controls in June 2015?
 8        A.    Yes, they were.
 9        Q.    Who was actually presenting the information?
10        A.    A flight controls engineer at the Boeing Company
11   was presenting the information.
12        Q.    Was Mr. Forkner there?
13        A.    Yes, he was.
14        Q.    Let's talk about what you learned about MCAS.
15              MR. ARMSTRONG:  GX-9, please, already in evidence.
16              And, Ms. Holbrook, can you please blow up that
17   part, please?
18              It is right there.  Perfect.
19              Thank you, ma'am.
20   BY MR. ARMSTRONG:
21        Q.    Ms. Klein, do you recognize this document?
22        A.    Ah, yes.
23        Q.    What is it?
24        A.    This is an email from Ross Chamberlain to myself,
25   copying Mark.
```

1       Q.    And what is the date?

2       A.    June 23rd, 2015.

3       Q.    And what is the subject?

4       A.    Presentations from June 16th meeting.

5       Q.    Taking a step back, who is Ross Chamberlain?

6       A.    Ross Chamberlain worked for Mark.  He was a pilot

7    and was an administrative support team member for Mark.

8       Q.    When you say that Mr. Chamberlain was

9    administrative support, what does that mean?

10       A.    He helped produce all of the -- the

11    documentations, the plans, you know, the Word documents that

12    would then be sent to myself and my team.

13       Q.    And what does Mr. Chamberlain write to you in the

14    email on which Mr. Forkner is copied?

15       A.    He says, "Stacey, there are four .pdf files of the

16    presentations given last Tuesday.  The files are large.  I

17    will split them into two emails.  Please forward the files

18    to EASA and Transport Canada."

19       Q.    Did Mr. Chamberlain include in this email the

20    flight controls presentation from June 2015 that you

21    mentioned a few minutes ago?

22       A.    Ah, yes.  There's two attachments, one for the 737

23    MAX -- MAX display system and the 737 MAX flight controls

24    overview.

25              MR. ARMSTRONG:  Ms. Holbrook, if you could please

 1   take that down.

 2            Please go to page 43 of Government Exhibit 9,

 3   please.

 4   BY MR. ARMSTRONG:

 5       Q.   Ma'am, do you recognize page 43 of Government

 6   Exhibit 9?

 7       A.   Yes.

 8       Q.   What is it?

 9       A.   That is the maneuver characteristics augmentation

10   system, MCAS system overview.

11       Q.   Is this a slide that you received in this

12   June 2015 meeting at the AEG?

13       A.   Yes, sir.

14            MR. ARMSTRONG:  Ms. Holbrook, if you can please

15   blow up MCAS operational envelope, please.

16            And, Ms. Holbrook, if you can please highlight the

17   second bullet.

18   BY MR. ARMSTRONG:

19       Q.   Ma'am, can you read that to the Jury?

20       A.   "Operate flaps up in Mach number range .7 to .8."

21       Q.   So, Ms. Klein, what were you told at this

22   June 2015 meeting about the speeds at which the MCAS would

23   operate?

24       A.   The speeds would be high-speed above Mach .7 to

25   .8.

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 346

```
 1        Q.   About how fast is .7, .8 in miles per hour,
 2   ballpark?
 3        A.   430 to 450 miles an hour.
 4        Q.   And at what phase of flight would be the plane be
 5   going at.7, .8 Mach or about 420 or 430 miles an hour?
 6        A.   At cruise.  So high speed.
 7        Q.   Is that high in the sky or low in the sky?
 8        A.   High in the sky.
 9        Q.   Does the plane ever going .7 or .8 Mach during
10   takeoff and landing?
11        A.   No.
12        Q.   Why not?
13        A.   An airplane can't take off and land at that speed.
14             MR. ARMSTRONG:  Ms. Holbrook, if you can please
15   highlight the first bullet point on page 43 of Government
16   Exhibit 9.
17   BY MR. ARMSTRONG:
18        Q.   Ma'am, can you please read that to the jury?
19        A.   "Operates outside of normal operating envelope."
20        Q.   What does this phrase mean, "normal operating
21   envelope"?
22        A.   The normal operating envelope is an envelope in
23   which the aircraft flies at max capacity, so all of the
24   passengers on board, baggage on board, from taxi, takeoff,
25   climb out, cruise, descent, approach to landing, landing and
```

1    taxiing in.  It is the envelope in which the aircraft would

2    normally do an airline flight from, say, Dallas to Chicago

3    or something.

4          Q.   Essentially it is a gate-to-gate flight?

5          A.   Yes.  Yeah.

6          Q.   So on this slide it says, "MCAS operates outside

7    of the normal operating envelope."

8               When you saw this information at the time, what

9    did you understand this to mean?

10         A.   That MCAS would not activate during the normal

11   course of a flight.

12         Q.   And were you given any examples about when MCAS

13   would actually operate, if it wasn't going to operate during

14   gate-to-gate or normal passenger flight?

15         A.   Yes.

16              So the conditions in which MCAS would activate

17   would be above Mach .7 to .8.  It would have to be at a high

18   angle of attack.  The aircraft would have to be pulling

19   above 1.3 Gs.  And in order for an airplane to be in that

20   condition, you would be doing what's called a high-speed

21   wind-up turn.

22         Q.   What was that?

23         A.   A high-speed wind-up turn.

24         Q.   What is a high-speed wind-up turn?

25         A.   It is a certification requirement to conduct a

1  high-speed wind-up turn so they can test the stick force

2  gradients.

3       Q.   I saw you going like this (indicating).

4            What does the plane actually look like in the sky

5  when it is doing a high-speed wind-up turn?

6       A.   It's going very fast in the sky at a high-angle of

7  bank.  It is doing a corkscrew through the sky, very fast.

8       Q.   In passenger flights, is the pilot ever expected

9  to do a high-speed corkscrew high in the sky?

10      A.   No.

11      Q.   Why not?

12      A.   It would be very uncomfortable for the passengers.

13      Q.   How so?

14      A.   Pulling more than 1.3 Gs would feel like you are

15  getting really pushed down into your seat.  You may feel

16  like you are getting pushed against the side of the

17  aircraft.  It would not be a comfortable maneuver.

18      Q.   In all of your time flying, have you ever heard of

19  a pilot doing a high-speed wind-up turn in a passenger

20  flight?

21      A.   No.

22      Q.   You mentioned before that a high-speed wind-up

23  turn is a certification maneuver.

24            What does that mean?

25      A.   The certification regulations require that

1   particular maneuver to test for the stick force gradient.

2   And so it is a flight test maneuver.  It is not something

3   that we would evaluate.

4        Q.   Is the high-speed wind-up turn essentially done

5   just to test the strength of the plane?

6        A.   Yes.

7        Q.   Based on this presentation, did you believe that

8   MCAS could operate at any time at all outside this

9   high-speed corkscrew turn?

10        A.   No.

11        Q.   So when did you believe MCAS would actually kick

12   in during a passenger flight?

13        A.   Never.

14        Q.   After this presentation, did you have a chance to

15   speak with Mr. Forkner about MCAS some more?

16        A.   I did.

17        Q.   How long after this presentation did you speak

18   with Mr. Forkner?

19        A.   Immediately following this -- completion of the

20   presentation, we were chatting in the hallway.

21        Q.   The hallway where?

22        A.   At the -- at my office, the Seattle AEG.

23        Q.   Was anyone else with you in this conversation with

24   Mr. Forkner immediately after this presentation?

25        A.   Yes.  Christine Walsh.

1        Q.   Christine Walsh, who is that?

2        A.   She was the deputy -- the 737 deputy chief pilot

3   for the flight test group.

4        Q.   Was she in Mr. Forkner's group or a different

5   group?

6        A.   A different group.

7        Q.   So when you, Ms. Walsh and Mr. Forkner were

8   talking about MCAS, after this presentation, what was said?

9        A.   She described exactly what a high-speed wind-up

10  turn is for and what, as a flight test pilot, they would be

11  looking for, technically, in the stick force gradients and

12  why MCAS would be needed for that.  And that a pilot would

13  never see MCAS activate.  It was outside of the normal

14  operating range.

15           And those were -- we were discussing what kind of

16  training would be required.  I was concerned about that.

17       Q.   Was Mr. Forkner participating in this

18  conversation?

19       A.   Yes.

20       Q.   What was he doing?

21       A.   He was standing next to Christine, nodding, fully

22  engaged, as we talked through my concerns for MCAS.

23       Q.   So during this conversation, did you get a new

24  understanding or the same understanding about whether MCAS

25  would operate outside this high-speed corkscrew turn?

1       A.    It is the same understanding.

2       Q.    About how long did this conversation last?

3       A.    About five to seven minutes.

4       Q.    Based on the presentation and this conversation,

5  did you have any belief that MCAS would operate outside of

6  what you were told?

7       A.    No.

8       Q.    And did you think that pilots needed to be trained

9  about MCAS, given what you were told about it?

10      A.    No.

11      Q.    Why not?

12      A.    In addition to the -- outside the normal operating

13  envelope, it would be not a system that the pilots would be

14  able to turn on and off, so they wouldn't be able to

15  interact with it.

16            And that it would only operate under these

17  conditions, and a pilot would never find themselves in these

18  conditions, and so it wasn't something that we considered

19  that we would have to train on.

20      Q.    Did you have any other conversations with Mr.

21  Forkner about MCAS after this point?

22      A.    Yes.

23      Q.    And what did he tell you about whether MCAS would

24  kick in during a normal passenger flight?

25      A.    That it would not -- a pilot would never see MCAS.

 1      Q.   And in these conversations, did he tell you

 2 anything about whether MCAS would kick in beyond this

 3 high-speed corkscrew turn?

 4      A.   No.

 5      Q.   And how did these explanations from Mr. Forkner to

 6 you come up?

 7      A.   They came up in a number of ways, both in meetings

 8 and then in the flight crew operating manual that they had

 9 proposed for concurrence, also had the same information as

10 the 2015 presentation.

11      Q.   Were the explanations that you did receive from

12 Mr. Forkner about how MCAS worked important or unimportant

13 about your understanding of MCAS?

14      A.   They were important.

15      Q.   Why is that?

16      A.   It is the basis in which we use to determine

17 whether or not we would evaluate the system for pilot

18 training.

19      Q.   Ms. Klein, did you continue talking with Mr.

20 Forkner about MCAS into March of 2016?

21      A.   Yes.

22      Q.   I'm showing you what is in evidence at GX-13.

23           MR. ARMSTRONG:  Ms. Holbrook, can you please blow

24 up that portion of GX-13, please?

25           Thank you, ma'am.

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 353

1  BY MR. ARMSTRONG:

2       Q.   Ma'am, who was this email from?

3       A.   This is from Mark Forkner to Stacey Klein and Eric

4  Perkins.

5       Q.   And what is the date?

6       A.   March 30th, 2016.

7       Q.   And what is the subject?

8       A.   MCAS lives in both FCCs.

9       Q.   What is an FCC?

10      A.   An FCC is a flight control computer.  There are

11 two on the MAX.

12      Q.   What does that mean to you, MCAS lives in both

13 FCCs?

14      A.   It means that -- I had requested additional

15 information on how MCAS was hosted on the aircraft.

16           Because it was required for a flight test

17 compliant regulation, I was concerned that MCAS would

18 operate all the time.

19           And so I had requested how is MCAS hosted on the

20 aircraft.

21      Q.   And this is the answer that you got back

22 essentially from Mr. Forkner?

23      A.   Yes.

24           MR. ARMSTRONG:  Ms. Holbrook, if you can please

25 highlight the first sentence?

 1  BY MR. ARMSTRONG:

 2      Q.   It says, "Aaron, I confirmed with the flight

 3  controls engineers at MCAS does live in both FCCs and needs

 4  one to function."

 5           Do you see that, ma'am?

 6      A.   Yes.

 7      Q.   So who did Mr. Forkner tell you that he confirmed

 8  with the operation of MCAS?

 9      A.   The Boeing flight control engineers.

10      Q.   Do you know how many flight control engineers

11  generally worked at Boeing on the MAX around this time?

12      A.   I don't have an exact number, but they are

13  responsible for developing the aircraft, so they have

14  thousands of engineers.

15      Q.   Why did you ask Mr. Forkner your question about

16  how MCAS operated instead of tracking down every one of

17  these thousands of flight control engineers at Boeing?

18      A.   Because Mark is my direct counterpart part.  He's

19  the one that knows who and where to get that information

20  from.

21           MR. ARMSTRONG:  Ms. Holbrook, if you can please

22  blow up -- I'm sorry -- please highlight the second

23  sentence.

24  BY MR. ARMSTRONG:

25      Q.    "So given that, are you okay with us removing all

1    references to MCAS from the FCOM training, as we discussed,

2    as it is completely transparent to the flight crew and only

3    operates way outside of the normal operating envelope?"

4            Do you see that, ma'am?

5    A.   Yes.

6    Q.   So what is Mr. Forkner asking you to do with

7    respect to MCAS?

8    A.   He's asking if it would be okay for them to remove

9    all reference to MCAS from the flight crew operating manual

10   and from the proposed training.

11   Q.   What does that mean, the FCOM?

12   A.   The FCOM is the flight crew operating manual.

13   Q.   Is that FCOM helpful for pilots?

14   A.   Yes.

15   Q.   Why is that?

16   A.   The FCOM is -- has all the system descriptions, it

17   has checklists, it is like the manual for the aircraft so

18   that pilots know how to interact with the aircraft.

19   Q.   Mr. Forkner also asked you, "If you are okay with

20   removing MCAS from the training," based on this email, what

21   was he talking about?

22   A.   So the training was in development for us to

23   evaluate, and so they wanted to remove MCAS from the

24   training proposal.

25   Q.   Essentially, that iPad or computer-based training?

1       A.   Yes, sir.

2       Q.   So in this email Mr. Forkner is asking you to

3  remove MCAS from what?

4       A.   The FCOM and the training.

5       Q.   And was it your decision or Mr. Forkner's?

6       A.   It was my decision.

7       Q.   Do you see where Mr. Forkner says, "As we

8  discussed" --

9       A.   Yes.

10       Q.   Did you actually discuss with Mr. Forkner removing

11  MCAS from the training and the FCOM?

12       A.   Yes.  He had requested that the MCAS get removed

13  from the FCOM and the training.  And so he was just

14  confirming our question that we had asked for more

15  information about how MCAS operated on the aircraft and was

16  hosted on the aircraft.

17       Q.   And based these discussions, did you believe that

18  MCAS would operate at high speed or low speed?

19       A.   High speed.

20       Q.   And in these conversations, did Mr. Forkner tell

21  you anything about whether MCAS would kick in outside of the

22  high speed corkscrew turn?

23       A.   No.

24       Q.   Did Mr. Forkner give you any reasons for why he

25  was asking you to remove MCAS from these documents in this

1    email?

2         A.    He did.

3         Q.    All right.

4               Where do you see that?

5         A.    After the comma, the last part of the sentence.

6         Q.    And can you read that to the jury?

7         A.    Sure.

8               "As it is completely transparent to the flight

9    crew and only operates way outside the normal operating

10   envelope."

11        Q.    What does that mean to you, "transparent to the

12   flight crew"?

13        A.    It means it's invisible, that the flight crew

14   would not be aware of its operation or be able to turn it on

15   and off.

16        Q.    So, in this context, what would be invisible to

17   the pilot at least at this time?

18        A.    Yes.

19        Q.    What would?

20        A.    Oh, MCAS operation.

21        Q.    And this was back in March of 2016, right?

22        A.    Yes, sir.

23        Q.    Now, just because something is transparent to the

24   pilot, does that mean a pilot automatically needs zero

25   training about it?



1    A.   No, there's plenty of systems that we still train

2  on that are transparent to the pilot.

3    Q.   What was the second reason Mr. Forkner gave you

4  back in March of 2016 to remove MCAS from the training

5  documents?

6    A.   As it only operates way outside the normal

7  operating envelope.

8    Q.   Mr. Forkner told you that MCAS should be removed

9  because it operates way outside the normal operating

10  envelope, what did you take him to mean?

11    A.   That he was referring to the high speed wind-up

12  turn.

13    Q.   Did you believe that he was referring to anything

14  else?

15    A.   No.

16    Q.   Why not?

17    A.   I didn't have any reason to believe otherwise.

18  All the information that was provided was greater than .7

19  Mach, flaps up, greater than 1.3 Gs, so...

20    Q.   Now, just because a system operates way outside

21  the normal operating envelope, does that mean pilots don't

22  need to get trained about it?

23    A.   No.

24    Q.   Why not?

25    A.   There is training that pilots have to receive,

1    full flight simulator training, they need to receive in

2    order to learn how to recover the aircraft.

3         Q.   Have you heard of something called "extended

4    envelope training"?

5         A.   Yes.

6         Q.   What's that?

7         A.   EET training is required for simulator training.

8    It is where an aircraft would encounter, say, a thunderstorm

9    and it would become upset, high-pitch angle or low-bank

10   angle or, I'm sorry, high bank angle low pitch, and the

11   pilot has to learn how to recover the aircraft safely.

12        Q.   And you mentioned this, but pilots learn about

13   extended envelope training where?

14        A.   Repeat the question?

15        Q.   Sure.

16             I think you mentioned this, but where do pilots

17   get training about this extended envelope training?

18        A.   Oh, EET training is required in a full flight

19   simulator.

20        Q.   And why does the AEG have extended envelope

21   training?

22        A.   Because there has been aircraft accidents resulted

23   from upsets.

24        Q.   Did you discuss with Mr. Forkner this extended

25   envelope training?

UNITED STATES vs MARK A. FORKNER

4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 360

1      A.   Yes, we did.

2      Q.   In what context?

3      A.   It was a new regulation that the FAA had

4  instituted, and the regulation was going to take effect

5  prior to the certification of the MAX, and Mark was

6  concerned that we would have to have a full flight simulator

7  training requirement in order to accommodate that regulation

8  for the MAX.

9      Q.   So based on Mr. Forkner telling you that MCAS

10 operates way outside the normal operating envelopes, what

11 speed did you take him to mean?

12     A.   High speed.

13          MR. ARMSTRONG:  And, Ms. Holbrook, can you please

14 pull that GX-12 in evidence?

15          And, Ms. Holbrook, if you can please blow up the

16 top half of the document, please.

17 BY MR. ARMSTRONG:

18     Q.   Ma'am, do you see this is an email from Mr.

19 Forkner to a few other people?

20     A.   Yes.  This is from Mark Forkner to Scott Andersen

21 and John Collier, cc'ing Ross Chamberlain, Mauricio Palacio,

22 and Patrik Gustavsson.

23     Q.   Is the date March 8, 2016?

24     A.   Yes.

25     Q.   Are you on this email?

1      A.    No, I'm not.

2      Q.    Did you see it during your evaluation of the MAX?

3      A.    No, I did not.

4            MR. ARMSTRONG:  And, Ms. Holbrook, if you can

5    please blow up the -- through Level B.  The first sentence

6    and a half, please.

7    BY MR. ARMSTRONG:

8      Q.    Ma'am, do you see that on the screen?

9      A.    Excuse me, yes.

10     Q.    What is Mr. Forkner describing as the biggest

11   threat to Level B?

12     A.    He says, "Here's the flight controls module

13   updated with a thorough review by the flight controls

14   engineers.  This module, of course, is a big one for us.

15   The material poses the greatest threat to Level B."

16           So I think -- let me just continue reading.

17           So I think he's talking about the flight controls,

18   the different storyboard.  Scott Anderson was the one that

19   was developing the training for Boeing.

20     Q.    The flight controls on the MAX?

21     A.    Yes.

22     Q.    What level of scrutiny did you give to changes to

23   the flight controls on the MAX?

24     A.    A high level of scrutiny.

25     Q.    Why did you give a high level of scrutiny to the

1  changes in the flight controls on the MAX?

2      A.   There were going to be two tests conducted to make

3  sure that the flight controls were not -- did not pose a

4  threat to the handling qualities of the aircraft.

5           And so it needed to be evaluated against the NG to

6  ensure either that they felt the same, and if they didn't

7  feel the same, then we would require a higher level of

8  training.

9      Q.   How important were the changes to the flight

10  controls in the MAX in deciding whether Level B or a high

11  level of training would be appropriate for the MAX?

12      A.   There were many flight control changes and so they

13  were -- it was a big deal to evaluate those.

14      Q.   Okay.

15           MR. ARMSTRONG:   Ms. Holbrook, if you can please

16  take that down.

17  BY MR. ARMSTRONG:

18      Q.   Back in 2016-2017, were there other people at the

19  FAA working on the MAX?

20      A.   Yes.

21      Q.   Did those people include people in the aircraft

22  certification office?

23      A.   Yes.   The Seattle aircraft certification office.

24      Q.   Approximately how many people in the Seattle

25  aircraft certification office worked on the MAX back in

 1    2016, 2017?

 2         A.    Approximately, a team of 18 or 20.

 3         Q.    And did the aircraft certification office or the

 4    ACO evaluate the engineering design of the MAX?

 5         A.    Yes.  The ACO's responsibility is to evaluate the

 6    engineering design for compliance with the certification,

 7    the airworthiness certification requirements for the

 8    airplane.

 9         Q.    Is the ACO or the airline certification office

10    essentially just trying to make sure that the airplane is

11    safe to fly from an engineering standpoint?

12         A.    Yes.  So they are responsible for the aircraft,

13    that it is safe to fly, it won't fall apart in the middle of

14    the sky.  And we are responsible for evaluating the training

15    associated with that aircraft.

16         Q.    Was the ACO's function the same function or a

17    different function compared to yours at the AEG?

18         A.    It's a different function.  They are finding

19    compliance to totally different regulations.

20         Q.    Can the ACO tell you, for example, the AEG, the

21    level of training for the MAX?

22         A.    No.  They are not familiar with the training

23    requirements that I have responsibility for oversight for.

24         Q.    Nonetheless, did you reach out to your ACO

25    colleagues to understand how MCAS worked around this time,

1    in early 2016?

2         A.    I did.

3         Q.    Why did you reach out to your colleague on the

4    other side to understand how MCAS worked?

5         A.    After my conversation with Mark and Christine in

6    the hallway, I reached out to our flight controls engineer

7    and are -- one of our flight test pilots to understand if

8    that is how the system was designed and worked, to evaluate

9    whether or not we would require some sort of training for

10   that system.

11        Q.    Did you confirm with the ACO whether MCAS operated

12   outside the high-speed corkscrew turn?

13        A.    Yes.  It would only operate at a high-speed

14   wind-up turn.

15             I needed to understand what stick force -- excuse

16   me -- stick force gradient that they were testing for, so

17   they understood under what conditions the aircraft would be

18   flying when the system would actually activate.

19        Q.    Did the ACO tell you when a pilot would expect to

20   see MCAS kick in back in March 2016 or around then?

21        A.    Can you repeat the question?

22        Q.    Sure.

23             Did the ACO tell you when MCAS would be expected

24   to kick in, back in March 2016?

25        A.    Oh, yes.  It would only kick in during the

 1   high-speed wind-up turn outside of the normal operating

 2   envelope.

 3        Q.   What did you then decide at the time about the

 4   amount of training that pilots needed for MCAS based on the

 5   descriptions you received?

 6        A.   I had decided that we would not need to include

 7   training to evaluate that system.

 8        Q.   Based on explanations provided to you by who?

 9        A.   Both Mark Forkner and corroborating that

10   information from my colleagues in the flight test group and

11   the flight engineering group.

12        Q.   Ms. Klein, in August 2016, did you make a

13   provisional Level B decision for the MAX?

14        A.   Yes.

15        Q.   What does that mean "provisional Level B"?

16        A.   So we had conducted the evaluation in July and

17   August of 2016, and upon completion, had agreed that Level B

18   would be an appropriate level of training.

19             But the aircraft had not been certified yet, so we

20   gave a provisional Level B determination, pending no

21   significant design changes.

22        Q.   Pending what?

23        A.   No significant design changes.

24        Q.   Did you tell Mr. Forkner about your provisional

25   Level B decision for the MAX?

1      A.   Yes.  I wrote a letter.

2      Q.   Did you tell him that your provisional decision

3  could change if were there any significant changes to the

4  MAX?

5      A.   Yes.

6      Q.   And you mentioned you sent him this decision?

7      A.   Yes.  In a letter.

8      Q.   All right.  I'm showing you, ma'am, GX-18, which

9  is in evidence.

10          MR. ARMSTRONG:  Ms. Holbrook, if you can please

11  blow up the top of the email please in GX-18.

12  BY MR. ARMSTRONG:

13     Q.   Ma'am, do you recognize this email?

14     A.   Yes.

15     Q.   What is it?

16     A.   It is an email from myself to Mark Forkner and

17  Ross Chamberlain.

18     Q.   And what is the date?

19     A.   August 18th, 2016.

20     Q.   And what do you write in this email?

21     A.   "Ross, here is the signed letter for Gate 4

22  acceptance."

23     Q.   Why do you address this email to Ross?

24     A.   Ross was kind of the administrator of the team,

25  and so he had requested -- he was the gatekeeper of all of

1    the documentation.

2         Q.   And you say, "Here is a signed letter."

3              What letter are you talking about?

4         A.   The PCP Gate 4 Letter of Acceptance.

5         Q.   Is that essentially your provisional Level B

6    letter?

7         A.   Yes.

8         Q.   And did you actually attach the Level B letter to

9    this email in GX-18 -- Government Exhibit 18?

10        A.   Yes.

11             MR. ARMSTRONG:  Ms. Holbrook, if you could please

12   pull up page 2.

13   BY MR. ARMSTRONG:

14        Q.   Ma'am, what is this letter?

15        A.    This is the letter that outlines the provisional

16   acceptance of Level B.

17             MR. ARMSTRONG:  And, Ms. Holbrook, if you can

18   please blow up the top half of this document, please.

19   BY MR. ARMSTRONG:

20        Q.   What is the date of this letter?

21        A.   August 17th, 2016.

22        Q.   And who did you address it to?

23        A.   Captain Stephen Taylor.

24        Q.   Who is that?

25        A.   He was the chief pilot of -- the director of the

1    flight training group that Mark worked for.

2        Q.   Why were you sending this letter to Captain

3    Taylor?

4        A.   Captain Taylor was Mark's boss at the time.

5        Q.   And was that the normal practice to send these

6    kinds of letters to Mr. Forkner's boss?

7        A.   Yes.  We always sent it to the head of the

8    department.

9             MR. ARMSTRONG:  Could you please take this down,

10   Ms. Holbrook?

11   BY MR. ARMSTRONG:

12       Q.   Who signed this letter?

13       A.   Myself.

14            MR. ARMSTRONG:  Ms. Holbrook, if you can please

15   pull up paragraph 2.

16            Ms. Holbrook, if you can please highlight

17   through -- right there.

18   BY MR. ARMSTRONG:

19       Q.   Ma'am, could you please read those first two

20   sentences for the jury on GX-18?

21       A.   Sure.

22            "Provisional approval of training course C.  The

23   Boeing course C is provisionally approved by the FSB."

24       Q.   What is training course C?

25       A.   As part of the pilot qualification plan to

 1  evaluate the aircraft, there were several different courses

 2  that were going to be evaluated.

 3          The first one that we evaluated was training

 4  course C, which was the differences training between the NG

 5  and the MAX.

 6      Q.   Okay.  So how did y'all get to C?

 7      A.   That was a Boeing developed decision.

 8      Q.   What was your decision as to this training course?

 9      A.   B level training.

10      Q.   And was this B level training for essentially the

11  iPad or computer-based training?

12      A.   Yes.  It is in the previous paragraph, paragraph

13  1.

14      Q.   And was this decision final or something else?

15      A.   No.  Provisional is temporary, pending no

16  significant design chance.

17      Q.   And did you explain in this letter how your Level

18  B iPad or computer-based training decision was temporary or

19  provisional?

20      A.   Yes.  The next sentence identifies that it was a

21  contingency.

22          MR. ARMSTRONG:  And, Ms. Holbrook, if you can

23  please highlight the sentence.

24  BY MR. ARMSTRONG:

25      Q.   And, Ms. Klein, can you please read that sentence

1    for the Jury?

2         A.   Sure.

3              "This approval is contingent upon no significant

4    aircraft design changes being incorporated into the MAX

5    prior to FAA Part 25 certification."

6         Q.   What does that mean, "the approval is contingent

7    upon no significant aircraft design changes"?

8         A.   The aircraft was in the final stages, but

9    sometimes design changes occur.  And so I wanted to make

10   sure that we would have the opportunity to evaluate any

11   design changes by making it contingent.

12             So no significant design changes.

13        Q.   So what is the impact of your provisional Level B

14   training to be?

15        A.   Any design change.

16             So in this case, the expansion of MCAS.

17        Q.   Who did you trust to tell you about any

18   significant design changes to the MAX after this

19   August 17th, 2016 letter?

20        A.   Mark Forkner.

21        Q.   Why is that?

22        A.   It was his job to inform me of design changes.

23        Q.   Did you talk to with Mr. Forkner around this time?

24        A.   Yes.

25        Q.   In phone or in person?

1    A.   He was with us during the evaluation down in

2  Miami, so in person.

3    Q.   How did Mr. Forkner react when you told him about

4  this provisional Level B decision you made in August 2016?

5    A.   He was elated.

6    Q.   Why do you say he was elated?

7    A.   That we had determined that B level training to be

8  sufficient on the MAX.  He was excited.

9    Q.   How did you feel about the decision at the time,

10  back in August 2016?

11    A.   At the time I was very confident.

12    Q.   Why were you confident?

13    A.   We -- I had put together a robust evaluation that

14  included airline pilots, FAA pilots, and we put together a

15  quantitative evaluation to evaluate those system

16  differences, and so I was confident in our ability to

17  complete that evaluation and that it was appropriate and

18  sufficient.  And so I was confident in that determination.

19    Q.   Had you a chance to actually fly the MAX around

20  this time, August of 2016?

21    A.   Yes.

22    Q.   Around this time did anybody tell you that MCAS

23  was expanded under low speed?

24    A.   No, they did not.

25    Q.   Did you ever think that Mr. Forkner wouldn't tell

```
 1  you about changes to the MAX after August 2016?

 2      A.   No.

 3           MR. ARMSTRONG:  GX-21, please, Ms. Holbrook.

 4           You can go to page 2, please, Ms. Holbrook.

 5           If you can please blow up the top part, please,

 6  Ms. Holbrook.

 7  BY MR. ARMSTRONG:

 8      Q.   Ma'am, do you see that this is a November 10, 2016

 9  email from Mr. Forkner to some other people in Boeing?

10      A.   Yes.

11      Q.   Did you have access to this email at the time of

12  your evaluation?

13      A.   No.  This is an internal email.

14      Q.   This document is March [sic] 10th, 2016.

15           About how many days before the shocker alert, I

16  lied unknowingly to regulators' chat in this email?

17      A.   Roughly, five days.

18           MR. ARMSTRONG:  Ms. Holbrook, if you can please

19  highlight the second paragraph.

20           Actually, I'm sorry.  Can you please highlight

21  this sentence?

22  BY MR. ARMSTRONG:

23      Q.   Ma'am, do you see where Mr. Forkner writes, "This

24  is what we sold to regulators who have already granted us

25  the Level B differences determination"?
```

1    A.   Yes.

2    Q.   Who was the regulator working with Mr. Forkner in

3  November 2016?

4    A.   Myself.

5    Q.   And who had granted Mr. Forkner the Level B

6  differences determination at this time?

7    A.   I had granted the provisional Level B.

8    Q.   Did you view your role at the time as someone who

9  had been sold on the changes on the MAX?

10    A.   No.

11    Q.   Is that how the evaluation of the MAX is supposed

12  to work?

13    A.   No.

14    Q.   Why not?

15    A.   It is based on mutual trust.

16    Q.   Did Mr. Forkner tell you at the time that this is

17  how he described your role to his Boeing colleagues?

18    A.   No.

19        MR. ARMSTRONG:  Ms. Holbrook, can you please

20  highlight the last sentence?

21  BY MR. ARMSTRONG:

22    Q.   "To go back to the now and tell them there is, in

23  fact, a huge difference in how you must operate the MAX

24  during an emergency descent would be a huge risk to that

25  differences training determination?"

```
 1              Do you see that, ma'am?

 2        A.   Yes.

 3        Q.   Did you know at the time, in November 2016, that

 4   Mr. Forkner expressed concerns his Boeing colleagues were

 5   not getting back to you, the regulator, about differences on

 6   the MAX?

 7        A.   No, I did not.

 8        Q.   Would that have been a concern to you?

 9        A.   Yes.  Because I had raised the concern earlier in

10   the development for the emergency descent spoiler alert.  I

11   was concerned about the training that we would have to

12   evaluate.

13        Q.   Is that how the evaluation is supposed to work,

14   where differences are not brought to your attention?

15        A.   No.

16        Q.   All right.  Ma'am, let's jump from August 2016 to

17   November 2016.

18              Around this time, did you discuss simulator

19   flights with Mr. Forkner?

20        A.   Yes.

21        Q.   What is a simulator flight?

22        A.   The simulator is a full-flight simulator used to

23   conduct pilot training.

24        Q.   How does it work?

25        A.   Safely.
```

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 375

1              It is a full replica of the flight deck of the
2     aircraft, and it is either hydraulically or electrically
3     moved to simulate the aircraft actually flying.
4         Q.   Is it pretty realistic?
5         A.   Yes, it is very realistic.
6         Q.   Did you learn that Mr. Forkner was planning to do
7     a simulator flight on the MAX around November of 2016?
8         A.   Yes.
9         Q.   How did you learn that?
10        A.   He was -- he told me.  He was headed to Montreal
11    to do simulator fly-outs.
12        Q.   He said the simulator was where?
13        A.   In Montreal, Canada.
14        Q.   And did he say when he was going to do the
15    simulator flights in Montreal?
16        A.   It was before Thanksgiving, so November of 2016.
17        Q.   What was your understanding of why Mr. Forkner was
18    going to do simulator flights in the MAX up in Montreal?
19        A.   So Boeing was developing a simulator.  It just
20    wasn't going to be ready for certification at the time of
21    the delivery of the first airplanes to the operators who
22    were already flying the 737.  The development was for those
23    airlines that didn't already have a 737.
24             So he was headed to Montreal to evaluate that the
25    simulator was just like the real airplane.

 1        Q.   Did he actually go?

 2        A.   Yes.

 3             MR. ARMSTRONG:  Ms. Holbrook, if you can please

 4   pull up GX-22.

 5             Ms. Holbrook, if you can please pull up 6:50,

 6   please.

 7   BY MR. ARMSTRONG:

 8        Q.   Ma'am, based on your experience, what is Mr.

 9   Forkner describing in the first two lines of this chat?

10        A.   He's describing the activation of MCAS and that

11   MCAS had been expanded down to Mach .2.

12        Q.   And where did he experience this, based on this

13   chat?

14        A.   At the simulator.

15        Q.   Is that what that means, in the sim?

16        A.   Yes.

17        Q.   Is that tech lingo?

18        A.   Yes, we call the full-flight simulator the sim.

19        Q.   After -- after November 15, 2016, the date of this

20   chat, did you have a chance to sit down with Mr. Forkner and

21   talk to him?

22        A.   Yes.  The following week we had a meeting.

23        Q.   The following week, the week after this chat?

24        A.   Yes.

25        Q.   Where was this meeting?

1        A.    It was at the Boeing Company.

2        Q.    What was the purpose of this meeting, from your

3    perspective?

4        A.    We were discussing the Flight Standardization

5    Board report.

6        Q.    Was anybody else there?

7        A.    Yes.

8        Q.    Who else was there?

9        A.    My colleagues and his colleagues.

10       Q.    Did you ask them how did it go on the simulator up

11   in Montreal?

12       A.    Yes.  I asked him how it went.

13       Q.    What did he tell you?

14       A.    And he said it went great, there were a few kinks

15   to work out.

16       Q.    What was that?

17       A.    There were a few kinks to work out.

18       Q.    During this meeting a week after this chat, did

19   Mr. Forkner tell you anything about how MCAS is now active

20   down to Mach .2?

21       A.    No, he did not.

22       Q.    Would this information have been important for you

23   to know at the time for your evaluation?

24       A.    Yes, it would have been.

25       Q.    Why is that?

1      A.   Because we did not evaluate MCAS, so it would have

2  been important so that we could.

3           MR. ARMSTRONG:  Ms. Holbrook, can you please pull

4  down to the bottom to capture 6:51, please?

5  BY MR. ARMSTRONG:

6      Q.   Ms. Klein, a week after this chat, when you sat

7  down with Mr. Forkner in a meeting, did he tell you how he

8  said the week before, "I basically lied to the regulators

9  unknowingly"?

10     A.   No, he did not.

11     Q.   Did he mention anything at all about that to you?

12     A.   No, he did not.

13          MR. ARMSTRONG:  Ms. Holbrook, if you please pull

14  this down and go to page 2.

15          And if you could please pull up 6:53.

16  BY MR. ARMSTRONG:

17     Q.   Ms. Klein, during this face-to-face meeting with

18  Mr. Forkner, did he tell you anything about, surprise, why

19  are we just reading about this now?

20     A.   No, he did not.

21          MR. ARMSTRONG:  Ms. Holbrook, if you can please

22  pull up GX 22 next to GX-18, the provisional letter.

23  BY MR. ARMSTRONG:

24     Q.   So, Ms. Klein, in November 2016, did Mr. Forkner

25  tell you that MCAS is now active down to Mach .2?

1    A.   No, he did not.

2    Q.   Was the fact that MCAS was active down to Mach .2

3  a significant aircraft design change that you pointed out in

4  your provisional Level B letter?

5    A.   Yes, it is.

6    Q.   Why is that?

7    A.   Because the operation of MCAS, prior to the

8  expansion, a pilot would not see it, and now, if it is able

9  to activate down to Mach .2, a pilot would have the

10 opportunity to interact with it, so we would need to

11 evaluate that.

12   Q.   Did you have a chance to?

13   A.   No, I did not.

14   Q.   Why not?

15   A.   I didn't know the system had been expanded.

16   Q.   Knowing that MCAS is now active down to Mach .2

17 have affected your Level B decision in August of 2016?

18   A.   Yes.

19   Q.   Can you explain to the Jury why that is?

20   A.   There are many maneuvers that that system would

21 interact with that is required pilot training in a

22 full-flight simulator.

23        And so, I did not have the opportunity to evaluate

24 that.

25        Once we learned about the expansion of MCAS, we

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                        Page 380

 1    did evaluate that and determined E level training would be

 2    appropriate.

 3         Q.   Was it also important for you to know about the

 4    low-speed expansion of MCAS down to Mach .2 because it could

 5    then kick in a passenger flight?

 6         A.   Yeah, it would now be available to kick in during

 7    the normal -- normal course of operation.

 8              MR. ARMSTRONG:  Ms. Holbrook, if you can please

 9    take that down.

10    BY MR. ARMSTRONG:

11         Q.   How about how many months are there between

12    November 2016 and the shocker alert chat and July 2017 when

13    you set the final Level B decision?

14         A.   About nine months.

15         Q.   Did you and Mr. Forkner talk over this nine

16    months?

17         A.   Yes.  Often.

18         Q.   What did y'all talk about?

19         A.   We were talking about the development and

20    publication of the Flight Standardization Board's report.

21         Q.   In that context, did you deal with Mr. Forkner

22    directly about MCAS?

23         A.   Yes, I did.

24         Q.   How many times in those interactions did Mr.

25    Forkner tell you MCAS is active down to Mach .2?

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 381

```
 1        A.    Never.

 2        Q.    What was he asking you to do instead with respect

 3   to MCAS in that FSB report you mentioned?

 4        A.    He was asking me to remove it.

 5        Q.    And you mentioned this term already, the FSB

 6   report.

 7        A.    Yes.

 8        Q.    Does the FSB report have the level of training for

 9   the MAX?

10        A.    Yes.

11        Q.    Who publishes the FSB report?

12        A.    The Seattle AEG.

13        Q.    And what was your role in writing it as the chair

14   of the FSB?

15        A.    I wrote it.

16        Q.    Did you work with anyone else in this room about

17   the contents of the FSB report?

18        A.    Yes.

19        Q.    Who?

20        A.    Mark Forkner.

21        Q.    Around when did you start working with Mr. Forkner

22   on this FSB report for the MAX?

23        A.    Immediately following the evaluation.

24        Q.    And why were you working with Mr. Forkner as

25   opposed to somebody else at Boeing?
```

1      A.   Because he was the -- my direct counterpart as the

2   chief technical pilot.

3      Q.   Would the FSB report require U.S. airlines, like

4   American and Southwest, to do anything on the MAX?

5      A.   Yes.  They have to follow the training

6   requirements in the FSB report.

7      Q.   So, for example, if the AEG says that this

8   difference on the MAX requires Level B, what does the

9   airline, like Southwest or American, have to do?

10     A.   They have to develop their training program to be

11  at a minimum of Level B.

12     Q.   Can they say forget Level B, I want to do Level A?

13     A.   No.

14     Q.   Why not?

15     A.   Because it's against the regulation.

16     Q.   If you at AEG say simulator training is required

17  for this difference, what does an airline have to do?

18     A.   They have to develop simulator training.

19     Q.   Around November 17th, 2016, did you send Mr.

20  Forkner a draft of that FSB report?

21     A.   Yes, I did.

22     Q.   I'm showing you what in evidence, GX-24.

23          MR. ARMSTRONG:  Please, Ms. Holbrook.

24          Ms. Holbrook, can you please blow up the bottom

25  half of this email?

1   BY MR. ARMSTRONG:

2       Q.   Ma'am, do you recognize this document?

3       A.   Yes.  It is an email I wrote.

4       Q.   Who did you write this email to?

5       A.   To Aaron Perkins, Chip Bosselmann, my two

6   colleagues, Mark Forkner, Ross Chamberlain and Patrik

7   Gustavsson at Boeing.

8       Q.   What is the date of this email?

9       A.   It is Thursday, November 17th, 2016.

10      Q.   How many days after the shocker alert email, where

11  Mr. Forkner described "lying unknowingly to the regulators,"

12  is this email?

13      A.   Two days.

14      Q.   And, ma'am, if you can please read the first

15  sentence.

16      A.   "I've completed the FSB report."

17      Q.   What are you talking about?

18      A.   That I completed the draft Flight Standardization

19  Board report that includes the evaluation of the MAX.

20      Q.   And did you send this draft to Mr. Forkner and the

21  other members of his team on November 17th, 2016?

22      A.   Yes, I did.

23      Q.   What did you want Mr. Forkner to do with it?

24      A.   I wanted Mr. Forkner and his team to review it for

25  accuracy.

1    Q.   Why?

2    A.   We always share our -- our FSB reports with the

3    manufacturer, but also the template for the report was

4    changing, and so I wanted to make sure that the information

5    that was changed outside of the MAX was also accurate.

6    Q.   Did you get a response back?

7    A.   I did.

8    Q.   About how long after you sent your draft did you

9    get a response back?

10   A.   A few days after this.

11   Q.   All right.

12        MR. ARMSTRONG:  Ms. Holbrook, if you can please

13   take that down and please pull up the top half of this

14   email.

15   BY MR. ARMSTRONG:

16   Q.   Ms. Klein, do you recognize this is an email that

17   Mr. Chamberlain sent to you on November 22nd, 2016?

18   A.   Yes.

19   Q.   And who is copied -- who is also copied on this

20   email?

21   A.   It is to myself and Aaron Perkins, Chip

22   Bosselmann, and Mark Forkner and Patrik Gustavsson from

23   Ross.

24   Q.   Are Aaron Perkins and Dale Bosselmann part of the

25   AEG as well?

1     A.    Yes.

2     Q.    And who else is on this email?

3     A.    Mark Forkner, Patrik Gustavsson.

4     Q.    What is the -- is this email just a follow-up of

5  the draft that you sent on November 17th, the draft FSB

6  report?

7     A.    Yes.  It's in response to that email with their

8  comments attached.

9     Q.    What does Mr. Chamberlain say to you in the first

10  sentence of this email?

11     A.    "Attached is the draft with our comments."

12     Q.    What is he talking about?

13     A.    I had sent the draft FSB report to them for them

14  to review for accuracy, and they are replying with the draft

15  attached with their comments.

16     Q.    How many days after the shocker alert that Mr.

17  Forkner was chatting with, with Mr. Gustavsson, did you get

18  this draft back from Mr. Chamberlain?

19     A.    A week.

20     Q.    One week later?

21     A.    Yes.  One week.

22     Q.    Let's take a look at what they sent you.

23           MR. ARMSTRONG:  Ms. Holbrook, if you can please

24  pull up page 28 of GX-24, Government Exhibit 24.

25  ///

1    BY MR. ARMSTRONG:

2         Q.   Ma'am, do you recognize Government Exhibit 24, at

3    page 28?

4         A.   Yes.  This is the difference table.

5         Q.   What does that mean a "difference table"?

6         A.   It identifies the NG to the MAX system differences

7    and what level of training and checking is required for each

8    of those differences.

9         Q.   All right.

10             MR. ARMSTRONG:  Ms. Holbrook, if you can please

11   blow up that part of the differences table.

12   BY MR. ARMSTRONG:

13        Q.   Ma'am, we see here on the differences table, we

14   see flight controls and then -- one, two, three, four --

15   five things next to it.

16             What does that mean?

17        A.   Of this section, of the flight control systems,

18   there were five systems that were included in this section.

19        Q.   And are these new or changed systems on the MAX

20   compared to the NG that pilots would be trained on if they

21   were flying -- if they were included in here at the end of

22   the day?

23        A.   Yes, they are new or changed.

24        Q.   And is MCAS on this list?

25        A.   It is, yes.

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 387

```
1        Q.   And is it the third bullet down?

2        A.   Yes.

3        Q.   Did you mean to put MCAS on this draft FSB report?

4        A.   No.  I had inadvertently added it to the

5   difference table.

6        Q.   And had you agreed with anyone at this point to

7   remove MCAS from the differences table in the FSB report?

8        A.   Yes.  I had agreed with Mark Forkner.

9             MR. ARMSTRONG:  Ms. Holbrook, if you can please

10  take that down and if you can please blow up from there to

11  there.

12  BY MR. ARMSTRONG:

13       Q.   Ma'am, is there a line through MCAS in this draft

14  FSB report that you received?

15       A.   Yes.

16       Q.   What did you take that line to mean when you got

17  it at the time?

18       A.   It's track changes, so it's a request to delete

19  MCAS.

20       Q.   And did you have any inclination as to who

21  proposed the deletion of MCAS?

22       A.   Yes.  It is identified as Mark Forkner requesting

23  that deletion.

24       Q.   And where do you see that, ma'am?

25       A.   In the comments to the right of the "MA 9"
```

1   comment.

2        MR. ARMSTRONG:  And, Ms. Holbrook, if you can

3   please take this down and blow up the comment by itself,

4   please.

5   BY MR. ARMSTRONG:

6        Q.   So, ma'am, who is "FMA" in this document?

7        A.   That is Mark A. Forkner.

8        Q.   And what change was he proposing to you?

9        A.   He was asking -- he said, "We agreed to not

10  difference MCAS since it is outside normal operating

11  envelope."

12       Q.   Since it is outside the normal operating envelope.

13            Have we seen that language already today?

14       A.   Yes.  From the 2015 presentation.

15       Q.   And also the March 2016 email?

16       A.   Yes.

17       Q.   Is it true at the time, back in November 2016,

18  that you agreed not to reference MCAS with Mr. Forkner?

19       A.   Yes.

20       Q.   When did you make that agreement?

21       A.   In 2016, based on the transparency and that it was

22  outside the normal operating envelope.

23       Q.   When you made that agreement, did you think that

24  MCAS would operate at high speed or low speed?

25       A.   High speed.

 1          Q.   When you made that agreement, did you think that
 2    MCAS would operate in passenger flight or as something else?
 3          A.   Just during a high-speed wind-up turn.
 4          Q.   That is the corkscrew maneuver?
 5          A.   Yes.
 6          Q.   And why did you have that understanding?
 7          A.   It is the only understanding that I had from the
 8    presentation and Mark Forkner's discussions.
 9          Q.   So if Mr. Forkner told you that MCAS is outside
10    the normal operating envelope, did you take him to mean that
11    high-speed corkscrew turn or something else?
12          A.   No, the high-speed wind-up turn.
13          Q.   Had you discussed with Mr. Forkner, around this
14    time, MCAS operating in any other scenario?
15          A.   No.
16          Q.   Did you have any reason to believe at this time
17    that MCAS actually would kick in during passenger flights?
18          A.   No.
19          Q.   Did you have any reason to believe at all during
20    this time that MCAS operates at low speed?
21          A.   No.
22          Q.   Did Mr. Forkner tell you, in this document or his
23    comments, that MCAS is now active down to Mach .2?
24          A.   No.  The agreement is outside the normal operating
25    envelope, which is in reference to the 2016 discussion and

1  the 2015 PowerPoint.

2      Q.   Would you have agreed to take MCAS out of this

3  document if you knew at the time that MCAS was active down

4  to Mach .2?

5      A.   No, I would have needed to reevaluate the system.

6      Q.   So at the time did you believe that your agreement

7  was based on right or wrong information?

8      A.   Wrong -- well, at the time I thought it was right

9  information.

10     Q.   What do you now know?

11     A.   It was wrong information.

12     Q.   Can you explain why?

13     A.   This request is after Mark learned about the

14  expansion of the MCAS down to Mach .2.

15     Q.   So what is the significance to you that Mr.

16  Forkner asked you to "delete MCAS, because, as we agreed, it

17  is outside the normal operating envelope"?

18     A.   That he lied.

19     Q.   Who did he lie to?

20     A.   Me.

21     Q.   What did he lie about?

22     A.   How MCAS operates.

23     Q.   After this email, did you have another opportunity

24  to discuss MCAS in the context of the FSB report with Mr.

25  Forkner?

```
1        A.   Yes.  A couple of months later.

2        Q.   I'm showing you what is in evidence GX-26.

3             Ma'am, are you familiar with this document?

4        A.   Yes.

5             MR. ARMSTRONG:  Ms. Holbrook, if you can please

6   blow up the top.

7   BY MR. ARMSTRONG:

8        Q.   What is this email?

9        A.   This is an email from Mark to myself with a copy

10  to Ross.

11       Q.   What is the date?

12       A.   January 17, 2017.

13       Q.   And the subject?

14       A.   "A few DT updates please."

15       Q.   What does that mean?

16       A.   He's requesting a few differences tables updates,

17  please.

18       Q.   The differences table, is that what we just looked

19  at in Government Exhibit 24, flight controls, MCAS is

20  crossed out?

21       A.   Yes.

22            MR. ARMSTRONG:  Ms. Holbrook, if you can please

23  pull down the zoom to the "delete MCAS" portion.

24  BY MR. ARMSTRONG:

25       Q.   Ma'am, what is Mr. Forkner's request of you about
```

```
 1   MCAS in this document on January 17th, 2017?

 2        A.   He's requesting that I delete MCAS.  He's

 3   referencing, recall we decided we weren't going to cover it

 4   in the FCOM or CBT since it's way outside the normal

 5   operating envelope.

 6             MR. ARMSTRONG:  Ms. Holbrook, can you please

 7   highlight "flight controls for the MCAS?"

 8   BY MR. ARMSTRONG:

 9        Q.   Ms. Klein, about how many days after the shocker

10   alert, that you saw before, did Mr. Forkner ask you to

11   delete MCAS the second time in this FSB report?

12        A.   Roughly, 60 days.

13        Q.   Did Mr. Forkner give you a reason why he's asking

14   you again for a second time to delete MCAS?

15        A.   Yes.  He said since it's way outside the normal

16   operating envelope.

17        Q.   Is it still your agreement with Mr. Forkner, on

18   January 17th, 2017, to delete MCAS from the iPad training or

19   the CBT?

20        A.   Yes.

21        Q.   And delete MCAS from the FSB report that we

22   discussed before?

23        A.   Yes.

24        Q.   In January 2017, is that agreement based on MCAS's

25   operating at high speed or low speed?
```

1      A.   High speed.

2      Q.   Is that agreement based on whether MCAS would kick

3   in during passenger flight or is that the high-speed

4   corkscrew turns?

5      A.   Just the high-speed wind-up turn.

6      Q.   In January 2017, 60 days after the shocker alert

7   chat, did you have any reason to believe at all that MCAS

8   would be active down to Mach .2?

9      A.   No, I did not.

10     Q.   Who did you trust to give you that information in

11  January of 2017?

12     A.   Mark Forkner.

13     Q.   Would you still have decided in January 2017 to

14  delete MCAS, if you knew at the time it was active down to

15  Mach .2?

16     A.   No.  I would have had to reevaluate it.

17     Q.   So what is the significance to you, when Mr.

18  Forkner asked you to delete MCAS, it says, "Do you recall,

19  we decided to delete it because it is way outside the normal

20  operating envelope"?

21     A.   That it's for a high-speed wind-up turn.

22     Q.   Do you think he was telling you the truth?

23     A.   I believe he was telling me the truth.

24     Q.   What do you now know?

25     A.   He was not.

1              MS. McFARLANE:  Objection, your Honor,

2    speculation.

3              THE COURT:  Overruled.

4    BY MR. ARMSTRONG:

5         Q.   What do you know now, ma'am?

6         A.   He did not.

7         Q.   Ma'am, did you actually evaluate, as the chair of

8    the FSB, the low-speed expansion of MCAS after the

9    January 2017?

10        A.   Yes, I did.

11        Q.   I'm sorry.

12             After January 2017, before July 2017?

13        A.   Oh, no, I did not.

14        Q.   Why not?

15        A.   I didn't know about it.

16        Q.   Because he didn't tell you?

17        A.   Correct.  Correct.  He did not tell me.

18        Q.   Who is "he"?

19        A.   Mark Forkner.

20             MR. ARMSTRONG:  GX-28, please, Ms. Holbrook,

21    already in evidence.

22             Ms. Holbrook, can you please blow up the top half

23    the email?

24    BY MR. ARMSTRONG:

25        Q.   Ms. Klein, is this an email from Mr. Forkner on

1    July 7th, 2017, Re: FSB Report?

2         A.   Yes, sir.

3         Q.   Is that ballpark when you, as the chair of the

4    FSB, published the final FSB report with Level B training

5    for the MAX?

6         A.   Yes, it is.

7         Q.   This report writes, "Attached is the final and

8    approved 737 FSB report, which adds the MAX.  This is

9    formally approving the MAX as the same type rating as the

10   737 and Level B differences between the NG and the MAX."

11        Do you see that?

12        A.   Yes.

13        Q.   Is he talking about your report?

14        A.   Yes.

15        Q.   Have you had a chance to review the attachments to

16   Government Exhibit 28?

17        A.   Yes.  The final report.

18             MR. ARMSTRONG:  Please go to page 5, Ms. Holbrook.

19   BY MR. ARMSTRONG:

20        Q.   What is the Jury looking at on page 5 of

21   Government Exhibit 28?

22        A.   This is the cover page of the Flight

23   Standardization Board report, Revision 14, dated July 5th,

24   2017.  It is the Boeing 737 FSB report.

25        Q.   And who approved it?

1        A.    Seattle AEG.

2        Q.    Is that you or somebody else?

3        A.    That is me.

4              MR. ARMSTRONG:  Page 23, please, Ms. Holbrook,

5    Government Exhibit 28.

6              Ms. Holbrook, please blow up "Flight Controls."

7    BY MR. ARMSTRONG:

8        Q.    Ma'am, is this the differences table for the MAX

9    that you published in July 2017 about flight controls?

10       A.    Yes.  This is the differences table between the NG

11   and the MAX.

12       Q.    So we see here, "Spoilers, loads, lams, jams, MDS,

13   EDS, something spoilers, and assist on"?

14       A.    Yes.  Speed breaks.

15       Q.    Does it say anywhere on here MCAS?

16       A.    No, sir.

17       Q.    Why not?

18       A.    I had removed it.

19       Q.    Based on right or wrong information?

20       A.    Wrong information.

21       Q.    When you removed it from the final document, did

22   you think that MCAS would operate at high speed or low

23   speed?

24       A.    High speed only.

25       Q.    When you decided Level B for the MAX in July 2017,

1   what did airlines, like Southwest or American, have to train

2   their pilots on?

3        A.   What did they have to train their pilots on?

4        Q.   Yes.

5        A.   IPad training CBT.

6        Q.   Did the pilots have to do simulator training at

7   all?

8        A.   No, they did not.

9        Q.   In July 2017, did any of these airlines have to

10  shoulder the expenses you mentioned before associated with

11  simulator training for MCAS?

12       A.   No, they did not.

13       Q.   Ms. Klein, last document.

14            MR. ARMSTRONG:  GX-31, please, Ms. Holbrook.

15  BY MR. ARMSTRONG:

16       Q.   At this time, did Mr. Forkner actually leave

17  Boeing at some point and go somewhere else?

18       A.   Yes, he did.

19       Q.   Where did he go?

20       A.   Southwest Airlines.

21       Q.   How do you know he went there?

22       A.   He told me.

23       Q.   Around when did Mr. Forkner leave Boeing for

24  Southwest Airlines?

25       A.   I believe it was the summer of 2018.

1              MR. ARMSTRONG:  Ms. Holbrook, if you can please

2    blow up the email.

3    BY MR. ARMSTRONG:

4         Q.   Ms. Klein, who is this email from?

5         A.   It is from Mark Forkner.

6         Q.   To who?

7         A.   Bob Waltz.

8         Q.   Are you included on this email?

9         A.   No, I'm not.

10        Q.   What is the date of this email?

11        A.   The date is November 14th, 2018.

12        Q.   How long after the incident you described in 2018,

13   in October, was this email sent by Mr. Forkner?

14        A.   Almost a year and a half.

15        Q.   I'm sorry.  How long after the October 2018

16   incident?

17        A.   Oh, the incident.  That is two weeks.

18        Q.   Two weeks later?

19        A.   Yes.  Two weeks later.

20        Q.   And where was Mr. Forkner working at the time he

21   sent this email two weeks after that October 2018 incident?

22        A.   Mr. Forkner was a technical pilot for Southwest

23   Airlines.

24        Q.   What is the subject of this email?

25        A.   AEG and MCAS.

```
 1              MR. ARMSTRONG:  Ms. Holbrook, can you please
 2    highlight the first sentence?
 3    BY MR. ARMSTRONG:
 4        Q.   Ms. Klein, Mr. Forkner writes, weeks after that
 5    incident, "MCAS is not specifically trained as a difference
 6    because most pilots will never stall a 737."
 7              Is that what he writes?
 8        A.   Yes.
 9        Q.   Ms. Klein, is that the reason why MCAS was not
10    specifically trained for pilots at American and Southwest
11    and other U.S.-based airlines?
12        A.   No, it was not.
13        Q.   Did your decision not to train these pilots about
14    MCAS have anything to do with stalling an aircraft?
15        A.   No.  And, in fact, we have to train stalls in a
16    full-flight simulator.
17        Q.   What was the reason you, as the AEG, actually
18    decided the pilots wouldn't need training on MCAS?
19        A.   It was based on the operation being a high-speed,
20    high-G maneuver for outside the normal operating envelope, a
21    high-speed wind-up turn.
22        Q.   How would you characterize what Mr. Forkner is
23    saying in the first line of this email?
24        A.   That it is false.
25        Q.   You had a chance to read this email?
```

1      A.   I've reviewed parts of it, yes.

2      Q.   Can you please read it to yourself and let me know

3  when you are done?

4          Ms. Klein, anywhere in this email does Mr. Forkner

5  say, "I didn't know that MCAS had changed from high speed to

6  low speed"?

7      A.   No.

8      Q.   Does it say anywhere, the engineers at Boeing just

9  didn't tell me about the change?

10     A.   No.

11     Q.   Does it say anywhere in the documents that I got

12  didn't bring MCAS's change to my attention?

13     A.   No.

14     Q.   Does it say anywhere, I didn't know at all the

15  MCAS operates down to low speed?

16          THE COURT:  The document speaks for itself.

17          MR. ARMSTRONG:  Thank you, Judge.

18          Ms. Holbrook, if you can please highlight the last

19  sentence.

20  BY MR. ARMSTRONG

21     Q.   Ms. Klein, can you please read that to the Jury.

22     A.   "Ultimately, it was agreed that the existing stall

23  identification systems information in the NG Boeing FCOM,

24  Volume 2, Section 9.20 was sufficient to cover how MCAS

25  provides stall identification."

1      Q.   Is the reason that you decided not to train U.S.

2  pilots about MCAS because of the stall identification

3  systems information?

4      A.   No, it was not.

5      Q.   Does the stall identification system have anything

6  to do with your decision how to train MCAS?

7      A.   No.  That is not how MCAS was supposed to operate.

8      Q.   Did you see here, Mr. Forkner says, "It was

9  agreed" and then talks about the stall identification

10  system, correct?

11      A.   Yes.

12      Q.   Did you have any agreement with Mr. Forkner at the

13  time about not training pilots on MCAS because of the stall

14  identification systems?

15      A.   No.

16      Q.   How would you characterize Mr. Forkner's

17  explanation in this email?

18      A.   False.  It is a lie.

19      Q.   Why do you say that?

20      A.   The agreement had nothing to do with the stall

21  identification system.  It had to do with the operation

22  being a high-speed wind-up turn only.

23           MR. ARMSTRONG:  No further questions, your Honor.

24           MS. McFARLANE:  If I may have a quick bathroom

25  break.

```
 1              THE COURT:  In a few minutes.

 2              MS. McFARLANE:  Okay.

 3                     CROSS-EXAMINATION

 4   BY MS. McFARLANE:

 5        Q.   Good afternoon, Ms. Klein.

 6        A.   Hi.

 7        Q.   My name is Ashlee McFarlane.  I'm an attorney

 8   representing Mark Forkner.

 9              On direct examination you talked about this being

10   a very complicated process.  You talked about the

11   certification of this new airplane taking five years,

12   correct, at least?

13        A.   Yes.

14        Q.   And you talked about there being many groups, many

15   people involved in this process, isn't that right?

16        A.   We all have our specialties, so -- and we are all

17   responsible for certain areas of compliance with the Federal

18   Aviation Regulations.

19        Q.   So there are hundreds of people involved in

20   certifying a new aircraft, isn't that correct, Ms. Klein?

21        A.   No, that is not correct.

22        Q.   How many people would you say are involved?

23        A.   The -- the BASU has about 18 to 20, and then our

24   team has five, including our resident specialist.

25        Q.   And there were engineers at Boeing that were
```

1    involved in designing the airplane, isn't that right?

2        A.   Yes, Boeing is responsible for designing their own

3    airplane.

4        Q.   So that was also involved in the certification

5    process.

6             Boeing's engineers were also involved, isn't that

7    correct, Ms. Klein?

8        A.   Yes.  Boeing engineers develop and design the

9    aircraft.

10       Q.   Thank you.

11            So there were many groups, you have got Boeing

12   engineers, you have got test pilots at Boeing, you have got

13   test pilots at the FAA, you have got, you said BASU, which

14   is another group of engineers at the FAA?

15       A.   I would like to make a clarification --

16            THE COURT:  Hold on.  Don't talk over each other.

17   Wait for her to finish her question, and then she will wait

18   for you to finish your answer.

19            THE WITNESS:  Okay.

20   BY MS. McFARLANE:

21       Q.   I was -- I was speaking, Ms. Klein, of the

22   different groups of people that were involved.  And then you

23   have got the AEG group, your group at the FAA that is

24   involved with training, and then you also mentioned an ACO

25   group, which is the test pilots or other certification

1    groups at the FAA, isn't that correct?

2         A.   The BASU is part of the ACO.  It is all one group,

3    and the BASU is responsible for the oversight of the Boeing

4    engineers.

5         Q.   The ACO is a subset of the BASU, is that correct?

6    Or is the ACO over the BASU?

7         A.   The BASU is the office responsible for finding

8    compliance to the Boeing design of the aircraft.

9         Q.   That wasn't my question, Ms. Klein.

10             Is ACO group a subset of BASU?

11        A.   No.  The ACO is a branch in which the BASU is part

12   of.

13        Q.   Okay.  So BASU is a subset of ACO, is that

14   correct?

15        A.   It is Boeing oversight office, yes.

16        Q.   Thank you.

17             So with all of these people working together in

18   this process, you get information from different sources.

19             You get information from test pilots about this

20   plane, isn't that correct?

21        A.   I get information from Mark Forkner, and I attend

22   the same meetings as Mark Forkner.

23        Q.   Ms. Klein, I need you to answer the question I

24   have asked.

25             Ms. Klein, you get information about this plane

1   and you receive information about this plane, the MAX plane,

2   from test pilots within the FAA and Boeing, isn't that

3   correct?

4        A.   Yes.  We talk about the different designs.

5        Q.   Thank you.

6             You also receive information, Ms. Klein, from the

7   BASU group at the FAA about this plane, isn't that correct?

8             Yes?

9        A.   Yes.

10       Q.   And, Ms. Klein, you also receive information from

11  others in the ACO group about the MAX plane, isn't that

12  correct?

13       A.   No.  The ACO engineers work for the BASU.

14       Q.   Have you never spoken to an ACO engineer, Ms.

15  Klein?

16       A.   Yes.

17       Q.   Okay.  And you receive information from those ACO

18  engineers, correct, Ms. Klein?

19       A.   Yes.  They are part of the BASU group.

20       Q.   Thank you.

21       A.   They are resources for the group.

22       Q.   And you receive this information from these

23  various different people and different groups through

24  meetings you attend, isn't that correct?

25       A.   Yes.

1    Q.   Presentations that are given, isn't that correct?

2    A.   Yes.

3    Q.   Phone calls that you have with these different

4    people, isn't that correct?

5    A.   Yes.

6    Q.   Emails that you correspond with all of these

7    different subsets of people, isn't that correct?

8    A.   Yes.

9    Q.   And all of this information that you receive from

10   all of these different subsets of people inform you on doing

11   your job in the AEG, isn't that correct?

12   A.   Yes.  It helps inform the conversations that Mark

13   and I would have.

14   Q.   It helps inform you to do your job, isn't that

15   correct, Ms. Klein?

16   A.   Portions of it help inform the process, certainly,

17   yes.

18   Q.   It helps to inform you in order to do your job

19   with the AEG, isn't that correct, Ms. Klein?

20   A.   It is not the sole --

21   Q.   I did not say that, Ms. Klein.  It is going to be

22   very important that you listen to my question and respond to

23   that.

24   A.   Well, sometimes there are complexities with that.

25   Q.   I understand.  We will talk about those

 1    complexities.

 2         A.    Okay.

 3         Q.    So we have mentioned the meetings and the

 4    presentations and the calls and the emails, and let's talk

 5    about one of those presentations in which you attended and

 6    received.

 7              I'm going to show you what has been marked as

 8    Defense Exhibit Number 35A.

 9              MS. McFARLANE:  May I approach, your Honor?

10              THE COURT:  Yes.

11    BY MS. McFARLANE:

12         Q.    Ms. Klein, you are looking at a document we

13    received from the Government through Boeing.  It is one of

14    Boeing's documents.

15              Do you recognize this document?

16         A.    There were many different --

17         Q.    Ms. Klein, do you recognize this document?

18              THE COURT:  Do you recognize it?

19              THE WITNESS:  Can I have some time to review it?

20              MS. McFARLANE:  You sure can.

21              THE WITNESS:  Thank you.

22    BY MS. McFARLANE:

23         Q.    Are you ready, Ms. Klein?

24         A.    Not quite yet.

25              Okay.  Yes, I'm ready.

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 408

```
1          Q.   Okay.  The first page of this document is a --
2               THE COURT:  Hold on a second.  Do you recognize
3    the document?
4               THE WITNESS:  Oh, yes.  I do recognize the
5    document.  Thank you.
6    BY MS. McFARLANE:
7          Q.   Okay.
8               And this document is a presentation that Boeing
9    gave that you attended about the 737 MAX plane?
10              MS. McFARLANE:  Your Honor, the defense would
11   offer Defendant's Exhibit 35A as an official business
12   record.
13              MR. ARMSTRONG:  No objection.
14              THE COURT:  Defense Exhibit 35A will be admitted.
15              (The referred-to document was admitted in Evidence
16         as Defense Exhibit 35A.)
17              MS. McFARLANE:  Thank you, your Honor.
18              Can we please publish the first page?
19              And let's zoom in on that.
20   BY MS. McFARLANE:
21         Q.   This, Ms. Klein, is a presentation that was given
22   by Christine Walsh, who is a test pilot at Boeing, and Derek
23   Pratt, who is an engineer, about the MAX handling qualities
24   and you attended this presentation, correct?
25         A.   I don't recall attending this particular
```

 1  presentation in 2014.  But if my name was on there, then,

 2  yes, I recognize the presentation.

 3      Q.   Would you like a document to help refresh your

 4  recollection?

 5      A.   Sure.  Yes, that would be great.

 6           MS. McFARLANE:  May I approach, your Honor?

 7           THE WITNESS:  Thank you.

 8  BY MS. McFARLANE:

 9      Q.   Ms. Klein, do you now recall whether you attended

10  this presentation?

11      A.   Yes, thank you.

12      Q.   And did you attend?

13      A.   Yes.

14      Q.   And if you look on the first page of this, it

15  says -- it's the dated May 22nd, 2014, is that correct?

16      A.   Yes.

17      Q.   Okay.  And this presentation, as I said, was given

18  by Christine Walsh and Derek Pratt.  And if we could turn to

19  page 30 of this presentation, it talks about MCAS.

20      A.   Uh-huh.

21      Q.   And it says that MCAS is operational outside of

22  the normal operating envelope, high angles of attack only

23  above 1.3 Gs, and it gives that Mach number range of .7 to

24  .8.

25           So, Ms. Klein, when you testified on direct that

 1    you learned about MCAS in 2015, that wasn't accurate, was

 2    it?

 3            A.    I guess it was 2014, that is more accurate.

 4            Q.    Did you forget about this presentation?

 5            A.    I had until you reminded me.

 6            Q.    Okay.

 7                  So it is accurate that you learned from Christine

 8    Walsh and Derek Pratt about MCAS in 2014, is that correct?

 9            A.    Yes.  But this is the same slide from 2015 as

10    well.

11            Q.    That's correct.

12                  MS. McFARLANE:  All right.  We can take that down.

13    BY MS. McFARLANE:

14            Q.    And this presentation, Ms. Klein, was given by

15    engineers and a test pilot, not by Mark Forkner, isn't that

16    correct?

17            A.    Yes, that's correct.

18            Q.    And in 2014, when this presentation was given,

19    Mark Forkner said nothing about MCAS, isn't that correct?

20            A.    I don't know.

21            Q.    You don't recall him telling you anything about

22    MCAS at that time, isn't that correct?

23            A.    Well, we talked about all kinds of changes to the

24    aircraft.

25            Q.    Ms. Klein, do you recall, in May of 2014, during

```
 1    this presentation that you just remembered you had, that

 2    Mark Forkner did not speak to you about MCAS?

 3              Do you recall whether you he spoke to you or not?

 4         A.   I do not remember that, no.

 5         Q.   Okay.

 6              Now, these kinds of presentations were given all

 7    the time by others, besides Mark Forkner, to you and your

 8    group, isn't that correct?

 9         A.   Yes.

10         Q.   And they were talking about details and

11    specifications about this new plane, isn't that correct?

12         A.   Yes.

13         Q.   And they were telling you, the AEG, this

14    information so that you can then do your job with the

15    training component, isn't that correct?

16         A.   Yes.  It was so that Mark and I could --

17         Q.   Thank you.

18         A.   -- discuss what those changes are.

19         Q.   And in order -- I want to recall something you

20    said on direct.

21              You said that you relied and you trusted Mark

22    Forkner to give you details and differences and provide

23    information to you, is that correct?

24         A.   Yes.

25         Q.   And you were to rely on him to provide information
```

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                     Vol 2 March 21, 2022                     Page 412

1    to you that he knew, isn't that correct?

2        A.   Yes.

3        Q.   Because how could he provide information to you if

4    he did not know it, isn't that correct?

5        A.   Correct.

6        Q.   Okay.  And you would agree with me that the way

7    that all of these groups were set up at Boeing, that

8    oftentimes Mark Forkner was left out of the loop of

9    information, isn't that right?

10       A.   I would not agree with that.

11       Q.   You would not agree with that?

12       A.   No.

13       Q.   Okay.

14       A.   I don't know is what I'm saying.  I don't know if

15   he was left out.

16       Q.   You don't know if he was left out of the loop on

17   occasion?

18       A.   Occasionally, it -- it appeared that I had more

19   information than him.

20       Q.   Occasionally, it appeared you had more information

21   about the MAX plane than Mark Forkner did, isn't that right?

22       A.   Yes.  So what I'm saying is, I don't know if he

23   was left out.

24       Q.   Let me just make sure I understand, Ms. Klein.

25       A.   Sure.

1    Q.   I don't want to speak over you.

2         There were occasions in which you knew information

3    and details about the plane that Mark Forkner did not know,

4    isn't that correct?

5    A.   Yes.  There were occasions --

6    Q.   I'm sorry.

7         MR. ARMSTRONG:  Objection, your Honor.  Let Ms.

8    Klein finish the question.

9         THE COURT:  I think she has answered the question,

10   that there were times when she knew more information than

11   Mr. Forkner.  So that is the answer.

12        Ask your next question.

13        MR. ARMSTRONG:  Thank you, Judge.

14   BY MS. McFARLANE:

15   Q.   And you knew there were occasions in which you

16   knew more than Mark Forkner because you would tell Mark

17   Forkner information about this plane and he had no idea,

18   isn't that correct?

19   A.   He would say he didn't have any idea.

20   Q.   He would tell you he had no idea, correct?

21   A.   Correct.

22   Q.   And then you even told others that you -- there

23   were countless times, numerous times, in which you told Mark

24   Forkner information about this plane and he had no idea.

25        Didn't you say that, Ms. Klein?

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                     Vol 2 March 21, 2022                          Page 414

1      A.   Yes, I did.

2      Q.   Okay.  And when you were talking -- when you said

3  that, you were talking with other people at the FAA, isn't

4  that correct?  Some of your colleagues?

5      A.   Yes.

6      Q.   And so you didn't work at Boeing, isn't that

7  correct?

8      A.   Correct.  I did not work at Boeing.

9      Q.   You worked at the FAA?

10     A.   Yes.

11     Q.   And so you received information from someone else

12  other than Mark Forkner about the MAX plane?

13     A.   I would attend the meetings --

14     Q.   -- isn't that --

15     A.   -- Boeing would hold.

16     Q.   I'm sorry.  Let me reask that.

17          And so, Ms. Klein, you would receive information

18  from others, other than Mark Forkner, about the MAX plane,

19  isn't that correct?

20     A.   Yes.

21     Q.   And so when you said you only received information

22  from Mark Forkner, that was not completely accurate?

23     A.   Well, it is Mark's responsibility to notify me of

24  all of the design changes.

25     Q.   Okay.

 1              MS. McFARLANE:  Your Honor, I actually do need

 2    that break.

 3              THE COURT:  All right.

 4              Let's go ahead and take about a 10-minute break.

 5              THE COURT SECURITY OFFICER:  All rise.

 6              (The jurors exited the courtroom.)

 7              THE COURT:  Okay.  Please be seated.

 8              All right.

 9              (Recess)

10              (The jurors entered the courtroom.)

11              THE COURT SECURITY OFFICER:  All rise.

12              False alarm.

13              All rise.

14              THE COURT:  Please be seated.

15    BY MS. McFARLANE:

16        Q.   Ms. Klein, before the break we were talking about

17    Mark Forkner being out of the loop on occasions and you

18    would inform him of changes to the aircraft on occasion.

19              I want to talk about what that loop is supposed to

20    look like, right?  The flow of information, right?

21              Engineers at Boeing design the airplane, they get

22    that information to the flight test group and then to Mark

23    Forkner, isn't that correct?

24        A.   I don't know what the loop is at Boeing.

25        Q.   You don't know what the chain of information is at

 1   Boeing?

 2       A.   No.

 3       Q.   And you've never said that information that

 4   Forkner would have been required to share you should have

 5   come directly from flight test engineers?  You never said

 6   that?

 7       A.   I don't recall that, no.

 8       Q.   Do you recall interviewing with the Government

 9   investigators and prosecutors in September 11, 2019?

10       A.   I interviewed with a lot of investigators.  Can

11   you refresh my memory?  Do you have a document?

12       Q.   I absolutely can.  One second.

13            MS. McFARLANE:  May I approach the witness, your

14   Honor?

15            THE COURT:  Yes.

16   BY MS. McFARLANE:

17       Q.   Ms. Klein, does this refresh your recollection of

18   whether you met with the Government agents and prosecutors

19   on September 11th, 2019?

20       A.   Yes.  I don't understand.  What is this document?

21       Q.   The document is just to refresh your recollection.

22            Does it do so?

23       A.   I didn't write this document.

24       Q.   I didn't ask you that.

25            Does this document refresh your recollection on

 1   whether you met with the Government on September 11th, 2019?

 2        A.   I met with the Government on September 11th, 2019.

 3        Q.   Okay.  Thank you.

 4             If you can turn to page 41 of this document -- I'm

 5   sorry -- page 7, the paragraph is listed as No. 41 in red.

 6        A.   Okay.

 7        Q.   If you can read that to yourself, not aloud.

 8             Please let me know when you're done.

 9        A.   I'm done.

10        Q.   Okay.

11             Now, isn't it true that on September 11th, 2019,

12   you told the Government investigators and prosecutors that

13   information Forkner was required to share with you should

14   have come directly from flight tests through engineers?

15        A.   I don't recall stating those words.

16        Q.   You don't recall stating those words?

17        A.   No.

18        Q.   Okay.  So this document does not accurately

19   reflect your statements?

20             MR. ARMSTRONG:  Objection, your Honor.

21             THE COURT:  Sustained.

22   BY MS. McFARLANE:

23        Q.   But, Ms. Klein, you do know that Mark Forkner had

24   to go and consult with engineers about information to

25   provide to you, isn't that correct?

 1        A.   Yes.

 2        Q.   Okay.

 3             Mr. Forkner did not design the airplane, isn't

 4   that right?

 5        A.   That's correct.

 6        Q.   And Mr. Forkner is not an engineer, correct?

 7        A.   Not that I'm aware of, no.

 8        Q.   On direct examination -- I can take that back if

 9   you -- or just set it down.  We don't need to look at

10   anymore.  Thank you.

11             On direction examination, we talked about -- you

12   talked about Level B and this computer-based training level,

13   isn't that right?

14        A.   Yes.

15        Q.   And the AEG or yourself, you are the one that

16   would determine whether this new plane would qualify for

17   Level B training, isn't that correct?

18        A.   Yes.

19        Q.   Okay.

20             And Boeing management and others higher than Mark

21   Forkner sort of set this goal for Level B for the MAX, isn't

22   that correct?

23        A.   Yes.

24        Q.   And, in fact, it's not unusual for a plane

25   manufacturer like Boeing to request Level B training, isn't

1   that correct?

2          A.   Can you repeat the question?

3          Q.   Sure.

4               It's not unusual, Ms. Klein, for an OEM or a plane

5   manufacturer like Boeing to request Level B training from

6   your group, isn't that correct?

7          A.   No, that's not unusual.

8          Q.   It is not unusual?

9          A.   No.

10         Q.   And, in fact, FAA guidance and regulations

11  encourage manufacturers to make as few differences between

12  models as possible, because it's safer, isn't that true?

13         A.   What are you referring to?  What regulation are

14  you referring to?

15         Q.   Are you familiar with the AC 120-53B?

16         A.   Yes.  I'm very familiar.

17         Q.   Okay.

18              And wouldn't you say that's sort of like the rule

19  book for FSB evaluations and evaluating differences in

20  airplanes?

21         A.   It's the guidance to the manufacturers on how to

22  evaluate the differences.

23         Q.   And as you mentioned, you're very familiar with

24  that regulation, correct?

25         A.   It's not a regulation.

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 420

```
1          Q.   Or how would you phrase it?

2          A.   It's an advisory circular, it's guidance to the

3    manufacturer.

4          Q.   Guidance.

5          A.   Yes.

6          Q.   So you're very familiar with that guidance?

7          A.   Yes.

8          Q.   And you're familiar then that that guidance says,

9    "It is intended to enhance safety by encouraging

10   manufacturers to design with the goal of developing common

11   characteristics between related aircraft," isn't that right?

12         A.   Yes.

13         Q.   Okay.

14              And so common characteristics between aircraft

15   designs would result in a Level B training, isn't that

16   right?

17         A.   It depends on the differences.

18         Q.   Well, fewer differences gets lower level of

19   training, isn't that correct?

20         A.   It depends on those differences, ma'am.

21         Q.   You're right.

22              If there is one very big change, that might --

23   that might require higher level -- sorry, higher level of

24   training, isn't that correct?

25         A.   It depends on the difference, the system
```

1   difference.

2        Q.   Okay.  But commonalities between the planes makes

3   the plane safer, isn't that correct?  To fly?

4        A.   Commonalities can decrease the amount of training,

5   yes.

6        Q.   Okay.

7             Now, on direct examination, you talked about a

8   meeting in the spring of 2015, after the presentation by

9   Ms. Christine Walsh.  Do you remember testifying to that?

10       A.   Yes.  Derek was the presenter, but Christine was

11  who I talked with, with Mark, in the hallway, yes.

12       Q.   So Derek Pratt, one of the engineers was the

13  presenter, but after that meeting, you remember speaking

14  with Christine Walsh, correct?

15       A.   Yes.  Yes.

16       Q.   Okay.

17            And during that meeting, Christine Walsh is who

18  told you that the parameters of MCAS were wind-up turns,

19  isn't that correct?

20       A.   Yes.

21       Q.   Mark -- is that correct?  I'm sorry, I don't want

22  to speak over you.

23       A.   Yes.

24       Q.   Mark Forkner did not tell you that, is that

25  correct?

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                     Vol 2 March 21, 2022                     Page 422

1        A.   No.  It was Christine Walsh.

2        Q.   Okay.

3             MS. McFARLANE:  I would like to pull that

4   Government Exhibit 13, please.  If I can call that out so

5   that we can see it clearer, please, Mr. Payton.

6   BY MS. McFARLANE:

7        Q.   Ms. Klein, you recalled discussing this email on

8   direct examination with the Government, isn't that

9   corrected?

10       A.   Yes.

11       Q.   And this is from Mark Forkner to yourself and

12  others regarding whether MCAS lives in both FCCs, correct?

13       A.   Yes.

14       Q.   And he asked if you were okay with us removing all

15  reference to MCAS.  He's talking about Boeing, isn't that

16  correct?

17       A.   Yes.

18       Q.   All right.  From the FCOM?

19       A.   Yes, and the training.

20       Q.   And he needed your permission before that is done,

21  isn't that correct?

22       A.   Yes.  It was an agreement that we would make.

23       Q.   Okay.  And he says, "As we discussed, it's

24  completely transparent to the flight crew and only operates

25  way outside the normal operating envelope."

```
 1              And on direct you said, "Transparent means
 2    invisible, not able to turn on or off," isn't that correct?
 3         A.   Yes.
 4         Q.   And MCAS would have been invisible, not able to
 5    turn on and off whether it was down to .2 or .7, isn't that
 6    correct?
 7         A.   The way that it was described to me as a
 8    high-speed wind-up turn, yes, but the expanded way, we would
 9    have a way to turn it off, ma'am.
10         Q.   Again, Ms. Klein, I didn't ask you about the
11    expanded way.
12         A.   Okay.
13         Q.   MCAS, if the only that thing that changed was the
14    speed was down to .2 instead of .7, it still would have been
15    invisible to the pilot, isn't that correct?
16         A.   I don't know how to answer that question because
17    it's more complex than that.  It's not -- it's not -- no.
18    That's not true.
19         Q.   Okay.
20              So are you saying, Ms. Klein, that the expanded
21    MCAS with the different speed range was no longer
22    transparent to the pilot?
23         A.   That's correct.
24         Q.   Okay.
25              And that's what you believed at that time and
```

1  that's what you believe today, that expanded MCAS was not

2  transparent?

3       A.   At the time, MCAS was transparent due to how it

4  was operating.

5            So maybe you could repeat the question.  I'm not

6  following your question, ma'am.  I'm sorry.

7       Q.   Okay.  So at the time when Mr. Forkner wrote this

8  email to you and he said it was completely transparent to

9  the flight crew, was that true, at this time?

10      A.   Yes.

11      Q.   Okay.

12           And he says, "It only operates way outside the

13 normal operating envelope," and on direct you said, "The

14 normal operating envelope was sort of a gate-to-gate

15 flight," right?  Takeoff, cruising, landing, correct?

16      A.   Yes.

17      Q.   All right.

18           And it's outside of the normal operating envelope

19 because your understanding, a wind-up turn is not something

20 you would experience in a normal flight from Dallas to

21 Houston, correct?

22      A.   Correct.

23      Q.   And one of the components of MCAS was also that it

24 was a high angle of attack, correct?

25      A.   At a high speed greater than 1.3 Gs, correct.

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 425

```
 1        Q.    Right.

 2              That was the version that you understood it to be,

 3   correct?

 4        A.    Correct.

 5        Q.    But even under the expanded version, it still

 6   required a high angle of attack, correct?

 7        A.    Yes.

 8        Q.    Okay.  And a high angle of attack is something

 9   that most of us who are not pilots would refer to as a stall

10   of some sort, or an approach to stall, right?

11        A.    That's a required training maneuver, ma'am.

12        Q.    That is not my question.

13              A high angle of attack is something that you could

14   describe as a stall or an approach to stall, isn't that

15   correct?

16        A.    It could be depending on what the high angle of

17   attack parameters were.

18        Q.    Okay.

19              And so a stall or a high angle of attack, when a

20   plane is like this, right?  Is that right?

21        A.    Uh-huh.

22              THE COURT:  Is that yes?

23              THE WITNESS:  Yes.

24   BY MS. McFARLANE:

25        Q.    Okay.  So the reporter gets down sort of my hands
```

 1   are up in the air, but that's not something that any of us

 2   would experience flying from Houston to Dallas typically,

 3   isn't that correct?  That's not a normal operating envelope,

 4   isn't that correct?

 5       A.   It's important that I clarify the reason the

 6   expansion to .2 at a high angle of attack is important --

 7            THE COURT:  I think she just asking, though, in

 8   terms of her question, a normal operating envelope with a

 9   plane angled at the high stage?

10            MS. McFARLANE:  That's correct, your Honor.

11   That's absolutely correct.

12            THE WITNESS:  Yeah, so you could still experience

13   a high angle of attack during takeoff and landing.

14   BY MS. McFARLANE:

15       Q.   Would that be the normal operating envelope --

16       A.   Yes.

17       Q.   -- to experience a high angle of attack, because

18   the way you described normal operating envelope was just a

19   normal flight, takeoff, cruise, and landing.

20       A.   Yes, during rotation increasing the angle of

21   attack and rotation when you land, you can experience a

22   higher angle of attack, where it could have.

23       Q.   So, Ms. Klein, it is your testimony that a high

24   angle of attack is within the normal operating envelope of a

25   flight?

1       A.   It's more complex than that.

2       Q.   It's more complex than that.

3       A.   Yes.

4       Q.   Okay.

5            Did you represent, even after you learned, or

6   didn't you represent, even after you learned about the

7   expansion of MCAS down to low speed, that it was still

8   transparent and outside the normal operating envelope?

9       A.   I don't recall what you're referring to.

10      Q.   Didn't you tell that to the FAA and others that

11  even after you learned MCAS was down to low speed, it was

12  still transparent and outside the normal operating envelope?

13      A.   Can you show me what you're referring to?

14      Q.   Do you recall that?

15           THE COURT:  Well, the question, first, is, do you

16  ever recall saying that.

17           THE WITNESS:  Yeah, as we were gathering

18  information and learning about the expansion of MCAS.

19  BY MS. McFARLANE:

20      Q.   Ms. Klein, I'm sorry, I really don't want to

21  interrupt.  But do you recall saying that -- yes or no?

22      A.   I don't recall exactly that.  If you could show me

23  something that references what you're talking about, that

24  would be helpful.

25      Q.   Sure.

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                        Vol 2 March 21, 2022                        Page 428

1        A.   I don't understand the context in what your

2    question is in regards to.

3              MS. McFARLANE:  May I have Exhibit 187, please?

4              Here you go.

5              May I approach, your Honor?

6    BY MS. McFARLANE:

7        Q.   If you could take a look at that, Ms. Klein.

8    Okay.

9              And specifically if you can turn to the second

10   page, where it says, "From a training perspective," and read

11   that paragraph.  That may refresh your recollection.

12       A.   From a training --

13       Q.   No, no, no.

14             THE COURT:  Just to yourself.

15             THE WITNESS:  Sorry.  My apologies.

16   BY MS. McFARLANE:

17       Q.   Okay.  Ms. Klein, are you ready?

18       A.   Yes.

19       Q.   Okay.

20             Does this document refresh your recollection on

21   whether after you learned about the expansion of MCAS that

22   you still represented that it was transparent and outside

23   the normal operating envelope?

24             Yes or no, Ms. Klein?

25       A.   It is transparent -- yes.  But in context --

 1              THE COURT:  Well, hold on.

 2              She's answered your question.  If they have any

 3  concerns about how complete your answer is, they will be

 4  able to ask you further questions.  But let's just answer

 5  counsel's questions here.  So she answered that.

 6              MS. McFARLANE:  Thank you, your Honor.  I will

 7  move on.

 8  BY MR. ARMSTRONG:

 9      Q.   Ms. Klein, on direct, we talked about the three

10  documents in which -- sorry -- on direct the Government

11  talked with you about the three documents, the three emails

12  in which Mark Forkner said that MCAS was outside the normal

13  operating envelope.

14              Do you recall those documents?

15      A.   Yes.

16              MS. McFARLANE:  And just for the record, it's

17  Government Exhibit 13, 24, and 26.

18  BY MS. McFARLANE:

19      Q.   And each time Mark Forkner represented it was

20  outside the normal operating envelope, correct?

21      A.   Correct.

22      Q.   Okay.

23              Mark Forkner never in any of those emails said

24  it's only limited to wind-up turns, correct?

25      A.   Correct.  That language is not used.

1    Q.    And on direct you said, "Well, I had a

2  conversation with Mark Forkner where he said it was wind-up

3  turns and high speed," correct?

4    A.    Yes.

5    Q.    But you spoke to the Government prior to today on

6  at least nine different occasions.

7    A.    Yes.

8    Q.    September 11th, 2019, September 13, 2019,

9  December 4, 2019, October 22nd, 2019, April 1st, 2020,

10  December 2nd, 2020, January 13, 2021, February 14th, 2022.

11         And then lastly, as far as I know, March 8th,

12  2022, which was just a few weeks ago, isn't that correct?

13    A.    Yes.

14    Q.    And March 8th, 2022, is the first time you've ever

15  said that Mark Forkner discussed with you wind-up turns and

16  high speed, isn't that correct?

17    A.    I would have to see the documents, but in

18  reference to the document, can I see?

19         THE COURT:  Well, hold on.  Forget about the

20  document.  The question to you is, other than on March 8th,

21  2022, have you ever disclosed that?

22         THE WITNESS:  Oh, I thought I had.

23  BY MS. McFARLANE:

24    Q.    You thought you had?

25    A.    Yes.  The agreement was that it was during a

1   high-speed wind-up turn from our 2015 post-meeting

2   discussion.

3        Q.   For the sake of time, I won't show you every

4   single statement from that time.  But you don't recall -- is

5   it fair to say, you don't recall whether in the eight times

6   leading up to that that you ever discussed a conversation

7   with Mark Forkner, isn't that correct?

8        A.   I don't recall if I had a conversation with Mark

9   Forkner?

10            THE COURT:  No, the question -- no, her question

11   is very simple.  It is, you met with the Government eight

12   times, investigators, prosecutors, whoever.

13            THE WITNESS:  Yes.

14            THE COURT:  You met with them eight times.  Did

15   you ever tell them in any of these eight times this

16   conversation you had with Mr. Forkner other than on

17   March 8th?  That's the question.

18            And either you did or you didn't.  Or you

19   remember, or you don't.

20            THE WITNESS:  Yes.  The conversation was the post

21   2015 meeting referring to the high-speed wind-up turn.

22            THE COURT:  And when -- but do you understand the

23   question?  The question is, you met with them on these

24   eight days.  The information appears to be that you talked

25   about it in the March 8th date, the March 8th meeting.

1          Do you remember telling them about it in any of

2    the previous meetings?

3    BY MS. McFARLANE:

4          Q.   To be clear.  It is that Mark Forkner told you

5    that it was wind-up turns and high speed.

6          A.   My recollection is the 2015 meeting discussing it

7    with Christine Walsh and Mark Forkner about how MCAS worked

8    after the meeting.  And he was present for the explanation

9    of the high-speed wind-up turn.

10         Q.   He was present for the explanation.  Did he tell

11   you?

12         A.   No.  Christine Walsh told me.

13         Q.   Okay.

14              And so the only time you told the Government that

15   was two weeks ago, that Mark Forkner told you?

16         A.   I'm referencing that meeting in 2015, yes.

17         Q.   Okay.  We'll move on.

18              Ms. Klein, you also talk about, after the sim

19   chat, the November 15, 2016 chat, that you met with Mark

20   Forkner and others in Miami.  Do you recall that, saying

21   that on direct?

22         A.   That was not in Miami; that was at Boeing in

23   Seattle.

24         Q.   Oh, at Boeing.  Okay.  My apologies.  At Boeing.

25              And you said it was shortly after that sim ride,

1    correct?

2         A.   Yes.  The following week.

3         Q.   Okay.

4              And you said on direct that you asked Mark Forkner

5    about the sim ride and he said, "Everything's fine, but

6    there's a few kinks to work out"?

7         A.   Yes.

8         Q.   Great.

9              And a few kinks to out, Mark Forkner was telling

10   you there were a few kinks to work out in the simulator,

11   correct?  Because you asked him about the simulator?

12        A.   Yes.

13        Q.   Okay.

14             And that's common to have kinks in a simulator,

15   isn't that correct?

16        A.   It's very common --

17        Q.   Very common.

18        A.   -- in the simulator.

19        Q.   To have thousands of issues with simulators while

20   in development, isn't that common?

21        A.   Well, I don't know about thousands, but it's

22   common in the development process, yes.

23        Q.   So it would not surprise you that this kink that

24   Mark Forkner experienced in the simulator was kink number

25   1,079.  So 1,079, that would not surprise you, would it?

1    A.    No.

2    Q.    Okay.

3          And you may or may not know this, but when folks

4    like Mark Forkner and others that are in a simulator

5    discover a kink, or an issue, or an error, they write

6    something in a report.

7          Do you know what that's called?

8    A.    Yes, they write it up in a report.  I can't recall

9    what it's called.

10   Q.    It is a discrepancy report, right?

11   A.    Okay.

12   Q.    And so if they see an issue or a kink in the

13   simulator, they write it in what's called a discrepancy

14   report, correct?

15   A.    Correct.

16   Q.    All right.

17         And so what Mark Forkner was telling you, he saw a

18   kink in the simulator, and you would expect him to write

19   that up in the discrepancy report, right?  If he saw a kink?

20   A.    Sure.

21   Q.    Okay.

22         Now, you also talked about on direct that if you

23   had known about expanded MCAS, you would have re-evaluated

24   it, correct?

25   A.    Yes, ma'am.

1    Q.    All right.

2          And by re-evaluating it, you mean you would have

3    went to Kevin Green, a test pilot for instance, and had him

4    test it out, isn't that correct?

5    A.    No.

6    Q.    That would not have been one of the things you

7    did?

8    A.    No.

9    Q.    Aren't test pilots used to test out differences in

10   the plane to determine whether there's pilot training

11   necessary to see if there's differences?

12   A.    No.  That's our job.

13   Q.    That's your job.  You actually do that?

14   A.    Yes.

15   Q.    So you fly the plane to determine whether there's

16   difference in the plane?

17   A.    Yes, or the simulator, yes.

18   Q.    Or the simulator.

19   A.    Yes.

20   Q.    So what are test pilots for?

21   A.    Test pilots find compliance to the aircraft

22   certification regulations, the Part 25 regulations.  I find

23   compliance to the Part 121 and 135 regulations.

24   Q.    You're right, compliance.  That's not what I'm

25   asking.

 1              If you knew of a difference in the plane, between
 2    the NG and the MAX, for instance, and you wanted to know
 3    what, if any, differences there would be for the pilot,
 4    wouldn't you ask Kevin Green to fly whatever that difference
 5    would be?
 6              MR. ARMSTRONG:  Objection, your Honor, asked and
 7    answered.
 8              THE COURT:  Overruled.
 9              Go ahead and answer, or answer again, if it has
10    been.
11              THE WITNESS:  Occasionally, we would have flight
12    tests look at something for us if we were not available to
13    fly.
14    BY MS. McFARLANE:
15        Q.   Right.  That's common.  That's something that you
16    would do.
17        A.   It's not common, no.
18        Q.   But it's something that you would do, correct?
19        A.   It's something we have done in the past, yes.
20        Q.   Okay.
21              And, in fact, you talked about a T2 test on
22    direct, which is actually a test where you fly the airplane,
23    right, and evaluate it.  The handling qualities, correct?
24        A.   Handling qualities.
25              Yes.

1   Q.   And by handling qualities, it's what the pilot

2   experiences, correct?  On the plane?  When flying the plane?

3   A.   Yes.  It's the flight controls and the handling of

4   the aircraft.

5   Q.   And you were actually on that flight, August 9th,

6   2016, when they tested the handling qualities of the MAX,

7   correct?

8   A.   Yes.

9   Q.   All right.

10   And when you were on that flight, they actually

11   flew a stall, isn't that correct?

12   A.   Yes, we flew a stall.

13   Q.   And MCAS activated but you did not know?

14   A.   That's correct.  Well, I don't know if it

15   activated, but we did stall in the aircraft.

16   Q.   So you checked out the scenario in which MCAS

17   would activate a stall, correct?

18   A.   We did a stall in the aircraft, yes.

19   Q.   Okay.

20   Did you do a wind-up turn?

21   A.   No.  A wind-up turn is for certification.

22   Q.   Correct.  But you did a stall?

23   A.   Yes.

24   Q.   And MCAS activated, but you did not know it

25   because it's transparent to the pilot, correct?

1      A.    Correct.

2      Q.    Okay.

3      A.    Just to clarify, I said correct that we did a

4   stall.  I don't know if it activated.

5            THE COURT:  Is that because it's transparent?

6            THE WITNESS:  Yes.

7            MS. McFARLANE:  Correct.

8            THE COURT:  You didn't know.  Or it might have not

9   activated, if it wasn't working?

10           THE WITNESS:  Right.

11           THE COURT:  Is there -- will there be records,

12  like if you land the plane, can you punch a button and it

13  pulls up whether it activated or not?

14           THE WITNESS:  The flight test engineers in the

15  back probably have records; we don't get those.

16  BY MS. McFARLANE:

17     Q.    And there was records of this flight, wasn't

18  there?

19     A.    Yes.  It was an AED T2 test, correct.

20     Q.    Right.

21           And in that T2 test, the pilots that flew the

22  plane that you were on, they said all said, "This feels just

23  like the NG," didn't they?

24     A.    Yes.

25     Q.    They all said, "This MAX, this new plane feels

1    just like the NG, there aren't any differences that we can

2    tell," isn't that correct?

3         A.   Correct.

4         Q.   And when you don't have differences it's

5    commonality, right, in the AC, that's the word that was used

6    in the AC, between the planes?

7         A.   Uh-huh.

8         Q.   And you get, like you said, a lower level of

9    training, isn't that correct?

10        A.   The T2 test is for the type rating determination.

11   The T3 test is for the training differences, for lower

12   levels of differences.

13        Q.   And even in the T3 test, there weren't -- they

14   still felt and flew the plane as if it was the NG, it was

15   still the same response, isn't that correct?

16        A.   The T3 was evaluating the system differences, that

17   did not include MCAS.

18        Q.   So the T2 test that did include MCAS, everyone

19   said, "This flew just like the NG"?

20             MR. ARMSTRONG:  Objection, your Honor, asked and

21   answered.

22             THE COURT:  Overruled.

23             THE WITNESS:  We didn't know the MCAS had been

24   expanded, so we were not testing the MCAS as part of the T2,

25   no.

```
 1              THE COURT:  Her question, though, is just the T2
 2   flight itself.
 3              THE WITNESS:  Yes.  Right.
 4   BY MS. McFARLANE:
 5       Q.   And at that time, MCAS had been expanded and was
 6   on the plane that you were on, correct?
 7       A.   I did not know that at the time.
 8       Q.   That wasn't my question.
 9       A.   I didn't know the MCAS was expanded.
10       Q.   But you do know that now, that on that flight, the
11   T2 flight you were on, on August 16th -- I'm sorry --
12   August 2016, MCAS had been expanded and it felt just like
13   the NG, correct?  You know that now?
14       A.   The aircraft passed the T2.
15       Q.   So pilots didn't say, "This feels just like the
16   NG"?
17       A.   Yes, they did.
18       Q.   Okay.  Thank you.
19              As part of the certification process, Ms. Klein,
20   you talked about an issue paper --
21       A.   Yes.
22       Q.   -- that you drafted, right?
23       A.   Yes.
24       Q.   And you put the issues that you saw that could
25   threaten Level B, isn't that correct?
```

1      A.   Yes.

2      Q.   In this issue paper, correct?

3      A.   Yes.

4      Q.   And you listed about eight or so issues.  I may

5  not have the number just right, but there were a more than a

6  few issues, correct?

7      A.   Yes.

8      Q.   And MCAS was not listed as one of them, isn't that

9  correct?

10      A.   That's correct.

11      Q.   Okay.

12          MCAS was not a threat to Level B at that time,

13  correct?

14      A.   As we understood the system, no, it was not.

15      Q.   Ms. Klein, I want to talk about the decision to

16  remove MCAS from the FCOM, which is sort of the training

17  manual for pilots, right?

18      A.   Uh-huh.

19      Q.   And you agreed to remove it from the FCOM because

20  it was your understanding that it was transparent and

21  outside the normal operating envelope, correct?

22      A.   Correct.

23      Q.   And that was your same conclusion even after you

24  learned of the expansion, we talked about that earlier?

25      A.   No.  That's not correct.

1    Q.   Okay.  Well, we'll let your testimony stand.

2         But the reason why you agreed when it was

3    transparent and outside the normal operating envelope is

4    because transparent functions or invisible functions should

5    not be in the FCOM, isn't that correct?

6    A.   No, that's not correct.

7    Q.   Transparent functions that are outside the normal

8    operating envelope?

9    A.   Oh, outside the normal operating -- that's

10   correct.

11   Q.   That is correct, okay.

12   A.   Yes.

13   Q.   That was my fault.

14   A.   I thought you were just asking about transparent

15   functions.

16   Q.   So transparent and outside the normal operating

17   envelope should not be in the FCOM, is that correct?

18   A.   Correct.

19   Q.   Okay.

20        And so when Mark Forkner asked you to remove it,

21   that's not something that's out of the ordinary or, you

22   know, wrong to ask to remove something that is transparent

23   and outside the normal operating envelope, correct?

24   A.   Incorrect.  That was very unusual.

25   Q.   It was unusual to ask you to remove something

1   that's transparent and outside the normal operating

2   envelope?

3        A.   Yes.  The first time we had been asked to remove

4   something from a training document like that.

5        Q.   But you said that should not be in the FCOM,

6   correct?

7        A.   The reasoning and the system function at the time

8   supported the request.  But that's -- that was not normal.

9        Q.   Let me be very clear.

10            If a system is transparent and outside the normal

11  operating envelope, it should not be in the FCOM, correct?

12       A.   If a pilot does not interact with it, it should

13  not be in the FCOM.

14       Q.   Okay.  Thank you.

15            We referred to an incident in October of 2018,

16  correct?

17       A.   Yes, ma'am.

18       Q.   And that incident involved Lion Air, correct?

19       A.   Correct.

20       Q.   All right.

21            And after that incident, you testified that you

22  learned that MCAS had been expanded down to .2, correct?

23       A.   Yes.

24       Q.   And as we saw in Exhibit 187, or the document I

25  just gave you, that was after the incident, correct?  When

 1   you said it was still -- it's not a system that a flight

 2   crew would ever experience, correct?  That was after the

 3   incident?

 4            MR. ARMSTRONG:  Objection, your Honor, we went

 5   over this.

 6            MS. McFARLANE:  This is a different topic, your

 7   Honor.

 8            THE COURT:  Overruled.

 9            THE WITNESS:  We were still gathering information.

10   We didn't know how the system completely worked at this

11   time.

12   BY MS. McFARLANE:

13       Q.   You did not know how the system MCAS worked at

14   this time, after the incident?

15       A.   We didn't have all of the details or the

16   investigation had not been far enough along to know all of

17   the intricate details of the system.  I don't think.

18       Q.   Okay.

19            I've handed you, I handed you this to refresh your

20   recollection.

21            This is a document, an email, your email, correct?

22       A.   Yes.  My email to colleagues back and forth.

23       Q.   To colleagues in the FAA.  And this was produced

24   to us by the Department of Justice.

25            MS. McFARLANE:  And, your Honor, we have a

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 445

```
 1  business record affidavit for this document.  We would offer
 2  Defense Exhibit 187 into evidence.
 3              MR. ARMSTRONG:  Your Honor, what's the relevance?
 4              THE COURT:  What is --
 5              MS. McFARLANE:  Materiality, your Honor.
 6              MR. ARMSTRONG:  Your Honor can we approach?
 7              THE COURT:  Okay.
 8              (Sidebar without being reported.)
 9  BY MS. McFARLANE:
10      Q.   Ms. Klein?
11      A.   Yes, ma'am.
12      Q.   This document that you have was written by you
13  November 5th, 2018, correct?  The portion that I referred
14  you to before.
15      A.   This portion here that you're talking about?
16      Q.   It's the second page, remember?  You've already
17  testified to this.  Do you see that?
18      A.   Yes.
19      Q.   Okay.
20           So this was written by you November 5th, 2018,
21  correct?
22      A.   Correct.
23      Q.   And this was after the incident with Lion Air in
24  October of 2018, isn't that correct?
25      A.   Yes.  This was less than a week after that.
```

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                   Vol 2 March 21, 2022                   Page 446

1    Q.   Right.  And that incident happened not at high

2    speeds, correct?  It happened at low speeds, isn't that

3    correct?

4    A.   Yes.  It happened at mid speeds, mid initial.  I

5    guess low speeds, yes.

6    Q.   So you learned that MCAS had expanded to low-speed

7    at this time and you still said that, "MCAS, it was right to

8    take it out of the FCOM because it is not a system that a

9    flight crew would experience and it is not designed to work

10   in the normal envelope of the aircraft," isn't that correct?

11        And you even said, "Kevin Green agrees with the

12   decision."

13        Kevin Green is a test pilot with the FAA, isn't

14   that correct?

15   A.   Yes.  But I was talking about the expanded -- the

16   high-speed decision, and that it was transparent and outside

17   the normal operating envelope, yes.  That's correct.

18   Q.   But you were saying this after you learned about

19   low expansion, correct?  You didn't say in this email that

20   we were wrong, did you?

21   A.   No.

22   Q.   Okay.

23        In fact, what you said in later correspondence was

24   that, "A decision to increase training level above Level B

25   was purely political," do you recall saying that?

1        A.    No.

2        Q.    You don't recall saying that?

3        A.    There was a lot going on.  If you have a document

4   that would --

5        Q.    I do have a document.

6        A.    -- it would be really helpful.

7              MS. McFARLANE:  Can I have Defense Exhibit 23B?

8              May I approach, your Honor?

9   BY MS. McFARLANE:

10       Q.    Let me know when you're ready, Ms. Klein.

11       A.    I'm ready.

12       Q.    Does this refresh your recollection, Ms. Klein?

13       A.    Yes.  But it was about FTC 12.1.1, not the

14   original software.

15       Q.    This was the updated software for MCAS, correct?

16       A.    That's correct.

17       Q.    But even in the updated software, it was still

18   down to low-speed, correct?

19       A.    Yes, but it had safety precautions that the other

20   software did not.

21       Q.    Safety precautions like what?

22       A.    It -- there was software developed into it that

23   would automatically turn it off if an erroneous activation

24   occurred.

25       Q.    Erroneous activation, correct?

```
 1        A.   Yes.

 2        Q.   All right.

 3             And erroneous activation meant when MCAS would

 4   trigger when it wasn't supposed to based on what?

 5        A.   Yes.  And it would also not repeatedly trigger.

 6        Q.   Repeatedly trigger, correct?

 7        A.   No.  The original software developed was a

 8   repeated function and this software update took that

 9   function away.

10        Q.   But you said on direct that if you knew about the

11   expanded MCAS, that it would be level E?

12        A.   Yes, but this is 12.1.1.  This is a different

13   software than 11.1.1.

14        Q.   Ms. Klein, listen to my question.

15        A.   Okay.

16        Q.   On direct, isn't it true that you said, if you

17   knew about the expanded MCAS, it would be a level E,

18   correct?

19             Do you recall saying that on direct?

20             THE COURT:  Is that what you said on direct?

21             THE WITNESS:  Yes.  But I was referring to --

22             THE COURT:  Hold on.  Okay.

23   BY MS. McFARLANE:

24        Q.   Okay.

25             And in an email that we just looked at, you did
```

1    know about the expanded MCAS?

2         A.   Yes.

3         Q.   And you said it was transparent and outside the

4    normal operating envelope, correct?  And, in fact, several

5    days later after that, the FAA issued an AD, do you recall

6    that?

7         A.   Yes.

8         Q.   And what is an AD, Ms. Klein?

9         A.   It's an air worthiness directive.

10        Q.   An air worthiness directive.  And it goes out to

11   all of the airlines and pilots, correct?

12        A.   It goes out to -- yes, all of the airlines.  They

13   have to incorporate it into their manual.

14        Q.   And the FAA sent this AD out to the airlines?

15        A.   Uh-huh.

16        Q.   Because the incident that happened in October of

17   2018, correct?

18        A.   Correct.

19        Q.   And this AD was sent just maybe weeks after in

20   November 7th, 2018, correct?

21        A.   Correct.

22        Q.   And the AD didn't say, we now require simulator

23   training, right?

24        A.   No, it did not.

25        Q.   In fact, the AD said, follow what?

1    A.    Follow the runaway stabilizer checklist, if there

2 were all of these other flight deck effects occurring.

3    Q.    Right.

4          Follow what you already know how to do when you

5 see a runaway stabilizer, isn't that correct?

6    A.    Correct.

7    Q.    There wasn't any additional training added, even

8 after you knew about the expanded MCAS.  It said follow the

9 training you already had, correct?

10    A.    We still hadn't evaluated it for pilot training.

11 We were evaluating what we knew at the time and thought that

12 was the best information that we had, that that was

13 sufficient.

14    Q.    And at the time you knew it was down to low-speed?

15    A.    That's correct.

16    Q.    Okay.

17          Thank you.

18          Now, Ms. Klein, you maintained on direct that no

19 one told you about low-speed expansion?

20    A.    That's correct.

21    Q.    That you learned after the crash?

22    A.    That's correct.

23    Q.    Right?

24          And you even said on the stand that Mark Forkner

25 knew and he lied to you.

1      A.   Yes.

2      Q.   Do you recall saying that?

3      A.   I do.

4      Q.   And you said, not only did Mark Forkner not tell

5  you, really nobody at Boeing tried to tell you, isn't that

6  right?

7      A.   Yes.

8           MS. McFARLANE:  May I have Defense Exhibit 12A?

9  This is my last topic area, your Honor.

10          May I approach, your Honor?

11          THE COURT:  Yes.

12          MS. McFARLANE:  Thank you.

13  BY MS. McFARLANE:

14     Q.   Can you take a look at that document, Ms. Klein?

15     A.   Yes.  If you'd give me a moment to review.

16     Q.   Sure.  Let me know when you're ready.

17          I'm only going to ask a few questions about it.

18     A.   Thank you.  I'm still getting up to speed.  I'm

19  trying to understand, there's a date that says this was to

20  start the week of July 5th, 2015, but the when and where

21  says July 5th, 2016.

22     Q.   I can explain.

23          This, as you can see, this again has the

24  Department of Justice's Bates numbers on it, which means we

25  received this document from the Government, who received it

 1  from Boeing -- I'm sorry -- the FAA, actually, not Boeing.

 2  My apologies.

 3          MS. McFARLANE:  And we have a business record for

 4  this document, your Honor.

 5          We would like to offer Defendants' Exhibit 12A.

 6          THE COURT:  12A?

 7          MS. McFARLANE:  Yes.

 8          MR. ARMSTRONG:  What is the relevance?

 9          MS. McFARLANE:  Pages 1, 2, and 16.

10          MR. ARMSTRONG:  What Bates?

11          MS. McFARLANE:  2274.  The second page.  And then

12  it's number 16 on the bottom.  2293.

13          MR. ARMSTRONG:  No objection.

14          THE COURT:  12A will be admitted.

15          (The referred-to document was admitted in Evidence

16      as Defendant's Exhibit 12A.)

17          MS. McFARLANE:  Thank you, your Honor.

18          All right.  If we can put 12A on the screen for

19  everyone to see.

20  BY MS. McFARLANE:

21      Q.   All right.

22          Ms. Klein, this is a meeting placeholder for a

23  tech familiarization meeting.  And you're familiar with tech

24  familiarization meetings, right?

25      A.   I am.

1      Q.   That's when Boeing and others, FAA, other

2    counterparts get together to talk about the specs on a

3    plane, the 737 MAX, correct?

4      A.   Yes.

5      Q.   And the placeholder for this meeting was between

6    July 5th, 2016, after MCAS expanded in March 2016, just so

7    we know.

8      A.   I didn't know that.

9      Q.   And July 16th, 2016, right?

10         And if you see, under required attendees, your

11   name is listed there, Stacey Klein.

12         MS. McFARLANE:  We can highlight that.

13   BY MS. McFARLANE:

14     Q.   And if we go to the second page, it says -- this

15   is from about Patrice Adjibly?

16     A.   Adjibly.

17     Q.   I pronounced it incorrectly, Patrice Adjibly.

18         And it says, "I've also attached the TCCA work

19   plan which details the TCCA requirement.  I added an FAA

20   team column to identify needed FAA support."

21         Okay?  And TCCA is Canada, right?

22     A.   Yes.  It's the regulatory oversight agency for

23   Canadian airlines.

24     Q.   So it's like the Canada FAA?

25     A.   Correct.

1        Q.   Okay.

2             And then if we go to page 16 of that document,

3    several of the topic areas, they requested for handling

4    qualities, for instance, where they discussed MCAS --

5             MS. McFARLANE:  Can we highlight that FT9?  Let's

6    start with FT9.

7    BY MS. McFARLANE:

8        Q.   Again, this is July, the week of July 11th, 2016.

9             MS. McFARLANE:  Could we highlight number 2?

10   BY MS. McFARLANE:

11       Q.   Briefing on maneuver characteristics augmentation

12   system, MCAS, right?

13            And they requested your attendance from the FAA,

14   correct?  That's your name, Stacey Klein?

15       A.   Yes.  I don't recall this.

16       Q.   Okay.

17            That's okay.  We will get there.

18            MS. McFARLANE:  Can I have 12C, please?

19   BY MS. McFARLANE:

20       Q.   Now, what I'm handing you what's been premarked

21   Defense Exhibit 12C, which would be the actual presentation

22   for that agenda item that we just saw.

23            MS. McFARLANE:  Your Honor, can I approach?

24            THE COURT:  Yes.

25   ///

1    BY MS. McFARLANE:

2        Q.   As you can see, this is a presentation with sort

3    of the same picture we see on all of the Boeing

4    presentations of the MAX plane.

5              It has a Boeing Bates number on the bottom that we

6    got from Boeing, or actually we got it from the Government,

7    who got it to from Boeing, and we've got an official

8    business record for this as well.

9              Your Honor, the Defense offers Exhibit 12C into

10   evidence.

11             MR. ARMSTRONG:  Your Honor, we would object.

12   Ms. Klein has testified that she has no recollection of this

13   meeting.  There's no foundation for this presentation having

14   been at this meeting at all.

15             MS. McFARLANE:  Your Honor, we have a business

16   record affidavit to authenticity and official business

17   record and an agenda item.

18             THE COURT:  Okay.  12C will be admitted.

19             (The referred-to document was admitted in Evidence

20       as Defendant's Exhibit 12C.)

21             MS. McFARLANE:  All right.  Could we show that on

22   the screen?

23   BY MS. McFARLANE:

24       Q.   All right.

25             So we've seen presentations like this before, and

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 456

 1  you've seen them, Ms. Klein.  In fact, we looked at one from

 2  June of 2015, when they discussed MCAS as well as May 2014,

 3  and you forgot about the May 2014 one.  Do you recall that?

 4       A.   Yes.

 5       Q.   All right.

 6            So this is July 2016, about the briefing on new

 7  and changed control systems.

 8            MS. McFARLANE:  Can we highlight that?

 9  BY MS. McFARLANE:

10       Q.   In July 2016.  And this is the very presentation,

11  if you see FT9, FT8, and FT9, those were the agenda items at

12  which they requested your presence?  Do you recall that?

13       A.   I don't recall attending this meeting.

14       Q.   I didn't ask that question.

15            But you did see the agenda item in which this is

16  the very presentation that they requested your presence,

17  correct?

18       A.   Uh-huh.

19       Q.   Okay.

20            MS. McFARLANE:  If we can go to page 7, MCAS

21  Overview.

22  BY MS. McFARLANE:

23       Q.   "It's a new system on the MAX.  Drive stabilizer

24  input in the airplane nose-down direction to enhance

25  stability at high angles of attack."

```
1              Two functions.

2              MS. McFARLANE:  Let's highlight that.

3    BY MS. McFARLANE:

4         Q.   Improves high Mach stick force gradient and

5    improves low-speed stall characteristics.

6              Isn't that the very thing you said no one tried to

7    tell you?

8         A.   Yes.

9         Q.   But they did try to tell you in July of 2016,

10   isn't that correct?

11        A.   I don't remember this meeting.

12        Q.   The question is, did Boeing tell you or attempt to

13   tell you in July 2016 of the change in MCAS?

14        A.   I don't recall being at this meeting.  I'm sorry.

15        Q.   That is not my question.

16             THE COURT:  Well, other than this meeting, has

17   Boeing tried to tell you that?

18             THE WITNESS:  No.

19   BY MS. McFARLANE:

20        Q.   Okay.  That's one meeting.

21             Let's go to another one.

22             October 2016.

23             MS. McFARLANE:  Can I have Defense Exhibit 14A?

24             May I approach, your Honor?

25             THE COURT:  Yes.
```

1              MS. McFARLANE:  Your Honor, this is another agenda

2     item, a document we received from the Department of Justice,

3     who received it from the FAA.  We have a business records

4     affidavit for it as well as the presentation that was

5     provided along with that agenda item.  So we are requesting

6     to offer Defendant's Exhibit 14A, and the presentation, 14C.

7              MR. ARMSTRONG:  Your Honor, same objection.  There

8     is no foundation for these presentations.

9              THE COURT:  Do you want to ask some questions

10    about these first?

11             MS. McFARLANE:  No problem, your Honor.

12             THE COURT:  Let's see.

13    BY MS. McFARLANE:

14        Q.   You have a copy of 14A in front of you, Ms. Klein.

15        A.   Okay.

16        Q.   And you can see that this is for October 2016,

17    correct?

18        A.   Correct.

19        Q.   And again, from the same, as the last presentation

20    sent from Patrice -- I'm going to mispronounce the last

21    name.

22        A.   Adjibly.

23        Q.   From the FAA to you, isn't that correct?

24        A.   Yes.  I'm listed.

25        Q.   All right.

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 459

```
 1              And this is very similar to the last invite that I
 2   showed as well, right?  This is just a different
 3   presentation in October, correct?
 4        A.   Yes.
 5        Q.   And it's related to the 737 MAX, correct?
 6        A.   I don't know what the contents of the attachment
 7   is.  I don't recognize it.
 8        Q.   I can give you the attachment.
 9             MS. McFARLANE:  If I can approach, your Honor?
10             THE COURT:  Yes.
11   BY MS. McFARLANE:
12        Q.   So as you can see, this is again a Boeing
13   presentation, just like the one we just looked at from
14   July 2016, correct?
15        A.   Uh-huh.
16             THE COURT:  Is that a yes?
17             THE WITNESS:  Yes.
18   BY MS. McFARLANE:
19        Q.   And it's related to MAX airplane, correct?
20        A.   Yes, to the MAX.
21             MS. McFARLANE:  Your Honor, Defendants offer
22   Exhibits 14A and 14C.
23             THE COURT:  Okay.  14A and 14C will be admitted.
24   ///
25   ///
```

```
 1              (The referred-to documents were admitted in

 2         Evidence as Defendant's Exhibit 14A and 14C.)

 3    BY MS. McFARLANE:

 4         Q.   All right.  If we can go to 14C, please.  Again,

 5    this is a presentation, October 2016, in which Patrice

 6    Adjibly invited you to attend, where Boeing updated your

 7    group and others at FAA about the flight control systems.

 8              Do you see that?  MCAS is the flight control

 9    system on the MAX.

10              Now, let's go to the next page.

11              This is very similar to the presentation we just

12    saw, right?  Under two functions, so I'm going to belabor

13    the point.  But if you can see, it says, "Improves low-speed

14    stall characteristics."

15              So, again, when you say that no one at Boeing

16    tried to tell you or told you about low speeds -- low-speed

17    stall characteristics of the MCAS, we now have two examples

18    in which they did.

19         A.   I don't recall being at these meetings, ma'am.

20         Q.   Okay.  And we will represent to you, Ms. Klein,

21    that we have two more examples.

22         A.   Okay.

23         Q.   Would you like to see those?

24         A.   Yes, I would.

25              MS. McFARLANE:  For speed, your Honor, 20A,
```

 1   Defense Exhibit 20A is an April 2017 invitation, and 20C is

 2   the very same presentation.  And 21A is another presentation

 3   from May 2017, all of which have official business records

 4   received from the FAA and provided by the Government.

 5              THE COURT:  So do you remember attending meetings

 6   on these very same subjects in April of 2017 and May of

 7   2017?

 8              THE WITNESS:  No, I do not.

 9              THE COURT:  Okay.  Well, I'm going to -- 20A and

10   20C?

11              MS. McFARLANE:  20A, 20C and 21A, your Honor.

12              THE COURT:  And 21A.

13              MS. McFARLANE:  Yes, your Honor.

14              THE COURT:  Not C.

15              MS. McFARLANE:  No, your Honor.

16              THE COURT:  Okay.  So 20A, 20C and 21A will be

17   admitted.

18              MS. McFARLANE:  Thank you, your Honor.

19              (The referred-to documents were admitted in

20      Evidence as Defendant's Exhibit 20A, 20C, and 21A.)

21   BY MS. McFARLANE:

22      Q.   So, Ms. Klein, I've just given you four examples

23   of meetings in which Boeing disclosed to your group that it

24   was down to low-speed stall characteristics.  Several of

25   these meetings were before provisional Level B., before you

1    certified the plane, before you took MCAS out of the FCOM.

2              And you say today that you don't recall attending

3    these meetings.

4         A.   Correct.

5         Q.   Why didn't you send a delegate to attend in your

6    place?

7         A.   I -- I'm not familiar with these meetings.  I'm

8    sorry, ma'am.

9         Q.   Why didn't you send a delegate in your place?

10        A.   It's -- it's not my responsibility to send a

11   secondary or tertiary -- if they're available, they can go.

12   It's not -- that's not how we get our primary source of

13   information, ma'am.

14        Q.   Presentations from Boeing is not how you get your

15   primary source of information about the differences in the

16   plane?

17        A.   No.  Mark Forkner presents the differences of the

18   aircraft, ma'am.

19        Q.   Okay.

20             But didn't you learn in May 2014 about MCAS from a

21   presentation with the very same picture on it?

22        A.   Yes.  Where we all attended together to learn

23   about the design of the aircraft.

24        Q.   Mark Forkner did not present that to you, ma'am.

25        A.   He was there to learn the same information as

 1  myself.

 2       Q.   Did Mark Forkner present to you about MCAS in

 3  May 2014?  Or was those other employees of Boeing?

 4       A.   It was the other employees of Boeing.

 5       Q.   Okay.

 6            And Mark Forkner was not invited to these four

 7  different meetings I just discussed?

 8       A.   Yeah, I don't recall attending these meetings.

 9       Q.   And Mark Forkner was not even invited to attend

10  them.

11       A.   It's from the FAA; Patrice would only be inviting

12  FAA personnel.

13            MS. McFARLANE:  Your Honor, if I could have one

14  moment, please.

15            Just a few more questions, Ms. Klein, and then I

16  will wrap it up.

17            Could you pull up Defense Exhibit 20A, please?

18            Exhibit 20A, 20, A as in apple.

19  BY MS. McFARLANE:

20       Q.   Okay.

21            Just really quickly just for the Jury to see, this

22  is another agenda item, March 2017, you're invited on this.

23            MS. McFARLANE:  If we can highlight her name.

24  BY MS. McFARLANE

25       Q.   And Mark Forkner is not.  And you've represented

 1   today that you don't -- you don't recall attending this

 2   meeting, correct?

 3       A.   I don't recall attending this meeting, and

 4   Samantha wouldn't be inviting Boeing personnel to internal

 5   FAA; she would only be inviting FAA employees.

 6       Q.   Okay.

 7            MS. McFARLANE:  And then if we go to 20C, page 17

 8   of that quickly, please.

 9   BY MS. McFARLANE

10       Q.   This is the very presentation that you don't

11   recall attending.

12       A.   Correct.

13            MS. McFARLANE:  Page 17.  Or at least it's listed

14   as 17.  It's Bates number DOJ 2919.  Okay.  Yes.

15   BY MS. McFARLANE:

16       Q.   And you can see, this presentation also that you

17   missed, this is the third one, it says, "low-speed

18   conditions," correct?

19       A.   Yes.  It does say that.

20       Q.   Okay.

21            And then Exhibit 21A, in May of 2017, this is

22   another tech familiarization meeting where your name is

23   listed as a required attendee on the last line.

24            Mark Forkner is nowhere listed on this invitation,

25   do you see that?

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 465

1     A.   Yes, ma'am.

2     Q.   Okay.  You talked about when you saw the chat,

3  where it says, it's down to low-speed, that you were angry,

4  and you were sad, that you were appalled, how come no one

5  could tell you.

6          Are you angry, sad, and appalled that you just

7  found out you missed four meetings when you could have

8  learned of low-speed MCAS?

9     A.   It's Mark Forkner's job to tell me of the design

10 changes, ma'am.

11    Q.   Is that a no?

12    A.   It's no.

13         MS. McFARLANE:  Pass the witness, your Honor.

14         MR. ARMSTRONG:  Ms. Holbrook, if you can please

15 pull up Exhibit 22, please, 650 to 651.

16                    REDIRECT EXAMINATION

17 BY MR. ARMSTRONG:

18    Q.   Ma'am, this is the document that we talked about

19 before, right?

20    A.   Yes.

21    Q.   And now Ms. McFarlane asked you questions about

22 how, you don't know what you don't know, right?

23    A.   Yes.

24    Q.   It's not a terribly controversial point, right?

25    A.   Right.

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Page 466

1      Q.   At what time did Mr. Forkner say, shocker alert,
2   MCAS now active, down to Mach .2?
3      A.   November 15th, 2016, at 6:50 p.m.
4      Q.   At what time?
5      A.   6:50 p.m.
6      Q.   And then what did he say right there?
7      A.   "So I basically lied to the regulators
8   unknowingly."
9      Q.   What time did he say that?
10      A.   6:51.
11      Q.   How much time is between 6:50 and 6:51?
12      A.   One minute.
13      Q.   About how much time did it take Mr. Forkner to put
14   two and two together?
15           MS. McFARLANE:   Objection to the form of the
16   question.
17           THE COURT:   Sustained.
18   BY MR. ARMSTRONG:
19      Q.   About how much time is between those two messages,
20   ma'am?
21      A.   One minute.
22      Q.   Why was it important to your evaluation to know
23   about MCAS being active down to a Mach .2 from Mr. Forkner?
24      A.   Because I relied on Mark to be able to provide the
25   system designs to us and the training proposal to us.

1      Q.   Did Mr. Forkner say here, I basically lied

2   unknowing to the regulators, but I'm sure Ms. Klein knows

3   anyway?

4      A.   No.

5      Q.   Ms. McFarlane asked you some questions about the

6   July 2016 meeting and the October 2016 meeting.

7           Do you recall those questions?

8      A.   Yes.

9           MR. ARMSTRONG:  Ms. Holbrook, will you please pull

10  up 12A?  Defense Exhibit.

11          I'm sorry, 14A.

12  BY MR. ARMSTRONG:

13     Q.   Ma'am, this is an invitation that Ms. McFarlane

14  asked you about, right?

15     A.   Yes.

16          MR. ARMSTRONG:  Ms. Holbrook, will you please blow

17  that up?

18  BY MR. ARMSTRONG:

19     Q.   Is Mr. Forkner listed anywhere on here?

20     A.   No.

21     Q.   So going back to you don't know what you don't

22  know, how did Mr. Forkner know what you were being told

23  maybe by someone else at FAA?

24     A.   He would not have.

25     Q.   Is the process of your evaluation as the chair of

1    the FSB supposed to work by maybe finding out information by

2    chance?

3          A.    No.

4          Q.    Why not?

5          A.    It's proposed by Mark Forkner's group and Mark

6    Forkner.

7                MR. ARMSTRONG:  No further questions, your Honor.

8                MS. McFARLANE:  Nothing further.

9                THE COURT:  You may step down.

10               Ladies and gentlemen, we probably should end here

11   tonight because I understand there's some weather coming in

12   from the west, and so I want to go ahead and get you out of

13   the building and into your car.  I don't know how close it

14   is, but it looks sunny out there.  That's never a good sign.

15   So I want to get you out.

16               But please remember all of my instructions.

17   Please don't conduct any independent investigation.  Please

18   avoid any type of news coverage that might talk about this

19   case.

20               We're moving through it at a decent clip.  We will

21   be towards the end of it in no time.  After it's over, you

22   can do all of that you want.  Please, in the interim,

23   remember those instructions.

24               We will start again, hopefully, by 9 a.m. in the

25   morning, just as soon as you are all here and we can get you

1    in the courtroom.  If that's earlier, we will be here

2    earlier to get you in.  So please be careful going home.

3    Have a good night and we will see your first thing in the

4    morning.

5              THE COURT SECURITY OFFICER:  All rise.

6              (The jurors exited the courtroom.)

7              THE COURT:  Okay.  Please be seated.

8              Okay.  Don't be late again.  Be here on time and

9    early on time.  When they're ready, we get them in the box.

10   Don't be walking in late and not without a witness here as

11   well.

12             MR. ARMSTRONG:  Understood.

13             THE COURT:  Anything else we need to take up?

14             MR. JACOBS:  No, your Honor.

15             MS. McFARLANE:  No, your Honor.

16             THE COURT:  All right.  We will see you-all in the

17   morning.

18             (Proceedings concluded at 5:00 p.m.)

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3        We, Zoie M. Williams, RMR, RDR, FCCR and Kelli Ann

4   Willis, RPR, CRR, CSR certify that the foregoing is a

5   transcript from the record of the proceedings in the

6   foregoing entitled matter.

7        We further certify that the transcript fees format

8   comply with those prescribed by the Court and the Judicial

9   Conference of the United States.

10       This 22nd day of March 2022.

11

12                         s/ Zoie M. Williams
                           s/ Kelli Ann Willis
13                         Official Court Reporters
                           The Northern District of Texas
14                         Fort Worth/Dallas Divisions

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1** 198:24 199:1

**$1,500** 341:7

**$117,500** 240:2

**$2,500** 242:5

**-**

**-7** 308:6

**1**

**1** 192:14 194:4,8 198:4,
8 220:18 248:25 369:13
452:9

**1,079** 433:25

**1.3** 347:19 348:14
358:19 409:23 424:25

**10** 192:20 194:4,8 216:7
217:14 228:6 241:17,22
278:9 286:18 372:8

**10-minute** 278:2 415:4

**101** 196:14,25 197:15

**101-104** 197:18

**102** 196:14,25 197:15

**103** 196:14 197:3,15

**104** 196:14 197:3,15

**10:48** 202:16

**10th** 286:11,12,16
372:14

**11** 192:22 194:4,8
225:9,17 227:15 291:5
416:9

**11.1.1** 448:13

**117,500** 239:24

**11:29** 205:13

**11A** 192:22 194:4,8
225:8,19 229:25 230:4

**11th** 416:19 417:1,2,11
430:8 454:8

**12** 192:24 194:4 206:15

226:19 241:22 242:2
274:14 312:23

**12,500** 304:18

**12-17** 194:8

**12.1.1** 447:13 448:12

**120-53B** 419:15

**121** 435:23

**12:24** 204:3

**12:31** 328:23

**12A** 451:8 452:5,6,14,
16,18 467:10

**12C** 454:18,21 455:9,
18,20

**13** 207:14 254:22 255:2
276:24 277:4 307:3
422:4 429:17 430:8,10

**135** 435:23

**14** 208:21 209:23
279:16 395:23

**140** 302:6

**14A** 457:23 458:6,14
459:22,23 460:2 467:11

**14C** 458:6 459:22,23
460:2,4

**14th** 398:11 430:10

**15** 199:24 209:20 218:4
221:15 232:20 233:2
242:8 243:3 251:11
257:25 286:25 292:14
296:2,9 330:7 376:19
432:19

**159,000** 240:3

**159,500** 238:24

**15th** 228:17 287:1,2
295:10 326:24 466:3

**16** 210:16,25 213:8
281:1 293:3 452:9,12
454:2

**16th** 335:12 344:4
440:11 453:9

**17** 192:24 194:4 213:2,
16 257:13 283:16
292:23 391:12 464:7,
13,14

**170** 305:5

**17th** 367:21 370:19
382:19 383:9,21 385:5
392:1,18

**18** 203:16 300:12,13,15
363:2 367:9 402:23

**1800** 303:17

**187** 428:3 443:24 445:2

**18th** 366:19

**19** 193:1 194:4,8 215:4
284:22

**190** 305:5

**1900D** 305:3

**1960s** 308:7

**1964** 308:6

**1968** 308:6

**1992** 302:4

**1998** 301:25 308:13

**1:45** 328:13

**1st** 430:9

**2**

**2** 192:16 194:4,8 202:7
216:15 219:13 246:24
248:14 286:11 295:12,
14 296:5 324:14,16,19
325:9,13,23 327:15
330:11 331:17,18,21
332:1,4,21,25 333:22
334:13,21 367:12
368:15 372:4 376:11
377:20 378:14,25
379:2,9,16 380:4,25
389:23 390:4,14 393:8,
15 400:24 423:5,14
426:6 443:22 452:9
454:9 466:2,23

**2,500** 242:4

**20** 231:16 363:2 402:23
463:18

**2001** 191:1

**2006** 303:23

**2009** 304:11 307:1,2

**2010** 315:3

**2011** 239:22 240:1

**2012** 308:16 309:2
314:8,14

**2014** 198:15 199:24
202:5,13 203:16 409:1,
15 410:3,8,18,25 456:2,
3 462:20 463:3

**2015** 201:2 204:21
205:6 206:6 323:3,20
342:2 343:7 344:2,20
345:12,22 352:10
388:14 390:1 410:1,9
421:8 431:1,21 432:6,
16 451:20 456:2

**2016** 206:21 209:9,23
210:14,25 213:8
215:10,14 216:7 217:14
218:4 221:16 228:11,17
241:22 242:2 243:3
256:10 262:9 274:18
279:21 284:25 286:11,
12,18 293:3 295:10
313:14 326:24 330:7,
19,22 331:2 333:15
334:5,23 335:13 352:20
353:6 357:21 358:4
360:23 363:1 364:1,20,
24 365:12,17 366:19
367:21 370:19 371:4,
10,20 372:1,8,14 373:3
374:3,16,17 375:7,16
376:19 378:24 379:17
380:12 382:19 383:9,21
384:17 388:15,17,21
389:25 432:19 437:6
440:12 451:21 453:6,9
454:8 456:6,10 457:9,
13,22 458:16 459:14
460:5 466:3 467:6

**2016-2017** 362:18

**2017** 221:14 223:23
224:20 257:13 313:14,
24 314:8,15 322:5
323:20 324:2 327:23
335:6 341:12,20 363:1
380:12 391:12 392:1,
18,24 393:6,11,13
394:9,12 395:1,24
396:9,25 397:9 461:1,3,
6,7 463:22 464:21

**2018** 240:2 324:4 325:3, 11 327:3 397:25 398:11,12,15,21 443:15 445:13,20,24 449:17,20

**2019** 325:19 327:5,13, 23 416:9,19 417:1,2,11 430:8,9

**2020** 430:9,10

**2021** 430:10

**2022** 182:2 306:16 307:2 430:10,12,14,21

**20A** 460:25 461:1,9,11, 16,20 463:17,18

**20C** 461:1,10,11,16,20 464:7

**20th** 209:9 279:21

**21** 182:2 193:3 194:5 198:15 216:1 286:8

**21-23** 194:9

**218** 201:4

**21A** 461:2,11,12,16,20 464:21

**22** 217:20 242:21 294:20 295:8 329:13,16 378:22 465:15

**227** 326:19

**2274** 452:11

**2293** 452:12

**22nd** 384:17 409:15 430:9

**23** 193:3 194:5 202:13 396:4

**230** 220:15 248:20

**23B** 447:7

**23rd** 344:2

**24** 231:13 257:15 300:12,13,15 385:24 386:2 391:19 429:17

**24-plus** 190:23

**246** 268:24 269:9,12,20

**24G** 241:12,14,15

**24H** 236:17 237:23 238:3,5,7

**25** 211:20 281:10 285:9 370:5 435:22

**26** 193:5 194:5,9 254:23 256:13 429:17

**26th** 215:15

**275** 298:3,5 299:17

**28** 193:7 194:5 221:8 385:24 386:3 395:16,21 396:5

**28-30** 194:9

**29** 223:10

**2919** 464:14

**2nd** 206:6 430:10

**3**

**3** 215:14 268:6

**3,000** 303:17

**30** 193:8 194:5 224:2 232:25 256:10 409:19

**30-minute** 280:15

**30th** 262:9 353:6

**31** 194:12 195:7,10

**32A** 195:13 196:5,8

**35A** 407:8 408:11,14,16

**39** 315:13

**3rd** 215:10 284:25

**4**

**4** 192:18 194:4 199:17 270:11,16 366:21 367:4 430:9

**4,000** 220:15 248:20

**4-8** 194:8

**400** 341:7

**403** 235:23

**41** 417:4,5

**420** 346:5

**43** 345:2,5 346:15

**430** 346:3,5

**450** 346:3

**4:33** 206:8

**5**

**5** 203:10 222:11 395:18, 20

**5,000** 332:20

**57** 232:14 242:8 296:1,9

**57-** 296:1

**5:00** 469:18

**5:24** 212:3

**5th** 205:6 228:11 395:23 445:13,20 451:20,21 453:6

**6**

**6** 204:24

**60** 392:12 393:6

**650** 327:11 465:15

**651** 327:11 465:15

**6800** 303:16

**6:46** 243:9,10

**6:50** 218:18,23 219:11 329:16 376:5 466:3,5, 11

**6:51** 218:24 219:22 220:14 333:25 378:4 466:10,11

**6:53** 218:18 378:15

**7**

**7** 205:25 207:14 221:14 223:23 224:20 260:10, 12,22 261:2 276:23,25 277:4 323:4,9,11 333:17 345:20,24 346:1,9 347:17 358:18 409:23 417:5 423:5,14 456:20

**737** 184:10,21 187:17, 23 193:15 197:22 205:11 207:19 209:11

**211**:17,18 214:6,10 216:12 222:2,3,4 223:19 224:14,15 282:5,18 283:23 284:20 288:6 302:9 305:4 307:23,25 308:1,3,8,10, 11,14,15 309:4,23,24 312:23 316:8 317:13,16 319:13 326:6 341:25 342:21 344:22,23 350:2 375:22,23 395:8,10,24 399:6 408:9 453:3 459:5

**747** 302:7

**747-400** 305:4

**787** 213:20 214:1,4 283:19,25 293:10 302:7,9 305:4

**7:33** 286:12

**7:57** 229:1,4

**7:58** 230:9

**7:59** 229:13 230:12 278:19

**7th** 395:1 449:20

**8**

**8** 192:18 194:4 200:21 201:2 206:21 273:4 274:17 345:20,25 346:1,5,9 347:17 360:23 409:24

**89** 268:24 269:9,11,20, 23

**8:00** 229:1,18

**8:55** 198:17

**8th** 430:11,14,20 431:17,25

**9**

**9** 266:14,19 267:12 268:2,4 300:12,15 345:2,6 346:16 387:25 468:24

**9.20** 400:24

**9th** 437:5

## A

**a.m** 278:19

**a.m.** 198:17 205:13 229:4,13,18 230:9,12 286:12 468:24

**Aaron** 255:9 354:2 383:5 384:21,24

**ability** 341:13 371:16

**abnormal** 320:19

**absolutely** 416:12 426:11

**abuse** 190:11 191:2

**AC** 419:15 439:5,6

**acceptable** 186:1

**acceptance** 281:14 366:22 367:4,16

**accepted** 281:15

**access** 331:4 372:11

**accidents** 359:22

**accommodate** 360:7

**accordance** 304:19 314:19

**accuracy** 383:25 385:14

**accurate** 193:24 195:4 196:2 197:11 232:17, 18,22 257:24 319:25 320:6,13,21 322:6,11 384:5 410:1,3,7 414:22

**accurately** 417:18

**achieve** 294:1

**achieved** 213:23 214:19,20 293:13

**achieving** 214:15

**ACO** 363:4,9,20,24 364:11,19,23 403:24 404:2,5,6,10,11,13 405:11,13,14,17

**ACO's** 363:5,16

**act** 186:1,18

**acted** 338:24

**activate** 325:1 347:10, 16 350:13 364:18 379:9 437:17

**activated** 437:13,15,24 438:4,9,13

**activation** 376:10 447:23,25 448:3

**active** 219:1,11 246:24 295:14 296:5 325:13,23 327:15 330:10 331:12, 20,23 332:25 333:22 334:13,21 335:18 377:19 378:25 379:2,16 380:25 389:23 390:3 393:8,14 466:2,23

**actual** 240:15 244:20 313:8 454:21

**AD** 449:5,8,14,19,22,25

**added** 387:4 450:7 453:19

**adding** 224:15

**addition** 201:23 302:25 351:12

**additional** 309:10 353:14 450:7

**address** 366:23 367:22

**adds** 222:3 395:8

**adequately** 310:8

**Adjibly** 453:15,16,17 458:22 460:6

**administered** 189:15 300:7

**Administration** 222:19 301:5

**administrative** 344:7, 9

**administrator** 366:24

**admissibility** 182:24

**admit** 237:22 241:11,12 259:11 260:10,16,19 267:12 269:9 299:17

**admitted** 194:7,9 195:9,10 196:7,8 197:17,18 238:4,5 241:14,15 254:17 256:14 260:21,22

268:2,4 269:19,20 298:12 300:14,15 408:14,15 452:14,15 455:18,19 459:23 460:1 461:17,19

**advisory** 420:2

**AED** 438:19

**AEG** 195:2 202:24 205:19 210:3,8 220:9 222:19 225:3,6 226:5 227:8 280:14,22 281:3 285:19,21 286:2 292:18 298:24 305:11,13,15, 16,25 306:8,10,11,25 307:1 308:22 309:3 314:20 315:5,6 316:4,7 317:17 318:25 320:22 321:23 337:17 338:24 339:3 342:13 343:6 345:12 349:22 359:20 363:17,20 381:12 382:7,16 384:25 396:1 398:25 399:17 403:23 406:11,19 411:13 418:15

**AEG's** 307:15,19 309:12 338:3 342:6,9

**aero** 220:23 249:4,8,9, 14

**affect** 322:24

**affected** 326:5,7 379:17

**affidavit** 267:16 298:4 445:1 455:16 458:4

**afternoon** 231:4 329:11,12 402:5

**agencies** 191:5

**agency** 190:10,24 453:22

**agenda** 454:22 455:17 456:11,15 458:1,5 463:22

**agent** 184:1 190:19,20, 24 191:23 193:10 194:11 195:12,24 196:11 197:21 198:8,21 199:8 200:6,23 201:23 204:20 207:17,23 208:23 212:2 213:25

214:24 216:3 217:22 218:20 221:3 222:16 223:5 224:4 225:2 227:20 228:24 230:2 231:4,10,13 232:1,3 233:24 235:8 237:5 238:7,12 239:5 240:9 241:18 242:2,8,24 244:15 245:7 246:9 249:5 252:19 253:15 259:11,20 261:5 262:15 263:19 266:18 268:7,23 270:19 272:22,24 276:3 277:5 278:11 285:20 286:17 291:11 292:8,17 293:2 295:3 296:1,7,18 297:17 298:17

**agents** 191:4,14 231:24 232:1 416:18

**aggravated** 337:5

**agitated** 337:7

**agree** 187:17 336:21 412:6,10,11

**agreed** 339:6 365:17 387:6,8 388:9,18 390:2, 16 400:22 401:9 441:19 442:2

**agreement** 185:23 195:19,20 388:20,23 389:1,24 390:6 392:17, 24 393:2 401:12,20 422:22 430:25

**agrees** 446:11

**ahead** 183:16 194:25 240:19 250:23 251:4 252:13 257:1 260:20 263:3 278:1 298:6 328:6 329:7 415:4 436:9 468:12

**air** 222:19 283:25 291:14,16 426:1 443:18 445:23 449:9,10

**aircraft** 184:21 187:16 214:3,5 227:7 234:6 275:15,16,20,21 276:16 284:2,5 302:7 304:10, 13,18,21 305:9,18 306:18,20,23 307:8,21 308:2,5,12,15 309:19, 24 310:6,9 314:11,15, 19,20 317:18 318:22,25

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 298 of 326   PageID 6529
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                              Vol 2 March 21, 2022                    Index: aircrafts..attached

319:22 320:1,9 321:10,
15 322:22,25 331:23
335:2 339:6,11,21
342:14 343:3,5 346:23
347:1,18 348:17
353:15,20 354:13
355:17,18 356:15,16
359:2,8,11,22 362:4,21,
23,25 363:3,12,15
364:17 365:19 369:1
370:4,7,8 375:2,3 379:3
399:14 402:20 403:9
404:8 410:24 415:18
420:11,14 435:21
437:4,15,18 440:14
446:10 462:18,23

aircrafts 307:16,19

airline 303:1,2,5 304:5
307:10 312:25 332:2
340:15 341:5,8 347:2
363:9 371:14 382:9,17

airliners 301:11 305:18

airlines 194:20,22
195:21 196:22,24
197:1,4 198:1 199:15
200:7,8,11 201:20,25
223:16,18 224:9,13,19
232:9,10 271:12,16
289:9,11,12 293:17
301:13,15,16 302:20
303:9,11,16 304:4
305:4,19 306:1,3,5,6
307:16 308:17,20
312:5,8 313:5,9,10
339:12,15,16,23 340:1,
10 341:21 375:23 382:3
397:1,9,20,24 398:23
399:11 449:11,12,14
453:23

airman 302:16,18,19,
21 303:3,7,13,18

airplane 184:19,21
187:15 199:2 210:1,6
211:22 215:23 281:11
285:16 292:18 302:14
308:1 309:20 313:8
314:12 321:19 346:13
347:19 363:8,10 375:25
402:11 403:1,3 415:21
418:3 436:22 456:24
459:19

airplanes 187:21

233:16 246:20 306:4
307:12,13 310:17 312:6
375:21 419:20

airport 315:12,13,22

Airports 315:8,10,11

airspeed 277:13
324:15

Airways 303:15

airworthiness 363:7

alarm 415:12

Alaska 308:21 313:9

alert 218:25 219:11
221:16 228:18 246:23
372:15 374:10 380:12
383:10 385:16 392:10
393:6 466:1

alerts 280:2

all's 182:5

allegations 190:10

allege 188:8

allowed 183:4

aloud 417:7

America 281:20 301:13

American 197:1
223:16,17 232:10
289:12,15 301:16
308:21 312:8 313:9
339:16 340:1 341:12
382:4,9 397:1 399:10

amount 239:19 365:4
421:4

amounted 232:25

amounts 232:20

and/or 207:6

Andersen 360:20

Anderson 361:18

angle 277:13 347:18
359:9,10 424:24 425:6,
8,13,16,19 426:6,13,17,
20,22,24

angled 426:9

angles 409:22 456:25

angry 328:1 337:10
465:3,6

anymore 418:10

apologies 428:15
432:24 452:2

apologize 322:3

appalled 465:4,6

appearance 187:1

appeared 412:18,20

appears 201:12 213:14
237:14,17 240:4 241:7
267:6 269:7 270:5
278:18 284:21 289:17
298:1 431:24

apple 192:22 195:14
225:9 463:18

appreciable 215:22
285:16

approach 191:19
220:18 236:20 237:25
240:7 248:25 259:18
264:10 266:15 268:20
277:8 296:15 330:3
346:25 407:9 409:6
416:13 425:10,14 428:5
445:6 447:8 451:10
454:23 457:24 459:9

approval 211:20,24
215:21 281:3,8,9,12
282:7 285:14 286:4
293:6 335:1 368:22
370:3,6

approved 211:7 222:2,
13,16,18 223:7 225:3
368:23 395:8,25

approves 222:4

approving 395:9

approximately 216:11
296:1,2 362:24 363:2

April 201:2 430:9
461:1,6

area 307:13 315:11
451:9

areas 402:17 454:3

ARMSTRONG 300:1,
10,17,19 316:19,22

323:18,19 326:20,22
327:10,12 329:5,10,13,
20,24 330:3,5 343:15,
20 344:25 345:4,14,18
346:14,17 352:23
353:1,24 354:1,21,24
360:13,17 361:4,7
362:15,17 366:10,12
367:11,13,17,19 368:9,
11,14,18 369:22,24
372:3,7,18,22 373:19,
21 376:3,7 378:3,5,13,
16,21,23 380:8,10
382:23 383:1 384:12,15
385:23 386:1,10,12
387:9,12 388:2,5 391:5,
7,22,24 392:6,8 394:4,
20,24 395:18,19 396:4,
7 397:14,15 398:1,3
399:1,3 400:17,20
401:23 408:13 413:7,13
417:20 429:8 436:6
439:20 444:4 445:3,6
452:8,10,13 455:11
458:7 465:14,17 466:18
467:9,12,16,18 468:7
469:12

article 282:6

ASAC 190:20,22 191:4

ASAP 285:18

Ashlee 231:7 402:7

assigned 318:25

assist 396:13

assistant 190:20
303:25

assume 202:25 233:20
244:3 245:11,16 250:2,
3 260:8 274:2 280:12

assumed 234:2

assuming 211:21
281:10

at.7 346:5

attach 207:11 226:16
367:8

attached 222:2,6,12
226:10,24 227:18
385:8,11,15 395:7
453:18

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 299 of 326   PageID 6530
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                Index: attachment..Boeing

**attachment** 207:12,14, 18 208:2 222:9 224:10 267:5 276:7,11,13 459:6,8

**attachments** 197:9 344:22 395:15

**attack** 277:13 347:18 409:22 424:24 425:6,8, 13,17,19 426:6,13,17, 21,22,24 456:25

**attempt** 457:12

**attend** 321:10,12 404:21 405:24 409:12 414:13 460:6 462:5 463:9

**attendance** 454:13

**attended** 407:5 408:9, 24 409:9 462:22

**attendee** 464:23

**attendees** 453:10

**attending** 408:25 456:13 461:5 462:2 463:8 464:1,3,11

**attention** 192:10 196:12 327:6,7 374:14 400:12

**attitude** 338:2,10

**attorney** 271:23 402:7

**augmentation** 207:25 222:24 277:7 322:13 345:9 454:11

**August** 210:3,11,12,25 213:8 215:15 241:22 242:2 293:3 365:12,17 366:19 367:21 370:19 371:4,10,20 372:1 374:16 379:17 437:5 440:11,12

**authenticated** 260:16

**authentication** 298:4

**authenticity** 455:16

**automatically** 277:12 357:24 447:23

**aviation** 222:18 301:6, 10,20,23 304:6,20 402:18

**avoid** 187:1,9,20 328:14 468:18

**award** 241:22 242:3

**aware** 200:19 245:5 246:2 254:9 263:20 275:3,8 291:14,16 296:9 315:20 357:14 418:7

**awareness** 275:9

**awesome** 246:20

---

**B**

**B-Y-E-R-S** 190:1

**bachelor** 301:19,21

**back** 189:9 208:5,6 212:1,15 217:4,15 223:2 228:20 229:3 239:1 242:8 243:21 278:3 285:24 304:12 322:4 328:8,12,18,19 330:18,21 331:2 333:15 334:5 341:12,20 344:5 353:21 357:21 358:4 362:18,25 364:20,24 371:10 373:22 374:5 384:6,9 385:18 388:17 418:8 438:15 444:22 467:21

**back-and-forth** 218:21 228:25

**backgrounds** 312:16

**backup** 209:16 280:3

**bad** 201:17 328:9

**baggage** 346:24

**ballpark** 303:14 346:2 395:3

**bank** 348:7 359:10

**base** 309:19 340:12

**based** 219:25 220:5 222:23 227:24 230:2 240:4 245:7,19 247:23 249:7 260:8 272:16,18 283:5,13 285:10 290:24 306:8 319:10 320:25 323:24 324:22 331:25 334:16 339:24 349:7

**351:4 355:20 356:17 360:9 365:4,8 373:15 376:8,12 388:21 390:7 392:24 393:2 396:19 399:19 448:4

**basically** 219:7,23 248:15 295:16 302:11 327:16 333:25 378:8 466:7 467:1

**basis** 261:18 264:24 265:6,7 332:3 352:16

**BASU** 402:23 403:13 404:2,3,5,6,7,10,11,13 405:7,13,19

**Bates** 237:11,12 240:21 259:23,24 266:20 269:2 451:24 452:10 455:5 464:14

**bathroom** 401:24

**Beech** 305:3

**beginning** 186:12 280:15 336:5 337:5

**behavior** 287:13

**belabor** 460:12

**belief** 351:5

**believed** 423:25

**big** 201:17 205:23 207:3 282:11,12 361:14 362:13 420:22

**bigger** 280:2 302:11

**biggest** 361:10

**binder** 191:23,25 192:11 194:12 195:14 196:15 254:18 270:12

**bit** 190:13,21 244:15 279:19 284:24 301:3

**blank** 313:9

**blessed** 302:19,23

**block** 226:23 227:6,17 289:4

**blocks** 317:23

**blow** 292:14 343:16 345:15 352:23 354:22 360:15 361:5 366:11 367:18 372:5 382:24

**386:11 387:10 388:3 391:6 394:22 396:6 398:2 467:16

**blow-up** 327:11

**blurry** 242:21,22

**BNN** 282:6

**board** 221:5 281:13 309:4 312:12,15,24,25 313:7 317:8 334:8 346:24 377:5 383:19 395:23

**Board's** 380:20

**Bob** 194:19 398:7

**body** 211:10

**Boeing** 184:21 187:15, 21 193:23,25 195:20,25 196:3,22,25 197:4,9 198:22 203:8,19 204:9, 12 205:8 209:4,6,7,13 211:3,5 212:11,24 215:12,18 218:11,12 221:23,24 225:24 232:9 233:6 234:5,7,12,16,23 235:9,21 236:3 237:13, 16,19 239:6,16 240:1, 11,25 249:11,13 252:23 253:16 254:5,6,7 260:14 267:3,8 269:5, 16 270:20,23 278:13,17 279:22 281:3 282:12, 14,17 283:4,12 285:1, 23 286:19 289:21 290:8,21 293:9,25 297:18,19,23 299:13 302:7 305:4 307:5,7,8, 11,16,20 308:1,3,17 309:4 316:1,2,7,8,9,24 317:10,12,25 318:10 319:3,6 321:7,11,18,22 331:7 339:11,19 341:17 342:6 343:10 354:9,11, 17 361:19 368:23 369:7 372:9 373:17 374:4 375:19 377:1 381:25 383:7 395:24 397:17,23 400:8,23 402:25 403:2, 8,11,12 404:3,8,15 405:2 407:13 408:8,22 412:7 414:6,8,15 415:21,24 416:1 418:20,25 419:5 422:15 432:22,24 451:5 452:1

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 300 of 326   PageID 6531
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                     Vol 2 March 21, 2022                     Index: Boeing's..chaos

453:1 455:3,5,6,7
457:12,17 459:12
460:6,15 461:23 462:14
463:3,4 464:4

**Boeing's** 233:24 260:4
289:11 314:13 403:6
407:14

**bold** 262:12

**bonus** 241:5

**book** 419:19

**boss** 282:11 318:11
368:4,6

**Bosselmann** 383:5
384:22,24

**bosses** 282:12

**bottle** 313:12

**bottom** 203:22 210:22
222:13 226:13 227:1
237:7,8 259:22 266:20
277:1,2,4 297:17
327:11 329:17 378:4
382:24 452:12 455:5

**box** 238:10 243:10,14
244:21 246:7 277:10
469:9

**boy** 311:7

**branch** 213:12 306:19
321:15 404:11

**branched** 225:14

**break** 278:2,3 328:7
330:6 401:25 415:2,4,
16

**breaking** 280:17

**breaks** 186:13 396:14

**briefing** 182:6 338:21
454:11 456:6

**briefings** 182:5

**Briefly** 292:5

**bring** 183:16 400:12

**BRM** 285:6

**brought** 186:6 187:12
278:6 327:5,7 374:14

**build** 307:11,13

**building** 468:13

**built** 285:10 307:16,20

**bulk** 317:10

**bullet** 345:17 346:15
387:1

**bully** 339:1,2

**bunch** 211:1,8

**Burn** 204:10

**Burrington** 286:11

**business** 260:13,16
267:14,16 269:10
281:24 408:11 445:1
452:3 455:8,15,16
458:3 461:3

**busy** 210:1 245:2
252:17

**button** 438:12

**buy** 229:14 230:14
278:23

**Byers** 189:14,25
191:23 196:11 197:21
201:23 214:24 217:22
218:20 221:3 222:16
231:4 233:24 235:8
237:5 238:7,12 239:5
240:9 241:18 242:2,8,
24 244:15 245:7 246:9
249:5 252:19 253:15
259:11,20 261:5 262:15
263:19 266:18 268:7,23
270:19 276:3 277:5
278:11 285:20 286:17
291:11 292:8,17 295:3
296:7,18 297:11 298:18

**C**

**call** 189:12 190:9
198:11,18 207:15,20
211:11 216:16 217:25
218:16 222:13 243:24
246:7 248:22 292:23
294:25 299:25 340:23
376:18 422:4

**call-out** 243:10,14

**called** 188:18 197:25
207:24 221:4 309:13
322:12 338:8 347:20

359:3 434:7,9,13

**calls** 189:14 254:10
264:16 287:20 290:22
300:2 406:3 407:4

**Canada** 279:5,9
281:14,17 344:18
375:13 453:21,24

**Canadian** 279:10
453:23

**capacity** 346:23

**captain** 302:25 303:10,
12,15,18 367:23 368:2,
4

**capture** 378:4

**car** 468:13

**careful** 469:2

**carelessness** 189:2

**Carolina** 307:14

**CAS** 282:5

**case** 182:25 183:25
184:1 185:10 186:14,
22,25 187:1,4,7 188:15,
24 189:6,7 191:11
219:9 220:13 231:8,19,
24 232:2,3,9 233:5,25
234:11,16,23 236:9
248:18 251:12 253:17
263:7,12,14 278:4
282:25 298:17 309:21
313:12 328:17 370:16
468:19

**cases** 191:2

**Casey** 279:22

**cash** 241:22 242:3

**caused** 188:8

**causing** 188:9

**CBT** 200:14 205:21
211:19 215:21 257:6,9
280:15 285:15 340:3
341:23 392:4,19 397:5

**cc'ing** 360:21

**CCS** 262:2

**certification** 205:18
210:2,7 211:21 281:10
306:18,20,24 314:14,20

317:3 321:10,15 335:2
342:14 347:25 348:23,
25 360:5 362:22,23,25
363:3,6,7,9 370:5
375:20 402:11 403:4,25
435:22 437:21 440:19

**certified** 285:10 365:19
462:1

**certifying** 402:20

**Cessna** 302:6,8,12

**chain** 201:10 202:15
203:17 210:18,21
212:20 213:9,13,15
225:20,23 243:6 336:19
415:25

**chair** 227:11 230:7,18
309:13 310:10 312:17,
19 313:17 318:15,22,24
319:6,14 381:13 394:7
395:3 467:25

**chairman** 309:5,6

**chairs** 313:14

**Chamberlain** 203:20,
24 204:2 225:24 226:6,
13,16,21 228:14,16,22,
25 229:4,8,12 230:4,12,
16 278:13,19 291:8
343:24 344:5,6,8,13,19
360:21 366:17 383:6
384:17 385:9,18

**Chamberlain's** 226:3,
24 227:2 229:21

**chance** 191:24 222:20
349:14 369:16 371:19
376:20 379:12 395:15
399:25 468:2

**change** 202:25 206:12
215:22 281:11 285:16
290:11 366:3 370:15
379:3 388:8 400:9,12
420:22 457:13

**changed** 263:20,25
264:1 265:5,9 309:19,
24 310:1,5 334:10
384:5 386:19,23 400:5
423:13 456:7

**changing** 384:4

**chaos** 244:13

**Characteristic** 277:7

**characteristics**
207:25 222:24 322:13
345:9 420:11,14 454:11
457:5 460:14,17 461:24

**characterization**
256:21

**characterize** 338:23
399:22 401:16

**Charge** 190:20

**charged** 188:9,10
190:10 269:13

**charges** 187:25

**chat** 193:19 217:23
218:3,4,5,9,13 219:12,
18,25 220:11 221:16
228:14,16,18 229:10,25
230:2 242:10 243:2,4,7
247:5,12 253:5 278:13,
15,16 286:22,25 287:1,
2 294:22,25 295:9
326:23 327:3,7 329:15,
16 330:24 331:1,9,25
334:23 372:16 376:9,
13,20,23 377:18 378:6
380:12 393:7 432:19
465:2

**chats** 286:25 297:23

**chatting** 349:20 385:17

**cheap** 290:14

**cheaper** 340:7

**check** 243:19 302:16,
18,19,20,21 303:3,7,13,
18

**checked** 437:16

**checking** 303:2 386:7

**checklist** 450:1

**checklists** 355:17

**Chicago** 347:2

**chief** 213:21 214:1
283:20,22 284:4,20
293:10 316:8,25
317:12,14,24 318:6,13,
15,23 319:5 330:20
338:19 350:2 367:25
382:2

**Chip** 383:5 384:21

**choice** 338:19

**Chris** 223:16

**Christine** 252:16
253:2,3,4,8 289:19,20,
23 349:25 350:1,21
364:5 408:22 409:18
410:7 421:9,10,14,17
422:1 432:7,12

**circular** 420:2

**claim** 245:5 246:2

**clarification** 403:15

**clarify** 426:5 438:3

**clear** 276:20 432:4
443:9

**clearer** 422:5

**climb** 346:25

**clip** 468:20

**close** 182:25 263:11
332:16 334:24 335:4,7
468:13

**closer** 190:14

**coat** 316:16

**cold** 243:22

**collaborative** 281:24

**colleague** 198:22
203:19 205:15 218:10,
11 247:25 278:13 364:3

**colleague's** 202:18

**colleagues** 203:6,7
209:3,4,8,14 211:5
212:24 215:12,19 216:9
221:23,25 227:21 228:3
278:17 293:6 338:24
339:3 363:25 365:10
373:17 374:4 377:9
383:6 414:4 444:22,23

**collect** 191:16

**collected** 295:23 296:8

**Collier** 360:21

**column** 238:18,22,23
239:10,11,12 277:5
453:20

**comfortable** 348:17

**comings** 186:14

**comma** 357:5

**commanding** 277:12

**commended** 282:3

**comment** 388:1,3

**comments** 385:8,11,
15 387:25 389:23

**commercial** 233:15
234:6

**committed** 188:13

**common** 291:13
420:10,14 433:14,16,
17,20,22 436:15,17

**commonalities** 421:2,
4

**commonality** 439:5

**communicate** 184:3
242:19

**communicated**
242:17

**communicating** 203:6
218:8

**communication**
217:23 218:14 228:13,
14,16 230:3,9 255:19,
22,23 256:4,5,15
257:11 294:22 295:9,
13,19 299:9,10 330:12

**communications**
182:9,12,15,16 193:12,
14,16,18,19 196:21,25
197:3,22,24 201:24
202:1 214:24 257:16,22
258:2,8,14,15 282:5
295:19 299:4

**company** 193:23
195:20,25 196:22,25
197:4,9 200:17 203:8
205:8 209:5,6 211:3
215:13 221:23 225:25
234:10 237:13,16,19
239:6,16 240:1 267:8
270:21,24 303:13 307:5
316:1,10 343:10 377:1

**compare** 302:8 311:18
321:21

**compared** 244:25
318:15 330:21 340:1
341:4 363:17 386:20

**comparing** 309:21,23
310:4

**compensation** 239:13
284:9

**complete** 320:2,4,6,10,
13,21 322:6 371:17
429:3

**completed** 383:16,18

**completely** 355:2
357:8 414:22 422:24
424:8 444:10

**completeness** 251:22

**completion** 349:19
365:17

**complex** 314:17,18
423:17 427:1,2

**complexities** 406:24
407:1

**compliance** 315:12
363:6,19 402:17 404:8
435:21,23,24

**compliant** 304:5
353:17

**complicated** 402:10

**complying** 184:5

**component** 411:15

**components** 424:23

**computer** 311:12
353:10

**computer-based**
211:19 311:11 339:25
340:3 355:25 369:11,18
418:12

**computers** 255:14,15

**concern** 336:18 374:8,
9

**concerned** 187:6
336:16 338:10 350:16
353:17 360:6 374:11

**concerns** 336:20
338:13,14,15 350:22
374:4 429:3

**concluded** 469:18

**conclusion** 188:21
441:23

**concurrence** 352:9

**condition** 347:20

**conditions** 277:13
333:24 347:16 351:17,
18 364:17 464:18

**conduct** 189:3 302:20
303:2 312:17 328:15
340:10 347:25 374:23
468:17

**conducted** 334:25
362:2 365:16

**confer** 292:3

**conference** 337:15
342:6

**confident** 371:11,12,
16,18

**confirm** 220:23 249:4,
14 364:11

**confirmed** 255:11
354:2,7

**confirming** 356:14

**connected** 186:13
343:3

**consideration** 287:13

**considerations**
288:11,15

**considered** 182:20
281:15 351:18

**consult** 417:24

**contact** 187:9 318:20
319:2

**content** 200:4 270:17

**contentious** 337:25

**contents** 191:24
381:17 459:6

**context** 199:13 208:2
210:12 213:25 214:4
219:12,18,25 220:5
230:2 245:9 247:13
249:18 250:6 253:5
274:1,2 275:6,10,13

279:19 284:24 286:9
357:16 360:2 380:21
390:24 428:1,25

**contingency** 369:21

**contingent** 370:3,6,11

**continue** 204:20
227:12 229:10 251:22
352:19 361:16

**CONTINUED** 329:9

**continues** 220:11,22
230:12 277:10 293:11

**contract** 199:2 200:17
271:18,19,21,25
272:23,24 293:17

**contractor** 233:7,11,13
235:10

**contracts** 190:12
200:18 271:15 272:1

**control** 207:1,2 255:11,
14,15 257:7 274:22,24
276:15,17 277:23
342:8,21 353:10 354:9,
10,17 362:12 386:17
456:7 460:7,8

**controls** 206:23,25
207:8,19,24 208:3,11,
12 250:1 274:18,21
275:4,11 276:5 342:7,
24 343:1,2,4,7,10
344:20,23 354:3
361:12,13,17,20,23
362:1,3,10 364:6
386:14 391:19 392:7
396:6,9 437:3

**controversial** 465:24

**conversation** 187:5
227:12 228:21 243:4
336:6 337:23 349:23
350:18,23 351:2,4
364:5 430:2 431:6,8,16,
20

**conversations** 335:17
337:13 351:20 352:1
356:20 406:12

**conveyed** 182:9
265:11

**COORD** 261:8,17,20
262:16

**Coordination** 261:5,7,
9,15,23

**copied** 344:14 384:19

**copies** 193:24 197:11

**copy** 195:4 196:2 391:9
458:14

**copying** 343:25

**corkscrew** 348:7,9
349:9 350:25 352:3
356:22 364:12 389:4,11
393:4

**corner** 237:7 259:22
266:20 297:18

**corral** 229:15 230:15
278:24

**corralling** 279:8

**correct** 182:12 201:8
226:15 230:8 231:10
232:3,11 233:17 234:9
235:17,22 239:16,19,23
240:3,15,22,25 241:2,6
242:15,18 243:4,6,7,11,
13 244:8,18,21,22
245:20 247:12 253:18,
24 254:2,23 255:8,9,20
256:11,16,20 257:12
258:3,7,10,17 259:15
266:25 267:1,3,4,9,10
269:3,6 270:1,2,4
271:20 273:12,13
274:9,25 275:1 277:17,
23 278:17 279:3 280:24
281:5,20 282:12 283:2,
5,13,14,23 284:1,4,14,
20 285:21,22,25 286:5,
20,21,22,23 287:15,16,
19 288:3,6,9,13,16
289:9,12,16 290:5
291:21 293:8 297:21,25
298:19,22 299:7,11,14
305:7 394:17 401:10
402:12,20,21 403:7
404:1,5,14,20 405:3,7,
12,18,24 406:1,4,7,11,
15,19 408:24 409:15
410:8,11,16,17,19,22
411:8,11,15,23 412:1,4,
5 413:4,18,20,21 414:4,
7,8,19 415:23 417:25
418:5,6,17,22 419:1,6,
24 420:19,24 421:3,14,

19,21,25 422:12,16,21
423:2,6,15,23 424:15,
21,22,24,25 425:3,4,6,
15 426:3,4,10,11
429:20,21,24,25 430:3,
12,16 431:7 433:1,11,
15 434:14,15,24 435:4
436:18,23 437:2,7,11,
14,17,22,25 438:1,3,7,
19 439:2,3,9,15 440:6,
13,25 441:2,6,9,10,13,
21,22,25 442:5,6,10,11,
17,18,23 443:6,11,16,
18,19,22,25 444:2,21
445:13,21,22,24 446:2,
3,10,14,17,19 447:15,
16,18,25 448:6,18
449:4,11,17,18,20,21
450:5,6,9,15,20,22
453:3,25 454:14 456:17
457:10 458:17,18,23
459:3,5,14,19 462:4
464:2,12,18

**corrected** 422:9

**correspond** 406:6

**correspondence**
446:23

**corresponds** 239:15,
17

**corroborating** 365:9

**cost** 201:19 204:9,12
340:16 341:8

**costly** 341:11

**costs** 206:12

**counsel's** 429:5

**counterpart** 279:4,9
316:9 317:1 318:17
354:18 382:1

**counterparts** 281:18
453:2

**countless** 413:23

**countries** 281:18

**counts** 188:10

**couple** 186:9 215:14
286:25 391:1

**courses** 369:1

**court** 182:4 183:5,8,11,

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 303 of 326   PageID 6534
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                        Vol 2 March 21, 2022                    Index: Court's..defer

14,18,21,24 184:2,7,12,
15,18,25 185:2,5,6,8,
11,18,20,22,25 186:3,6,
7 188:1,4,6 189:16
191:21 194:7 195:9
196:7 197:17 208:16
220:4,7 233:9,19,22
234:17,20,24 235:2,13,
24 236:11,21,24 237:2
238:1,3 241:14 245:24
250:12,15,20,23 251:4,
24 252:1,4,7,13 256:23
258:22 259:3,8 260:11,
15,19 261:13,16
262:17,22 263:3,8,13
264:6,11,17,21 265:9,
13,15,17 266:10
267:16,18 268:1 269:18
276:19 278:1,6,7
279:12 287:7,23 290:25
291:2 294:12 297:4,9,
12 298:5,10,15 299:1,3,
18,21,24 300:3,6,9,13
316:11,21 328:6,24,25
329:4,7,23 330:2 394:3
400:16 402:1 403:16
407:10,18 408:2,14
413:9 415:3,5,7,11,14
416:15 417:21 425:22
426:7 427:15 428:14
429:1 430:19 431:10,
14,22 436:8 438:5,8,11
439:22 440:1 444:8
445:4,7 448:20,22
451:11 452:6,14 454:24
455:18 457:16,25
458:9,12 459:10,16,23
461:5,9,12,14,16
466:17 468:9 469:5,7,
13,16

**Court's** 230:24

**courthouse** 185:16

**courtroom** 183:3,10,
12,15,19,22 187:19
235:16 325:12 329:8
415:6,10 469:1,6

**cover** 223:3 226:21
256:19 257:6,9 392:3
395:22 400:24

**coverage** 187:20
468:18

**crafting** 282:6

**crash** 184:20 187:15
188:8,9 450:21

**crashes** 182:18,21
185:7

**crazy** 220:16 248:21

**create** 217:1 317:19

**creates** 216:24

**crew** 207:7 268:7,11
269:25 270:3 282:1
285:8 289:21 290:5,7
324:24 340:14 352:8
355:2,9,12 357:9,12,13
422:24 424:9 444:2
446:9

**crews** 290:12

**criminal** 189:3 191:8,
10

**criteria** 305:17

**critical** 332:6,10,12,13,
18

**cross** 294:3 295:18,24

**cross-examination**
231:2 292:9 293:19
295:4 402:3

**crossed** 391:20

**cruise** 277:11 346:6,25
426:19

**cruising** 424:15

**cry** 246:17,21

**CSID** 199:3 267:20
268:15

**CSIDS** 270:4

**culminates** 281:23

**current** 190:22 202:23

**customer** 201:20

**customers** 212:11
246:20 280:16,17
282:17 285:12,13
289:7,8,11

---

**D**

---

**Dale** 384:24

**Dallas** 347:2 424:20
426:2

**Data** 281:25

**date** 198:12,14,15
199:23,24 201:1,2
202:12,13 203:15,16
205:5,6 206:5,20,21
209:7,22 210:23,25
213:7,9 215:9 216:6,7
218:3 221:13,14
223:22,24 224:18,21
228:10,11 262:8 293:2
326:23 329:15 344:1
353:5 360:23 366:18
367:20 376:19 383:8
391:11 398:10,11
431:25 451:19

**dated** 215:10 218:4
257:13 274:17 284:25
395:23 409:15

**David** 254:1,10

**day** 186:12,14 188:23
214:15 224:20 293:5
386:22

**days** 218:5 286:22
341:1 372:15,17
383:10,13 384:10
385:16 392:9,12 393:6
431:24 449:5

**DC** 338:22

**DC-9** 305:4

**deal** 225:6 316:3,6,23
362:13 380:21

**dealing** 187:19 202:24

**December** 203:16
430:9,10

**decent** 468:20

**decide** 314:2 319:23
365:3

**decided** 257:5,8 365:6
392:3 393:13,19 396:25
399:18 401:1

**deciding** 362:10

**decision** 312:7 313:19,
21 334:24 335:5,6,8
336:11 356:5,6 365:13,
25 366:2,6 369:7,8,14,
18 371:4,9 379:17

**decisions** 199:5

**deck** 282:1 375:1 450:2

**decrease** 421:4

**defendant** 189:4
198:9,17,21,24 199:9,
21 200:6,10,24 201:7,
14,24 202:1,4,10,15,18,
21 203:5,7,13,18,23
204:6,12,20 205:3,14,
15 206:3,18,24 208:24
209:13,22,24 210:6,9,
19 211:13,23 212:3,8,
17 213:5,16 214:14,25
215:7,18 216:4,9,14,19,
22 217:8,11,15,23
218:8,16 219:10,16,20,
21 220:1,13,19,24
221:4,11,19,21 222:6
223:6,13,15,17 224:5,7,
12 225:5,15 226:7
227:3,20,24 228:3,12
229:1,4 230:10,19
269:13 292:17 293:5,9
296:4,10

**defendant's** 182:13,24
197:22,24 199:25
201:3,10 206:5,8,22
208:5,9 209:10 210:23
211:1,4,10 213:7,25
214:9 215:15 218:21,23
221:13 223:3 228:17,21
260:10 261:1 266:19
269:9 408:11 452:16
455:20 458:6 460:2
461:20

**Defendants** 459:21

**Defendants'** 452:5

**defense** 193:9 194:15
195:23 196:13 236:18
237:22,23 238:5
241:11,12,15 260:9,11,
22 266:14 267:11,12
268:4,24 269:8,12,20
298:2,3 299:16,17
407:8 408:10,14,16
445:2 447:7 451:8
454:21 455:9 457:23
461:1 463:17 467:10

**defer** 298:10

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 304 of 326   PageID 6535
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Index: degree..document

**degree** 301:17,19

**delegate** 462:5,9

**delete** 257:7 387:18 390:16 391:23 392:2, 11,14,18,21 393:14,18, 19

**deletion** 387:21,23

**deliberate** 189:9

**delivery** 375:21

**Delta** 301:16

**denied** 299:18

**Denver** 306:18,20,24

**department** 190:3,6,8, 25 231:10,16 259:25 270:25 368:8 444:24 451:24 458:2

**depending** 333:24 425:16

**depends** 420:17,20,25

**deputy** 330:20 350:2

**Derek** 408:22 409:18 410:8 421:10,12

**descent** 217:6 290:12 346:25 373:24 374:10

**describe** 318:9,11,14 321:17 338:2,4 425:14

**describing** 361:10 376:9,10

**description** 219:4 269:17 276:13

**descriptions** 355:16 365:5

**design** 199:5 285:12 317:17 318:21 319:21, 25 320:1 321:2,4 324:23 335:2 336:7,16 363:4,6 365:21,23 369:16 370:4,7,9,11,12, 15,18,22 379:3 403:8 404:8 414:24 415:21 418:3 420:10 462:23 465:9

**designed** 364:8 446:9

**designing** 403:1,2

**designs** 319:10 334:17 405:4 420:15 466:25

**detail** 276:15

**detailed** 321:2,4

**details** 273:17 275:23 411:10,22 413:3 444:15,17 453:19

**determination** 188:18 205:20 208:17 215:24 217:4,7,18 281:16 285:17 290:13 313:20 326:7,16 365:20 371:18 372:25 373:6,25 439:10

**determine** 188:11 201:18 326:12 352:16 418:16 435:10,15

**determined** 182:8 280:14,22 371:7 380:1

**determining** 189:1 201:14

**develop** 314:12 321:13,19 382:10,18 403:8

**developed** 308:12,16 310:6 314:11 369:7 447:22 448:7

**developing** 308:5 314:18 341:17 354:13 361:19 375:19 420:10

**development** 282:1 315:12 355:22 374:10 375:22 380:19 433:20, 22

**dick** 246:14

**Diff** 201:4

**difference** 199:4 205:18,20 206:13 217:5,16 287:15 310:17 373:23 382:8,17 386:4, 5 387:5 388:10 399:5 420:25 421:1 435:16 436:1,4

**differences** 197:25 200:13 201:22 202:1,25 203:3 204:16,21 205:11,16,22 206:11,12 207:19 209:11 211:6, 16,19 216:25 217:1,3,7,

18 222:5 223:5 229:7 271:4 287:18 288:2,9, 12,16,24 306:3 309:13, 16,18,20,22 311:25 312:4,18 314:21 319:10,21 321:5 335:25 341:23 342:15,18,20 369:4 371:16 372:25 373:6,25 374:5,14 386:6,8,11,13 387:7 391:16,18 395:10 396:8,10 411:22 419:11,19,22 420:17, 18,20 435:9,11 436:3 439:1,4,11,12,16 462:15,17

**differs** 310:20

**difficult** 337:25

**direct** 189:19 192:10 194:11 196:11 231:9 237:1,2 242:9 243:1 244:17 252:9 255:4,5 259:2 270:10 272:11 273:7 278:12 279:18 281:2 282:9 284:23 285:20 286:9 288:25 291:6 300:18 316:9,25 318:17 329:9 354:18 382:1 402:9 409:25 411:20 418:8 421:7 422:8 423:1 424:13 429:9,10 430:1 432:21 433:4 434:22 436:22 448:10,16,19,20 450:18

**directing** 195:12 262:24

**direction** 187:11 225:14 229:20 230:22 418:11 456:24

**directive** 206:13 449:9, 10

**directives** 200:12 206:10 217:1,9 271:3

**directly** 273:2 315:14 380:22 416:5 417:14

**director** 367:25

**disclosed** 296:10 430:21 461:23

**disclosures** 182:8

**discourteousness** 186:24

**discover** 434:5

**discrepancy** 245:16, 18,21 434:10,13,19

**discuss** 197:21 213:20 283:19 293:10 356:10 359:24 374:18 390:24 411:18

**discussed** 270:9 355:1 356:8 389:13 392:22 422:23 430:15 431:6 454:4 456:2 463:7

**discusses** 267:21

**discussing** 225:6 350:15 377:4 422:7 432:6

**discussion** 182:21 203:23 329:3 389:25 431:2

**discussions** 356:17 389:8

**dismayed** 328:1

**display** 344:23

**displays** 280:2

**disposal** 321:18

**disrespect** 186:23

**distribute** 280:15

**District** 304:2

**division** 234:5 315:8, 10,11,22

**document** 194:13,16 195:4,16,24 196:2 207:11 228:8,11 237:5, 15,16,18 238:12,15 239:4,7,25 240:4,10,15, 24,25 241:23 259:20 260:1,3,4 261:14 262:8, 18,19,24,25 263:2 265:14 266:24 267:7,21 268:6,7,8,9,10,12 269:14,25 270:12,14 276:22 277:22 278:12 290:24 294:17 296:10 329:25 343:21 360:16 367:18 372:14 383:2 388:6 389:22 390:3

391:3 392:1 396:21
397:13 400:16 407:12,
15,17 408:1,3,5,8,15
409:3 416:11,20,21,23,
25 417:4,18 428:20
430:18,20 443:4,24
444:21 445:1,12 447:3,
5 451:14,25 452:4,15
454:2 455:19 458:2
465:18

**documentation** 367:1

**documentations**
344:11

**documenting** 281:13
338:20

**documents** 191:16
192:2,5,8 193:21,23,24
196:14,18 232:6,9,14,
20,23,25 233:6 240:11,
17,20 242:9 251:11
257:25 260:6 267:23
269:1,5 270:3,4,9
271:17,20 293:24
294:4,9 295:4,23 296:3,
7,9,19 297:5,6,7,17
344:11 356:25 358:5
400:11 407:14 429:10,
11,14 430:17 460:1
461:19

**Dogs** 229:9 230:11

**DOJ** 259:25 266:23
269:2 464:14

**dollar** 292:20 293:13

**dollars** 204:9,13
340:16

**DOT** 190:9,18 231:10

**DOT's** 190:11

**doubt** 188:12

**dozen** 243:23

**dozens** 285:11

**draft** 382:20 383:18,20
384:8 385:5,11,13,14,
18 387:3,13

**drafted** 440:22

**drawing** 313:9

**drink** 246:19

**Drive** 456:23

**DRS** 245:4,14,15

**DT** 391:14

**duck** 187:8

**Dude** 243:16

**due** 424:3

**duplicates** 277:8

---

**E**

**earlier** 255:24 256:4,5
272:21 374:9 441:24
469:1,2

**early** 364:1 469:9

**EASA** 281:14,17
344:18

**easy** 244:25 314:17

**Ed** 282:2

**EDS** 396:13

**educate** 342:13

**EET** 359:7,18

**effect** 360:4

**effects** 450:2

**efforts** 281:24 282:4

**egregious** 220:21
249:2

**EIS** 285:5,18 289:7,15
290:15,21

**elated** 371:5,6

**electrically** 375:2

**electronic** 193:16,18
196:21 197:8

**element** 188:18

**elements** 188:21

**elevator** 187:10

**elicit** 263:11

**eliciting** 263:6

**eliminate** 212:13
282:18

**else's** 242:22

**email** 193:19 194:19,
21,22,24 198:9,14,15,
16 199:20,23,24,25
200:23 201:1,2,3,10,11
202:9,14 203:12,17
205:2,7,13 206:2,7,17,
22 207:8,18 208:23
209:22 210:18 211:4
212:1 213:4,9,13,15
215:6,9,10,15 216:3,8,
14 218:6 221:10,13,14,
18 222:9 223:3,12
224:4,10,13,14 225:12,
13,23 226:9,17,21,23
227:12,16,24 230:3
243:6 245:8 255:4,5,6,7
270:17 273:7,23
274:17,19 275:6,10,13
276:2 279:17,20 280:24
281:1 283:18 284:11,23
285:1 286:8,10 288:19
289:1,19 293:3 343:24
344:14,19 353:2 355:20
356:2 357:1 360:18,25
366:11,13,16,20,23
367:9 372:9,11,13,16
382:25 383:3,4,8,10,12
384:14,16,20 385:2,4,7,
10 388:15 390:23
391:8,9 394:23,25
398:2,4,8,10,13,21,24
399:23,25 400:4 401:17
422:7 424:8 444:21,22
446:19 448:25

**emailing** 203:18
205:10 223:15,17 224:8
277:20 281:2

**emails** 219:25 220:6
221:3 225:5,10 243:23
245:8,20 258:5 259:12
267:2 274:10 280:11
283:13 297:23 298:18,
21 344:17 406:6 407:4
429:11,23

**Embraer** 305:5

**emergency** 217:6
290:12 373:24 374:10

**employed** 314:25

**employee** 235:21
236:3 254:6 289:21

**employees** 267:3
290:21 299:13 463:3,4

464:5

**employer** 235:10

**employers** 234:8

**encounter** 186:13
359:8

**encountered** 337:16

**encourage** 419:11

**encouraging** 420:9

**end** 186:12 188:23
214:12 386:21 468:10,
21

**enforcement** 191:5,14

**engaged** 242:10
350:22

**engagement** 339:8

**engine** 302:15

**engineer** 274:24 275:2
276:8 282:1 343:10
364:6 405:14 408:23
418:6

**engineering** 249:13
282:2,3 363:4,6,11
365:11

**engineers** 207:3
249:10 255:11 274:23
277:23 314:11 321:11,
13 342:14 354:3,9,10,
14,17 361:14 400:8
402:25 403:6,8,12,14
404:4 405:13,18 410:15
415:21 416:5 417:14,24
421:12 438:14

**enhance** 420:9 456:24

**ensure** 304:5 362:6

**entered** 329:8 415:10

**entries** 252:6

**envelope** 256:20
257:10 258:17,20
259:4,14 277:15,17
333:14 345:15 346:19,
21,22 347:1,7 351:13
355:3 357:10 358:7,10,
21 359:4,13,17,20,25
365:2 388:11,12,22
389:10,25 390:17
392:5,16 393:20 399:20

409:22 422:25 424:13, 14,18 426:3,8,15,18,24 427:8,12 428:23 429:13,20 441:21 442:3,8,17,23 443:2,11 446:10,17 449:4

envelopes 360:10

environment 202:23

Eric 353:3

erroneous 447:23,25 448:3

error 434:5

essential 320:9 332:19,20

essentially 213:12 263:11 340:7 342:23 347:4 349:4 353:22 355:25 363:10 367:5 369:10

established 283:7,8, 11 317:2

establishes 312:4

establishing 211:17

evaluate 306:2 307:21 309:20,25 314:21 317:18 320:9 321:4,25 326:3 333:3,6,8 334:18 338:1 339:6 349:3 352:17 355:23 362:13 363:4,5 364:8 365:7 369:1 370:10 371:15 374:12 375:24 378:1 379:11,23 380:1 394:7 419:22 436:23

evaluated 326:16 362:5 369:2,3 450:10

evaluating 305:18 313:19 320:22 363:14 419:19 439:16 450:11

evaluation 222:19 227:7 229:14 230:14 278:23 281:13 304:10, 13 305:9,17 306:5 312:17 317:8,19 321:6 322:18 323:1,10,13,17 325:5,7,23 326:6,9,10 327:25 334:8,25 335:20 338:3,25 361:2 365:16 371:1,13,15,17 372:12

373:11 374:13 377:23 381:23 383:19 466:22 467:25

evaluations 419:19

Everything's 433:5

evidence 188:16,21 194:9 195:10 196:9 197:19 198:4,7 199:17 200:21 202:7 208:15,17 221:8 225:9 238:5,7 241:15 251:24 252:7 256:22 260:22 268:4 269:21 287:6,8 292:13, 23 294:11,13,20 300:16 329:25 343:15 352:22 360:14 366:9 382:22 391:2 394:21 408:15 445:2 452:15 455:10,19 460:2 461:20

exact 213:9 236:13,15 257:19 354:12

examination 189:19 231:9 243:1 270:10 273:7 291:6 292:6 300:18 329:9 402:9 418:8,11 421:7 422:8 465:16

examples 347:12 460:17,21 461:22

exceed 200:13 271:4

Excel 240:14

exchange 186:20,21

exchanging 187:3

excited 371:8

exclamation 211:8

excuse 189:3 228:15 330:15 361:9 364:15

executive 282:13,14 338:22

exhibit 192:14,16,20 193:1,5,7 194:12 195:7, 10,13 196:5,8 197:15 198:4,8 199:17 200:21 202:7 203:10 204:24 205:25 206:15 207:14 208:21 209:20 210:16 213:2,16 215:4 216:1 217:20 221:8 222:12

223:10 224:2 225:8,17, 19 226:20 227:15 228:6 230:4 236:17,18,19 237:23 238:3,5 241:12, 15,17,21 242:21 254:18,22,23 255:1 256:13 257:15 260:10, 12,17,19,20,21,22 261:2 266:14,19 267:12 268:2,4,24 269:9,12,23 270:11,16 278:9 279:16 281:1 283:16 284:22 286:7 287:6 291:5 292:14,23 294:19 295:8 298:3 299:17 326:19 329:13,16 345:2,6 346:16 367:9 385:24 386:2 391:19 395:16,21 396:5 407:8 408:11,14, 16 422:4 428:3 429:17 443:24 445:2 447:7 451:8 452:5,16 454:21 455:9,20 457:23 458:6 460:2 461:1,20 463:17, 18 464:21 465:15 467:10

exhibits 185:21 192:11,18,22,24 193:3, 11 194:4,8 196:13,25 197:18 233:3 269:20 300:12,15 459:22

exist 254:14

existing 400:22

exited 415:6 469:6

expanded 296:4 324:14,18 331:23 333:13 334:10 371:23 376:11 379:15 423:8, 11,20 424:1 425:5 434:23 439:24 440:5,9, 12 443:22 446:6,15 448:11,17 449:1 450:8 453:6

expansion 296:11 325:2 335:10 370:16 379:8,25 380:4 390:14 394:8 426:6 427:7,18 428:21 441:24 446:19 450:19

expect 285:13 364:19 434:18

expectation 283:1,3,4

expected 348:8 364:23

expenses 397:10

expensive 339:20,22 340:4,19 341:3,6

experience 339:24 340:14 376:8,12 424:20 426:2,12,17,21 444:2 446:9

experienced 433:24

experiences 437:2

expert 182:24 183:11

experts 183:3,13,15

explain 264:3 320:8 324:21 333:2 340:6 369:17 379:19 390:12 451:22

explanation 401:17 432:8,10

explanations 352:5,11 365:8

Express 304:4

expressed 374:4

extended 359:3,13,17, 20,24

extent 182:10

extreme 246:11

eye 187:9

F

FAA 182:8 205:19 211:25 220:9 225:3,6 252:24 255:8,9 256:16 277:20 279:5,10 281:11,14,17,20 296:11 301:7,9 302:20,23 303:1,18,20,22 305:13 306:21 313:3,4 314:25 315:18,23 360:3 362:19 370:5 371:14 403:13, 14,23 404:1 405:2,7 414:3,9 419:10 427:10 444:23 446:13 449:5,14 452:1 453:1,19,20,24 454:13 458:3,23 460:7

461:4 463:11,12 464:5 467:23

**FAA's** 282:7

**face** 337:12

**face-to-face** 378:17

**faced** 337:9,14

**facilities** 340:17

**facility** 340:25

**fact** 217:5,16 232:8 233:15 255:10 324:18 326:5 327:8 373:23 379:2 399:15 418:24 419:10 436:21 446:23 449:4,25 456:1

**fail** 333:5

**failed** 333:10

**fair** 431:5

**fall** 290:17 363:13

**false** 399:24 401:18 415:12

**familiar** 194:16 195:16 196:17 198:8 199:11,20 200:23 202:9 203:12 205:2 206:2,17 208:23 210:18 213:4 215:6 216:3 217:22 221:10 223:12 224:4 225:10 228:8 254:1 255:6 259:21,23 260:11 261:15 262:21 268:10, 13,15 273:14,17,18 277:17 304:14 307:5,23 308:10 310:10 311:7,13 312:11 313:6 322:12 331:16 332:6 363:22 391:3 419:15,16,23 420:6,8 452:23 462:7

**familiarization** 452:23, 24 464:22

**family** 308:12,15

**Fantastic** 212:10 282:10,16

**fast** 269:24 346:1 348:6,7

**fault** 442:13

**FCC** 255:13 353:9,10

**FCCS** 255:12 353:8,13 354:3 422:12

**FCOM** 255:18 256:19 257:6,9 324:24 355:1, 11,12,13,16 356:4,11, 13 392:4 400:23 422:18 441:16,19 442:5,17 443:5,11,13 446:8 462:1

**FD** 285:5

**Fear** 227:23 228:4 291:10,13

**February** 205:6 430:10

**fed** 290:17

**federal** 191:13 222:18 235:10 301:6 304:5,19 402:17

**feel** 337:19 348:14,15 362:7 371:9

**feelings** 328:2

**feels** 438:22,25 440:15

**feet** 220:15 248:20 332:20

**felt** 293:24 338:6 339:1 362:6 439:14 440:12

**fewer** 420:18

**figure** 292:20 293:13

**filed** 182:6

**files** 344:15,16,17

**fill** 284:19

**final** 188:22 189:8 211:20 222:2,25 223:6 252:6 281:10 299:22 312:7 314:14 335:7 369:14 370:8 380:13 395:4,7,17 396:21

**finalized** 335:6

**finalizing** 334:24 335:4,7

**finally** 188:17 196:11

**financial** 200:16 201:4, 14 205:23 271:11 272:6 293:25 339:18

**find** 182:14,18 315:12

351:17 435:21,22

**finding** 281:14 363:18 404:7 468:1

**fine** 433:5

**finish** 282:4 403:17,18 413:8

**fire** 243:23

**first-hand** 233:11

**firsthand** 233:20,21

**fix** 290:14,21

**fixed** 285:4,18,24 289:6,14

**flag** 210:5

**flaps** 345:20 358:19

**fleet** 319:1

**flew** 305:3 437:11,12 438:21 439:14,19

**flies** 346:23

**flight** 206:23,24 207:1, 2,7,8,19,24 208:3,11,12 211:17 213:23 214:18 219:19 221:4 250:1 255:11,14,15 257:7 262:13 274:18,21,22,24 275:4,11 276:4,15,17 277:23 281:13,25 282:1,2 284:13 289:21 290:7 302:21 303:2 304:1 308:6,12 309:4 310:18,25 311:20 312:11,15 313:7 317:8 318:1 321:11,15 322:24,25 323:15,22 324:24 326:18 332:2,3, 7,10,14,18 333:21,23 334:8 340:4,13,14,18 341:10 342:7,8,15,21, 23 343:1,2,7,10 344:20, 23 346:4 347:2,4,11,14 348:20 349:2,12 350:3, 10 351:24 352:8 353:10,16 354:2,9,10, 17 355:2,9,12 357:8,12, 13 359:1,18 360:6 361:12,13,17,20,23 362:1,3,9,12 364:6,7 365:10,11 368:1 374:21 375:1,7 377:4 380:5,20 383:18 386:14,17 389:2

391:19 392:7 393:3 395:22 396:6,9 415:22 416:5 417:14 422:24 424:9,15,20 426:19,25 436:11 437:3,5,10 438:14,17 440:2,10,11 444:1 446:9 450:2 460:7,8

**flights** 333:19 348:8 374:19 375:15,18 389:17

**flip** 239:4

**floor** 315:18

**flow** 415:20

**flown** 302:5,6

**fly** 302:11 305:19 310:8 312:6 340:24 363:11,13 371:19 421:3 435:15 436:4,13,22

**fly-outs** 375:11

**flying** 220:20 249:1 313:8 340:15 348:18 364:18 375:3,22 386:21 426:2 437:2

**FMA** 388:6

**focus** 198:16 201:9 202:14 205:13 212:5 213:18 216:15,17 218:17 221:25 234:1

**focusing** 201:10,13 206:8 225:22

**folks** 211:1,3 230:10 299:10,12 434:3

**follow** 188:14 338:5,7 382:5 449:25 450:1,4,8

**follow-up** 385:4

**food** 328:10

**force** 291:14,17 348:1 349:1 350:11 364:15,16 457:4

**forces** 277:11

**forget** 382:12 410:4 430:19

**forgot** 313:11 456:3

**Forkner** 188:8,9,13 193:13,14,17 194:19

212:23 218:25 219:6
221:24 226:2 229:9,17
231:8 235:16,18 236:2
238:14 239:6,16 241:2
242:3,10,15 243:9,16,
21 244:11,24 245:3
246:13,16,23 247:1,17
248:15,19 249:1 251:9
254:11 255:7,19 256:6,
15 257:12,16,22 258:2,
6 259:13 267:23
274:10,17,24 277:20
279:21 280:7 281:2
283:9,12,19,22 285:1
289:2,8,19 290:9,18
291:7,16,19 293:24
294:14,17 295:1,5,9,14
298:18,22 314:22,24
315:2,6,8,14 316:2,6,8,
11,20,23 317:24 318:8
319:4,15,18 320:14,16,
18 321:3,7,12,18,22
322:5 325:6,16,21,22
327:1,19 330:10,12
331:1,9,12 333:25
334:4,7,11,12,20
335:13,21 336:14
337:19 338:16,19,24
339:8,9,18 343:12
344:14 349:15,18,24
350:7,17 351:21 352:5,
12,20 353:3,22 354:7,
15 355:6,19 356:2,7,10,
20,24 358:3,8 359:24
360:9,19,20 361:10
365:9,24 366:16
370:20,23 371:3,25
372:9,23 373:2,5,16
374:4,19 375:6,17
376:9,20 377:19 378:7,
18,24 380:15,21,25
381:20,21,24 382:20
383:6,11,20,23,24
384:22 385:3,17 387:8,
22 388:7,18 389:9,13,
22 390:16,25 392:10,
13,17 393:12,18
394:19,25 397:16,23
398:5,13,20,22 399:4,
22 400:4 401:8,12
402:8 404:21,22
410:15,19 411:2,7,22
412:8,21 413:3,11,16,
17,24 414:12,18,22
415:17,23 416:4
417:13,23 418:3,6,21

421:24 422:11 424:7
429:12,19,23 430:2,15
431:7,9,16 432:4,7,15,
20 433:4,9,24 434:4,17
442:20 450:24 451:4
462:17,24 463:2,6,9,25
464:24 466:1,13,23
467:1,19,22 468:6

Forkner's 207:8,18
236:3 242:14 262:5
278:13 292:9 295:19
318:14 319:5 330:7,21
350:4 356:5 368:6
389:8 391:25 401:16
465:9 468:5

form 240:12,15,20
250:10 466:15

formal 243:6

formally 222:4 395:9

forward 184:4 188:15
201:6 212:17 344:17

forwarding 212:20,23

found 465:7

foundation 258:21
264:8 455:13 458:8

frame 323:17

Frankly 201:16

fraud 188:10,13,19
190:11 191:1,2,6,8

free 213:21

frequently 317:5

friend 242:13

front 270:12 322:21
458:14

FSB 221:5,20,25 222:2,
6,16,25 223:7,19
224:14 225:3 227:10
230:7,18 312:12,14,19,
22 313:15,18 318:16,
21,24 319:6,14 368:23
381:3,5,8,11,14,17,22
382:3,6,20 383:16
384:2 385:5,13 387:3,7,
14 390:24 392:11,21
394:8 395:1,4,8,24
419:19 468:1

FSDO 304:1

FT8 456:11

FT9 454:5,6 456:11

FTC 447:13

Fuel 277:11

full 189:23 248:2,4
310:18,25 311:20
326:18 340:4,13 359:1,
18 360:6 375:1

full-flight 374:22
376:18 379:22 399:16

fully 350:21

function 255:16 354:4
363:16,17,18 443:7
448:8,9

functionalities 207:6

functionality 277:14

functioning 331:22

functions 258:9
277:14 442:4,7,15
457:1 460:12

fundamental 245:5
246:2

Funny 278:21

_____

G
_____

gang 229:19 230:22

Gate 366:21 367:4

gate-to-gate 347:4,14
424:14

gatekeeper 366:25

gathering 427:17
444:9

gave 281:3 358:3
365:20 408:9 443:25

GE-22 329:25

gears 335:20 341:24

general 190:4,7,9,25
266:5 275:8 298:25

generally 192:7,9
193:10,15,16 194:23
195:18 196:17,20,21
202:2 205:8 209:1
219:14 223:15 225:10

268:12 301:9 304:3
313:1 314:16 322:20
341:3 354:11

Generation 308:11

gentlemen 186:8
224:9 235:2 468:10

GERGER 183:2,23
184:8,14,17,22

give 186:3 188:7,20
279:18 284:24 286:9
317:19 320:15 328:4
356:24 361:22,25
392:13 393:10 411:22
451:15 459:8

giving 185:10 280:17

goal 283:7,11 418:21
420:10

goings 186:15

good 185:25 186:16
188:4 189:16,21,22
231:4,5 246:12 263:9
298:15 300:9,21,22
328:9 329:11,12 402:5
468:14 469:3

Goose 243:22 244:2

government 182:12
188:7,12 189:12
192:14,16,18,20,22,24
193:1,3,5,7 194:3,8,12
195:7,10,13 196:5,8,13,
24 197:14,18 198:4,8
199:17 200:21 202:7
203:10 204:24 205:25
206:15 208:20 209:20
213:1,15 215:3 216:1
217:19 221:8 223:10
224:2 225:8,17,19
227:15 228:6 230:3
233:7,10,13,25 235:11
236:18 237:18 241:10,
11 242:9 251:23
254:18,22,23 255:1
256:13 257:15 258:1
259:1 260:7,14 266:23
267:8 269:3,6,12 270:9,
11,16 271:2 273:6
274:19 276:23 278:12
283:15,18 284:22 286:7
291:5 292:14,23 294:19
295:8 297:19 300:11,15
318:25 326:19 345:2,5

346:15 367:9 385:24
386:2 391:19 395:16,21
396:5 407:13 416:8,18
417:1,2,12 422:4,8
429:10,17 430:5 431:11
432:14 451:25 455:6
461:4

**government's** 182:25
236:17 278:9 279:16
280:25

**gradient** 349:1 364:16
457:4

**gradients** 348:2
350:11

**granted** 217:3 220:20
249:1 372:24 373:5,7

**gray** 316:15

**great** 219:3 248:13
276:14 289:7,16 377:14
409:5 433:8

**greater** 201:15 205:21
211:18 304:18 339:12,
20 358:18,19 424:25

**greatest** 207:4 208:10
361:15

**Green** 435:3 436:4
446:11,13

**Grey** 243:22 244:2

**ground** 203:3 332:16,
20 341:9

**group** 212:18,21
222:19 227:7 242:15
246:22 249:9,13 253:6
284:17 290:8 291:9
304:10,14 305:9 312:15
317:25 318:1,2,6 350:3,
4,5,6 365:10,11 368:1
403:14,23,25 404:2,10
405:7,11,19,21 411:8
415:22 419:6 460:7
461:23 468:5

**group'** 227:9

**groups** 402:14 403:11,
22 404:1 405:23 412:7

**Gs** 347:19 348:14
358:19 409:23 424:25

**guess** 247:14 410:3
446:5

**guessing** 199:4

**guidance** 320:25
419:10,21 420:2,4,6,8

**guide** 229:16 230:16
278:25

**guilty** 234:12

**Gun** 289:23

**Gustavsson** 218:10,
16,21 219:3,8 220:11,
17,22 226:2,7 228:18
242:11,13 243:18
244:12 245:1 246:15,21
248:17,24 249:3 250:25
252:14,20 284:17,19
291:8 295:1 325:21
327:2 330:13,14,16,17,
18 331:8 360:22 383:7
384:22 385:3,17

**Gustavsson's** 218:24

**Guy** 246:17

**GX** 378:22

**GX-12** 360:14

**GX-13** 352:22,24

**GX-18** 366:8,11 367:9
368:20 378:22

**GX-21** 372:3

**GX-22** 376:4

**GX-24** 382:22 385:24

**GX-26** 391:2

**GX-28** 394:20

**GX-31** 397:14

**GX-9** 343:15

---

**H**

**half** 303:7,12 324:9
327:22 360:16 361:6
367:18 382:25 384:13
394:22 398:14

**hallway** 185:15 187:8
329:5 349:20,21 364:6
421:11

**hand** 236:16 300:6

**handed** 191:23 237:6

240:9 266:18 268:23
296:19 444:19

**handing** 454:20

**handling** 362:4 408:23
436:23,24 437:1,3,6
454:3

**hands** 337:14 425:25

**hands-on** 310:18
340:13

**happen** 209:18 280:5

**happened** 446:1,2,4
449:16

**happening** 219:2
246:25 247:22

**happy** 211:15 212:22
282:22

**hard** 186:25

**hated** 246:10

**head** 210:3,10 305:1
368:7

**headed** 375:10,24

**header** 207:15,17
217:25

**heads** 187:9

**hear** 189:17 190:15
256:2 263:9 270:22
286:13 301:3

**heard** 248:8,9 348:18
359:3

**hearing** 221:2 251:7

**hearsay** 236:23,24
264:5,16 266:10 267:13
298:13

**heavily** 205:19

**helped** 344:10

**helpful** 355:13 427:24
447:6

**helping** 291:20

**helps** 406:12,14,18

**hero** 210:4 292:19

**high** 211:2 221:21
224:7 258:13 264:1
277:13 305:25 309:16

311:17 323:4,6 325:5
331:18 332:22 333:17
334:10 346:6,7,8
347:17 348:9 356:18,
19,22 358:11 359:10
360:12 361:24,25
362:10 388:24,25
392:25 393:1 396:22,24
400:5 409:22 424:24,25
425:6,8,13,16,19 426:6,
9,13,17,23 430:3,16
432:5 446:1 456:25
457:4

**high-angle** 348:6

**high-g** 324:25 399:20

**high-pitch** 359:9

**high-speed** 324:25
345:24 347:20,23,24
348:1,5,9,19,22 349:4,9
350:9,25 352:3 364:12,
13 365:1 389:3,11,12
393:3,5,21 399:19,21
401:22 423:8 431:1,21
432:9 446:16

**higher** 362:7 418:20
420:23 426:22

**highest** 238:23 311:4

**highlight** 226:10 238:9,
17 239:20 241:21,23
262:12 270:16 277:1
278:20 345:16 346:15
353:25 354:22 368:16
369:23 372:19,20
373:20 392:7 399:2
400:18 453:12 454:5,9
456:8 457:2 463:23

**highlighted** 198:25
200:11 201:13 202:22
205:16 206:9,25
209:14,24 211:14
213:18 215:19 216:17,
22 222:1 226:12 227:21
228:21 229:5 271:2
277:6 292:15

**history** 238:13

**hit** 330:2

**Holbrook** 198:5,12,19
200:3 204:18 207:13,21
208:6 211:10 212:6
214:22 218:1,18 222:14

224:23 226:20 227:15
229:24 294:24 326:20
327:10 343:16 344:25
345:14,16 346:14
352:23 353:24 354:21
360:13,15 361:4 362:15
366:10 367:11,17
368:10,14,16 369:22
372:3,4,6,18 373:19
376:3,5 378:3,13,21
380:8 382:23,24 384:12
385:23 386:10 387:9
388:2 391:5,22 392:6
394:20,22 395:18
396:4,6 397:14 398:1
399:1 400:18 465:14
467:9,16

**hold** 265:15 304:25
403:16 408:2 414:15
429:1 430:19 448:22

**home** 243:20 340:11,12
469:2

**Honor** 183:2,7,17,25
184:8,10,22,23 185:1,3,
12,14 186:2,5 189:13,
18 191:19 194:6 195:8
196:6 197:16 208:14,19
231:1 233:21 234:15,19
235:1,6 236:20,22
237:22,24 240:7 241:10
250:9,14,21 251:21,25
252:5,12 258:24,25
259:7,18 260:9,14,18,
23,25 262:20 263:2,5,
10,17 264:9,10 266:8,
13,15 267:11,15,17,20,
22 268:3,20 269:8,11,
15 278:8 287:9 292:2,4,
5 296:13,14,15 297:2,8,
15 298:2,7,14 299:16,
22,23 300:1,10 316:19
323:16 329:6 330:3
394:1 401:23 407:9
408:10,17 409:6 413:7
415:1 416:14 417:20
426:10 428:5 429:6
436:6 439:20 444:4,7,
25 445:3,5,6 447:8
451:9,10 452:4,17
454:23 455:9,11,15
457:24 458:1,7,11
459:9,21 460:25
461:11,13,15,18 463:13
465:13 468:7 469:14,15

**host** 340:17

**hosted** 353:15,19
356:16

**hotel** 243:22 341:1

**hour** 341:8 346:1,3,5

**hours** 279:24 303:14,
16

**housekeeping** 186:9

**houses** 302:10,11

**Houston** 424:21 426:2

**huge** 212:10 217:6,17
282:16 373:23,24

**hundreds** 402:19

**Hurrell** 223:16

**hydraulically** 375:2

**hyperbole** 273:22

**I**

**ice** 243:22

**idea** 325:8 341:21
413:17,19,20,24

**identification** 192:12,
13 194:12 195:13
196:12 316:20 400:23,
25 401:2,5,9,14,21

**identified** 387:22

**identifies** 369:20 386:6

**identify** 316:13 336:24
453:20

**Illinois** 301:18,20

**immediately** 349:19,
24 381:23

**impact** 201:4 285:6
287:14,17,18 288:16,
20,23 289:7 290:11
370:13

**impacts** 201:15,17
289:15

**importance** 339:19

**important** 311:25
319:6 320:5 332:17,24
352:12,14 362:9 377:22

378:2 380:3 406:22
426:5,6 466:22

**impropriety** 187:2

**improves** 457:4,5
460:13

**in-court** 316:20

**inadvertently** 387:4

**inappropriate** 243:23

**incident** 324:4,8,10
325:3,11 327:3 398:12,
16,17,21 399:5 443:15,
18,21,25 444:3,14
445:23 446:1 449:16

**inclination** 387:20

**include** 193:19 333:14
344:19 362:21 365:6
439:17,18

**included** 313:6,10
330:24 342:18 371:14
386:18,21 398:8

**includes** 383:19

**including** 208:12,13
230:10 327:15 342:22
402:24

**incomplete** 320:2

**incorporate** 449:13

**incorporated** 370:4

**Incorrect** 442:24

**incorrectly** 453:17

**increase** 446:24

**increasing** 285:8
426:20

**incrementally** 310:22

**independent** 328:15
468:17

**indicating** 348:3

**individual** 266:6
318:22

**individuals** 253:17
266:1

**indulgence** 230:24

**inexperience** 229:18
230:21

**inform** 211:15 370:22
406:10,12,14,16,18
415:18

**informal** 278:16

**information** 182:10,
19,20 241:4,5,7 265:11
266:4 319:9,19,20,24,
25 320:2,3,6,10,13,15,
21 321:3,4 322:6,11
324:19,20,23 325:4
328:5 342:2,5 343:9,11
347:8 352:9 353:15
354:19 356:15 358:18
365:10 377:22 384:4
390:7,9,11 393:10
396:19,20 400:23 401:3
404:18,19,21,25 405:1,
6,10,17,22 406:9
411:14,23,25 412:3,9,
19,20 413:2,10,17,24
414:11,17,21 415:20,
22,25 416:3 417:13,24
427:18 431:24 444:9
450:12 462:13,15,25
468:1

**initial** 201:11 446:4

**initials** 199:9,11 200:7

**inoperative** 333:7

**input** 456:24

**inputs** 290:10

**insane** 244:11

**insanely** 210:1

**Inspection** 190:9

**inspector** 190:4,7,25
304:1 305:16

**instance** 258:13 435:3
436:2 454:4

**instant** 327:1 331:7

**instituted** 360:4

**instruct** 182:16 184:11

**instructing** 227:22
228:2 291:10,19,20

**instruction** 182:14
185:6 188:6 235:3

**instructions** 186:4
188:15,20,23 189:5,8
328:14 468:16,23

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 311 of 326   PageID 6542
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                          Vol 2 March 21, 2022                    Index: instructor..Klein

**instructor** 341:9

**instructors** 340:18 341:2

**insufficient** 326:14

**intended** 420:9

**intense** 311:2

**intensity** 311:4

**intent** 182:13 285:12

**interact** 225:6 333:5 351:15 355:18 379:10, 21 443:12

**interacted** 333:9

**interactions** 380:24

**Interface** 268:8,11 269:25 270:4

**interim** 468:22

**interject** 244:15

**internal** 182:8 325:18 331:7 372:13 464:4

**interrupt** 244:14 427:21

**interview** 203:24

**interviewed** 266:1,2,3 416:10

**interviewing** 416:8

**intimately** 313:6

**intricate** 444:17

**introduce** 300:23

**invest** 340:15

**investigating** 190:10 231:19 233:5 236:2

**investigation** 191:10, 14,17 192:5 194:1 196:3 232:14 234:1 236:8 237:19 240:11,16 245:19 247:23 249:7 253:15 260:7 261:8 263:19 264:20,22 265:12,22 266:5 272:17,18 282:25 283:6 294:8 295:23 296:8 297:20,21,24,25 328:15 444:16 468:17

**investigations** 190:5 191:1,6,7 294:5

**investigative** 236:5 248:5 253:19,24 265:25 272:7

**investigators** 416:9,10 417:12 431:12

**invisible** 357:13,16 423:2,4,15 442:4

**invitation** 461:1 464:24 467:13

**invite** 459:1

**invited** 460:6 463:6,9, 22

**inviting** 463:11 464:4,5

**invoices** 196:23

**invoke** 183:2

**involve** 309:13

**involved** 186:11 187:4, 5 219:5 232:5 284:8 402:15,19,22 403:1,4,6, 22,24 443:18

**ipad** 311:12,17,23 314:4 339:25 340:6,9 341:4,23 355:25 369:11,18 392:18 397:5

**irrelevant** 298:8

**irritated** 337:6,7,9,12 338:4

**issue** 182:11 287:18 290:20,21 338:21 434:5,12 440:20 441:2

**issued** 340:9,23 449:5

**issues** 245:5 246:2 290:15,16 433:19 440:24 441:4,6

**item** 203:1 454:22 455:17 456:15 458:2,5 463:22

**items** 217:2 456:11

---

**J**

---

**JACOBS** 183:6,9,13, 17,20,25 184:6,24

185:1,3,9,12,19,23 186:2,5 187:25 188:2,5 469:14

**jams** 396:12

**January** 228:11 257:13 306:16 307:2 391:12 392:1,18,24 393:6,11, 13 394:9,12 430:10

**jeopardizes** 206:13

**jet** 280:3

**jets** 307:10

**job** 188:11 190:18 191:7 209:25 210:1 244:11 246:18,19 314:17,18,20 316:3 319:5,6,14,15 320:5 370:22 406:11,14,18 411:14 435:12,13 465:9

**John** 360:21

**join** 303:19,22

**joined** 303:18 304:10, 13

**Joint** 281:13

**jointly** 282:6

**Judge** 300:17 400:17 413:13

**judgment** 182:23

**July** 221:14 223:23 224:20 322:5 324:2 335:6 365:16 380:12 394:12 395:1,23 396:9, 25 397:9 451:20,21 453:6,9 454:8 456:6,10 457:9,13 459:14 467:6

**jump** 374:16

**June** 209:23 342:2 343:7 344:2,4,20 345:12,22 456:2

**jurors** 188:11 415:6,10 469:6

**jury** 182:16 184:11,18 185:7,10,14 186:6 190:21 199:18 208:16 235:2 238:9 252:1 260:24 278:6 287:6 289:2 294:12 300:23 303:14 345:19 346:18

357:6 368:20 370:1 379:19 395:20 400:21 463:21

**Justice** 259:25 444:24 458:2

**Justice's** 451:24

---

**K**

---

**K-E-N-T** 190:1

**K-L-E-I-N** 301:1,4

**Katie** 270:19

**KEARNEY** 184:16,23

**Keith** 212:2 282:9,11

**Kent** 189:14,25

**Kevin** 435:3 436:4 446:11,13

**keys** 285:7

**kick** 221:2 251:6 324:11 333:18,19,20,23 349:11 351:24 352:2 356:21 364:20,24,25 380:5,6 389:17 393:2

**kicked** 322:20

**killer** 201:22 273:20,21, 25 274:4,5

**kind** 266:5 302:5 326:17 350:15 366:24

**kinds** 342:20 368:6 410:23 411:6

**kink** 433:23,24 434:5, 12,18,19

**kinks** 377:14,17 433:6, 9,10,14

**Klein** 182:9,20 227:4 228:1,2 230:6,10,18,20 255:8,20 256:6,16 257:12,17,23 258:2,6 277:20 279:2 285:21,25 295:20 296:4 300:2,4, 10,25 301:2,4,5,17 314:22 323:20 330:6 343:21 345:21 352:19 353:3 365:12 369:25 378:6,17,24 384:16 392:9 394:25 397:13

398:4 399:4,9 400:4,21
402:5,20 403:7,21
404:9,23,25 405:6,10,
15,18 406:15,19,21
407:12,17,23 408:21
409:9,25 410:14,25
412:24 413:8,25 414:17
415:16 416:17 417:23
419:4 422:7 423:10,20
426:23 427:20 428:7,
17,24 429:9 432:18
440:19 441:15 445:10
447:10,12 448:14 449:8
450:18 451:14 452:22
453:11 454:14 455:12
456:1 458:14 460:20
461:22 463:15 467:2

**Klein's** 227:9,17

**knew** 390:3 393:14
412:1 413:2,10,15,16
436:1 448:10,17 450:8,
11,14,25

**knots** 220:15 248:20

**knowing** 326:5 330:11
379:16

**knowledge** 183:20
233:11,21 253:7,23

———————————————

**L**

**labor-intensive**
311:19,22

**ladies** 186:8 235:2
468:10

**lady** 316:17

**lams** 396:12

**land** 346:13 426:21
438:12

**landing** 332:5,11,13
346:10,25 424:15
426:13,19

**language** 271:19,21
272:1,3 388:13 429:25

**large** 234:10 344:16

**largest** 234:7,8 235:9

**last-minute** 290:16

**lastly** 430:11

**late** 469:8,10

**lateral** 284:6,7

**laughing** 244:8

**law** 191:5,13

**lawsuit** 186:11 187:21
188:7

**lay** 264:8

**layer** 310:23,24

**lead** 231:24

**leadership** 212:12
338:22

**leading** 431:6

**learn** 236:8,12 265:9
272:21 321:7,9 322:17
323:11 324:10,13
325:11,17 359:2,11,12
375:6,9 462:20,22,25

**learned** 233:6 261:8
265:20 272:17,18
302:7,8 323:3 325:18
334:14 343:14 379:25
390:13 410:1,7 427:5,6,
11 428:21 441:24
443:22 446:6,18 450:21
465:8

**learning** 325:2 427:18

**leave** 315:22 397:16,23

**leaves** 229:6

**left** 218:22 238:18,22,
23 240:2 246:18,22
412:8,15,16,23

**legal** 271:25

**letter** 195:19 199:3
281:12 282:7 366:1,7,
21 367:2,3,4,6,8,14,15,
20 368:2,12 369:17
370:19 378:22 379:4

**letters** 368:6

**letting** 185:14

**level** 197:25 199:3,4,7
200:10,13,14,15 201:4,
15,21,24 202:1,5,21
203:1,3 204:7,16,21
205:16,20,21 206:9,12,
25 207:4 208:10
209:14,17 211:2,6,7,14,

18,24 213:23 214:16,
20,25 215:16,21,23
216:10 217:3,10 221:21
222:5 223:5,8,20,21
224:7,16,17 264:1
271:4 273:10 280:4,14,
22 281:3,15 282:13,14
283:2,3,5 285:15,17
286:4,20 290:13 293:6,
13 294:1 305:25 309:16
310:14,15,18,21,23,24,
25 311:2,3,4,6,7,10,11,
15,16,17,18,20,22,23,
24 312:7,20 313:22,24
314:2,3,4,8 319:23
321:17,21,22 322:4
323:24 324:1,2,7 326:7,
12,14,15,17 327:20,23
334:24 335:1,5,21,25
336:1,2,4,12,15,17,24
337:12,20 338:6 339:7,
10,12,19,21,24 361:5,
11,15,22,24,25 362:7,
10,11 363:21 365:13,
15,17,18,20,25 367:5,8,
16 369:9,10,17 370:13
371:4,7 372:25 373:5,7
379:4,17 380:1,13
381:8 382:8,11,12
386:7 395:4,10 396:25
418:12,17,21,25 419:5
420:15,18,23 439:8
440:25 441:12 446:24
448:11,17 461:25

**leveling** 220:14 248:19

**levels** 310:11,13,14,20
439:12

**Leverkuhn** 212:3,8
282:9,11

**Leverkuhn's** 212:17

**lie** 219:9 220:12 246:20
248:17 390:19,21
401:18

**lied** 219:7,23 248:15
294:9 295:16 298:22
299:3,10 327:16 334:1
372:16 378:8 390:18
450:25 466:7 467:1

**lies** 298:24

**light** 263:12

**limited** 182:21 298:9

429:24

**limiting** 182:14

**lines** 233:1 252:3,8,9
291:7 376:9

**lingo** 376:17

**Lion** 443:18 445:23

**list** 386:24

**listed** 262:5 417:5
441:4,8 453:11 458:24
464:13,23,24 467:19

**listen** 406:22 448:14

**listening** 182:7

**listens** 290:9

**live** 255:11 354:3

**lives** 353:8,12 422:12

**LMAO** 244:5,6

**loads** 396:12

**locked** 243:22

**Loffing** 254:1,10

**log** 243:16

**logged** 243:18

**logic** 285:6,11

**LOL** 246:15

**long** 212:12 240:14
302:3 303:6 304:7
306:24 308:3 314:9,12
324:7 327:20 349:17
351:2 384:8 398:12,15

**longer** 225:22 423:21

**longest-standing**
212:13 282:18

**looked** 182:5 234:5
236:3 248:6 254:22
391:18 448:25 456:1
459:13

**loop** 252:16,21 412:8,
16 415:17,19,24

**lose** 204:7,15

**lost** 250:24 264:25

**lot** 186:10 191:2 232:19
233:3 240:17 274:11
295:4 311:19 321:13,19

333:4 335:14 340:4
416:10 447:3

**lots** 281:2

**loud** 189:16 263:9

**low** 324:15,18 325:8
331:18,19,23 332:4,22,
23 333:8 334:13 335:18
346:7 356:18 359:10
371:23 388:24 389:20
392:25 396:22 400:6,15
427:7,11 446:2,5,19
460:16

**low-bank** 359:9

**low-speed** 296:11
335:10 380:4 394:8
446:6 447:18 450:14,19
457:5 460:13,16 461:24
464:17 465:3,8

**lower** 338:6 339:24
420:18 439:8,11

**lowest** 239:19

**lunch** 186:13 328:7,21

**lying** 383:11

——————————

**M**

**M-C-A-S** 322:15

**M.2** 219:12 331:16

**M.2.** 219:1 331:13

**MA** 387:25

**Mach** 219:13,14,15
277:11 295:12,14 296:5
323:4,7,9,11 324:14,16,
19 325:9,13,23 327:15
330:11 331:17,18,21
332:1,4,21,25 333:17,
22 334:13,21 345:20,24
346:5,9 347:17 358:19
376:11 377:20 378:25
379:2,9,16 380:4,25
389:23 390:4,14 393:8,
15 409:23 457:4 466:2,
23

**machine** 330:2

**made** 199:6 249:9
292:10 371:4 388:23
389:1

**main** 336:5

**maintained** 450:18

**Major** 238:23

**majority** 332:19

**make** 188:18 208:17
229:13 230:13 246:14
254:17 278:22 305:23
362:2 363:10 365:12
370:9 384:4 388:20
403:15 412:24 419:11
422:22

**maker** 336:11

**makes** 205:20 312:7
421:2

**making** 287:13 370:11

**management** 301:20,
23 418:20

**manager** 306:19
342:14

**maneuver** 324:25
343:5 345:9 348:17,23
349:1,2 389:4 399:20
425:11 454:11

**Maneuvering** 207:24
222:23 277:7 322:13

**maneuvers** 326:10
379:20

**manual** 324:24 352:8
355:9,12,17 441:17
449:13

**manufacture** 233:15
307:9,10

**manufacturer** 233:16
234:3 235:9 307:8
318:20 320:20 321:1
334:17 384:3 418:25
419:5 420:3

**manufacturer's**
318:24

**manufacturers**
419:11,21 420:10

**manufactures** 308:1

**manufacturing** 308:3

**March** 182:2 206:6,21
256:10 262:9 274:17
314:15 352:20 353:6

357:21 358:4 360:23
364:20,24 372:14
388:15 430:11,14,20
431:17,25 453:6 463:22

**Mark** 204:8,9,14
212:10,14 231:8 236:2,
3 238:14 241:2 242:3
243:9 254:11 255:7,19
257:11 262:5 274:24
277:19 278:12 279:20
280:7 281:2 282:10,16,
22 283:5,8,11,19,22
284:25 290:9,18 291:7
298:18 314:22,24,25
316:15 318:8 319:4,18
320:16,18 321:3,12,18
325:16,21 327:1,19
328:4 330:12,23
334:11,19 337:5 343:25
344:6,7 353:3 354:18
360:5,20 364:5 365:9
366:16 368:1 370:20
381:20 383:6 384:22
385:3 387:8,22 388:7
389:8 390:13 391:9
393:12 394:19 398:5
402:8 404:21,22 406:12
410:15,19 411:2,7,16,
21 412:8,21 413:3,16,
23 414:12,18,22
415:17,22 417:23
418:20 421:11,21,24
422:11 429:12,19,23
430:2,15 431:7,8 432:4,
7,15,19 433:4,9,24
434:4,17 442:20 450:24
451:4 462:17,24 463:2,
6,9,25 464:24 465:9
466:24 468:5

**Mark's** 330:20 368:4
414:23

**marked** 192:11,13
194:11 195:13 196:12
407:7

**marketing** 279:22

**massive** 216:24

**material** 182:11 207:4
208:9 317:17 361:15

**materiality** 182:15,19
188:19 189:1 445:5

**materials** 191:24
197:11 298:8

**matter** 187:18 232:6,
21,24 234:12 236:2
262:21,23

**Mauricio** 360:21

**max** 184:10,11,16,17,
21 187:18,23 193:15
194:23,24 195:3 196:23
197:6,22 199:6 200:1,
13 201:22 204:3
205:11,19,22 206:11
207:6,19 209:11 211:6,
14,17 212:14 214:6,16
215:1 216:12,20 217:6,
16 222:3,4,5 223:19,20
224:15,16 229:8 271:4
280:8,12,13,17 282:1,
18,20,21 283:1,4,23,24
285:11 287:13 288:6,9
293:7 294:1 308:10,14,
15,17,23 309:1,3,6,12,
24 310:2,5 312:20,23
313:15,18,22,25 314:7,
9,13 317:9,11 319:13,
23 320:6,13 321:6
322:4,6,18 323:1,10,13,
17,25 324:5,7 325:23
326:6 327:20,25 334:24
335:8,20,22 336:4,12,
17 337:20 338:25 339:9
341:14,18,25 342:16,
21,24 344:23 346:23
353:11 354:11 360:5,8
361:2,20,23 362:1,10,
11,19,25 363:4,21
365:13,25 366:4 369:5
370:4,18 371:8,19
372:1 373:9,11,23
374:6 375:7,18 381:9,
22 382:4,8 383:19
384:5 386:6,19 395:5,8,
9,10 396:8,11,25 405:1,
11 408:9,23 412:21
414:12,18 418:21 436:2
437:6 438:25 453:3
455:4 456:23 459:5,19,
20 460:9

**MCAS** 195:3 207:25
208:2,13 218:25 219:11
222:23 246:23 247:8
249:23,25 250:1
255:10,11,18,20 256:6,
16 257:8,12,17,23
258:2,9 263:20 265:4
267:21 269:17 273:12

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 314 of 326   PageID 6545
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022              Index: Mcas's..modified

276:23 277:7 280:19
295:5,10,13 296:4,11
322:15,17,20 323:2,3,
11,14,21 324:11,14,18,
25 325:2,5,8,12,22
327:15 330:10 331:12,
20,25 332:25 333:8,16,
18,22 334:9,13,20
335:10,18 341:25
342:3,22 343:14
345:10,15,22 347:6,10,
12,16 349:8,11,15
350:8,12,13,22,24
351:5,9,21,23,25 352:2,
12,13,20 353:8,12,15,
17,19 354:3,8,16 355:1,
7,9,20,23 356:3,11,12,
15,18,21,25 357:20
358:4,8 360:9 363:25
364:4,11,20,23 365:4
370:16 371:22 376:10,
11 377:19 378:1,25
379:2,7,16,25 380:4,22,
25 381:3 386:24 387:3,
7,13,19,21 388:10,18,
24 389:2,9,14,17,20,23
390:2,3,14,16,22,24
391:19,23 392:1,2,7,11,
14,18,21 393:2,7,14,18
394:8 396:15,22 397:11
398:25 399:5,9,14,18
400:5,15,24 401:2,6,7,
13 409:19,21 410:1,8,
19,22 411:2 421:18
422:12,15 423:4,13,21
424:1,3,23 427:7,11,18
428:21 429:12 432:7
434:23 437:13,16,24
439:17,18,23,24 440:5,
9,12 441:8,12,16
443:22 444:13 446:6,7
447:15 448:3,11,17
449:1 450:8 453:6
454:4,12 456:2,20
457:13 460:8,17 462:1,
20 463:2 465:8 466:2,
23

**MCAS's** 392:24 400:12

**Mcfarlane** 194:6 195:8
196:6 197:16 208:14
220:3 231:1,3,7 233:12,
23 234:15,19,22 235:7,
15 236:1,14 237:4,22
238:6,8,11,17,19 239:1,
3 240:6,8 241:10,16,20

242:1,6,7,20,23 245:25
246:6,8 250:11,14,18,
21 251:1,8,21,25 252:2,
5,11,18 253:13,14
255:1,3 257:3 258:23
259:10,18,19 260:9,13,
18,23 261:3,11,19,24
262:1,11,14,20 263:1,4,
18 264:7,12,13 265:2,3,
19 266:8,12,17 267:11,
14,17,20,25 268:3,5,19,
22 269:8,15,22 270:15,
18 273:4,5 274:14,16
276:20,21,25 277:3
278:8,10 279:14,15
283:15,17 286:13,15
287:9,11,21 288:1
290:1,23 291:4,23
292:2,8 293:16 294:3,
10 295:3 296:14,17
297:10,15,16 298:2,14,
16 299:6,16,20,22
323:16 394:1 401:24
402:2,4,7 403:20 407:9,
11,20,22 408:6,10,17,
20 409:6,8 410:12,13
413:14 415:1,15
416:13,16 417:22
422:3,6 425:24 426:10,
14 427:19 428:3,6,16
429:6,16,18 430:23
432:3 436:14 438:7,16
440:4 444:6,12,25
445:5,9 447:7,9 448:23
451:8,12,13 452:3,7,9,
11,17,20 453:12,13
454:5,7,9,10,18,19,23
455:1,15,21,23 456:8,9,
20,22 457:2,3,19,23
458:1,11,13 459:9,11,
18,21 460:3,25 461:11,
13,15,18,21 463:13,19,
23,24 464:7,9,13,15
465:13,21 466:15
467:5,13 468:8 469:15

**MDS** 396:12

**Meaning** 283:4

**means** 219:4 247:4
248:13 259:3,5 261:17
266:3 269:2 272:1,15
331:22 353:14 357:13
376:15 423:1 451:24

**meant** 208:18 448:3

**meantime** 328:13

**measurement** 219:15

**measures** 186:9

**meet** 314:24 315:2

**meeting** 229:13 230:13
278:22 344:4 345:12,22
376:22,25 377:2,18
378:7,17 421:8,13,17
431:21,25 432:6,8,16
452:22,23 453:5
455:13,14 456:13
457:11,14,16,20 464:2,
3,22 467:6

**meetings** 317:1,2,3,4
321:11 337:8,24 352:7
404:22 405:24 407:3
414:13 432:2 452:24
460:19 461:5,23,25
462:3,7 463:7,8 465:7

**member** 344:7

**members** 185:14
312:24 313:3 317:20
343:6 383:21

**memory** 203:1 217:2
416:11

**mention** 199:5 203:5
258:6,12 323:8 328:16
378:11

**mentioned** 191:6
201:6 214:8 232:10
251:10 264:14 272:6
285:20 286:3 301:12
303:19 305:8 310:21
314:4 323:7 340:20
344:21 348:22 359:12,
16 366:6 381:3,5
397:10 403:24 407:3
419:23

**message** 198:19,22
199:13 200:4,8 201:6,
10 202:12,13,19 205:5,
6 206:5,8,20,21 207:11
209:2,3,7,10,15 210:12,
24 211:11,23 212:5,18,
23 213:7 214:1,5,12
215:11,12,19 216:6,7,
16,19,23 217:12
218:13,23,24 225:19,22
226:4,12,24 227:2,18
292:24 325:18,20 327:1

331:7

**messages** 193:19
197:8 203:6 229:21
466:19

**met** 314:25 335:14
416:18 417:1,2 431:11,
14,23 432:19

**Miami** 371:2 432:20,22

**microphone** 190:14
301:3

**mid** 446:4

**middle** 363:13

**Midwest** 304:4

**Midwestern** 190:4

**miles** 346:1,3,5

**military** 291:11

**million** 198:24 199:1
232:14,20 233:2 242:8,
9 251:15 257:25 296:2,
9

**millions** 204:9,13
340:16

**Milwaukee** 304:1

**mind** 188:16 243:3

**minimize** 206:11 285:6

**minimum** 200:17
382:11

**minute** 466:12,21

**minutes** 300:20 344:21
351:3 402:1

**mispronounce** 458:20

**missed** 464:17 465:7

**missing** 329:1

**Misstates** 294:10

**Misstating** 208:14

**mistaken** 293:25

**mister** 246:16

**model** 284:2,3

**models** 287:15,17,19
288:3,5,24 419:12

**modified** 309:18

**module** 207:1,3,9 274:21 275:4,5,11,16, 18,25 276:4,5,10,13,15, 18 340:4 361:12,14

**moment** 292:2 296:20 451:15 463:14

**money** 229:13 230:13 278:22 292:10 340:1

**monitoring** 285:9

**month** 340:24

**months** 215:14 221:15 380:11,14,16 391:1

**Montreal** 375:10,13,15, 18,24 377:11

**morning** 186:17 189:10,21,22 231:5,6 278:2 300:21,22 468:25 469:4,17

**morning's** 184:9

**motion** 185:6

**motive** 234:16,20,22

**mountain** 233:6

**move** 235:1 266:12 267:11 279:14 296:20 299:17,21 429:7 432:17

**moved** 375:3

**moves** 237:22 241:10, 12 260:9 269:9

**movie** 274:7,8

**movies** 274:11

**moving** 468:20

**multinational** 234:8 235:9

**multipage** 202:14 205:7 206:7 216:14

**mutual** 321:1 337:25 339:7 373:15

---

**N**

**N2** 285:8

**naiveté** 189:2

**named** 203:20 212:2 213:16 226:16

**names** 262:3

**narrow-body** 308:2

**narrowed** 259:1

**native** 240:12,20

**nature** 190:12 284:10

**Naw** 243:21

**needed** 350:12 351:8 362:5 364:15 365:4 390:5 422:20 453:20

**negligence** 189:2

**negotiate** 285:19 286:1,2

**newer** 310:5

**news** 184:9,19 187:14, 20 212:10 282:10,16 328:14,16 468:18

**NG** 200:13 201:21 205:11,18,22 206:11 207:6,19 211:18 222:5 229:8 271:4 277:8 280:1 287:14 288:6,9 308:10,11,16 309:23 310:5 341:22 342:16 362:5 369:4 386:6,20 395:10 396:10 400:23 436:2 438:23 439:1,14, 19 440:13,16

**Nice** 246:17

**night** 243:24 469:3

**nodding** 350:21

**Nonetheless** 363:24

**nonfinancial** 201:17

**normal** 244:13 256:19 257:10 258:16,19 259:4,14 277:14,16 285:7 320:19,23 323:14,22 332:2,3 333:14,20 337:23 346:19,20,22 347:7,10, 14 350:13 351:12,24 355:3 357:9 358:6,9,21 360:10 365:1 368:5 380:7 388:10,12,22 389:10,24 390:17 392:4,15 393:19 399:20 409:22 422:25 424:13, 14,18,20 426:3,8,15,18,

19,24 427:8,12 428:23 429:12,20 441:21 442:3,7,9,16,23 443:1, 8,10 446:10,17 449:4

**North** 307:14

**nose** 322:21,22,23

**nose-down** 277:12 456:24

**notation** 237:8

**note** 187:12

**noted** 222:17

**notice** 239:8

**notifications** 328:14

**notify** 414:23

**noting** 295:13

**November** 215:10,14 216:7 217:14 218:4 221:15 228:17 243:3 284:25 286:11,12,16, 18,25 287:1,2 295:10 326:24 330:7,19,22 331:2 333:15 334:5,23 335:12,13 372:8 373:3 374:3,17 375:7,16 376:19 378:24 380:12 382:19 383:9,21 384:17 385:5 388:17 398:11 432:19 445:13,20 449:20 466:3

**number** 192:12 201:16, 18 205:7 232:16,22 239:24 240:3,21 257:19 259:23,24 292:9 294:4 295:18 323:7 345:20 352:7 354:12 407:8 409:23 433:24 441:5 452:12 454:9 455:5 464:14

**numbers** 266:21 269:2 277:11 451:24

**numerous** 299:9 413:23

---

**O**

**O'NEILL** 189:13,20 191:19,22 194:3,10 195:7,11 196:5,10

197:14,20 198:3,6,11, 13,18,20 199:16,19 200:3,5,20,22 202:6,8 203:9,11 204:17,19,23 205:1,24 206:1,14,16 207:13,16,20,22 208:5, 8,19,22 209:19,21 210:15,17 211:9,12 212:5,7,15,16 213:1,3 214:21,23 215:3,5,25 216:2,16,18 217:19,21, 25 218:2,15,19 220:10 221:7,9 222:11,15 223:2,4,9,11 224:1,3,23 225:1,18,21 226:19,22 227:14,19 228:5,7,20, 23 229:24 230:1,24 233:8,18 234:14 235:1, 6,12,23 236:10,22 237:1,24 241:13 245:23 250:9 256:21 258:21,25 261:10 263:5,10,17 264:5,10,16 267:13,22 269:11 279:11 287:5,20 289:25 290:22 291:22 292:5,7,13,16,22 293:1 294:16,19,21,24 295:2 296:13 297:2 298:7,13, 23

**oath** 189:15 300:7

**object** 183:6,8 236:22 245:23 250:9 263:5,10, 15 267:23 269:14 298:7 455:11

**objection** 184:24 194:6 195:8 196:6 197:16 208:14 220:3 233:8,18 234:14 235:3,12,23 236:10 237:24 241:13 256:21 258:21 259:9 261:10 264:5,11,16 267:13 269:11 279:11 287:5,20 289:25 290:22 291:22 294:10 297:2 298:23 300:12 323:16 394:1 408:13 413:7 417:20 436:6 439:20 444:4 452:13 458:7 466:15

**objects** 269:12

**observe** 285:8

**obtain** 192:4,7 194:21 195:24 197:8 201:21

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 316 of 326   PageID 6547
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Index: obtained..PCP

273:10

**obtained** 192:8 232:8, 10,19 237:19 294:4

**obtaining** 205:21

**occasion** 412:17 415:18

**Occasionally** 412:18, 20 436:11

**occasions** 413:2,5,15 415:17 430:6

**occur** 205:23 370:9

**occurred** 447:24

**occurring** 450:2

**October** 239:22 307:2 324:4 327:5,23 398:13, 15,21 430:9 443:15 445:24 449:16 457:22 458:16 459:3 460:5 467:6

**OEM** 419:4

**offenses** 188:13

**offer** 194:3 195:7 196:5 197:14 298:3 300:11 408:11 445:1 452:5 458:6 459:21

**offers** 455:9

**office** 190:4,7,8,25 243:20 304:2 306:18, 20,24 315:18 317:4,21 321:10 342:9 349:22 362:22,23,25 363:3,9 404:7,15

**officer** 303:17 328:24 415:5,11 469:5

**offices** 306:9

**official** 267:14 269:9,16 297:24 299:10 408:11 455:7,16 461:3

**oftentimes** 298:22 412:8

**OIG** 190:9,18 231:10

**one-propeller** 302:13

**open** 337:19

**opening** 182:7

**operable** 332:1

**operate** 217:5 323:2, 11,14,21 325:8 332:1,4 333:16 345:20,23 347:13 349:8 350:25 351:5,16 353:18 356:18 364:13 373:23 388:24 389:2 396:22 401:7

**operated** 325:5 333:9 354:16 356:15 364:11

**operates** 258:13 295:11 346:19 347:6 355:3 357:9 358:6,9,20 360:10 389:20 390:22 400:15 422:24 424:12

**operating** 256:20 257:10 258:16,20 259:4,14 277:15,16 324:24 333:14 346:19, 20,22 347:7 350:14 351:12 352:8 355:3,9, 12 357:9 358:7,9,21 360:10 365:1 388:10, 12,22 389:10,14,24 390:17 392:5,16,25 393:20 399:20 409:22 422:25 424:4,13,14,18 426:3,8,15,18,24 427:8, 12 428:23 429:13,20 441:21 442:3,8,9,16,23 443:1,11 446:17 449:4

**operation** 354:8 357:14,20 379:7 380:7 399:19 401:21

**operational** 345:15 409:21

**operations** 190:12 281:13 304:1 305:16

**operative** 333:7

**operators** 375:21

**opinion** 201:18 249:20 289:3,6

**opportunities** 316:3

**opportunity** 370:10 379:10,23 390:23

**opposed** 381:25

**Ops** 282:1

**order** 312:17 347:19

359:2 360:7 406:18 411:19

**ordered** 328:7

**ordinary** 442:21

**original** 447:14 448:7

**outlined** 310:16

**outlines** 367:15

**overly** 268:13

**overnight** 340:11

**overruled** 220:7 233:9, 19 236:11 237:3 238:3 245:24 256:23 268:1 269:18 294:12 299:1 394:3 436:8 439:22 444:8

**oversight** 304:4 313:4 321:24 363:23 404:3,15 453:22

**overview** 344:24 345:10 456:21

———

**P**

**p.m.** 202:16 204:3 206:8 212:3 218:18 219:11,22 243:9 328:23 466:3,5 469:18

**pages** 218:15 232:14 242:8 294:25 296:2,9 452:9

**paid** 246:19

**Palacio** 360:21

**paper** 310:16 440:20 441:2

**papers** 338:21

**paragraph** 262:12 281:7 368:15 369:12 372:19 417:5 428:11

**paragraphs** 285:2

**parameters** 421:18 425:17

**pardon** 203:2

**parentheses** 200:18 201:21

**parking** 333:4

**part** 183:8 189:3 191:7, 16 201:9 202:15 205:16 208:3 211:20 218:21 250:1 260:7 275:21 277:2 281:1,10 297:25 305:13 306:21 315:13 343:17 354:18 357:5 368:25 370:5 372:5 384:24 386:11 404:2,11 405:19 435:22,23 439:24 440:19

**participant** 329:1

**participants** 187:11 312:25 313:7 326:25

**participating** 350:17

**parts** 225:12 243:1 286:8 400:1

**Pass** 465:13

**passed** 211:16 266:4 440:14

**passenger** 323:14,22 333:19,20,23 347:14 348:8,19 349:12 351:24 380:5 389:2,17 393:3

**passengers** 346:24 348:12

**past** 279:25 436:19

**path** 190:22

**Patrice** 453:15,17 458:20 460:5 463:11

**Patrick** 227:22 330:20

**Patrik** 242:10,13 284:16,19 291:8,9 325:21 327:2 330:13,14 360:22 383:6 384:22 385:3

**Pause** 245:7 247:1

**pay** 204:11 238:20,24 239:5,21 240:1 241:5,7 242:2

**payment** 241:22 242:3

**Payton** 238:9 239:2 261:1 263:4 286:13 422:5

**PCP** 367:4

**pdf** 344:15

**penalties** 205:23
293:25

**penalty** 198:25 199:1
200:16,19 271:11 272:6

**pending** 211:20 281:9
335:2 365:20,22 369:15

**peons** 290:10

**people** 186:10,13,21
187:8 205:8 246:11
252:23 264:21 265:10,
25 266:2,3 279:22
281:2 309:7,9,10
312:22 313:2,5 318:2
321:20 322:1 360:19
362:18,21,24 372:9
402:15,19,22 403:22
404:17 405:23 406:4,7,
10 414:3

**percent** 285:9

**perfect** 290:12 343:18

**period** 242:2

**periodically** 189:7

**periods** 241:5

**Perkins** 255:9 353:4
383:5 384:21,24

**permission** 422:20

**permit** 182:21

**person** 335:15 336:8,
10 370:25 371:2

**personnel** 463:12
464:4

**perspective** 205:18
318:7 342:12 377:3
428:10

**pertaining** 190:11

**pertains** 195:3

**pertinent** 253:17
298:11

**phase** 332:6,10,13,18
346:4

**phone** 253:16,17,21
254:10 335:15 336:9
370:25 406:3

**phrase** 259:12 277:16,
19 291:13 346:20 420:1

**physically** 337:11

**picture** 455:3 462:21

**piece** 310:15

**pilot** 213:21 214:1
244:25 259:7 282:3
283:20,23 284:4,20
289:23 293:10 302:1,2,
3,23 304:19,22 305:17
307:21 309:13,16,18,
22,25 310:2,16 312:20
313:7 315:20 316:9,25
317:12,15,24 318:13,
15,23 319:5 326:3,10
330:20 332:17,19 333:6
334:18 335:5 336:12
338:20 340:23 343:4
344:6 348:8,19 350:2,
10,12 351:17,25 352:17
357:17,24 358:2 359:11
364:19 367:25 368:25
374:23 379:8,9,21
382:2 398:22 408:22
410:15 423:15,22
435:3,10 436:3 437:1,
25 443:12 446:13
450:10

**pilots** 252:15,21,22,23,
25 303:5 304:15,17
310:8 311:25 312:5,8,
16,25 313:3,8 321:11
340:9,20 341:13,20,22
342:15 351:8,13
355:13,18 358:21,25
359:12,16 364:7 365:4
371:14 386:20 397:2,3,
6 399:6,10,13,18 401:2,
13 403:12,13,25 404:19
405:2 425:9 435:9,20,
21 438:21 440:15
441:17 449:11

**pinpoint** 266:6

**pitch** 280:16 302:10
343:3 359:10

**place** 187:22 239:9
250:24 462:6,9

**placeholder** 452:22
453:5

**plan** 199:5 209:16
280:4 317:19 368:25

**plane** 185:7 188:8,9
220:15 244:20 248:20
284:1 319:12 320:21
322:21,23,24 332:3,21
346:4,9 348:4 349:5
404:20,25 405:1,7,11
408:9 411:11 412:21
413:3,17,24 414:12,18
418:16,24 419:4 421:3
425:20 426:9 435:10,
15,16 436:1 437:2
438:12,22,25 439:14
440:6 453:3 455:4
462:1,16

**planes** 302:5,13 304:24
305:2 421:2 439:6

**planet** 201:22 273:20,
21,25 274:3,5

**planning** 375:6

**plans** 229:14 230:15
278:23 344:11

**plead** 234:12

**pleadings** 182:6

**pleasantries** 186:20,
21 187:4

**plenty** 358:1

**point** 184:4 219:6
263:21,22 265:5 266:11
286:19 287:8 296:14
302:16 303:19 315:22
318:20 319:2 323:10,20
331:10 346:15 351:21
387:6 397:17 460:13
465:24

**pointed** 379:3

**points** 211:8

**pole** 210:5

**policy** 313:5,6

**politely** 186:16

**political** 446:25

**populated** 329:18

**portion** 198:19 209:15,
25 211:14 215:19
216:17,23 228:21 229:5
277:6 292:15,24 352:24
391:23 445:13,15

**453:19**

**portions** 262:24
294:25 406:16

**pose** 362:3

**posed** 208:10

**poses** 207:4 361:15

**position** 190:14 213:21
214:1,2,3,9,15 254:6
283:20 284:3,7,10
293:11 317:10 318:9,14

**possibility** 336:15
337:20

**post** 431:20

**post-meeting** 431:1

**potential** 205:10

**pounds** 304:18

**Powerpoint** 390:1

**practice** 368:5

**Pratt** 408:23 409:18
410:8 421:12

**precautions** 447:19,21

**preliminary** 187:16

**premarked** 236:16
266:19 268:24 454:20

**prescription** 248:14

**presence** 456:12,16

**present** 229:18 230:21
321:14 432:8,10 462:24
463:2

**presentation** 314:13
324:23 342:7,9,11,18,
23 343:7 344:20 349:7,
14,17,20,24 350:8
351:4 352:10 388:14
389:8 408:8,21,24
409:1,2,10,17,19 410:4,
14,18 411:1 421:8
454:21 455:2,13
456:10,16 458:4,6,19
459:3,13 460:5,11
461:2 462:21 464:10,16

**presentations** 321:14
344:4,16 406:1 407:4,5
411:6 455:4,25 458:8
462:14

**presented** 215:21

UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022              Index: presenter..rampant

285:15

**presenter** 421:10,13

**presenting** 343:9,11

**presents** 462:17

**preserve** 206:11

**pressure** 246:11

**pretend** 186:19

**pretty** 245:2,4,9 278:16
375:4

**previous** 369:12 432:2

**previously** 193:8
194:15 195:22 196:13

**primary** 203:3 232:1
462:12,15

**prime** 200:12 271:3

**principal** 303:25

**prior** 263:12,14 285:4,
18 289:6,14 290:15
360:5 370:5 379:7
430:5

**probative** 182:13

**problem** 261:22 265:2
458:11

**proceduralizes**
290:15

**procedures** 290:11

**proceed** 185:25 246:9
250:11 252:2,5

**proceedings** 469:18

**process** 337:6 338:3,5,
8 402:10,15 403:5
404:18 406:16 433:22
440:19 467:25

**PROD** 259:25 266:23
269:2

**produce** 344:10

**produced** 260:1
266:24 269:3 297:19
444:23

**professional** 312:16
339:8

**program** 200:12 203:4
206:10 209:17 212:14,

22 216:25 217:9 271:3,
7 275:22 280:5,7,8,9,
10,12,13 282:5,19,20,
21,22 283:1 290:14
342:14 382:10

**programs** 190:11

**project** 210:2,7,9
292:18

**promoted** 306:14,15,
23

**promotion** 284:7,8

**pronounce** 330:17

**pronounced** 453:17

**proposal** 317:20 339:7
355:24 466:25

**proposed** 352:9
355:10 387:21 468:5

**proposes** 318:20

**proposing** 388:8

**proprietary** 240:25

**prosecutors** 232:24
416:9,18 417:12 431:12

**protect** 199:7

**Protecting** 203:2

**proved** 188:12

**provide** 211:24 301:10
319:19,20 320:20
321:2,24 411:22,25
412:3 417:25 466:24

**provided** 193:8 194:15
195:22 196:13 251:14,
18 276:13 304:4 305:17
322:5 324:23 325:4
335:1 358:18 365:8
458:5 461:4

**providing** 313:4
317:16

**provision** 272:5

**provisional** 211:20,24
214:25 215:15,20
216:10 281:3,8,9,12
282:7 285:14 286:4,20
293:6 335:1 365:13,15,
20,24 366:2 367:5,15
368:22 369:15,19
370:13 371:4 373:7

378:22 379:4 461:25

**provisionally** 368:23

**provisions** 293:17,21

**public** 301:11,12
320:11 326:4

**publication** 380:20

**publicized** 325:19

**publish** 198:4 199:17
200:21 202:7 203:10
204:23 205:24 206:15
208:20 209:20 210:15
213:1 215:3 216:1
217:19 221:7 223:9
224:2 225:10,18 228:5
238:8 260:24 408:18

**published** 223:24
224:21 395:4 396:9

**publishes** 381:11

**pull** 210:3 226:20
229:25 241:20 242:20
246:6 254:16 255:1
261:1 270:15 292:13,19
294:19,24 313:1 326:21
329:13 360:14 367:12
368:15 376:4,5 378:3,
13,15,22 384:13 385:24
391:23 422:3 463:17
465:15 467:9

**pulled** 242:25

**pulling** 347:18 348:14

**pulls** 438:13

**punch** 438:12

**Pupo** 248:8,10

**purchase** 195:19

**purely** 446:25

**purpose** 182:17,21
235:5 342:11,13 377:2

**purposes** 310:2

**pursuant** 187:11

**push** 322:22 328:14

**pushed** 311:12 322:23
348:15,16

**put** 245:8 246:11 280:3
292:19 293:13 300:3

312:17 329:15 371:13,
14 387:3 440:24 452:18
466:13

_____

**Q**

**qualification** 368:25

**qualify** 303:1 336:17
337:24 418:16

**qualities** 362:4 408:23
436:23,24 437:1,6
454:4

**quantitative** 371:15

**question** 220:8 235:4
250:10,15,18 252:8
256:24 262:13 263:1
264:24,25 265:6,17
272:20 276:19 277:2
287:6,24 291:3 297:3
298:15 299:4,19,23
307:17 354:15 356:14
359:14 364:21 403:17
404:9,23 406:22 413:8,
9,12 419:2 423:16
424:5,6 425:12 426:8
427:15 428:2 429:2
430:20 431:10,17,23
440:1,8 448:14 456:14
457:12,15 466:16

**questions** 262:18
263:11 270:8 292:4,9,
11 293:17,18 294:4,6
295:4,6,18,20,24
401:23 429:4,5 451:17
458:9 463:15 465:21
467:5,7 468:7

**queue** 285:9

**quick** 401:24

**quickly** 463:21 464:8

**quit** 246:14

_____

**R**

**raise** 300:6 336:14
337:9 338:13

**raised** 336:18,20
338:14 374:9

**rampant** 219:1,17
246:24 247:2,7,9,18

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 319 of 326   PageID 6550
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022              Index: range..regulatory

**range** 345:20 350:14
409:23 423:21

**ranged** 240:1

**rate** 238:20,24 239:13,
21

**rates** 239:5,8,14 241:5

**rating** 211:18 222:4
304:14,17,20 305:19
310:7 395:9 439:10

**ratings** 304:25 305:6

**rattle** 305:1

**RCAS** 201:21 273:10,
12,14 280:14,19,23

**re-evaluated** 434:23

**re-evaluating** 435:2

**reach** 363:24 364:3

**reached** 364:6

**reaching** 283:19

**react** 371:3

**reaction** 327:24

**read** 218:20 228:24
229:3 238:21 240:3
243:1,2 250:12,16,23
251:3,4 255:5 277:5
279:17,20 281:1,7
284:23 285:2 286:8
287:3 288:25 289:1
328:16 345:19 346:18
357:6 368:19 369:25
383:14 399:25 400:2,21
417:7 428:10

**reading** 243:8 250:11
251:22 252:5 279:23
361:16 378:19

**reads** 250:19

**ready** 189:11 296:22
297:11 328:19 375:20
407:23,25 428:17
447:10,11 451:16 469:9

**real** 245:5 246:1 375:25

**realistic** 375:4,5

**realms** 313:4

**reask** 414:16

**reason** 182:14 187:10
358:3,17 389:16,19
392:13 393:7 399:9,17
401:1 426:5 442:2

**reasonable** 188:12

**reasoning** 443:7

**reasons** 356:24

**recall** 208:16 232:21
240:10 248:6 255:5
256:7,8 257:5,8 268:14
273:7 274:18 278:11
283:20 292:10 293:2,18
295:6,20 297:7 392:3
393:18 408:25 409:9
410:21,25 411:3,19
416:7,8 417:15,16
427:9,14,16,21,22
429:14 431:4,5,8
432:20 434:8 446:25
447:2 448:19 449:5
451:2 454:15 456:3,12,
13 457:14 460:19 462:2
463:8 464:1,3,11 467:7

**recalled** 422:7

**receipt** 282:6

**receive** 295:5 304:20
310:6,8,16 319:24
320:5,12 341:1,22
342:2,5 352:11 358:25
359:1 405:1,6,10,17,22
406:9 414:17

**received** 193:25 195:5
196:3 197:12 232:13
233:2,3 237:12 238:21
239:6,19 240:17,20
242:3 251:12 260:7,14
266:24 267:8 269:6
286:19 297:20,25
345:11 365:5 387:14
407:6,13 414:11,21
451:25 458:2,3 461:4

**receiving** 240:11

**recess** 278:5 328:23
415:9

**reciprocating** 302:15

**recognize** 259:20
266:20 267:2 269:25
297:17 343:21 345:5
366:13 383:2 384:16
386:2 407:15,17,18

408:2,4 409:2 459:7

**recognizing** 297:13

**recollection** 409:4
416:17,21,25 428:11,20
432:6 444:20 447:12
455:12

**record** 189:24 192:9
260:13,16 267:15,16
279:1 300:24 316:19
329:3 408:12 429:16
445:1 452:3 455:8,16,
17

**records** 232:19 234:5
253:16,17,21 254:9,10,
14 269:10,16 297:18,24
298:17 438:11,15,17
458:3 461:3

**recover** 332:12,16
359:2,11

**recovered** 258:1

**RECROSS-
EXAMINATION**
296:16

**red** 337:9,12,14 417:5

**redaction** 185:21

**redactions** 185:24

**redirect** 292:6 298:9,24
465:16

**redo** 326:9

**reevaluate** 390:5
393:16

**refer** 214:5 216:12
219:12 229:21 230:10
245:10 255:13 260:3
275:11 276:22 425:9

**reference** 200:1
209:11 255:17 272:11
274:6,11 276:12,23
355:9 388:18 389:25
422:15 430:18

**referenced** 208:3
222:24 227:2 276:2
288:7,24 327:4

**references** 207:8
219:16 226:17 288:14
355:1 427:23

**referencing** 239:22
274:8 392:3 432:16

**referred** 244:17 443:15
445:13

**referred-to** 408:15
452:15 455:19 460:1
461:19

**referring** 220:1 227:25
230:4,17 245:16 246:3
247:11,17,24 249:17
250:5 252:21 253:4,8,
12 263:2 280:8,9
285:21 288:22 289:8
291:20 358:11,13
419:13,14 427:9,13
431:21 448:21

**refers** 244:8 261:8,20
271:8,12 275:5,12
276:4,10 279:1,8
282:21

**reflect** 316:19 417:19

**reflected** 223:6 271:17

**refresh** 409:3 416:11,
17,21,25 428:11,20
444:19 447:12

**regard** 230:19 290:11

**regime** 331:24

**Regional** 190:4

**regulation** 320:25
353:17 360:3,4,7
382:15 419:13,24,25

**regulations** 304:6,20
314:19 326:11 336:24
348:25 363:19 402:18
419:10 435:22,23

**regulator** 220:4 321:2
334:4 373:2 374:5

**regulators** 215:22
217:2,13,15 219:7,21,
23 220:1 248:16 280:3
285:10,13,15 294:9
295:15,16 321:14
327:16 330:11 334:1
372:24 378:8 383:11
466:7 467:2

**regulators'** 372:16

**regulatory** 453:22

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 320 of 326   PageID 6551
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                Index: relate..row

**relate** 197:6

**related** 234:5 280:23 283:19 420:11 459:5,19

**relates** 182:18 188:15

**relating** 191:1

**relationship** 233:25

**released** 282:6

**relevance** 233:8 234:14 235:23 267:24 269:14 298:24 445:3 452:8

**relevancy** 267:13

**relevant** 182:10,19 234:15,20,22 267:19 269:16

**relied** 319:18 321:3 334:11 411:21 466:24

**rely** 320:15,19 334:9,16 411:25

**remember** 188:22,25 189:5 215:20 227:22 228:3 235:3 285:14 293:21 294:5,12 295:23 328:13 411:4 421:9,13 431:19 432:1 445:16 457:11 461:5 468:16,23

**remembered** 291:9 411:1

**remind** 313:11

**reminded** 410:5

**reminding** 256:18

**reminds** 216:9

**remove** 355:8,23 356:3,25 358:4 381:4 387:7 441:16,19 442:20,22,25 443:3

**removed** 356:12 358:8 396:18,21

**removing** 255:17 354:25 355:20 356:10 422:14

**rent** 341:7

**repeat** 189:6 229:2 247:15 264:23,25 265:2 287:24 307:17 359:14

**repeated** 448:8

**repeatedly** 448:5,6

**rephrase** 247:15 257:4

**replica** 375:1

**replies** 212:3 282:22

**reply** 225:15

**replying** 385:14

**report** 187:14,22 221:20,25 222:3,5,7,12, 16,25 223:7,19,24 224:14,21 225:3 377:5 380:20 381:3,6,8,11,17, 22 382:3,6,20 383:16, 19 384:3 385:6,13 387:3,7,14 390:24 392:11,21 395:1,4,7,8, 13,17,23,24 434:6,8,10, 14,19

**reported** 445:8

**reporter** 425:25

**reports** 184:19,20 187:16 245:17,18,21 337:17 384:2

**represent** 231:7 427:5, 6 460:20

**represented** 428:22 429:19 463:25

**representing** 402:8

**represents** 205:21

**request** 184:13 185:6 192:9 280:16 284:6 387:18 390:13 391:25 418:25 419:5 443:8

**requested** 353:14,19 356:12 366:25 454:3,13 456:12,16

**requesting** 387:22 391:16 392:2 458:5

**requests** 232:11

**require** 310:24 348:25 362:7 364:9 382:3 420:23 449:22

**required** 280:2 305:19 306:2 310:7 326:10,11

**requirement** 347:25 360:7 453:19

**requirements** 285:5 307:22 312:5 317:18 318:21 333:4 363:7,23 382:6

**requires** 310:18,23 311:19 340:14 382:8

**requiring** 211:18

**reserve** 182:23

**resident** 402:24

**resources** 321:7,17, 21,22 405:21

**respect** 185:24 219:21 227:10 276:1,7 295:15 307:15,19 355:7 381:2

**respond** 220:13,19,24 226:9 230:19 406:22

**responded** 219:3,6 246:21,23 248:15,17,19 249:1 282:10

**responding** 198:21 202:18

**responds** 219:8 220:14,20,25 243:18,21 244:11,12,24 245:1,3 246:13,15,16 248:24 252:15

**response** 204:6 264:6 336:23 384:6,9 385:7 439:15

**responsibility** 363:5, 23 414:23 462:10

**responsible** 317:16 354:13 363:12,14 402:17 403:2 404:3,7

**result** 420:15

**resulted** 359:22

**results** 200:16 262:13

**reversed** 290:14

**review** 191:24 197:24 201:25 206:23 207:2 214:24 221:3 222:20,23 225:5 245:8 272:5 274:22 277:23 290:24 293:23 294:8 361:13 383:24 385:14 395:15 407:19 451:15

**reviewed** 253:16 258:6 271:15 272:22,24 273:6 298:18,20,21 400:1

**reviewing** 182:7 232:6 233:6,25 245:20 274:3, 10 298:17,21

**Revision** 395:23

**ride** 432:25 433:5

**ridicule** 227:23 228:4 291:10,13

**right-hand** 237:7 259:22 266:20 297:18

**ring** 257:21

**rise** 328:22,24 415:5, 11,13 469:5

**risk** 201:4 212:14 215:23 282:18 285:17 287:14 288:16,20,23 373:24

**road** 340:11

**robust** 371:13

**role** 190:22 227:9 284:19 290:3 307:15,19 309:3 330:21 373:8,17 381:13

**Roman** 229:15 230:15 278:24 279:4,8,12

**room** 243:22 337:15 342:7 381:16

**Ross** 203:20 278:13,19 279:8 291:8 343:24 344:5,6 360:21 366:17, 21,23,24 383:6 384:23 391:10

**rotation** 426:20,21

**Roughly** 372:17 392:12

**row** 207:21 239:18,20, 21

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 321 of 326   PageID 6552
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Index: rude..sir

**rude** 185:17

**rule** 183:3 184:3,5
203:3 250:22 251:22
419:18

**ruled** 263:15

**rules** 314:19

**ruling** 183:1 263:7
298:10

**rulings** 263:12,14

**runaway** 450:1,5

**running** 219:1,17
246:24 247:2,7,8,17

**Ryanair** 246:10

**RYR** 244:25

———————————

**S**

**s-i-m** 219:17

**S-T-A-C-E-Y** 300:25
301:4

**sad** 328:1 465:4,6

**safe** 301:11 320:11
326:4 363:11,13

**safely** 310:9 312:6
359:11 374:25

**safer** 419:12 421:3

**safety** 287:18 301:10,
12 334:18 338:1 420:9
447:19,21

**sake** 431:3

**salary** 236:3,9,12,13,15
292:10

**sales** 199:2 200:17
246:18,19 271:18
279:22

**Samantha** 464:4

**sandwiches** 328:7,8

**sarcasm** 227:23 228:4
291:10,13

**sat** 312:22 378:6

**save** 339:25

**SB** 206:23

**scenario** 335:9 389:14
437:16

**schedule** 243:19

**scheduled** 340:25

**scheme** 269:13

**science** 301:19,21

**scope** 236:23,24 237:1,
2 245:23 269:13 298:8,
23

**Scott** 360:20 361:18

**screen** 198:5,7 242:21
243:13 250:25 329:19
361:8 452:18 455:22

**scrutinized** 205:19

**scrutiny** 361:22,24,25

**Sean** 287:3

**seat** 300:9 348:15

**seated** 182:4 186:7
278:7 328:25 415:7,14
469:7

**Seattle** 304:10,13
305:8 306:10,25 307:1,
13 317:22 342:6 349:22
362:23,24 381:12 396:1
432:23

**secondary** 462:11

**section** 222:14 257:7
386:17,18 400:24

**SECURITY** 328:24
415:5,11 469:5

**segment** 340:23

**selected** 232:24

**self-serving** 298:13

**sell** 308:17

**send** 224:18 280:16
368:5 382:19 383:20
462:5,9,10

**sending** 196:23 224:12
281:11 368:2

**sentence** 271:3 287:10
353:25 354:23 357:5
361:5 369:20,23,25
372:21 373:20 383:15
385:10 399:2 400:19

**sentences** 368:20

**separate** 234:4 244:20
280:19

**September** 199:24
416:9,19 417:1,2,11
430:8

**series** 192:11,13 193:7,
21

**served** 291:11,16

**serving** 190:19 191:4

**set** 283:1,3,4 305:25
312:20 313:21,24 314:8
322:2,3,4 323:25 324:2,
7 327:20,23 380:13
412:7 418:9,21

**share** 325:22 331:1,9
384:2 416:4 417:13

**shared** 315:18

**Sheet** 261:5,7,8,9,17,
20,23 262:16

**shifting** 335:20 341:24

**shirt** 316:15

**shocked** 328:1

**shocker** 218:25 219:11
221:16 228:17 246:23
372:15 380:12 383:10
385:16 392:9 393:6
466:1

**short** 190:9 207:25
305:11

**shortly** 432:25

**shoulder** 397:10

**shoulders** 204:8

**show** 182:10 407:7
427:13,22 431:3 455:21

**showed** 459:2

**showing** 262:23
326:19 352:22 366:8
382:22 391:2

**shows** 221:1 251:6

**shy** 300:20

**sic** 211:7 372:14

**side** 226:21 227:16,17

229:25 318:24 348:16
364:4

**sidebar** 238:2 445:8

**sign** 186:23 468:14

**signature** 226:23
227:6,17 289:4

**signed** 245:4,14 366:21
367:2 368:12

**significance** 390:15
393:17

**significant** 211:21
281:10 365:21,23 366:3
369:16 370:3,7,12,18
379:3

**sim** 219:1,17,18 220:18
244:13,17 246:24
247:3,7,18 248:24
340:18 376:15,18
432:18,25 433:5

**similar** 200:19 207:5
459:1 460:11

**simple** 431:11

**simply** 310:15

**simulate** 375:3

**simulator** 219:19
244:18 245:12,13 247:2
249:24,25 250:2,3
291:21 310:19 311:1,
13,18,20,23 326:18
340:2,5,7,13,16,21
341:4,7,18 359:1,7,19
360:6 374:18,21,22
375:7,11,12,15,18,19,
25 376:14,18 377:10
379:22 382:16,18
397:6,11 399:16
433:10,11,14,18,24
434:4,13,18 435:17,18
449:22

**simulators** 341:13,19
433:19

**single** 296:10 318:19
319:2 431:4

**sir** 190:2,13 193:20
194:14 195:15 198:23
199:10 200:25 201:12
202:11,20 203:14,21
204:1 205:4 207:10

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 322 of 326   PageID 6553
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                    Index: sit..states

208:1 210:20 212:4
217:24 221:6,17 222:22
223:1 224:6,22 225:11
226:8,11 228:9 229:2,
23 239:8 292:21 293:4,
15 295:25 296:12 305:7
307:24 309:15 310:3
311:9,14 312:13 313:23
316:5 320:7 321:8
322:7,14 324:3,17
327:9 330:9,15 332:8
333:1 334:3 336:3
342:10 345:13 356:1
357:22 395:2 396:16

**sit** 376:20

**sitting** 235:16,21
316:13,15,17

**sky** 303:15 332:22,23
346:7,8 348:4,6,7,9
363:14

**Skyway** 303:9,11,16
305:3

**slam** 337:14

**slide** 345:11 347:6
410:9

**slow** 305:20 324:15

**small** 202:25 277:10
302:12,14

**smaller** 212:18,21
302:10

**socialized** 285:11

**software** 331:22
333:13 447:14,15,17,
20,22 448:7,8,13

**sold** 217:2,11 339:11,
21 372:24 373:9

**sole** 406:20

**solely** 319:18

**sort** 240:14 244:21
279:4 282:11 287:17
310:7 364:9 418:21
419:18 424:14 425:10,
25 441:16 455:2

**sounds** 266:10

**source** 462:12,15

**sources** 404:18

**Southern** 301:17,20

**Southwest** 194:20,22
195:5,20 197:4 198:1
199:15 200:7,8,11
201:11,20,25 224:9,12,
18 232:9 271:12,15
289:11,15 293:17
301:16 308:21 312:9
339:16 340:1 341:12
382:4,9 397:1,20,24
398:22 399:10

**Southwest's** 271:17

**speak** 189:16 190:13
263:9 301:2 322:1
337:3 349:15,17 411:2
413:1 421:22

**speaking** 192:7,9
194:23 195:18 196:20
264:7 301:9 304:3
313:1 314:16 322:20
341:3 403:21 421:13

**speaks** 400:16

**special** 190:19,20,24
191:23 193:10 194:11
195:12,24 196:11
197:21 198:8,21 199:8
200:6,23 201:23 204:20
207:17,23 208:23 212:2
213:25 214:24 216:3
217:22 218:20 221:3
222:16 223:5 224:4
225:2 227:20 228:24
230:2 231:10 292:8,17
293:2 295:3 296:1,7

**specialist** 402:24

**specialties** 402:16

**specific** 252:8 265:14
287:5 297:3 317:25

**specifically** 199:6
272:5,15,22 323:5
399:5,10 428:9

**specifications** 411:11

**specs** 453:2

**speculate** 259:6,9
288:17

**speculation** 220:3
287:20 290:22 394:2

**speed** 219:4,15 248:14

258:12 297:12,13
323:5,6 331:18,19,23,
25 332:4 333:8 334:13
346:6,13 356:18,19,22
358:11 360:11,12
371:23 388:24,25
389:20 392:25 393:1
396:14,22,23,24 400:5,
6,15 423:14,21 424:25
427:7,11 430:3,16
432:5 451:18 460:25

**speeds** 258:13 323:2,3,
4,11 324:11,19 325:5,8
332:4 333:15,17 334:10
335:18 345:22,24
446:2,4,5 460:16

**spell** 189:23 300:23

**spelled** 190:1

**spend** 341:1

**split** 344:17

**spoiler** 374:10

**spoilers** 396:12,13

**spoke** 411:3 430:5

**spoken** 405:14

**spreadsheet** 221:1
251:6,10,13,17

**spreadsheets** 240:14

**spring** 421:8

**squarely** 204:8

**stability** 456:25

**stabilizer** 277:12
450:1,5 456:23

**stable** 245:4,9

**Stacey** 227:1,4 228:1
229:6,15,22 230:5,6,16,
18 255:8,20 256:6
257:12 277:20 278:24
279:1,5,9 285:21
295:20 300:2,4,25
301:4 344:15 353:3
453:11 454:14

**Stacey's** 226:9,17

**stage** 426:9

**stages** 370:8

**stake** 204:10

**stall** 277:8 399:6
400:22,25 401:2,5,9,13,
20 425:9,10,14,19
437:11,12,15,17,18,22
438:4 457:5 460:14,17
461:24

**stalling** 399:14

**stalls** 399:15

**stamp** 237:11,12

**stand** 189:14 442:1
450:24

**Standard** 304:2

**Standardization**
221:5 309:4 312:15
334:8 377:4 380:20
383:18 395:23

**Standardized** 312:11
317:8

**standing** 350:21

**standpoint** 276:8
363:11

**stands** 244:6 308:11

**start** 202:4 218:22
243:8 246:13 278:15
279:23 285:7 303:24
308:25 328:12 381:21
451:20 454:6 468:24

**started** 190:23 218:17
303:25 308:5 314:7
329:2 338:20

**starting** 218:23 229:4
281:7 286:10 287:3
308:16 329:16

**starts** 243:16

**state** 189:23 200:15
203:2 222:3 229:12,17
246:17 249:3 294:17

**stated** 199:1 218:25
220:20 250:25 285:4
287:16 294:14

**statement** 431:4

**statements** 182:7
417:19

**states** 189:14 229:9
238:24 241:1 257:7
261:6 277:6 280:24

Case 4:21-cr-00268-O   Document 198   Filed 03/28/22   Page 323 of 326   PageID 6554
UNITED STATES vs MARK A. FORKNER
4:21-cr-00268-O-1                    Vol 2 March 21, 2022                  Index: stating..terribly

281:21 286:6 300:1 301:14 306:6,7 308:18 312:1

**stating** 219:3 220:14, 25 243:16 252:15 417:15,16

**stay** 183:4,9,11

**steer** 229:19 230:22

**steering** 343:4

**step** 299:24 344:5 468:9

**Stephen** 213:17 367:23

**Steve** 213:21

**Steven** 279:21 286:11

**stick** 348:1 349:1 350:11 364:15,16 457:4

**stop** 243:25 249:5 280:6 339:2

**stories** 328:15,16

**storyboard** 361:18

**strange** 212:13

**strategic** 207:5

**strength** 349:5

**stressing** 207:5

**strike** 235:1

**string** 210:4

**stuff** 243:20 250:13

**stupidity** 189:2

**subject** 187:18 195:2 199:25 201:3 206:22 209:10 211:4,6 216:12 221:18,20 226:3 262:21,22 263:7 344:3 353:7 391:13 398:24

**subjects** 263:14,16 461:6

**submitted** 185:5

**subpoena** 192:9

**subpoenas** 232:11

**subset** 404:5,10,13

**subsets** 406:7,10

**subsystem** 280:18

**successfully** 211:16

**suck** 220:20 249:1

**sufficient** 326:13,14,15 336:25 338:7 371:8,18 400:24 450:13

**summary** 259:1 263:6, 12

**summer** 397:25

**sunny** 468:14

**supervising** 191:4

**supervisors** 338:14

**supervisory** 336:18

**support** 344:7,9 453:20

**supported** 443:8

**supposed** 220:23 221:1 249:4,15 251:6 329:18 373:11 374:13 401:7 415:19 448:4 468:1

**surfaces** 343:2

**surprise** 325:3 378:18 433:23,25

**sustain** 234:17,24 235:3,13 259:8

**sustained** 235:24 264:11 279:13 417:21 466:17

**SWA** 199:2,9,13 200:17 201:11 271:12

**sworn** 300:6

**system** 206:11 216:20 222:24 263:20 273:16 275:15,16,20 277:7 280:20 319:10,21 322:13 324:23 333:5 334:16 336:7,16 342:8, 15,17,20,21 344:23 345:10 351:13 352:17 355:16 358:20 364:8, 10,18 365:7 371:15 379:15,20 386:6 390:5 401:5,10,21 420:25 439:16 441:14 443:7,10 444:1,10,13,17 446:8 454:12 456:23 460:9

466:25

**systems** 207:25 211:21 268:7,11 269:25 270:4 281:11 309:19,24 310:2,5 358:1 386:17, 18,19 400:23 401:3,14 456:7 460:7

---

**T**

**T1** 338:8

**T2** 436:21 438:19,21 439:10,18,24 440:1,11, 14

**T3** 211:16 439:11,13,16

**table** 184:1 221:1 251:6,14,17 300:3 337:15 386:4,5,11,13 387:5,7 391:18 396:8, 10

**tables** 251:10 391:16

**takeoff** 332:5,11,13 346:10,24 424:15 426:13,19

**takes** 314:12

**taking** 344:5 402:11

**talk** 185:16 187:20 225:8 226:7,13 258:16 285:25 288:11 291:6 295:5 317:5,7 335:13, 21 343:14 370:23 376:21 380:15,18 403:16 405:4 406:25 407:4 415:19 432:18 441:15 453:2 468:18

**talked** 232:8 242:9 247:8 251:11 283:18 294:23 350:22 402:9, 10,14 410:23 418:11,12 421:7,11 429:9,11 431:24 434:22 436:21 440:20 441:24 465:2,18

**talking** 185:20 187:7 228:12 244:3 245:11 265:23 288:2,5,8 289:19 305:23 313:12 330:7 350:8 352:19 355:21 361:17 367:3 380:19 383:17 385:12 395:13 411:10 414:2,3

415:16 422:15 427:21 445:15 446:15

**talks** 255:10 271:11 273:9 401:9 409:19

**taxi** 346:24

**taxiing** 347:1

**Taylor** 213:17 214:14 293:9 367:23 368:3,4

**TCCA** 453:18,19,21

**team** 191:16 192:4 212:11 213:23 214:18 232:13 236:5 248:5 253:19,24 265:25 272:7 282:3,17 284:13 293:12 297:20 309:6,11 317:20 318:10,23 321:12,16,25 343:6 344:7,12 363:2 366:24 383:21,24 402:24 453:20

**teams** 282:1

**tech** 213:21,23 214:1, 18 244:25 283:22 284:4,13,20 376:17 452:23 464:22

**technical** 281:25 283:20 293:10 316:8,25 317:12,14,24 318:1,13, 15,23 319:5 338:20 382:2 398:22

**technically** 305:23 350:11

**technicians** 340:18

**telling** 217:16 285:23 330:10 337:3 360:9 393:22,23 410:21 411:13 432:1 433:9 434:17

**template** 384:3

**temporary** 369:15,18

**tens** 204:9,12

**tentative** 184:20

**term** 219:14 268:15 280:10 304:14 331:16 381:5

**terms** 426:8

**terribly** 465:24

tertiary 462:11

test 252:15,20,22,23,25
262:13 282:2,3 289:21,
23 290:4,7 313:7
321:11,15 338:8 342:15
348:1 349:1,2,5 350:3,
10 353:16 364:7 365:10
403:12,13,25 404:19
405:2 408:22 410:15
415:22 416:5 435:3,4,9,
20,21 436:21,22
438:14,19,21 439:10,
11,13,18 446:13

tested 437:6

testified 225:2 235:8,
14 269:24 270:14
289:20 409:25 443:21
445:17 455:12

testifies 300:11

testifying 421:9

testimony 222:21
259:1 263:6,12 328:20
426:23 442:1

testing 364:16 439:24

tests 362:2 417:14
436:12

text 198:25 200:11
201:13 202:22 206:9,25
213:18 222:1 227:21
244:7 325:18,20

thank-you 212:18

Thanksgiving 375:16

Thayer 229:6

thing 185:13,19 213:22
214:17 243:2 284:13
290:12 293:12 423:13
457:6 469:3

things 185:4 188:17
190:12 226:7 265:24
386:15 435:6

thinking 187:6

thinks 219:2 246:25
247:22

Thirty-one 195:9

thought 214:17 335:22
339:10 390:8 430:22,24
442:14 450:11

thousands 321:20
354:14,17 433:19,21

thread 206:7 212:1
213:12 225:12,13,16
227:16,24

threat 205:21 207:4
208:10 216:25 217:6,17
361:11,15 362:4 441:12

threaten 440:25

three-page 198:16

thrown 204:8

thunderstorm 359:8

Thursday 226:5 383:9

ticket 204:4

time 194:3 197:14
201:18 203:7 231:6
263:9 266:6 279:25
283:22 286:19 298:12
303:17 308:22 314:7,
12,21 315:7,15,19
323:17 324:10 325:4,7
329:15 330:18 331:2
332:16,25 333:10,18
334:23 338:9,11 347:8
348:18 349:8 353:18
354:11 357:17 363:25
365:3 368:4 370:23
371:9,11,20,22 372:11
373:6,8,16 374:3,18
375:20 377:23 387:17
388:17 389:14,16,20
390:3,6,8 392:11,14
393:14 397:16 398:20
401:13 407:19 410:22
411:7 423:25 424:3,7,9
429:19 430:14 431:3,4
432:14 440:5,7 441:12
443:3,7 444:11,14
446:7 450:11,14 466:1,
4,9,11,13,19 468:21
469:8,9

times 232:7 274:12
299:9 315:4 335:12
380:24 413:10,23
431:5,12,14,15

timing 280:18

tired 313:12

tireless 281:23

title 207:17 268:7

today 187:15,22 211:17
222:21 231:6 232:23
235:17,22 244:13 308:7
316:11 328:9,10 388:13
424:1 430:5 462:2
464:1

told 219:9 220:12
248:18 336:2 339:9,13
345:21 351:6,9 358:8
371:3 375:10 389:9
397:22 413:22,23
417:12 421:18 432:4,
12,14,15 450:19 460:16
467:22

tonight 468:11

tools 227:22 228:2
291:9

top 201:9 202:15
205:13 206:8 207:15
213:15,19 225:15
227:16 238:9,12 240:24
243:9 260:3 261:4
262:2 270:16 273:6
277:10 278:15 279:20
285:2 289:18,23 291:7
292:24 305:1 326:21
360:16 366:11 367:18
372:5 384:13 391:6
394:22

topic 336:6 444:6 451:9
454:3

TOS 262:2

total 239:13 303:16
312:23

totally 363:19

track 387:18

tracking 354:16

Traffic 222:19

train 280:1 303:4
339:25 341:13,20,22
351:19 358:1 397:1,3
399:13,15 401:1,6

trained 304:19 351:8
358:22 386:20 399:5,10

training 197:25 199:3
200:13,16 201:5 202:2
203:3 204:16,21

205:16,17,20,22 206:12
209:11 211:6,7,16,19
215:23 216:25 217:7,18
223:5,20 224:16 229:14
230:14 271:4 275:22
278:23 279:24 281:25
285:6,10,17 286:20
287:3,12 288:12,20
290:13 294:1 302:20,
22,24 303:2 305:19
306:1,2 307:21 309:14,
17,18,22,25 310:2,7,11,
13,15,18,23,24,25
311:2,5,8,10,11,13,18,
20,23,25 312:4,8,20
313:20,22,24 314:4,8
317:18 318:21 319:9,23
321:4 323:25 324:1
326:3,10,12,14,15,17,
18 327:23 332:17,20
333:4,6 334:18 335:1,5,
22,25 336:12,25
337:20,24 338:6
339:12,25 340:2,3,4,6,
7,10,13,21,25 341:1,2,
4,9,10,23 350:16
352:18 355:1,10,20,22,
24,25 356:4,11,13
357:25 358:4,25 359:1,
4,7,13,17,18,21,25
360:7 361:19 362:8,11
363:14,21,22 364:9
365:4,7,18 368:1,22,24
369:3,4,8,9,10,11,18
370:14 371:7 373:25
374:11,23 379:21 380:1
381:8 382:5,10,16,18
386:7 392:18 395:4
397:5,6,11 399:18
401:13 403:24 411:15
418:12,17,25 419:5
420:15,19,24 421:4
422:19 425:11 428:10,
12 435:10 439:9,11
441:16 443:4 446:24
449:23 450:7,9,10
466:25

training-intensive
310:22

training-level 202:24

transparency 388:21

transparent 207:7
355:2 357:8,11,23
358:2 422:24 423:1,22

424:2,3,8 427:8,12
428:22,25 437:25 438:5
441:20 442:3,4,7,14,16,
22 443:1,10 446:16
449:3

**Transport** 279:5,9
281:14,17 344:18

**transport-category**
305:18

**Transportation** 190:3,
6,8,25 231:11,17

**trial** 191:25

**trigger** 203:1 448:4,5,6

**triggered** 200:16

**trim** 219:4 248:14
277:12

**trimming** 220:15
248:20

**trip** 212:13

**trips** 340:25

**true** 193:24 195:4 196:2
197:11 247:16 251:13
257:21 261:12 319:25
320:6,10,12,20 322:6,9,
10,11 388:17 417:11
419:12 423:18 424:9
448:16

**trust** 232:16,18 257:24
303:1 320:17 321:1
334:16 370:17 373:15
393:10

**trusted** 319:18 328:4
334:19 411:21

**truth** 276:6 393:22,23

**Tuesday** 344:16

**turn** 198:3 199:16
200:20 202:6 203:9
204:23 205:24 206:14
207:14 208:20 209:19
210:15 211:9 215:25
217:19 222:11 223:9
224:1 226:19 241:17
268:6 270:11 292:22
343:2 347:21,23,24
348:1,5,19,23 349:4,9
350:10,25 351:14 352:3
356:22 357:14 358:12
364:12,14 365:1 389:3,

11,12 393:5,21 399:21
401:22 409:18 417:4
423:2,5,8,9 424:19
428:9 431:1,21 432:9
437:20,21 447:23

**turns** 258:7,10,11
393:4 421:18 429:24
430:3,15 432:5

**TV** 229:9 230:11

**twin-engine** 308:2

**two-page** 203:17
210:21 218:13 294:22

**type** 211:17,21 222:4
281:10 283:25 284:1
304:14,17,20,25 305:6,
19 314:21 333:6 395:9
439:10 468:18

**type-rated** 304:22,24

**types** 342:17

**typically** 341:8 426:2

---

**U**

**U.S.** 190:3 315:12 382:3
401:1

**U.s.-based** 306:6
399:11

**Uh-huh** 244:1 274:13
409:20 425:21 439:7
441:18 449:15 456:18
459:15

**ultimate** 313:19,21
336:11

**ultimately** 312:20
322:2 400:22

**unanswered** 235:4

**uncomfortable** 348:12

**uncontrollably** 246:18

**understand** 199:3
219:18 234:7,9 244:6
249:16 262:15,23
264:1,8,15,18 271:19,
21 272:3 282:13 283:1
290:2,4 336:6 347:9
363:25 364:4,7,15
406:25 412:24 416:20
428:1 431:22 451:19

**468:11**

**understanding** 229:7
245:13 247:10,25
249:8,9,21,23 252:24
258:19,23 264:7,15,24
265:7,8 266:5 271:7
272:14,16 273:22
281:19 282:15 291:18
293:20 323:2,14,21,24
324:22 338:1 350:24
351:1 352:13 375:17
389:6,7 424:19 441:20

**understands** 286:3

**understood** 264:14
265:4 364:17 425:2
441:14 469:12

**undertaken** 259:2

**undertaking** 340:19

**unfolds** 188:16

**unfortunate** 229:15
230:15 278:24

**unimportant** 352:12

**United** 189:13 281:21
300:1 301:14,16 306:6,
7 308:18 312:1

**units** 281:24

**University** 301:20

**unknowing** 467:2

**unknowingly** 219:7,24
248:16 295:17 327:16
334:1 372:16 378:9
383:11 466:8

**unopposed** 185:5

**unpack** 275:7

**unprofessional**
337:18

**unusual** 418:24 419:4,
7,8 442:24,25

**update** 219:4 248:13
448:8

**updated** 207:2 223:19
267:21 269:17 274:22
277:22 361:13 447:15,
17 460:6

**updates** 391:14,16

**upset** 359:9

**upsets** 359:23

**upstairs** 328:8,9

---

**V**

**validation** 211:16

**variable** 201:19

**variety** 191:1 265:24

**verdict** 189:9

**version** 341:25 425:2,5

**versions** 306:1 308:8

**viable** 199:5

**victim** 189:2

**view** 373:8

**Vince** 219:2 220:25
246:25 247:21,24
248:4,8,10 250:7 251:5,
9,14,18

**visit** 226:5 315:19

**vodka** 244:3

**voice** 337:9

**Vol** 248:14

**volume** 294:4 295:22
400:24

---

**W**

**wait** 265:17 403:17

**walk** 210:21

**walking** 469:10

**Walsh** 253:9 289:19,20,
24 349:25 350:1,7
408:22 409:18 410:8
421:9,14,17 422:1
432:7,12

**Waltz** 194:19 398:7

**wanted** 334:12 355:23
370:9 383:24 384:4
436:2

**wanting** 250:16

**Washington** 306:10

**waste** 190:11 191:2 201:18

**watching** 229:9 230:11

**water** 313:12

**ways** 352:7

**weapons** 233:16 234:2 235:9

**wearing** 316:14

**weather** 186:18 328:9 468:11

**week** 185:20 216:8 317:2,6 376:22,23 377:18 378:6,8 385:19, 20,21 433:2 445:25 451:20 454:8

**weeks** 280:15 281:12 398:17,18,19,21 399:4 430:12 432:15 449:19

**west** 468:12

**wheel** 343:4

**white** 316:15

**widely** 201:19

**Wilson's** 282:2

**win** 212:10 282:17

**wind-up** 258:7,9,11 347:21,23,24 348:1,5, 19,22 349:4 350:9 358:11 364:14 365:1 389:3,12 393:5,21 399:21 401:22 421:18 423:8 424:19 429:24 430:2,15 431:1,21 432:5,9 437:20,21

**wire** 188:10,13,18

**witnesses** 182:24 183:9,11,18,21 184:4 234:16,23

**wondering** 213:22 284:11,12 293:11

**word** 282:20 344:11 439:5

**words** 208:9 295:10 327:13,18,21,24 330:7 417:15,16

**work** 190:2,3 191:6,7, 10,13 203:7 205:8 209:25 227:5 238:13 243:20 252:17 253:3,5 301:5,6 306:11,17,24 308:22 309:12 313:3 315:14 317:11 321:20 337:17 373:12 374:13, 24 377:15,17 381:16 405:13 414:6,8 433:6, 10 446:9 453:18 468:1

**worked** 239:16 242:14, 16 303:11 306:9 307:1 315:8 318:1 330:23 344:6 352:12 354:11 362:25 363:25 364:4,8 368:1 414:9 432:7 444:10,13

**working** 186:25 191:1, 5 210:2,7 212:1 234:11 244:25 308:25 309:7 314:7 315:4,6 318:2 334:4,7 338:15 362:19 373:2 381:21,24 398:20 404:17 438:9

**works** 227:7 254:5 318:19,24 342:3

**world** 210:5 234:8 235:10

**worthiness** 449:9,10

**wrap** 463:16

**write** 198:24 200:10 201:14 202:21 204:4,6 205:15 206:9,24 209:1, 13,24 211:13 212:8,20 213:16 215:18 216:22 217:8,15 219:21 221:24 226:6 227:20 295:15 344:13 366:20 383:4 416:23 434:5,8,13,18

**writes** 198:17 204:2 219:10 220:12,17 226:13 227:25 230:13 291:19 331:12 333:25 372:23 395:7 399:4,7

**writing** 204:20 209:1 211:1,2 215:11 216:20 218:18 221:21 228:15 274:2 291:7 338:21 381:13

**written** 199:2 247:13 255:22,23 256:5 257:22 258:1 445:12,20

**wrong** 220:18 239:9 248:25 332:11,15 337:1,2 390:7,8,11 396:19,20 442:22 446:20

**wrote** 200:12 201:16 202:4,23 204:7 205:17 206:10 207:1 209:16 210:1 211:15 212:10,22 213:20 214:15,25 215:20 216:24 217:17 218:17 219:23 292:17, 19 293:5,9 294:9 366:1 381:15 383:3 424:7

**Y**

**y'all** 317:7 369:6 380:18

**year** 210:13 301:24 324:9 398:14

**years** 190:23 191:3 210:2 231:13,16,20,22, 23 232:5 239:5,15,17 281:23 303:7,12 304:8 307:3 314:10,17 327:8, 22,25 402:11

**Yo** 278:16

**yoke** 343:4

**York** 186:19

**you-all** 328:19 469:16

**Younkin** 270:19

**Z**

**zoom** 212:15 228:20 391:23 408:19